# EXHIBIT 2

IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
Division of St. Thomas/St. John

———O———

In the Matter of the Estate of: ) PROBATE CASE
) 
) NO. ST-19-PB-0080
JEFFREY E. EPSTEIN, )
) ACTION FOR TESTATE
Deceased. ) ADMINISTRATION
)

Official Transcript
FEBRUARY 4, 2020

BEFORE:         THE HONORABLE CAROLYN P. H. PERCELL
                Magistrate Judge Presiding

APPEARANCES:    ARIEL SMITH, ESQ.,
                PAMELA TEPPER, ESQ.,
                Assistant Attorneys General
                Department of Justice
                GERS Building, Second Floor
                St. Thomas, Virgin Islands
                { On Behalf of the Government}

                William Blum, Esq.
                Christopher Kroblin, Esq.
                Marjorie Whalen, Esq.
                Shari D'Andrade, Esq.
                Andrew Tomback, Esq.
                Daniel Weiner, Esq.
                {On Behalf of the Co-Executors }

1  Program is what is being proposed by the
2  estate to address these claims that are going
3  to be filed in multiple jurisdictions,
4  numerous of them pending in New York, right?
5              ATTORNEY BLUM: Correct. Most of
6  them.
7              THE COURT: Most of them in New
8  York. There's also in Florida.
9              ATTORNEY BLUM: And Minnesota.
10             THE COURT: And Minnesota, right.
11             ATTORNEY BLUM: And we expect more.
12             THE COURT: And we expect more.
13             Let me summarize it --and
14 everyone listen and if anybody has an
15 objection to what I am going to say, then you
16 can raise it.
17             How I read, all the persons who
18 have filed claims through Counsel present here
19 in this courtroom, they have, the claimants
20 have no objection to the Voluntary Claims
21 Resolution Program. Their concern is how much
22 money is to be expended to set up this
23 program.
24             I think it was Attorney Benham--
25 is he still here? Do you see him in the

1  claims are paid. This is about the victims.
2  It's about the people's whose lives are ruined
3  and we are very in favor of the voluntary
4  program. The victims desperately need help.
5  It's pressing and we would urge the Court to
6  hear from the administrators and perhaps we
7  can resolve this today. Thank you, Your
8  Honor.
9               THE COURT: Thank you.
10              Have I heard from all the
11 attorneys representing persons who may be
12 filing or have filed claims against the
13 estate?
14              ATTORNEY BOURNE-VANNECK: Good
15 morning, Your Honor. Richard Bourne-Vanneck on
16 behalf of the claimant Tela Davis. I would
17 second the issues that have been raised by
18 Attorney Benham. I thought he did it
19 adequately so that is why I sat back down.
20 Thank you.
21              THE COURT: Thank you. So if I
22 understand what the persons here, the
23 attorneys representing the claimant, what we
24 really just need to get is testimony on the
25 numbers. I think everybody says they're in

1  favor of this program. They're satisfied how
2  the program may be set up. We just need to
3  know how much monies we are talking about that
4  would be allotted to this program.
5              ATTORNEY SMITH: Your Honor, I
6  would just state one thing. I really just
7  want an opportunity to present our own
8  witnesses. I think there's information that we
9  may have that I would like to present to the
10 Court also before the Court can make its final
11 decision.
12             THE COURT: I'm not making a
13 decision. I specifically said that. I'm
14 going to take the testimony because the
15 persons are here to testify.
16             ATTORNEY SMITH: Okay.
17             THE COURT: I think I specifically
18 said I'm not ruling on this and I'm also going
19 to require Counsel to brief the Court on the
20 effects of this lien as to anything how this
21 estate proceeds as far as it wants to set up
22 the claims. I understand that the estate just
23 want at this point permission to set up this
24 program. That is what I am understanding -
25 permission to set up the program.

1 shed light on what the proposed design was so
2 that she understood that many of her
3 assumptions about the program were incorrect
4 and had been addressed in the draft protocol.
5           ATTORNEY TOMBACK: Your Honor,
6 I'd like to have marked as Exhibit 3 that
7 letter. It's dated January 16, 2020.  It's
8 written by Ms. Feldman to the Honorable Denise
9 N. George, Attorney General.
10          THE COURT: Okay.
11 By Attorney Tomback:
12      Q.  Is that the letter you wrote, Ms.
13 Feldman, to Attorney General George?
14      A.  I don't have a copy.
15          ATTORNEY SMITH: Your Honor, I'm
16 not questioning the witness but I do believe
17 that this goes beyond what the Court was
18 anticipating.
19          THE COURT: I think Attorney
20 Tomback is going to bring me to what I need to
21 know about the monies. I haven't heard that,
22 setting that up.  That is really what I want
23 to know.
24          I think we agreed that everybody
25 believes this program is a great program but

1  what is going to be the costs of setting up
2  this program?
3              ATTORNEY TOMBACK:  Your Honor,
4  the short answer is that the costs definitely
5  justifies the program and we are going to get
6  to the cost but I just want help on one item
7  and you tell me if I should do it or not, but
8  I think that while I have Ms. Feldman here
9  --and quite frankly it's wonderful to come
10 down here.  It's beautiful, but Ms. Feldman
11 is here and Mr. Feinberg is here.  I'd like to
12 close the gap for the Court and so the
13 Attorney General understand the proposed
14 program is not what the Attorney General wrote
15 about.  It just isn't remotely related to the
16 process that is laid out in her papers.
17             Judge, there's no live person
18 that the Attorney General represents. The
19 Attorney General represents a claim of a
20 client that is historical. I've just been
21 admitted to be pro hac. I don't profess to be
22 an expert of the law but I think it's clear to
23 everyone in the courtroom that this program
24 needs to go forward to save the estate, quite
25 frankly, just to address the victims or the

1  eligibility criteria, the methodology for
2  determining compensation, proof requirements
3  and claims procedures, close quote.
4          Can you briefly address program
5  protocol?
6       A.  Yes. It just, it lays out the
7  terms and conditions or the proposed terms and
8  conditions of how the program would operate.
9  It gives some visibility of the criteria that
10 we'll apply when evaluating claims for
11 eligibility and compensation and outlines the
12 way that we'll process the claims and the
13 expectations in terms of timing.
14      Q.  And how is the protocol developed?
15      A.  So Mr. Feinberg, Ms. Biros and I
16 drafted the protocol in November and December
17 of 2009. One of our main objectives was to
18 make it as broad and as claimant friendly as
19 possible and with that in mind, we removed a
20 lot of the barriers that would apply or could
21 apply in litigation. The Statute of
22 Limitations is not an issue that we'll keep in
23 allowing people to participate; prior
24 settlement would not preclude someone from
25 participating in the program; and so we

1  developed a protocol with that in mind.
2           We want any victim who suffered
3  abuse to be able to come in and participate in
4  the program and once we had an initial draft,
5  we circulated it to the estate, to the
6  Plaintiff's lawyers, to the USVI Attorneys
7  Office, in the Southern District of New York
8  to get their feedback on the protocol.
9      Q.  And just to be clear, I might not
10 have heard you but I take it numerous
11 Plaintiff's met with you and proceeded with
12 you or Plaintiff's Counsel, some of whom are
13 here?
14     A.  Yes, we met with nearly all of the
15 lawyers we know about who represented
16 Plaintiffs.
17     Q.  And if the Attorney General or her
18 representative wanted to meet with you or just
19 talk to you on the phone or have a series of
20 meetings to express concerns, will you listen
21 to her?
22     A.  Absolutely.  In fact, in my letter
23 I invited an opportunity to meet with her and
24 discuss more about the program and seek her
25 input.