**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Danielle Bensky and Jane Doe 3,
individually and on behalf of all
others similarly situated,

        Plaintiffs,                       CASE NO:     1:24-cv-01204-AS

v.

Darren K. Indyke and Richard D. Kahn,

        Defendants.

_____

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO STAY DISCOVERY**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 1

ARGUMENT ................................................................................................................. 6

      A.    Defendants' partial motion to dismiss does not make an adequate showing to defeat Plaintiffs' meritorious claims................................................................ 7

      B.    Defendants have failed to demonstrate the "overbreadth" of discovery sought or any "undue burden" in participating in discovery. ............................... 10

      C.    There is substantial prejudice to Plaintiffs in staying discovery.......................... 14

CONCLUSION.............................................................................................................. 15

**TABLE OF AUTHORITIES**

**Cases**

*Alapaha View Ltd. v. Prodigy Network, LLC*,
  2021 WL 1893316 (S.D.N.Y. May 10, 2021) ........................................................ 7

*Am. Web, Inc. v. Flom Corp.*,
  2012 WL 3129196 (D. Colo. July 31, 2012) ........................................................ 8

*Barrett v. Forest Labs., Inc.*,
  2015 WL 4111827 (S.D.N.Y. July 8, 2015) ........................................................ 6

*Bennett v. Cuomo*,
  2023 WL 2021560 (S.D.N.Y. Feb. 15, 2023) ................................................ 7, 8, 15

*Bensmaine v. City of New York*,
  2022 WL 3362188 (S.D.N.Y. Aug. 15, 2022) ...................................................... 11

*Chudasama v. Mazda Motor Corp.*,
  123 F.3d 1353 (11th Cir. 1997) ...................................................................... 12

*CT Espresso LLC v. Lavazza Premium Coffees Corp.*,
   2022 WL 1639485 (S.D.N.Y. May 24, 2022) ...................................................... 7

*Geordiadis v. First Boston Corp.*,
  167 F.R.D. 24 (S.D.N.Y. 1996) ...................................................................... 14

*Golightly v. Uber Techs., Inc.*,
  2021 WL 3539146 (S.D.N.Y. Aug. 11, 2021) ................................................... 6, 8

*Guiffre v. Maxwell*,
  2016 WL 254932 (S.D.N.Y. Jan. 20, 2016) ........................................... 9, 10, 11, 15

*Hertz Glob. Holdings, Inc. v. Nat. Union Fire Ins. Co. of Pittsburgh*,
  2020 WL 6642188 (S.D.N.Y. Nov. 12, 2020) .................................................... 11

*Howard v. Gutterman*,
  3 B.R. 393 (S.D.N.Y. 1980) .......................................................................... 14

*Jackson v. Anheuser-Busch InBev SA/NV, LLC*,
  2021 WL 493959 (S.D. Fla. Feb. 10, 2021) ...................................................... 12

*Kirschner v. J.P. Morgan Chase Bank*,
  2020 WL 230183 (S.D.N.Y. Jan. 15, 2020) ...................................................... 14

*Miller's Ale House, Inc. v. DCCM Rest. Grp., LLC*,
  2015 WL 6123984 (M.D. Fla. Oct. 16, 2015) .................................................... 13

*MindbaseHQ LLC v. Google LLC*,
   2021 WL 680887 (S.D. Fla. Feb. 22, 2021) ............................................................... 12

*Mirra v. Jordan*,
   2016 WL 889559 (S.D.N.Y. Mar. 1, 2016) ........................................................... 8, 11

*Montoya v. PNC Bank, N.A.*,
   2014 WL 2807617 (S.D. Fla. June 20, 2014) ........................................................... 13

*Moran v. Flaherty*,
   1992 WL 276913 (S.D.N.Y. Sept. 25, 1992) .............................................................. 6

*Morien v. Munich Reins. Am., Inc.*,
   270 F.R.D. 65 (D. Conn. 2010) .................................................................................. 7

*Nielsen Co. (US) LLC v. TVSquared LTD*, \2023 WL 4363005 (S.D.N.Y. July 6, 2023)...... 10, 11

*Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*,
   2022 WL 2966615 (D.N.M. July 27, 2022).................................................................. 8

*Ray v. Spirit Airlines, Inc.*,
   2012 WL 5471793 (S.D. Fla. Nov. 9, 2012)............................................................... 12

*Robinson v. Deutsche Bank Tr. Co. Americas*,
   572 F. Supp. 2d 319 (S.D.N.Y. 2008)........................................................................ 9

*Spinelli v. Nat'l Football League*,
   2015 WL 7302266 (S.D.N.Y. Nov. 17, 2015) ........................................................ 7, 10

*Worldhomecenter.com, Inc. v. M.J. Resurrection, Inc.*,
   2012 WL 12922 (S.D.N.Y. Jan. 3, 2012) .................................................................... 9

**Statutes**

New York City Gender-Motivated Violence Protection Act.......................................... 6

Trafficking Victims Protection Act, 18 U.S.C. § 1595.................................................. 6

**Rules**

Fed. R. Civ. P. 26(f)(1) .................................................................................................. 13

Plaintiffs Danielle Bensky and Jane Doe 3, individually and on behalf of all others similarly situated, by and through undersigned counsel, oppose Defendants' Motion to Stay Discovery (ECF No. 35) and respond as follows.

## INTRODUCTION

Recognizing that discovery in this case will expose the full extent of their involvement in Epstein's sex-trafficking enterprise, Defendants Darren K. Indyke and Richard D. Kahn have moved for a stay of all discovery as a part of their scattershot strategy to avoid facing Plaintiffs and the Class's claims.  At its core, the motion to stay (filed before any discovery had even commenced) rests on the faulty premise that the pendency of their partial motion to dismiss (a ubiquitous fixture in federal civil litigation) necessitates an automatic delay in the discovery process.  But courts disagree:  good cause is required for a stay of discovery, and courts consider the strength of the motion, the breadth of discovery sought and the burden of responding to it, and any prejudice that would result from a stay.  On these considerations, Defendants are zero for three. Their motion to dismiss does not seek dismissal of Jane Doe 3's negligence claim, so there is no pending motion that would be case-dispositive if granted.  At any rate, Defendants' motion to dismiss fails to make a strong showing to defeat Plaintiffs' meritorious claims.  Moreover, Defendants have not shown any "undue burden" or "unfair prejudice" in participating in discovery, while there is significant risk to Plaintiffs should discovery be stayed.  The motion should be denied.

## BACKGROUND

From its inception until Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the Epstein sex-trafficking enterprise operated both (1) to lure young women and girls into a position where Epstein could coerce them to engage in commercial sex acts and commit sexual offenses against them and (2) to conceal its

1

sex trafficking from law enforcement organizations.  ECF No. 1 ¶ 3.  The Epstein enterprise provided financial and other benefits to those who assisted and enabled both of the enterprise's purposes.  *Id.*  It would not have existed for the duration it did and at its scope and scale, without the collaboration and support of others.  *Id.* ¶ 4.

As detailed in Plaintiffs' Complaint, Indyke and Kahn, Epstein's personal lawyer and accountant, respectively, personally participated in Epstein's sex-trafficking enterprise from approximately 1995 onward and reaped multi-million-dollar rewards for their participation.  *Id.* ¶ 5.  After Epstein's death, Defendants were named co-executors of Epstein's Estate.  *Id.* Defendants concealed their personal involvement in the sex-trafficking venture for years; however, they have since been exposed as part of Epstein's innermost circle, and key facilitators of sex trafficking.  *Id.* ¶ 11.

Indyke and Kahn were personally essential to the Epstein sex-trafficking enterprise's success—among other things, they helped structure Epstein's bank accounts and cash withdrawals to give Epstein and his associates access to large amounts of cash in furtherance of sex trafficking. *Id.* ¶ 6.  Indyke and Kahn also personally assisted with creating the Epstein enterprise's complex financial infrastructure, which involved dozens of bank accounts at various banking institutions, many of which were held in the name of corporate entities with no legitimate business purpose and that appear to have been created to simply facilitate the illegal sex-trafficking venture.  *Id.* ¶ 7. Defendants were well aware of the Epstein enterprise's purposes, effects, and operations. Defendants were on Epstein's payroll for years, and they knowingly and intentionally personally benefited and received things of value from Epstein and his sex-trafficking operation.  *Id.* ¶ 8.

A 2020 Consent Order from the New York State Department of Financial Services ("DFS Consent Order") highlighted Defendants' role as to Epstein's bank accounts.  *Id.* ¶ 128.  The DFS

Consent Order included various specific findings about the conduct of two individuals referred to "ACCOUNTANT-1" and "ATTORNEY-1." *Id.*  ACCOUNTANT-1 is Defendant Kahn, and ATTORNEY-1 is Defendant Indyke. *Id.*  As described in the DFS Consent Order:

> Mr. Epstein's personal attorney (herein, 'ATTORNEY-1'), was active in withdrawing cash for Mr. Epstein. ATTORNEY-1, on behalf of Mr. Epstein, made a total of 97 withdrawals from the Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Mr. Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (i.e., withdrawals made by an authorized user who is not a primary account holder). When Bank personnel asked ATTORNEY-1 why Epstein needed cash, ATTORNEY-1 replied Epstein used it for travel, tipping and expenses.

*Id.* ¶ 129.  Between 2014 to 2016 alone, Indyke made over 40 separate checkcashing withdrawals at a pace of two to three per month, each for the amount of $7,500, which was the bank's limit for third-party withdrawals. *Id.* ¶ 130.

On January 17, 2018, Indyke cashed a check for $100,000, and Kahn coordinated with the bank to make sure to have cash ready for pick up. *Id.* ¶ 131.  As described by the DFS Consent Order:

> In 2018, just prior to the Bank's closing of the Park Avenue Branch, which was located nearby Mr. Epstein's house, ATTORNEY-1 withdrew $100,000.00 in cash on behalf of Mr. Epstein. When later questioned why ATTORNEY-1 withdrew these sums from the Bank, ATTORNEY-1 reported that Mr. Epstein needed the funds for tipping and household expenses. . . . In total, in a roughly four-year period, ATTORNEY-1 withdrew on Mr. Epstein's behalf more than $800,000 in cash from Mr. Epstein's personal accounts.

*Id.*  In addition, from June 2018 to February 2019, there was a series of at least 97 separate withdrawals of $1,000 made from an Epstein account for which Indyke was a signatory, all taken from an ATM a short walk from Indyke's law office at the time. *Id.* ¶ 132.  From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of

3

converting U.S. dollars to Euros totaling over $126,000.  *Id.*  Without exorbitantly large amounts of cash procured by Defendants, Epstein's operation could not effectively operate.  *Id.* ¶ 133.

Indyke and Kahn also assisted Epstein in concealing Epstein's illegal activity and avoiding detection by law enforcement, including by repeatedly structuring their cash withdrawals for Epstein to evade banking reporting requirements.  *Id.* ¶ 135.  The DFS Consent Order highlighted Defendants' role in seeking to avoid detection by law enforcement of his illegal activities.  *Id.* ¶ 136.  On one occasion, and despite numerous publications describing Epstein's sex trafficking, ACCOUNTANT-1 provided false reasons for massive cash withdrawals from Epstein's accounts:

> In a May 2018 email, a compliance officer submitted an inquiry to RELATIONSHIP MANAGER 2 about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties. After submitting the questions to ACCOUNTANT-1, RELATIONSHIP MANAGER-2 forwarded ACCOUNTANT-1's response to the compliance officer, which read "SENT TO A FRIEND FOR TUITION FOR SCHOOL."

*Id.* ¶ 138.  The DFS Consent Order documents how ATTORNEY-1 probed the bank's policy on how closely it monitored cash withdrawals:

> In May 2014, ATTORNEY-1 inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert." Then, "[i]n 2017, ATTORNEY-1 again inquired about triggering an alert. Specifically, in July 2017, ATTORNEY-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days.

*Id.* ¶ 139.  Indyke and Kahn also conspired to assist Epstein in evading banks running diligence reports on him for the purpose and effect of concealing Epstein's sex trafficking and permitting that sex trafficking to continue.  *Id.* ¶ 141.  As described in the DFS Consent Order, in one instance,

ACCOUNTANT-1 withdrew Epstein's name from a non-profit's brokerage account to avoid a due diligence report being run on Epstein:

> On January 4, 2016, an accountant representing Mr. Epstein (herein, 'ACCOUNTANT-1') requested that the Bank open a brokerage account for Gratitude America, Mr. Epstein's private charity. COVERAGE TEAM MEMBER-1 escalated the request to AML OFFICER-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Mr. Epstein. In response to the request for additional information, ACCOUNTANT-1 informed the Bank of Mr. Epstein's resignation from Gratitude America and withdrew the request to open the account. As a result, no due diligence report was run on Mr. Epstein.

*Id*.

Defendants also directed, approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking enterprise, including payments to women who were forced to have sex with Epstein and/or recruited others to be victimized, recruiters, and to maintain the immigration status of victims of the Epstein sex-trafficking enterprise. *Id.* ¶ 144. Defendants (at least one of them, but often both) had power of attorney or signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition. *Id.* ¶ 145. At least one Defendant was a signatory on over 130 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and other expenses. *Id.* ¶ 146. Between 2016 and 2019, Indyke made wire transfers from Epstein's personal accounts to victims and entities to facilitate the Epstein sex-trafficking enterprise. *Id.* ¶ 147. Defendants oversaw over $2,500,000 in payments from a single account (and millions more from other accounts) in which Defendant Indyke was a signatory to dozens of women with Eastern European surnames,

purportedly for hotel expenses, rent, and other expenses, and to an immigration lawyer who was involved in forced marriages arranged among Epstein's victims to secure victims' immigration status. *Id.* ¶ 148.

On February 16, 2024, Plaintiffs filed suit against Defendants on behalf of themselves and the putative Class, bringing claims for (1) aiding, abetting, and facilitating battery; (2) intentional infliction of emotional distress; (3) negligence; (4) knowingly benefitting from participation in a sex-trafficking venture in violation of the Trafficking Victims Protection Act, 18 U.S.C. § 1595 (the "TVPA"); (5) obstruction of the enforcement of the TVPA; (6) conspiracy to violate the TVPA; and (7) violation of the New York City Gender-Motivated Violence Protection Act. *Id.* ¶¶ 199–309.  On April 8, 2024, Defendants filed a partial motion to dismiss.  ECF No. 29.  The same day (before discovery had commenced), Defendants filed the instant motion to stay all discovery.  ECF No. 36.

## <u>ARGUMENT</u>

Defendants have not met their burden of showing good cause to justify a stay of discovery pending a ruling on their partial motion to dismiss.  Courts have "discretion under Rule 26(c) to stay discovery pending decision on a motion to dismiss if the moving party demonstrates good cause." *Golightly v. Uber Techs., Inc.*, 2021 WL 3539146, at *2 (S.D.N.Y. Aug. 11, 2021).  But, "[i]t, of course, is black letter law that the mere filing of a motion to dismiss the complaint does not constitute 'good cause' for the issuance of a discovery stay." *Barrett v. Forest Labs., Inc.*, 2015 WL 4111827, at *4 (S.D.N.Y. July 8, 2015); *see also Moran v. Flaherty*, 1992 WL 276913, at *1 (S.D.N.Y. Sept. 25, 1992) ("Discovery should not be routinely stayed simply on the basis that a motion to dismiss has been filed."); *Spinelli v. Nat'l Football League*, 2015 WL 7302266,

at *2 (S.D.N.Y. Nov. 17, 2015) (citing *Morien v. Munich Reins. Am., Inc.*, 270 F.R.D. 65, 66–67 (D. Conn. 2010) ("The pendency of a dispositive motion is not an automatic ground for a stay.").

When a motion to dismiss is pending before the court, the courts consider multiple factors in determining whether to stay discovery: "(1) whether a defendant has made a strong showing that the plaintiff's claim is unmeritorious, (2) the breadth of discovery and the burden of responding to it, and (3) the risk of unfair prejudice to the party opposing the stay." *Bennett v. Cuomo*, 2023 WL 2021560, at *2 (S.D.N.Y. Feb. 15, 2023) (quoting *Alapaha View Ltd. v. Prodigy Network, LLC*, 2021 WL 1893316, at *2 (S.D.N.Y. May 10, 2021)).

### A. Defendants' partial motion to dismiss does not make an adequate showing to defeat Plaintiffs' meritorious claims.

Defendants have failed to make an adequate showing to defeat Plaintiffs' claims in their stay motion or in any of their other motions before the Court. They insist (without waiting for Plaintiffs' response to their pending motions) that Plaintiffs' claims are without merit. For the multiple reasons forthcoming in Plaintiffs' responses to Defendants' motion to dismiss and motions for sanctions (incorporated by reference herein), Plaintiffs' claims are meritorious. A stay of discovery, therefore, would be inappropriate.

"On the first factor of the merits of Plaintiff's claims, courts tend to consider whether the resolution of the pending motion to dismiss may dispose of the entire action." *CT Espresso LLC v. Lavazza Premium Coffees Corp.*, 2022 WL 1639485, at *2 (S.D.N.Y. May 24, 2022) (cleaned up) (collecting cases); *see also Bennett,* 2023 WL 2021560, at *3. Here, Defendants do not move to dismiss Plaintiffs' case in its entirety, as their motion to dismiss expressly does not seek dismissal of Jane Doe 3's negligence claim (Count III). MTD at 7. "There is thus no pending motion that potentially disposes of this entire action." *CT Espresso LLC*, 2022 WL 1639485, at *2 (denying motion to stay discovery because pending motion to dismiss was only partial); *see*

*also Bennett* 2023 WL 2021560, at *3 (same) ("Additionally, the pending actions will not completely dispose of the matter").  It makes little sense for a stay of all discovery in this matter when even if Defendants' dismissal motion were granted in its entirety, there would be active litigation proceeding.  The only cases Defendants cite for the position that a stay of discovery is appropriate pending resolution of a non-case-dispositive dismissal motion involved plaintiffs who did not even oppose a stay of at least some discovery.  *See Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 2022 WL 2966615, at *3 (D.N.M. July 27, 2022) (motion to stay written discovery unopposed; "Plaintiffs do not oppose a stay of discovery involving requests for production, written interrogatories, or depositions"); *Am. Web, Inc. v. Flom Corp.*, 2012 WL 3129196, at *1 (D. Colo. July 31, 2012) ("Plaintiff does not oppose a stay as to Defendant Abeles").

Even if Defendants' motion to dismiss were case-dispositive, it fails to make a strong showing to defeat Plaintiffs' meritorious claims.  While considering a party's attempts to stay discovery, courts consider "whether the complaint is facially without merit or whether the plaintiff has been unable to cite relevant authority in response to a defendant's challenge." *Bennett*, 2023 WL 2021560 at *2.  For example, in *Golightly*, the court explained that while a defendant's motion to dismiss may be meritorious, discovery should not be stayed in light of a motion to dismiss because the claims were not "self-evidently" meritorious.  2021 WL 3539146, at *5.  And even if the merits of a plaintiff's claim require a "fact-intensive analysis," courts "have declined to conclude that a plaintiff's claims are unmeritorious."  *Bennett*, 2023 WL 2021560 at *3; *see, e.g.*, *Mirra v. Jordan*, 2016 WL 889559, at *2 (S.D.N.Y. Mar. 1, 2016) ("Given that such an analysis is fact-specific and based on various factors, and in light of the parties' citations to case law in support of both arguments, the Court is unable to conclude that the defendant made a strong

showing, at this time, that the plaintiff's claim is not meritorious."); *Guiffre v. Maxwell*, 2016 WL 254932, at \*2 (S.D.N.Y. Jan. 20, 2016) ("Plaintiff has pled concrete facts and law to support all of her arguments. With strong arguments on both sides, Defendant's argument does not rise to a level of the requisite 'strong showing' that Plaintiff's claim is unmeritorious.").

Defendants spend four pages in their brief regurgitating the same arguments made in their motion to dismiss.  Plaintiffs incorporate by reference their forthcoming responses in opposition to Defendants' motions to dismiss and motion for sanctions.  In taking all of the allegations in the Complaint as true as the Court must, *Worldhomecenter.com, Inc. v. M.J. Resurrection, Inc.*, 2012 WL 12922, at \*2 (S.D.N.Y. Jan. 3, 2012), Defendants do not, and cannot, show that Plaintiffs' claims are unmeritorious.  Plaintiffs' claims, and particularly their arguments concerning fraudulent inducement and/or concealment, which refute Defendants anticipated affirmative defenses, are particularly fact intensive.  Courts regularly find that fraudulent inducement allegations (and whether or not Plaintiffs plead adequate reliance) "is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss."  *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) (collecting cases).

Plaintiffs' position that Defendants fraudulently concealed their involvement in Epstein's sex-trafficking enterprise from Plaintiffs and the Class is meritorious.  As the Complaint describes, "[f]or many years, Indyke and Kahn intentionally concealed the extent of their personal involvement in the sex-trafficking venture including specific false denials of their role in the Epstein Enterprise, making themselves out to be mere outside advisors to Epstein—but . . . have since been exposed as part of Epstein's inner most circle, and key facilitators of sex trafficking." Compl. ¶ 11; *see also id.* ¶ 9 ("Defendants denied and concealed their personal involvement in the Epstein Enterprise to evade prosecution and civil liability from individuals such as Danielle

Bensky and Jane Doe 3), ¶ 164 ("Defendants publicly and privately denied their role in the Epstein Enterprise, including in March of 2020, when Defendants publicly, and falsely, denied allegations that they were an integral part of the Epstein Enterprise . . .  Defendants' false denials included denials that were made, and conspired to be made, under oath).  The DFS Consent Order also highlighted Defendants' role as to Epstein's bank accounts.  *Id.* ¶ 128.  It included various specific findings about the conduct of two individuals referred to "ACCOUNTANT-1" and "ATTORNEY-1."  *Id.*   ACCOUNTANT-1 is Defendant Kahn, and ATTORNEY-1 is Defendant Indyke.  *Id.* Discovery will bear out, and the evidence will show, that Defendants fraudulently concealed their involvement and culpability with Epstein's sex-trafficking enterprise.

Defendants' motion to dismiss is neither case-dispositive nor does it make an adequate showing to warrant a stay of discovery.  This factor supports no stay of discovery.

**B. Defendants have failed to demonstrate the "overbreadth" of discovery sought or any "undue burden" in participating in discovery.**

Defendant have not demonstrated exactly how participating in discovery will unduly burden them.  They have also not explained in their stay motion how Plaintiffs' requested discovery is overbroad—nor could they considering they filed their motion before Plaintiffs' served discovery on them.  The discovery that Plaintiffs have since requested only confirms that discovery will not burden or prejudice Defendants, let alone justify a stay of discovery.

The breadth of discovery and the burden of responding to discovery, is not met when plaintiffs only seek "normal discovery in a limited matter."  *Maxwell*, 2016 WL 254932, at *2; *Nielsen Co. (US) LLC v. TVSquared LTD*, 2023 WL 4363005, at *2 (S.D.N.Y. July 6, 2023) ("Courts often consider whether discovery would 'reach such a wide-breadth that good cause for a stay exists.'").  For example, this factor was satisfied in *Spinelli* when there were forty defendants, and discovery would therefore be "broad and significant."  2015 WL 7302266, at *2.

So too was this factor satisfied when plaintiff's discovery "request was expansive enough in its wording to impose significant discovery obligations on Defendants." *Hertz Glob. Holdings, Inc. v. Nat. Union Fire Ins. Co. of Pittsburgh*, 2020 WL 6642188, at *1 (S.D.N.Y. Nov. 12, 2020). Moreover, conclusory allegations of the burden of discovery are inadequate to satisfy this factor. The movant must allege "how long it expects discovery to take, the costs associated with discovery, or any other indicator that might demonstrate why discovery will be overly burdensome." *Nielsen*, 2023 WL 4363005, at *2; *see also Bensmaine v. City of New York*, 2022 WL 3362188, at *2 (S.D.N.Y. Aug. 15, 2022) (declining to stay discovery when "Defendants mention that Plaintiff has served sixty-seven discovery demands on them, but do not explain (other than listing the number) what is unduly burdensome about them"); *Mirra*, 2016 WL 889559, at *2 ("The defendant does not identify any burden associated with the production, other than asserting that the plaintiff's requests 'seek extensive documents related to a wide variety of issues.'").

Here, in contrast to these cases, Plaintiffs' initial discovery requests are not so extensive to impose an undue burden on Defendants, rather, "[d]iscovery in this case is accordingly tailored . . . and does not reach such a wide-breadth that good cause for a stay exists." *Guiffre*, 2016 WL 254932, at *2.  Plaintiffs' request for production and interrogatories seek only discovery that is necessary for them to pursue and further investigate their claims and those which are provided by local rule.  Documents sought relate primarily to Defendants' roles in Epstein's operation, including:  (1) access to cash, (2) evading law enforcement, (3) facilitation of payments, (4) control over corporate entities, (5) arranging sham marriages, and (6) concealment of the venture after Epstein's death.  Responsive documents should have been produced in other Epstein cases, so there should be little to no burden for Defendants' longtime counsel in these matters to produce these documents to Plaintiffs in this case.

Defendants' citation to the Eleventh Circuit case *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997), is misplaced.   The district court in *Chudasama* delayed resolution of a motion to dismiss for more than a year and a half and repeatedly failed to rule on the defendants' objections to abusive discovery requests. 123 F.3d at 1356–60.   The Eleventh Circuit "confronted a very specific situation involving a threefold problem." *Ray v. Spirit Airlines, Inc.*, 2012 WL 5471793, at *3 (S.D. Fla. Nov. 9, 2012) (citing *Chudasama*, 123 F.3d at 1368–69). Specifically, it confronted "unjustifiable delay by the district court in ruling on the motion to dismiss, an erroneous decision to compel discovery from the defendant prior to adjudicating the motion to dismiss, and an especially dubious fraud claim that was likely to be dismissed." *Ray*, 2012 WL 5471793, at *3 (citing *Chudasama*, 123 F.3d at 1368–69).  "Thus, as many district courts have recognized, *Chudasama* involved particularly egregious facts which one hopes will be seldom, if ever, duplicated again." *Id.* (collecting cases).

Here, "[u]nlike the exceptional circumstances presented in *Chudasama*," Defendants' motion to dismiss has only been pending for two weeks and was filed alongside the motion to stay discovery.  *MindbaseHQ LLC v. Google LLC*, 2021 WL 680887, at *2 (S.D. Fla. Feb. 22, 2021). Defendants' motion to dismiss has "yet to be fully briefed[;] [t]his fact alone essentially renders *Chudasama* inapplicable." *Id.*  "Without the benefit of Plaintiff[s'] responses and defenses to the issues presented in the motion[], the Court cannot properly take a 'preliminary peek' at the viability of the motion[] to determine if this case presents the kind of 'especially dubious' claim that would justify staying discovery to avoid needless and extensive discovery. *Id.* (internal citation omitted). Accordingly, Defendants' motion to stay "is premature because it falls short of placing the Court in a position to determine that it would be meritorious and case dispositive." *Id.*; *see also Jackson v. Anheuser-Busch InBev SA/NV, LLC*, 2021 WL 493959, at *2 (S.D. Fla. Feb. 10, 2021) (denying

motion to stay discovery pending the resolution of a defendant's anticipated motion to dismiss where the plaintiff had yet to file its amended complaint); *see also Miller's Ale House, Inc. v. DCCM Rest. Grp., LLC*, 2015 WL 6123984, at *2 (M.D. Fla. Oct. 16, 2015) (distinguishing *Chudasama* on the ground, among others, that defendant's motion to dismiss had yet to be fully briefed, and noting that plaintiff would likely be given leave to amend even if defendant's motion to dismiss was to be granted); *Montoya v. PNC Bank, N.A.*, 2014 WL 2807617, at *2 (S.D. Fla. June 20, 2014) ("Because the dismissal motions are not even fully briefed, the Undersigned is not prepared to now assess the viability of the motions. Nevertheless, my admittedly incomplete and preliminary review suggests that the motions may not be the 'slam-dunk' submissions the Defendants describe them to be in their papers and at the hearing."). *Chudasama* is factually inapposite.

Defendants have failed to show any notable burden or prejudice from participating in the Court's contemplated discovery procedures, and therefore this factor warrants a denial of Defendants' stay request as well. Plaintiffs have been diligent in proceeding with discovery by holding an early Rule 26(f) conference on April 10, 2024 (per the Court's individual rules) and then subsequently serving requests for production and interrogatories the very same day. *See* Fed. R. Civ. P. 26(f)(1) ("the parties must confer as soon as practicable"); I.P.C.C. ¶ 4(E) ("The parties should fulfill their obligations to confer as required by Federal Rule of Civil Procedure 26(f) as soon as practicable after service of the complaint. Any party's failure to promptly confer should be brought to the Court's attention pursuant to the procedures in Paragraph 5 of these Individual Practices."). The Court's rules envision that discovery is well underway by the time the initial pretrial conference (set for May 30, 2024) takes place. *See, e.g.*, I.P.C.C. ¶ 4(E); *id.* ¶ 4(D) ("In most cases, the Court will give the parties four months (from the date of the conference) to complete all discovery"). A stay of all discovery would be antithetical to the Court's aims.

**C.  There is substantial prejudice to Plaintiffs in staying discovery.**

Finally, there is risk of substantial prejudice to Plaintiffs in allowing discovery to be stayed. Courts will not stay discovery if the non-moving party would be prejudiced by the passage of time that a stay would impose.  For example, in *Kirschner v. J.P. Morgan Chase Bank*, "the combination of the risk of witnesses' memories further fading with time as well as the unnecessary depletion of the trust's resources as a result of deposing witnesses more than once weigh[ed] against a further stay of discovery." 2020 WL 230183, at \*3 (S.D.N.Y. Jan. 15, 2020).

So too here will the passage of time substantially prejudice Plaintiffs.  Especially given that the underlying sexual abuse in this case happened a number of years ago, it is imperative that Plaintiffs be able to obtain documents and depose witnesses quickly to ensure that memories do not fade and documents are not destroyed.  The problems of fading memories, destruction of evidence and unavailability of witnesses are augmented in particular in this case, because much of the discovery concerns events that took place beginning nearly ten years ago.  Thus, "[a] stay would frustrate rather than advance judicial administration.  As time progresses, evidence becomes stale, memories fade, and the search for truth necessarily becomes more elusive." *Howard v. Gutterman*, 3 B.R. 393, 394 (S.D.N.Y. 1980); *Geordiadis v. First Boston Corp.*, 167 F.R.D. 24, 25 (S.D.N.Y. 1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case [six years], that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.")).[1]

---

[1] Defendants assert that there is no prejudice because "Plaintiffs' counsel already possesses at least 28,000 documents that the Epstein Estate and Epstein-related companies produced in response to third-party subpoenas in the Bank Litigation, and Defendant Kahn was deposed in the Bank Litigation."  ECF No. 36 at 11.  As Defendants concede, however, Defendant Indyke was not deposed in those cases and the discovery produced (and testimony sought) in those cases were tailored to requests and questioning seeking information about the banks' roles in Epstein's sex-trafficking enterprise, and not the role of the Defendants here.

Even if Plaintiffs were not prejudiced by a stay of discovery, because Defendants do not otherwise demonstrate good cause to warrant a stay, *lack* of unfair prejudice to the non-moving party does not independently justify a stay. *Guiffre*, 2016 WL 254932, at *2 ("Good cause not otherwise having been shown, lack of prejudice does not justify a stay."). For example, in *Bennett*, the defendants moved for a stay of discovery, but the court declined to issue a stay, and explained that although there was "little risk of prejudice to [the plaintiff]," "that alone does not justify staying discovery." 2023 WL 2021560, at *5. So too here. Because Defendants have not demonstrated sufficient good cause for their stay request as to whether Plaintiffs' claims are meritorious (they are) or whether they will be unfairly burdened (they will not), a stay of discovery is unwarranted regardless of whether Plaintiffs will be prejudiced (they will be).

## <u>CONCLUSION</u>

Discovery in this matter should proceed without delay so Plaintiffs and the Class can ascertain the full extent of Indyke and Kahn's involvement in Jeffrey Epstein's sex-trafficking operation. The motion to stay all discovery should be denied.

DATED:        April 22, 2024                           Respectfully submitted,

<u>/s/ *Sigrid McCawley*</u>
David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com