**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Danielle Bensky and Jane Doe 3,
individually and on behalf of all
others similarly situated,

       Plaintiffs,

v.

Darren K. Indyke and Richard D. Kahn,

       Defendants.

Case No.: 1:24-cv-01204-AS
[rel: 1:24-cv-02192-AS]

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 1

I.     Epstein Trafficked and Abused Plaintiffs and the Class Through His Sex-
       Trafficking Enterprise. ......................................................................................... 2

II.    Defendants Were Epstein's Right-Hand Men and Crucial to the Operation of the
       Sex-Trafficking Enterprise. .................................................................................. 4

III.   After Epstein's Death, Defendants Fraudulently Concealed Their Involvement
       with the Epstein Enterprise During the Epstein Victims Compensation Program. ........... 5

ARGUMENT .................................................................................................................... 6

I.     The EVCP Agreement Does Not Bar Bensky's and Other Putative Class Members
       Claims. ................................................................................................................. 6

       A.     The EVCP Agreement does not discharge the claims because it was
              procured by Defendants' fraud. .............................................................. 7

       B.     The covenants not to sue are non-binding absent consideration. ......................... 10

              1.     Certain Plaintiffs' claims are subject to covenants not to sue. ................ 11

              2.     Covenants not to sue require valid consideration, which Defendants
                     did not provide. ...................................................................... 12

       C.     The EVCP Agreement should not be interpreted to protect Defendants in
              their individual capacity. ....................................................................... 14

       D.     Defendants' motion is procedurally improper at this stage. ................................ 16

              1.     Dismissing allegations based on a release or covenant not to sue
                     would be improper at this stage. ............................................... 16

              2.     Defendants' motion to strike is procedurally premature. .......................... 17

II.    The Complaint Sufficiently States Claims for All Counts. .................................................. 18

       A.     Plaintiffs' Complaint states a claim for aiding, abetting, or facilitating
              battery (Count I). .................................................................................. 18

B.    Plaintiffs' Complaint states a claim for intentional infliction of emotional distress (Count II). ................................................................................................ 20

C.    Plaintiffs' Complaint states a claim under 18 U.S.C. § 1595 for knowingly benefitting from participation in a sex-trafficking venture (Count IV). ............... 22

D.    Plaintiffs' Complaint states a claim for obstruction of the TVPA in violation of 18 U.S.C. § 1591(d) (Count V). ........................................................ 25

E.    Plaintiffs' Complaint states a claim for conspiracy to violate the TVPA (Count VI). ........................................................................................................ 25

F.    Plaintiffs' Complaint states a claim under the Victims of Gender Motivated Violence Protection Law (Count VII). ................................................. 28

CONCLUSION ............................................................................................................................. 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ................................................................. 30

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005) ............................................................... 30

*Aiena v. Olsen*,
    69 F. Supp. 2d 521 (S.D.N.Y. 1999) .................................................... 7

*Allen v. WestPoint-Pepperell, Inc.*,
    945 F.2d 40 (2d Cir. 1991) ................................................................. 10

*Annie Farmer v. Indyke et al.*,
    No. 19-10475 (Nov. 12, 2019) .............................................................. 8

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................... 18

*Barrett v. Freifeld*,
    883 N.Y.S.2d 305 (2009) ................................................................... 10

*Bell v. SL Green Realty Corp.*,
    2021 WL 516575 (S.D.N.Y. Feb. 11, 2021) ......................................... 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................... 18

*Belsito Commc'ns, Inc. v. Dell, Inc.*,
    2013 WL 4860585 (S.D.N.Y. Sept. 12, 2013) .................................... 18

*Benedict v. Amaducci*,
    1993 WL 87937 (S.D.N.Y. Mar. 22, 1993) ......................................... 14

*Bonner v. Guccione*,
    916 F. Supp. 271 (S.D.N.Y. 1996) ..................................................... 21

*Breest v. Haggis*,
    115 N.Y.S.3d 322 (2019) .............................................................. 29, 30

*Bur-Tex Hosiery, Inc. v. World Tech Toys, Inc.*,
    2024 WL 989841 (S.D.N.Y. Mar. 7, 2024) ......................................... 6

*Buttry v. Gen. Signal Corp.*,
    68 F.3d 1488 (2d Cir. 1995) ............................................................... 23

*Cahill v. Regan*,
　5 N.Y.2d 292 (1959) ................................................................................................ 15

*Canosa v. Ziff*,
　2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ............................................................ 21

*Caramante v. Barton*,
　494 N.Y.S.2d 498 (3d Dep't 1985) ........................................................................... 9

*Childers v. N.Y. & Presbyterian Hosp.*,
　36 F. Supp. 3d 292 (S.D.N.Y. 2014) ........................................................................ 22

*Colton v. N.Y. Hosp.*,
　98 Misc. 2d 957, 414 N.Y.S.2d 866 (Sup. Ct. 1979) ........................................ 11, 12

*Directory Assistants, Inc. v. Healthmart USA, LLC*,
　2013 WL 1748083 (D. Conn. Apr. 23, 2013) .......................................................... 27

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
　671 F. Supp. 3d 387 (S.D.N.Y. 2023) ........................................................ 24, 25, 28

*Doe 1 v. JPMorgan Chase Bank, N.A.*,
　2023 WL 3945773 (S.D.N.Y. June 12, 2023) ................................................... 17, 25

*Doe v. Siddig*,
　810 F. Supp. 2d 127 (D.D.C. 2011) ......................................................................... 28

*Eaves v. Designs for Fin., Inc.*,
　785 F. Supp. 2d 229 (S.D.N.Y. 2011) ........................................................................ 8

*Eckhart v. Fox News Network, LLC*,
　2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021), *on reconsideration in part*,
　2022 WL 4579121 (S.D.N.Y. Sept. 29, 2022) .................................................... 29, 30

*Eskridge v. Diocese of Brooklyn*,
　210 A.D.3d 1056 (N.Y. App. Div. 2022) ............................................................ 20, 21

*Fimbel v. Vasquez*,
　80 N.Y.S.3d 527 (3d Dep't 2018) .............................................................................. 8

*Fleites v. MindGeek S.A.R.L.*,
　2022 WL 4456077 (C.D. Cal. 2022) ........................................................................ 26

*Ford v. Phillips*,
　994 N.Y.S.2d 688 (3d Dep't 2014) ............................................................................ 8

*Freeman v. Jacobson*,
　2021 WL 3604754 (S.D.N.Y. Aug. 13, 2021) .......................................................... 19

*Gitman v. Pearson Educ.*,
    2015 WL 5122564 (S.D.N.Y. Aug. 31, 2015) .................................................................. 18

*Giuffre v. Andrew*,
    579 F. Supp. 3d 429, 452 (S.D.N.Y. 2022) ................................................................... 21

*Harris v. City of N.Y.*,
    186 F.3d 243 (2d Cir. 1999) .......................................................................................... 22

*Hoffman v. Ighodaro*,
    2016 WL 6093236 (S.D.N.Y. Sept. 28, 2016), *report and recommendation adopted*,
    2016 WL 6092706 (S.D.N.Y. Oct. 18, 2016) ................................................................ 16

*Hongxia Wang v. Enlander*,
    2018 WL 1276854 (S.D.N.Y. Mar. 6, 2018) ............................................................ 22, 23

*Huang v. Llerena-Salazar*,
    203 N.Y.S.3d 341 (2023) .............................................................................................. 15

*In re Actrade Fin. Techs., Ltd.*,
    424 B.R. 59 (Bankr. S.D.N.Y. 2009) ........................................................................ 14, 15

*In re Clinton Street Food Corp.*,
    254 B.R. 523 (Bankr. S.D.N.Y. 2000) ...................................................................... 14, 15

*In re Sept. 11 Prop. Damage & Bus. Loss Litig.*,
    481 F. Supp. 2d 253 (S.D.N.Y. 2007) ............................................................................ 7

*In re Skat Tax Refund Scheme Litig.*,
    356 F. Supp. 3d 300 (S.D.N.Y. 2019) .......................................................................... 21

*In re Tronox, Inc. Sec. Litig.*,
    2010 WL 2835545 (S.D.N.Y. June 28, 2010) ............................................................... 17

*Ironforge.com v. Paychex, Inc.*,
    747 F. Supp. 2d 384 (W.D.N.Y. 2010) .......................................................................... 17

*Kashef v. BNP Paribas S.A.*,
    2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) .................................................................. 22

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ...................................................................................................... 26

*Leshinsky v. Telvent GIT, S.A.*,
    873 F. Supp. 2d 582 (S.D.N.Y. 2012) ....................................................................... 26, 27

*Levine v. Landy*,
    860 F. Supp. 2d 184 (N.D.N.Y. 2012) .......................................................................... 10

*Levy v. Sterling Holding Co., LLC*,
  544 F.3d 493 (3d Cir. 2008)................................................................................... 27

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)................................................................................... 17

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  470 F. Supp. 2d 1195 (S.D. Cal. 2007)................................................................. 15

*Maurizi v. Callaghan*,
  2022 WL 1446500 (W.D.N.Y. Feb. 25, 2022), *report and recommendation adopted*,
  2022 WL 1444182 (W.D.N.Y. May 5, 2022) ........................................................ 19

*Mazzola v. Roomster Corp.*,
  849 F. Supp. 2d 395 (S.D.N.Y. 2012)................................................................... 18

*Middleton v. City of Chicago*,
  578 F.3d 655 (7th Cir. 2009) ................................................................................ 27

*Noble v. Weinstein*,
  335 F. Supp. 3d 504 (S.D.N.Y. 2018)................................................................... 22

*Ostano Commerzanstalt v. Telewide Sys., Inc.*,
  794 F.2d 763 (2d Cir. 1986).................................................................................... 9

*Ortiz v. Cornetta*,
  867 F.2d 146 (2d Cir. 1989).................................................................................. 22

*Pegram v. Herdrich*,
  530 U.S. 211 (2000), *aff'd*, 9 F.4th 95 (2d Cir. 2021) ........................................... 14

*Pozo v. BlueMercury, Inc.*,
  2023 WL 4980217 (S.D.N.Y. Aug. 3, 2023).......................................................... 18

*Ratha v. Phatthana Seafood Co.*,
  35 F.4th 1159 (9th Cir. 2022) ......................................................................... 27, 28

*Reynolds v. Lifewatch, Inc.*,
  136 F. Supp. 3d 503 (S.D.N.Y. 2015)................................................................... 17

*Sacchetti-Virga v. Bonilla*,
  73 N.Y.S.3d 194 (2018)........................................................................................... 7

*Sacerdote v. New York Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018)................................................................... 13

*Scollo ex rel. Scollo v. Nunez*,
  847 N.Y.S.2d 899 (Sup. Ct. 2007), *aff'd*, 60 A.D.3d 840 (N.Y. App. Div. 2009) .................. 19

vi

*Shaw v. Hornblower Cruises & Events, LLC*,
   2022 WL 16748584 (S.D.N.Y. Nov. 7, 2022) ................................................................ 18

*Shea v. Cornell Univ.*,
   596 N.Y.S.2d 502, 504 (1993) ...................................................................................... 19

*Steinberg v. Goldstein*,
   274 N.Y.S.2d 46 (Sup. Ct. 1966), *aff'd*, 279 N.Y.S.2d 240 (1967)......................... 20

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999)............................................................................................ 8

*Trusz v. UBS Realty*,
   2016 WL 1559563 (D. Conn. Apr. 18, 2016) .......................................................... 27

*Tucker v. Am. Int'l Grp.*,
   936 F. Supp. 2d 1 (D. Conn. 2013) ........................................................................ 17

*Turner v. Manhattan Bowery Mgmt. Corp.*,
   28 N.Y.S.3d 651 (Sup. Ct. 2015) .............................................................................. 21

*United States v. Alessi*,
   638 F.2d 466 (2d Cir. 1980).......................................................................................... 26

*United States v. Beech-Nut Nutrition Corp.*,
   871 F.2d 1181 (2d Cir. 1989)........................................................................................ 26

*Velez v. Sanchez.*,
   693 F.3d 308 (2d Cir. 2012)........................................................................................ 28

*W. Chelsea Buildings, LLC v. United States*,
   109 Fed. Cl. 5 (2013), *aff'd*, No. 13-5066 (Fed. Cir. Feb. 12, 2014) ................ 11, 12

*Wade Park Land Holdings, LLC v. Kalikow*,
   589 F. Supp. 3d 335 (S.D.N.Y. 2022), *amended*,
   2022 WL 2479110 (S.D.N.Y. July 6, 2022) .......................................................... 11, 12, 14

*Walker v. Triborough Bridge & Tunnel Auth.*,
   198 N.Y.S.3d 46 (2023) ............................................................................................ 30

*Wall v. Constr. & Gen. Laborers' Union, Local 230*,
   224 F.3d 168 (2d Cir. 2000)........................................................................................ 23

*Wall v. CSX Transp., Inc.*,
   471 F.3d 410 (2d Cir. 2006).......................................................................................... 8

*Watson v. Consol. Edison of N.Y.*,
   594 F. Supp. 2d 399 (S.D.N.Y. 2009)...................................................................... 16

*Watson v. United States*,
    865 F.3d 123 (2d Cir. 2017).................................................................. 23

*Weiss v. Equifax, Inc.*,
    2020 WL 3840981 (E.D.N.Y. July 8, 2020) ........................................ 7

*Wild Bunch, SA v. Vendian Ent., LLC*,
    256 F. Supp. 3d 497 (S.D.N.Y. 2017)................................................. 10

*Williams ex rel. Williams v. Pro. Sec. Bureau Ltd.*,
    803 N.Y.S.2d 21 (table) ..................................................................... 20

*Zimmerman v. Poly Prep Country Day Sch.*,
    888 F. Supp. 2d 317 (E.D.N.Y. 2012) ......................................... 23, 24

*Zumpano v. Quinn*,
    6 N.Y.3d 666 (2006) ........................................................................... 23

## Statutes

18 U.S.C. § 1591 .......................................................................................... 25

18 U.S.C. § 1591(a) ...................................................................................... 22

18 U.S.C. § 1591(a)(2) .................................................................................. 25

18 U.S.C. § 1591(d) ...................................................................................... 25

18 U.S.C. § 1594 ........................................................................................... 25

18 U.S.C. § 1595 ..................................................................................... 22, 28

18 U.S.C. § 1595(a) ...................................................................................... 27

## Rules

Fed. R. Civ. P. 12(b)(6).................................................................................. 30

Fed. R. Civ. P. 15(a)(2) .................................................................................. 30

## Other Authorities

Abolish Trafficking Reauthorization Act of 2022, S. 3946, 117th Cong. § 102 (2023) .............. 27

*Jeffrey Epstein's estate prevented his victims from suing Ghislaine Maxwell,* Business Insider
    (Dec. 15, 2021), https://www.businessinsider.com/jeffrey-epstein-victims-compensation-
    program-accusers-cant-sue-ghislaine-maxwell-2021-12 ........................................ 6

Maggie Lee and Martina E. Vandenberg, *Congress Amends the TVPRA to Correct Ninth Circuit's Erroneous Ruling in Ratha, Transactional Litigation Blog* (Aug. 1, 2023), https://tlblog.org/congress-amends-the-tvpra-to-correct-ninth-circuits-erroneous-ruling-in-ratha/ ....................................................................................................................... 28

New York City, N.Y. Code § 10-1105 ................................................................................. 29

Restatement (Second) of Contracts § 284 cmt. a (1981)) ............................................. 11

Plaintiffs Danielle Bensky and Jane Doe 3, individually and on behalf of all others similarly situated, by and through undersigned counsel, oppose Defendants' Motion to Dismiss (ECF No. 29), and respond as follows.

## INTRODUCTION

Defendants, Darren K. Indyke and Richard D. Kahn, Epstein's right-hand men, have been intimately involved with facilitating the Epstein sex-trafficking enterprise since its earliest years. Since 1995, Indyke and Kahn, Epstein's personal lawyer and accountant, respectively, personally participated in Epstein's sex-trafficking enterprise and reaped multi-million-dollar rewards for their participation. After Epstein's death, Defendants were named co-executors of his Estate. Defendants concealed their personal involvement in the sex-trafficking venture for years; however, they have since been exposed as part of Epstein's innermost circle, and key facilitators of sex-trafficking. To seek justice, Plaintiffs Danielle Bensky and Jane Doe 3 have brought suit against Defendants individually and on behalf of a putative Class of Epstein survivors. As explained below, the motion to dismiss fails to set forth sufficient grounds for dismissal of the Complaint and should be denied in its entirety.

## FACTUAL BACKGROUND

Danielle Bensky, Jane Doe 3, and the Class all suffered at the hands of Jeffrey Epstein, the most notorious sex offender in modern history. But Epstein did not work alone. Beginning in the 1990s, Epstein created and ran a complex, sophisticated sex-trafficking venture and conspiracy ("Epstein Enterprise") with the help of many influential individuals and entities who both knew he was sexually abusing and sexually trafficking young women and girls, and knowingly provided support to facilitate Epstein's operation. Compl. ¶ 5. Defendants worked closely with Epstein through every step of the sex-trafficking operation's expansion and growth. *Id.* ¶ 12. They hid their

1

integral involvement with the Epstein Enterprise from Plaintiffs through concealments, false denials, and other efforts. *Id.*

## I.     Epstein Trafficked and Abused Plaintiffs and the Class Through His Sex-Trafficking Enterprise.

By now Epstein's *modus operandi* needs little introduction: Epstein would lure young girls or women to one of his luxurious mansions under the guise of being a wealthy philanthropist, able to advance careers, education, or provide other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would coerce each of his unsuspecting victims to engage in a variety of commercial sex acts. *Id.* ¶ 2. The Epstein Enterprise operated both to lure young women and girls into a position where Epstein could coerce them to engage in commercial sex acts and commit sexual offenses against them, and to conceal its sex-trafficking from law enforcement organizations. *Id.* ¶ 3. The Enterprise provided financial and other benefits to those who assisted and enabled both of these purposes. *Id.* ¶ 3.

Bensky and Doe were just two of Epstein's many, many victims. Bensky was an aspiring dancer in New York City in 2004 when she was recruited by the Epstein Enterprise. *Id.* ¶ 72. A woman she knew approached Bensky and asked her to provide a massage to a man in exchange for $300 dollars. *Id.* ¶ 73. That man turned out to be Epstein. *Id.* ¶ 74. She went over to Epstein's New York mansion and was escorted into a room with a massage table. *Id.* ¶ 75. During the massage, Epstein demanded Bensky take her clothes off; Epstein then turned over and began masturbating. *Id.* Epstein then told Bensky to leave and, after the massage, paid her $300 in cash. *Id.* Bensky was called several times by Epstein's employees to return for additional massages. *Id.* ¶ 76. Terrified of what would happen to her if she refused, she went back to Epstein several times. *Id.* ¶¶ 76, 77. During those times, Epstein would ask Bensky to undress into her bra and underwear; masturbated during massages; fondled her breasts and other intimate parts of her body; and forced

her to pinch his nipples. *Id*. ¶ 77. At some point, Epstein learned that Bensky's mom had a brain tumor, so he promised he would find her a good surgeon in New York through his connections. *Id*. ¶ 79. This, of course, was a lie: Epstein held Bensky's mother's illness over Benksy's head and threatened her that she would not receive care unless Bensky complied with his demands. *Id.* Recognizing Bensky's mother's illness as a vulnerability, Epstein became even more aggressive with Bensky; on one occasion Epstein ordered Bensky to get completely naked, then grabbed her, used a vibrator on her vagina very forcefully causing great pain, and told her to "pretend" she was enjoying it. *Id.* ¶ 80. Bensky was abused by Epstein for approximately one year. *Id*. ¶ 83.

Doe was recruited by one of Epstein's co-conspirators in 2014, who arranged to have her meet Epstein under the false pretense that he knew wealthy and powerful individuals and would help her succeed in business. *Id*. ¶ 102. Epstein paid for Doe to fly from Europe to New York, where he instructed her to stay in one of his apartments and provided her with a cell phone for communications. *Id*. ¶ 51. On one occasion while Doe was in Epstein's New York home, Epstein had another girl perform oral sex on him while forcing Doe to watch in close proximity. *Id*. ¶ 104. When Doe refused Epstein's request to join in, Epstein started to forcibly touch Doe without her consent on her breasts and below the waist. *Id*. Epstein abused Doe on many other occasions: forced oral sex in Epstein's New York home; forced digital penetration in Epstein's car in New York; forcibly touching her breasts; forcibly pressing a sex toy on her genitals while she cried; forced digital penetration while she was asleep; and raping her in her bedroom. *Id.* ¶¶ 105–113. Doe received cash from Epstein's employees at his New York office. *Id*. ¶ 107.

## II.    Defendants Were Epstein's Right-Hand Men and Crucial to the Operation of the Sex-Trafficking Enterprise.

Defendants personally participated in the Epstein Enterprise from approximately 1995 onward and reaped multi-million-dollar rewards for their participation. *Id.* ¶ 5. They were essential to the Enterprise's success in myriad ways:

- Defendants helped structure Epstein's bank accounts and cash withdrawals to give Epstein and his associates access to large amounts of cash in furtherance of sex-trafficking. *Id.* ¶ 6. They also personally assisted with creating the Enterprise's complex financial infrastructure, which involved dozens of bank accounts at various banking institutions, many of which were held in the name of corporate entities with no legitimate business purpose and that appear to have been created to simply facilitate the illegal sex-trafficking venture. *Id.* ¶ 7.

- A 2020 Consent Order from the New York State Department of Financial Services highlighted Defendants' role as to Epstein's bank accounts. *Id.* ¶ 128. The DFS Consent Order included various specific findings about the conduct of "ACCOUNTANT-1" (Kahn) and "ATTORNEY-1" (Indyke) *Id.* Indyke made a total of 97 withdrawals from 2013 to 2017 from personal accounts belonging to Epstein, two to three times per month, all in the amount of $7,500. When bank personnel asked Indyke why Epstein needed cash, he replied that Epstein used it for "travel, tipping and expenses." *Id.* ¶ 129.

- From June 2018 to February 2019, at least 97 separate withdrawals of $1,000 were made from an Epstein account for which Indyke was a signatory, all taken from an ATM a short walk from Indyke's law office at the time. *Id.* ¶ 132. From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of converting U.S. dollars to Euros totaling over $126,000. *Id.*

- Indyke probed bank policy on how closely it monitored cash withdrawals. In 2014, Indyke asked the bank "how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert." In 2017, Indyke asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days.

- Defendants conspired to assist Epstein in evading banks running diligence reports on him for the purpose and effect of concealing Epstein's sex-trafficking and permitting that sex-trafficking to continue. *Id.* ¶ 141. In one instance, Kahn withdrew Epstein's name from a non-profit's brokerage account to avoid a due diligence report being run on Epstein. *Id.*

- Defendants directed, approved, enabled, and justified millions of dollars in payments that fueled the Epstein Enterprise, including payments to women who were forced to have sex with Epstein and/or recruited others to be victimized, recruiters, and to maintain the immigration status of victims of the Enterprise. *Id.* ¶ 144. Defendants (at least one of them, but often both) had power of attorney or signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on

payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition. *Id.* ¶ 145. At least one Defendant was a signatory on over 130 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and other expenses. *Id.* ¶ 146. Between 2016 and 2019, Indyke made wire transfers from Epstein's personal accounts to victims and entities to facilitate the Enterprise. *Id.* ¶ 147. Defendants oversaw over $2,500,000 in payments from a single account (and millions more from other accounts) in which Indyke was a signatory to dozens of women with Eastern European surnames, purportedly for hotel expenses, rent, and other expenses, and to an immigration lawyer who was involved in forced marriages arranged among Epstein's victims to secure victims' immigration status. *Id.* ¶ 148. On one occasion, when a bank compliance officer inquired about purpose of payments to accounts of women with Eastern European surnames and Epstein's relationship with the counterparties, Kahn's response was "SENT TO A FRIEND FOR TUITION FOR SCHOOL." *Id.* ¶ 138.

III.    **After Epstein's Death, Defendants Fraudulently Concealed Their Involvement with the Epstein Enterprise During the Epstein Victims Compensation Program.**

Epstein died suddenly while under indictment for federal sex-trafficking charges on August 10, 2019. Before his death, Epstein executed a last will and testament appointing Defendants as the executors of his Estate. Defendants are also administrators and co-trustees of The 1953 Trust. Faced with a barrage of civil litigation from Epstein's many victims, Defendants created the EVCP to handle each victim's claims more expeditiously. The EVCP ran for a little over a year between June 2020 and August 2021. Bensky and other Class Members participated in the EVCP; other Epstein victims, including Doe, did not.

The EVCP's claims administrator had independent autonomy over all aspects of the program except one: the form agreement requiring EVCP claimants to promise not to sue Epstein's Estate or co-conspirators ("EVCP Agreement"). Stylized as a "[g]eneral [r]elease," the EVCP Agreement purports to cover claims in a timespan ranging "from the beginning of the world" up until the date of the Agreement's execution. While the Agreement permitted victims to carve out individuals they intended to sue, they needed permission from Defendants to do so. *See* ECF No. 49-1. Defendants refused carve-outs of certain key Epstein co-conspirators from the Agreement,

such as Ghislaine Maxwell.[1] At base, Defendants themselves were the arbiters of who victims could carve out of the Agreement and still receive compensation for their abuse.

Defendants fraudulently concealed their involvement and culpability with the Epstein Enterprise; had Bensky and the Class known of the full extent of Defendants' involvement in the Enterprise while Epstein was alive, they would never have agreed not to sue Defendants.

## ARGUMENT

The motion to dismiss is meritless for several reasons. First, the EVCP Agreement does not bar Bensky's and other putative Class Members' claims against Defendants, as the agreement was procured by fraud. Moreover, when Bensky and other Class Members entered the settlement with Defendants, their purported "release" of unknown claims represent covenants not to sue rather than releases which, under New York law, requires consideration that Defendants did not provide. At any rate, the EVCP Agreement and any releases it purports to contain should not be interpreted to apply to Defendants' personal role in the Epstein sex-trafficking venture.

The Complaint also sufficiently alleges causes of action for aiding, abetting, and facilitating battery; IIED; negligence (uncontested); violations of the TVPA (beneficiary liability, obstruction liability, and conspiracy to violate); and violation of the GMVPL. As explained below, each of these claims is well-pled and supported by detailed factual allegations, and thus should survive the motion-to-dismiss stage.

## I.    The EVCP Agreement Does Not Bar Bensky's and Other Putative Class Members Claims.

"Reliance on a contractual release is an affirmative defense." *Bur-Tex Hosiery, Inc. v. World Tech Toys, Inc.*, 2024 WL 989841, at *3 (S.D.N.Y. Mar. 7, 2024). Thus, plaintiffs need not

---

[1] *See* Jacob Shamsian, *Jeffrey Epstein's estate prevented his victims from suing Ghislaine Maxwell,* Business Insider (Dec. 15, 2021), https://www.businessinsider.com/jeffrey-epstein-victims-compensation-program-accusers-cant-sue-ghislaine-maxwell-2021-12.

"plead facts to negate [a] Release," as it is the defendant's burden to plead their affirmative defense. *Id.*; *see also Bell v. SL Green Realty Corp.*, 2021 WL 516575, at *7 n.1 (S.D.N.Y. Feb. 11, 2021) ("To survive a motion to dismiss, a Complaint is not required to plead facts negating possible affirmative defenses[.]"); *Weiss v. Equifax, Inc.*, 2020 WL 3840981, at *1 (E.D.N.Y. July 8, 2020) ("[P]laintiff was not required to anticipate and negate this defense in his pleading."); *In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 481 F. Supp. 2d 253, 258 (S.D.N.Y. 2007) ("Defendants have the burden to plead the affirmative defense, by answer or by motion; the plaintiff is not required to allege facts to negate the affirmative defense."). Defendants have not met that burden for several reasons.

While Defendants insist that the EVCP Agreement bars Bensky and other Class Members who signed it from recovery (though concede that it has no impact on Doe's claims, who never signed it), their insistence ignores the fact that Defendants procured Bensky's and other Class Members' assent to the EVCP Agreement through fraudulent inducement by hiding their intimate involvement in Epstein's sex-trafficking venture. The EVCP Agreement also contains non-binding covenants not to sue due to a lack of consideration, as well as non-binding releases as to Defendants' personal role in the Epstein Enterprise. Finally, this argument is procedurally premature at the motion-to-dismiss stage. Any one of these reasons is grounds for the Court to reject Defendants' release affirmative defense.

## A.    The EVCP Agreement does not discharge the claims because it was procured by Defendants' fraud.

A motion to "dismiss a complaint on the basis of a release 'should be denied where fraud or duress in the procurement of the release is alleged.'" *Sacchetti-Virga v. Bonilla*, 73 N.Y.S.3d 194, 196 (2018); *see also Aiena v. Olsen*, 69 F. Supp. 2d 521, 539 (S.D.N.Y. 1999) ("The releases executed . . . are not conclusive because plaintiffs have asserted a legally sufficient claim for fraud

in their inducement."); *Fimbel v. Vasquez*, 80 N.Y.S.3d 527, 529 (3d Dep't 2018) ("plaintiff['s] sufficiently alleged . . . [a] cognizable claim of fraudulent inducement in the procurement of the release" that "constitutes a basis to deny" the motion to dismiss); *Ford v. Phillips*, 994 N.Y.S.2d 688, 691 (3d Dep't 2014) ("motion to dismiss a complaint based solely upon a release should be denied when the plaintiff alleges fraud or duress in the release's procurement").

Defendants procured Bensky's and other Class Members' assent to the EVCP Agreement through fraudulent inducement in the form of public and private denials as to their role in the Epstein Enterprise. Compl. ¶ 164, *see also, e.g.*, *Annie Farmer v. Indyke et al.*, No. 19-10475 (Nov. 12, 2019), Answer (ECF No. 45) (denying allegations relating Epstein's sex trafficking and abuse (¶¶ 1, 2, 5, 31)). To state a claim for fraudulent inducement under New York law, a plaintiff must allege that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006). A material, false representation is successfully pled when a plaintiff: "(1) specif[ies] the statements that the plaintiff contends were fraudulent, (2) identif[ies] the speaker, (3) state[s] where and when the statements were made, and (4) explain[s] why the statements were fraudulent." *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).

Defendants intended to defraud Bensky and the Class through their repeated claims that they were not involved in or aware of the Epstein Enterprise, which Plaintiffs relied on to their detriment. Compl. ¶ 164. "Under New York law, a claim for fraud may lie even when a defendant does not make the statement directly to the plaintiff, but only if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to him." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229,

251 (S.D.N.Y. 2011). The plaintiff must be one of the "intended beneficiaries." *Caramante v. Barton*, 494 N.Y.S.2d 498, 500 (3d Dep't 1985). For example, in *Ostano Commerzanstalt v. Telewide Sys., Inc.*, a statement to a third party was sufficient to establish fraudulent inducement. 794 F.2d 763, 766 (2d Cir. 1986). There, the court reasoned that "a fraudulent misrepresentation made with 'notice in the circumstances of its making' that the person to whom it was made would communicate it to third parties subjects the person making the misrepresentation to liability to the third party." *Id*. New York courts have found that "the language . . . and the surrounding circumstances" are integral to determining if "plaintiffs were the intended beneficiaries." *Caramante*, 494 N.Y.S.2d at 500.

Defendants plausibly knew that Bensky and the Class would rely on their statements, whether directly or indirectly, that they were not involved in Epstein's crimes. As parties who are settling a claim against the estate that Defendants were the executors of, Defendants were on "notice in the circumstances" that any statements they made would be "communicate[d] . . . to third parties." *Ostano*, 794 F.2d at 766. And the Court must consider the surrounding circumstances of the interactions between the Class and Defendants. *Caramante*, 494 N.Y.S.2d at 500. Defendants likely wanted to reassure the Class that the perpetrators of the crimes against them were limited to a group of individuals that did *not* include them—and in expressing these statements, induced the parties to sign a settlement agreement. Defendants intended for and benefited from the Class's reliance on these statements. Without a genuine belief that the perpetrators of the sex-trafficking ring did not include Defendants, no Class Member would have signed the EVCP Agreement—and Defendants knew this.

Even if Defendants attempt to argue that they did not make any affirmative fraudulent statements, a claim of fraudulent inducement can be based on "a material misrepresentation or

omission of fact." *Levine v. Landy*, 860 F. Supp. 2d 184, 193 (N.D.N.Y. 2012). To successfully plead a cause of action for fraudulent concealment based on a defendant's omission, the plaintiff must allege that that the defendant "had a duty to disclose material information and failed to do so." *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 307 (2009). That is the case here.

Defendants had a duty to Plaintiffs because they had knowledge of special facts within their unique control that Plaintiffs could not have discovered on their own. Pursuant to the special-facts doctrine, a duty to disclose material facts "may arise where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Wild Bunch, SA v. Vendian Ent.*, *LLC*, 256 F. Supp. 3d 497, 503 (S.D.N.Y. 2017) (cleaned up). "[T]he heartland of this doctrine is the realization that an arm's-length negotiation cannot honestly operate if one party keeps secret a material fact that the other party cannot reasonably discover." *Id.* (denying motion to dismiss); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (fraudulent omission claim proper when the defendant "had access to critical information . . . that appellants did not have"). Here, Defendants were in a position of trust sufficient to imply a duty to disclose under the special-facts doctrine. As the Complaint describes in detail, their involvement in the Epstein Enterprise has been artfully concealed, and was just recently exposed, only after Class Members signed the EVCP Agreement (in 2020). Compl. ¶ 11; *see also id.* ¶ 9, 164. Such involvement would have been a material fact that the Class Members would have wanted to know and would have influenced their choice to sign. Defendants "had access to critical information . . . that appellants did not have," which influenced Class Members to sign the EVCP Agreement under fraudulent circumstances. *Allen*, 945 F.2d at 45.

**B.    The covenants not to sue are non-binding absent consideration.**

Although the EVCP Agreement uses the term "release," it in fact contains both releases and covenants not to sue. Under New York law, there are two key distinctions between releases

and covenants not to sue. First, releases deal with duties that exist at the time of agreement, while covenants not to sue deal with duties that the grantor did not hold at the time of the agreement. *Colton v. N.Y. Hosp.*, 98 Misc. 2d 957, 965, 414 N.Y.S.2d 866, 873 (Sup. Ct. 1979). Second, a covenant not to sue requires proper consideration. *W. Chelsea Buildings, LLC v. United States*, 109 Fed. Cl. 5, 17 (2013), *aff'd*, No. 13-5066 (Fed. Cir. Feb. 12, 2014). Here, these distinctions are significant because, as explained below, Bensky's claims included some she did not have at the time she entered the EVCP Agreement. Therefore, they are subject to covenants rather than releases, which are non-binding because Defendants never paid proper consideration. The EVCP Agreement is clear that the Estate only paid consideration to secure binding covenants to protect itself, its beneficiaries, and others in their official capacity related to the Trust. So the Estate's consideration cannot be interpreted as being paid on behalf of Defendants in their personal capacity as such an action would violate the Estate's fiduciary duty to its beneficiaries. Because no consideration was paid to support covenants protecting Defendants in their personal capacity, they do not have the benefit of binding covenants and Bensky's claims are not subject to dismissal.

### 1. Certain Plaintiffs' claims are subject to covenants not to sue.

While Defendants argue that Bensky and other Class Members released duties that existed when the EVCP Agreement was signed (with the Estate and Defendants), they entered covenants not to sue regarding claims that were unavailable at that time. Under New York law, a "purported release of a duty that does not yet exist . . . is not a release but a promise to discharge a duty in the future." *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 369 (S.D.N.Y. 2022) (citing Restatement (Second) of Contracts § 284 cmt. a (1981)), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022). Indeed, "[a] purported release of a duty that is revived on the occurrence of a condition is not a release but a contract not to sue." *Id*. Put another way, while "[a] release is retrospective; a covenant not to sue, like any other covenant, is prospective." *Colton*, 414 N.Y.S.2d

at 873. That a covenant not to sue is stylized as a "release" or contains text "recit[ing] the familiar litany 'release and forever discharge' is "of no moment." *Id.* (finding that agreement barring claims not in existence was covenant not to sue "notwithstanding its use of traditional words of release"). Here, claims brought by Plaintiffs through New York's Adult Survivors Act (Counts I–III) and under New York City's Victims of Gender-Motivated Violence Act (Count VII) were claims unavailable to Plaintiffs at the time of the settlement and later revived on the occurrence of new legislation that provided a look-back period.

As such, with respect to those claims, Bensky and others entered into covenants not to sue rather than releases ("EVCP Covenants").[2]

### 2.    Covenants not to sue require valid consideration, which Defendants did not provide.

The EVCP Covenants require valid consideration to be binding. Under New York law, a covenant not to sue requires consideration. *W. Chelsea Buildingss*, 109 Fed. Cl. at 17  (describing a covenant not to sue as a "unique type of contract," but still one that requires the basic elements of a contract, *i.e.*, offer, acceptance, consideration, mutual assent, and intent to be bound). Therefore, without valid consideration, the EVCP Covenants are not binding.

---

[2] Defendants' ASA argument is a red herring. Mot. at 12–13. They argue that the passage of the ASA (signed into law on May 24, 2022) "did not create any 'new' claim for Bensky or any other Epstein victim." *Id.* at 13. But Defendants appear to be arguing against themselves; Plaintiffs have not alleged that the ASA created a standalone cause of action, nor have they pled as such in their Complaint. *See* Compl. ¶¶ 199–234 (pleading New York common-law claims). Rather, the ASA revived Plaintiffs' tort claims that were previously unavailable due to the statute of limitations prior to the law's enactment. Because the ASA "d[id] not yet exist" at the time of the EVCP Agreement, any promise to not bring claims that were "revived on the occurrence of a condition [*i.e.*, passage of the ASA] is not a release but a contract not to sue. *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 369 (S.D.N.Y. 2022). The EVCP Agreement's reference to revival statutes does not impact this conclusion as this is "retrospective" language characterizing a release of present duties. *Colton*, 414 N.Y.S.2d at 873 (comparatively, "a covenant not to sue, like any other covenant, is prospective"). Because Plaintiffs' tort claims were revived under the ASA which had not yet been enacted at the time they signed the EVCP Agreement, they entered into covenants not to sue with respect to those claims.

The EVCP Covenants related to Defendants in their personal capacity are not supported by consideration and are non-binding.

The EVCP Covenants include covenants with the Estate and its beneficiaries (the "Estate Covenants"), covenants with certain individuals related to the Estate in their official capacity (the "Officials Covenants"), and allegedly covenants with Defendants in their personal capacity (the "Defendant Covenants"). In the EVCP Agreement, the Estate provided consideration for itself, its beneficiaries, and others tied to the Estate in their *official* capacity but did not pay consideration to support covenants for the Defendants in their personal capacity. Indeed, in describing all parties supported by the Estate's consideration in settlement, the EVCP unambiguously describes parties with respect to their professional roles in relationship to the Estate:

> Co-Executors of the Estate of Jeffrey E. Epstein (the "Epstein Estate"), the Co-Trustees of The 1953 Trust, the Epstein Estate, any entities owned or controlled in whole or part by the Epstein Estate (the "Epstein Entities") and their respective current and former principals, officers, directors, stockholders, managers, members, partners, limited partners, trustees, beneficiaries, administrators, agents, employees, attorneys, predecessors, successors, assigns and affiliates, and any entities or individuals who are or have even been engaged by (whether as independent contractors or otherwise), employed by, worked in any capacity for, or provided any services to Mr. Epstein, the Epstein Entities or the Epstein Estate.

EVCP Agreement at 1–2. It is clear from the text of the EVCP Agreement that the Estate did not pay consideration to support the Defendant Covenants. Accordingly, the Defendant Covenants are non-binding.

Even if the text of the EVCP Agreement were unclear, the consideration paid by the Estate cannot be interpreted as supporting the Defendant Covenants because to do so would mean the Estate violated its fiduciary duty to its beneficiaries.

A trust has a fiduciary duty to act only in its beneficiaries' best interest. "'The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty. . . . It is the duty of a trustee to administer the trust solely in the interest of the beneficiaries.'" *Sacerdote*

*v. New York Univ.*, 328 F. Supp. 3d 273, 283 (S.D.N.Y. 2018) (citing *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000)), *aff'd*, 9 F.4th 95 (2d Cir. 2021); *Benedict v. Amaducci*, 1993 WL 87937, at *4 (S.D.N.Y. Mar. 22, 1993) ("imposition of duty of undivided loyalty permits trustees to be granted broad discretion in managing trust affairs because of faith that they will always act in beneficiary's best interests"). Here, the Estate had a duty of loyalty to its beneficiaries to act only in their best interest. Paying consideration to support covenants not to sue the co-executors in their personal capacity related to conduct for which the Estate would not be liable cannot be in the beneficiaries' best interest. So any consideration paid by the Estate cannot be interpreted as consideration to support the Defendant Covenants.

Without valid consideration, the EVCP Covenants do not protect Defendants in their personal capacity.

### C.    The EVCP Agreement should not be interpreted to protect Defendants in their individual capacity.

Even if the EVCP Agreement is interpreted to only include releases rather than both releases and covenants not to sue, those releases would not shield Defendants from liability under New York law.

"It is [] a firm principle of New York law that it is less likely that claims are covered by a general release if they are unknown at the time of the release." *In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 72 (Bankr. S.D.N.Y. 2009) (citing *In re Clinton Street Food Corp.*, 254 B.R. 523, 535 (Bankr. S.D.N.Y. 2000)). "A release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is 'fairly and knowingly made.'" *Wade Park*, 589 F. Supp. 3d at 363. The requirement of an 'agreement fairly and knowingly made' covers situations where because "the releasor has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to

allow the release to serve as a bar to the claim of the injured party." *Huang v. Llerena-Salazar*, 203 N.Y.S.3d 341, 344 (2023); *see also In re Actrade Fin. Techs., Ltd*., 424 B.R. at 69 ("[a]lthough the effect of a general release, in the absence of fraud or mutual mistake, cannot be limited or curtailed . . . its meaning and coverage necessarily depend, as in the case of contracts generally, upon the controversy being settled and upon the purpose for which the release was actually given. Certainly, a release may not be read to cover matters which the parties did not desire or intend to dispose of.") (quoting *Cahill v. Regan*, 5 N.Y.2d 292, 299 (1959)).

In *Clinton Street Food Corp*., the court, applying New York law, dealt with a release that was "[c]oncededly . . . quite broad, and look[ed] like it should embrace the Trustee's claims against [one of the defendants] . . . ." 254 B.R. at 534. However, even though the "final WHEREAS clause in the stipulation indicates the intention to enter into a global release of all claims, not just the claims asserted in the pending lawsuit," the court concluded:

> The general release was given in the context of the settlement of a specific and entirely unrelated action . . . Nothing in the stipulation or the record of the earlier lawsuit focuses on the specific issue in this litigation . . . This is not surprising. *The pending claims were unknown to the trustee* and hence not the subject of a dispute at the time, making it less likely they are covered by the release. In addition, it does not appear that the parties bargained over the auction claims, or that the estate received any additional consideration for releasing such potentially valuable claims.

*Id*. at 534–35 (emphasis added; citation omitted); *see also Lucent Technologies, Inc. v. Gateway, Inc*., 470 F. Supp. 2d 1195, 1202 (S.D. Cal. 2007) (applying New York law, court concluded that despite the facially broad language, the remaining portions of the agreement established an unambiguous context, that the parties were concerned only with a dispute over maintenance service overpayments, and that the release could not be construed to cover the patent infringement claims later at issue). Similarly, here, while the EVCP Agreement specifically contemplated the release of claims against the Estate and Defendants as its executors, nothing in the context of the

Agreement suggests that it was intended to cover Plaintiffs' claims against Defendants personally and individually as instrumentalities in the Epstein Enterprise while he was alive. Indeed, these claims were unknown to Plaintiffs at the time, as Plaintiffs were not aware of their personal roles in the Epstein Enterprise until after the EVCP Agreement was signed. Thus, the EVCP Agreement and any releases it purports to contain should not be interpreted to apply to Defendants' personal role in the Epstein Enterprise.

### D. Defendants' motion is procedurally improper at this stage.

#### 1. Dismissing allegations based on a release or covenant not to sue would be improper at this stage.

The Court need not decide at this stage whether the EVCP Agreement releases any of Bensky's claims, as the applicability of a release is a fact-specific inquiry, which is improper to determine at this stage of the litigation. On a motion to dismiss, the court considers: "(1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and effect the complaint relies heavily, *i.e.*, documents that are 'integral' to the complaint." *Hoffman v. Ighodaro*, 2016 WL 6093236, at *9 (S.D.N.Y. Sept. 28, 2016), *report and recommendation adopted*, 2016 WL 6092706 (S.D.N.Y. Oct. 18, 2016). Here, "[t]he alleged release falls under none of these categories." *Id.* The Complaint "makes no reference whatsoever to the releases purportedly signed by plaintiffs." *Watson v. Consol. Edison of N.Y.*, 594 F. Supp. 2d 399, 410 (S.D.N.Y. 2009). "In order for the Court to consider the releases on defendants' motion to dismiss, plaintiffs must have relied on the terms and effect of such documents when drafting the Complaint. Here, in the absence of such reliance and with no discussion of the releases in the Complaint, defendants' arguments in this respect are premature, and defendants' motion to dismiss in this respect must therefore be denied." *Id.*

## 2.    Defendants' motion to strike is procedurally premature.

Defendants assert that the Court should strike the class allegations[3] but their motion to strike the class allegations is premature. Rule 12(f) motions to strike are generally disfavored, and "should be granted only when there is a strong reason for doing so." *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *4 (S.D.N.Y. June 28, 2010). In the context of class allegations, a motion to strike is particularly disfavored because it would "require[] a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 404 (W.D.N.Y. 2010) (cleaned up). Thus, a party moving to strike "bears a heavy burden" and must show "(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the issues in the case; and (3) permitting the allegations to stand would result in prejudice to the movant." *Tucker v. Am. Int'l Grp.*, 936 F. Supp. 2d 1, 15–16 (D. Conn. 2013). The court "should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Defendants have not met this heavy burden, nor do they attempt to.

Defendants' assertion that similar motions are "on occasion" granted is disingenuous and vastly distorts the long line of caselaw explaining that "motions to strike class allegations are *often* denied as premature." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015) (emphasis added). In contrast to Defendants' proposition, "district courts in this Circuit have *frequently* found that a determination of whether the Rule 23 requirements are met is more properly

---

[3] Plaintiffs fully expect to certify a class for the reasons set forth at length in Judge Rakoff's opinion granting class certification in the Epstein victims' class against JPMorgan. *Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773 (S.D.N.Y. June 12, 2023).

deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination." *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) (emphasis added). In fact, this argument is belied by Defendants' own authority. *See Gitman v. Pearson Educ.*, 2015 WL 5122564, at *3 (S.D.N.Y. Aug. 31, 2015) (finding Defendants motion to strike procedurally premature because "at [the motion to dismiss] stage, there [was] nothing in Plaintiffs' Complaint to suggest that a class could never be certified"); *see also Pozo v. BlueMercury, Inc.*, 2023 WL 4980217, at *8 (S.D.N.Y. Aug. 3, 2023) (denying "Defendant's motion to strike Plaintiff's class allegations" as procedurally premature); *Shaw v. Hornblower Cruises & Events, LLC*, 2022 WL 16748584, at *9 (S.D.N.Y. Nov. 7, 2022) (similar).

Because the Defendants have not "demonstrated that, as a matter of law, the putative class is unascertainable," Defendants' arguments to strike the class allegations are premature, and the Court should decline to "take the disfavored action of striking the class allegations." *Belsito Commc'ns, Inc. v. Dell, Inc.*, 2013 WL 4860585, at *11 (S.D.N.Y. Sept. 12, 2013).

## II.     The Complaint Sufficiently States Claims for All Counts.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not contain "detailed factual allegations," but must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

### A.     Plaintiffs' Complaint states a claim for aiding, abetting, or facilitating battery (Count I).

To allege a cause of action for aiding and abetting an assault and battery, the plaintiff must allege: "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant's

knowing and substantial assistance in the principal violation." *Scollo ex rel. Scollo v. Nunez*, 847 N.Y.S.2d 899 (Sup. Ct. 2007), *aff'd*, 60 A.D.3d 840 (N.Y. App. Div. 2009). Plaintiffs have adequately alleged each element: (1) they were sexually abused by Epstein for at least a year, amounting to battery (Compl. ¶¶ 75, 77, 80); (2) Defendants were aware of their role in Epstein's overall illegal activity, his sex-trafficking venture (*id.* ¶¶ 8, 93, 117, 154, 155; *see also* Section II.C); and (3) Plaintiffs provided knowing and substantial assistance through their direct participation in and facilitation of Epstein's sex-trafficking venture, pursuant to which Plaintiffs were battered for years (Compl. ¶¶ 7, 135, 141, 143; *see also* Section II.C). *See, e.g.*, *Maurizi v. Callaghan*, 2022 WL 1446500, at *14 (W.D.N.Y. Feb. 25, 2022), *report and recommendation adopted*, 2022 WL 1444182 (W.D.N.Y. May 5, 2022) (denying motion to dismiss aiding and abetting claims where complaint alleged defendant knew coach was engaging in sexual activity with skaters, yet endorsed him for a coaching position where abuse continued).

For example, in *Freeman v. Jacobson*, upon which Defendants rely, the plaintiff properly alleged that the defendants "knew of and substantially aided" a defendant in "assault and battery" when they offered a "reasonable" "inference" which "evidence[d]" the defendants' knowledge of the plan to assault and batter the plaintiff. 2021 WL 3604754, at *10 (S.D.N.Y. Aug. 13, 2021). And even *Scollo*, which Defendants point to, declined to dismiss a plaintiff's complaint for aiding and abetting battery when "there [were] at least triable questions of fact presented by plaintiffs that defendants . . . were acting in concert with" the wrongdoers. 847 N.Y.S.2d at 899.

Here, plaintiffs offer a reasonable inference evidencing Defendants' knowledge of Epstein's plan to batter Plaintiffs. Compl. ¶¶ 8, 93, 117, 154, 155. And the caselaw Defendants offer to the contrary is distinguishable. *Shea v. Cornell Univ.*—which was decided at the summary judgment stage rather than the motion-to-dismiss stage—is inapplicable. 596 N.Y.S.2d 502, 504

(1993). There, the court dismissed a plaintiff's aiding and abetting assault claim when there was no evidence in the record of an overt act. In contrast, the conduct that the Complaint accuses Defendants can plausibly be interpreted as "intentionally or deliberately directed at causing the assault." *Id.*; *see also Steinberg v. Goldstein*, 274 N.Y.S.2d 46, 48 (Sup. Ct. 1966), *aff'd*, 279 N.Y.S.2d 240 (1967), is also inapplicable (dismissal warranted when plaintiffs offered no evidence of "encouragement of [the assault] by word or sign"), as is *Williams ex rel. Williams v. Pro. Sec. Bureau Ltd.*, 803 N.Y.S.2d 21 (table), at *4 (Civ. Ct. 2005) (at summary judgment stage, no evidence that defendants were complicit in "creating a climate of imminent threat or fear that the offensive action would be effectuated").

The Complaint directly alleges multiple acts "by either Defendant that would have encouraged Epstein to commit acts of battery." *See* Compl. ¶¶ 126–164 (detailing various ways Defendants assisted Epstein by providing him reliable access to resources and cash, evading law enforcement, facilitating payments, controlling his corporate entities, arranging sham marriages, and concealing Epstein's venture after his death).

**B.    Plaintiffs' Complaint states a claim for intentional infliction of emotional distress (Count II).**

Plaintiffs have sufficiently pled their IIED claim under New York law. "The elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct; (2) the intent to cause, or the disregard of a substantial likelihood of causing, severe emotional distress; (3) causation; and (4) severe emotional distress." *Eskridge v. Diocese of Brooklyn*, 210 A.D.3d 1056, 1057–58 (N.Y. App. Div. 2022). Defendants' conduct in facilitating and concealing Epstein's sex-trafficking was extreme and outrageous, causing Plaintiffs severe emotional distress that continues to date. Defendants' arguments to the contrary are wrong.

20

First, Defendants argue that Plaintiffs' IIED claim is duplicative of their negligence counts. But plaintiffs "may plead claims that provide alternative bases for relief," and "a claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other." *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 325 (S.D.N.Y. 2019); *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 452 (S.D.N.Y. 2022) (because "any risk of duplicative recovery may be resolved by jury instructions . . . battery and IIED claims routinely proceed in tandem under New York law").

Second, Defendants insist that their conduct was not "extreme" or "outrageous" enough to result in liability for an IIED claim. Not so. The extreme and outrageous element of an intentional infliction of emotional distress claim is satisfied where a plaintiff alleges a continuous nature of abusive conduct. *Canosa v. Ziff*, 2019 WL 498865, at *8 (S.D.N.Y. Jan. 28, 2019); *Turner v. Manhattan Bowery Mgmt. Corp.*, 28 N.Y.S.3d 651, at *10 (Sup. Ct. 2015) (while each individual act committed by defendants was not actionable, "when aggregated over time, the continuous nature of the conduct may make it sufficiently outrageous"); *Bonner v. Guccione*, 916 F. Supp. 271, 276–78 (S.D.N.Y. 1996) (same). For example, in *Canosa*, the court found an actionable IIED claim based on plaintiff's allegations of a "course of intimidating and abusive conduct by [the defendant] spanning August 2010 to August 2017." 2019 WL 498865, at *8. Just as in *Canosa*, here Defendants' actions, even if not actionable alone, in the aggregate present a claim for IIED. *See also Eskridge*, 180 N.Y.S.3d at 181 (denying to dismiss a Plaintiff's IIED claim when "the defendants had knowledge of the priest's sexual abuse of the plaintiff and other children, yet concealed the abuse and permitted it to continue," because such conduct was extreme and outrageous).

Third, Defendants argue that Plaintiffs cannot prove that Defendants' conduct was directed at Plaintiffs specifically. But such an inquiry is improper at the motion-to-dismiss stage, where the court "must accept as true all of the [factual] allegations contained in [the] complaint." *Kashef v. BNP Paribas S.A.*, 2021 WL 603290, at *3 (S.D.N.Y. Feb. 16, 2021). Accepting all factual allegations as true, the Complaint plainly does plead that Defendants' conduct was directed at Plaintiffs. *See* Compl. ¶¶ 210, 252.

### C.    Plaintiffs' Complaint states a claim under 18 U.S.C. § 1595 for knowingly benefitting from participation in a sex-trafficking venture (Count IV).

The elements of a beneficiary liability claim under Section 1591(a) are that the defendant: (1) "knowingly benefitted," (2) "from participation in a commercial sex trafficking venture," (3) while knowing (or in reckless disregard of the fact) that means of force, fraud or coercion would be used to cause the trafficked person to engage in a commercial sex act." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523–24 (S.D.N.Y. 2018). Plaintiffs have adequately pled each of these elements. *See, e.g.*, Compl. ¶ 185.

Defendants first assert that Bensky and other Class Members' claims (but not Doe's) are time-barred. Timeliness is an affirmative defense, and Defendants bear the burden of proof. *See Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 301 (S.D.N.Y. 2014). A motion to dismiss based on timeliness should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989); *see also Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999) ("dismissal is appropriate only if a complaint clearly shows the claim is out of time").

The facts in the Complaint support arguments for equitable tolling and equitable estoppel, which render dismissal in advance of discovery improper. *See Hongxia Wang v. Enlander*, 2018 WL 1276854, at *4 (S.D.N.Y. Mar. 6, 2018) ("Given the possibility of equitable tolling, a TVPRA

claim is subject to dismissal based on a statute of limitations defense only if the complaint makes clear that the alleged wrongful conduct arose more than ten years before the claim was filed, and that the plaintiff has not been pursuing her rights diligently, and that no extraordinary circumstance stood in her way."); *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317 (E.D.N.Y. 2012) (denying motion to dismiss in sex abuse case where plaintiff raised equitable estoppel based on misrepresentations about abuser's "good standing" by the employer-school).

Bensky's allegations, which will be proven true in discovery, show that her claims *are* timely pursuant to equitable tolling and equitable estoppel. Tolling is warranted here because Bensky and the Class have been "(1) pursuing [their] rights diligently, and (2) that some extraordinary circumstance stood in [their] way." *Watson v. United States*, 865 F.3d 123, 132 (2d Cir. 2017). Estoppel is warranted because Plaintiffs were "induced by fraud, misrepresentations or deception to refrain from filing a timely action," *Zumpano v. Quinn*, 6 N.Y.3d 666, 673 (2006), and they "reasonably relied on that misrepresentation to [their] detriment," *Wall v. Constr. & Gen. Laborers' Union, Local 230*, 224 F.3d 168, 176 (2d Cir. 2000) (quoting *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)).

Defendants cannot show that extraordinary circumstances did not stand in the way of Plaintiffs filing this action. *Hongxia Wang*, 2018 WL 1276854, at *4 (court found it plausible that "extraordinary circumstances" prevented the plaintiff from asserting her trafficking claims given she was "the victim of coercion, manipulation, threats, physical assault and monitoring" until August 2011). The Complaint alleges that Epstein threatened and manipulated Bensky, including threatening that "her mother would not get the medical treatment she needed for her brain tumor." Compl. ¶¶ 76, 98, 101. Epstein's victims were "coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding." *Id.* ¶ 117. Class Members wanted to

escape from the Epstein Enterprise, yet Epstein and his supporting team of co-conspirators used fraud, force, and coercion to cause them to remain compliant in fulfilling Epstein's sexual demands. *Id.* ¶¶ 95, 119, 120.

As in *Zimmerman*, Defendants' motion should be denied because Plaintiffs have alleged facts to show Defendants made misrepresentations that prevented them from filing a timely action. *Id.* ¶ 164 (detailing Defendants' denials of involvement in the Epstein Enterprise). Epstein and his co-conspirators constantly reminded Class Members how powerful and important Epstein was just like the school touted the abuser-coach as being in "good standing" in *Zimmerman*. 888 F. Supp. 2d at 340–41; *see also* Compl. ¶ 115. Plaintiffs were frequently told "Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise." *Id.* ¶ 116.

Defendants also argue that the Complaint fails to allege that Defendants had any awareness of Epstein's sex-trafficking venture in particular. But in contrast, "Plaintiffs have pled sufficient facts to support their allegations that [Defendants] had such knowledge of Jeffrey Epstein's sex-trafficking venture, either directly or by recklessly disregarding what was plainly to be seen." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 407 (S.D.N.Y. 2023) ("*Deutsche Bank/JPMorgan*") (emphasis added). Just as the court in *Deutsche Bank/JPMorgan* explained, "[p]laintiffs allege that [Defendants were] aware of Epstein's convictions for sex crimes and ignored numerous red flags associated with Epstein's accounts, which all suggested that Jeffrey Epstein operated a sex-trafficking venture." *Id.* Judge Rakoff concluded that "these allegations alone are sufficient to support plaintiffs' allegations that [Defendants] knew or recklessly disregarded that Epstein operated such a venture." So too here. Even Defendants concede, as they must, that the complaint shows "a pattern of transferring Epstein's money to women" and

"withdrawing cash from Epstein's accounts on Epstein's behalf while seeking to avoid reporting requirements." Mot. at 24. Defendants cannot plead ignorance to avoid liability.

**D.    Plaintiffs' Complaint states a claim for obstruction of the TVPA in violation of 18 U.S.C. § 1591(d) (Count V).**

Defendants argue that an obstruction count is not proper unless Defendants knew about an active government investigation. Mot. at 25. "The TVPA forbids either benefiting from, or obstructing the enforcement of the TVPA with respect to, a sex-trafficking venture." *Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *9 (S.D.N.Y. June 12, 2023). "For a defendant to be liable for obstructing the enforcement of the TVPA, it must (1) know of an effort to enforce the TVPA and (2) intentionally obstruct or attempt to obstruct that enforcement effort." *Deutsche Bank/JPMorgan*, 671 F. Supp. 3d at 409.

Defendants admit that Plaintiffs' Complaint "shows at most a pattern of transferring Epstein's money to women" and "withdrawing cash from Epstein's accounts on Epstein's behalf while seeking to avoid reporting requirements." Mot. at 24. Just as the obstruction claim in *Deutsche Bank/JPMorgan* survived a motion to dismiss when plaintiffs claimed defendants "intentionally failed to file suspicious activity reports in order to frustrate such investigations," here Defendants' actions to avoid reporting requirements similarly obstruct government efforts to enforce the TVPA. The Court should "den[y] defendants' motions to dismiss plaintiffs' obstruction claims." *Deutsche Bank/JPMorgan*, 671 F. Supp. 3d at 409.

**E.    Plaintiffs' Complaint states a claim for conspiracy to violate the TVPA (Count VI).**

Engaging in a conspiracy to violate the TVPA is actionable. 18 U.S.C. § 1594 ("Whoever conspires with another to violate section 1591" is guilty of an offense). Plaintiffs have adequately alleged that Defendants conspired with Epstein to violate section 1591(a)(2). Epstein was engaged in a criminal, sex-trafficking venture (which Defendants do not dispute), and Defendants

25

knowingly and intentionally agreed to provide Epstein with the means to effectuate and continue that criminal venture with the accounts, cash, and other tools it provided him. Compl. ¶¶ 126–164 (detailing the various ways that Defendants assisted Epstein by providing him reliable access to resources and cash, evading law enforcement, facilitating payment, controlling his corporate entities, arranging sham marriages, and concealing Epstein's venture after his death). Such allegations are sufficient to state a claim for conspiracy under the TVPA. *See Fleites v. MindGeek S.A.R.L.*, 2022 WL 4456077, at *10 (C.D. Cal. 2022) (plaintiff adequately alleged TVPA conspiracy claim based on "Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos, like those featuring Plaintiff").

Defendants argue that they had no knowledge of Epstein's crimes, which absolves them of any liability. Mot. at 26. But whether Defendants knew the extent of Epstein's sex-trafficking ring is a factual dispute that is improper to decide at the motion-to-dismiss stage. And regardless, when a party is "placed . . . at the center of the illegal activities . . . [which] gave him more than ample reason to know the dimensions of the overall conspiracy alleged," an agreement is inferred. *United States v. Alessi*, 638 F.2d 466, 473–74 (2d Cir. 1980). "The agreement needed to support a charge of conspiracy need not be explicit but may be tacit." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989); *see* Compl. ¶ 283.

The 2023 Amendment validly covers the contours of Defendants' conduct. Defendants make much of the language of *Landgraf*, which Defendants contend supports their argument against retroactivity. Mot. at 26 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). But the 2023 TVPA Amendment was a clarification to the TVPA, rather than a substantive change in the law. Therefore, *Landgraf* does *not* apply in these circumstances. In *Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 590–91 (S.D.N.Y. 2012), the Southern District of New York collected

cases and adopted a framework guiding a court's inquiry into amendments and clarifications: though "there is no bright-line test" for determining whether an amendment clarifies existing law, decisions across the country point to several factors for a court to consider: (1) whether the enacting body declared that it was clarifying a prior enactment; (2) whether a conflict or ambiguity existed prior to the amendment; and (3) whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history. *See also Middleton v. City of Chicago*, 578 F.3d 655, 663–65 (7th Cir. 2009); *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 506–08 (3d Cir. 2008) (citing decisions "finding retroactivity to be a non-issue with respect to new laws that clarify existing law"). Other courts in the Second Circuit have followed these guidelines.[4]

The 2023 Amendment to the TVPA is another example of a clarification, and fits squarely into the three-factor test adopted by the *Leshinsky* court. First, the name of the Section of the Bill that amended 1595(a) is clearly titled "Technical and Clarifying Update to Civil Remedy." *See* Abolish Trafficking Reauthorization Act of 2022, S. 3946, 117th Cong. § 102 (2023). *Leshinsky* explained that "it was most significant that Congress formally declared in the titles of the relevant subsections . . . that the amendments . . . were 'clarifying' and 'technical.'" 873 F. Supp. 2d at 592 (cleaned up) (citing cases). Such is the case here; six members of Congress even submitted an amicus brief urging the reversal of a district court opinion that refused to reopen *Ratha* in light of the clarifying amendment. *Ratha v. Phatthana Seafood Co*., 35 F.4th 1159 (9th Cir. 2022).[5]

---

[4] *See, e.g., Trusz v. UBS Realty*, 2016 WL 1559563 at *5 (D. Conn. Apr. 18, 2016); *Directory Assistants, Inc. v. Healthmart USA, LLC*, 2013 WL 1748083 at *2 (D. Conn. Apr. 23, 2013).

[5] The amicus noted that the members of Congress, including Amici Rep. Nadler who "shepherded the passage" of the bill containing the amendment, chose the title of the amendment "deliberately… because members of Congress were aware that federal courts have found this terminology to be the most convincing evidence of the clarifying nature of an amendment." (emphasis added). *See* Brief of Members of Congress Representative Nadler, Et Al., as Amici Curiae in Support of Plaintiffs-Appellants 13, Case No. 2:16-cv-04271-JFW ("Amici Curiae Brief").

As to the second factor, the text of the law was ambiguous before the 2023 Amendment; while the *Ratha* Court thought that an "attempt" to benefit could not satisfy a "knowingly benefit" requirement, *see Ratha*, 35 F.4th at 1176, two other circuit courts and members of Congress believed that the "broad civil liability for forced labor victims [created by the TVPRA] is coextensive with criminal liability under the TVPRA[.]" *See* Amici Curiae Brief.[6]

And the final factor, whether the 2023 Amendment is consistent with a reasonable interpretation of a prior enactment and its legislative history, points to a clarification rather than a substantive change. Defendants point to the language of *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012). *Velez* held that the 2003 Amendment to the TVPA was not retroactive, but until the 2003 amendment, the TVPA only offered *criminal* liability; so retroactively applying the 2003 amendment would impose significant increased liability. But because the TVPA does *now* impose civil liability, the 2023 Amendment only clarifies its reach, and does not "represent[] a significant expansion of civil liability." *Velez*, 693 F.3d at 325. *Deutsche Bank/JPMorgan*, 671 F. Supp. 3d at 405 (quoting *Doe v. Siddig*, 810 F. Supp. 2d 127, 135 (D.D.C. 2011)).

**F.    Plaintiffs' Complaint states a claim under the Victims of Gender Motivated Violence Protection Law (Count VII).**

To state a claim for a violation of the GMVPL, a plaintiff must plead that "(1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) presenting a serious risk of

---

[6] The out-of-circuit case Defendants rely on, *Ratha*, 35 F.4th at 1176, is of course not binding on this Court. It was also erroneously decided. Commentators, noting their concerns with *Ratha* and its impact on liability under the TVPA, even explained that "[t]he Ninth Circuit's holding that civil liability under 18 U.S.C. § 1595 did not extend to an 'attempt' to knowingly benefit was the first of its kind." *See* Maggie Lee and Martina E. Vandenberg, *Congress Amends the TVPRA to Correct Ninth Circuit's Erroneous Ruling in Ratha, Transactional Litigation Blog* (Aug. 1, 2023), https://tlblog.org/congress-amends-the-tvpra-to-correct-ninth-circuits-erroneous-ruling-in-ratha/. The Ninth Circuit's "narrow reading" in *Ratha* of the TVPA puts the legislation "directly at odds" with the Tariff Act and is contrary to "Congress's comprehensive accountability strategy to combat human trafficking." *Id*.

physical injury; (3) that was perpetrated because of plaintiff's gender; (4) in part because of animus against plaintiff's gender; and (5) resulted in injury." *Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at *25 (S.D.N.Y. Sept. 9, 2021), *on reconsideration in part*, 2022 WL 4579121 (S.D.N.Y. Sept. 29, 2022).

First, Defendants are wrong that the GMVPL does not apply retroactively to Plaintiffs conduct that occurred prior to 2022. This argument ignores that 2-year "lookback" window that is in effect until March 1, 2025. *See* N.Y. Code § 10-1105. Plaintiffs' GMVPL claims are therefore timely, since the Complaint was filed in February 2024.

Second, Defendants argue that Plaintiffs failed to plead that Defendants actions constituted a crime of violence. A crime of violence is "'an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law." *Breest v. Haggis*, 115 N.Y.S.3d 322, 325 (2019). Conduct that presents "a serious risk of physical injury to another," is actionable, "whether or not those acts actually resulted in criminal charges, prosecution or conviction.'" *Id.* Defendants argue that their facilitation of the Epstein Enterprise did not pose a serious risk of physical injury to Plaintiffs. It is clear Defendants' actions—by facilitating Epstein's access to women such as Plaintiffs—posed a serious risk of physical harm to those women, and Plaintiffs allege that Defendants committed violent crimes constituting misdemeanors or felonies. *See* Compl. ¶ 305.

Plaintiffs properly pled gender motivated animus, as Defendants' own authority acknowledges. Defendants ignore the fact that in *Breest*, the court found that "even under [the malice and ill will] definition[,] plaintiff's claims in the amended complaint that she was raped and sexually assaulted are sufficient to allege animus on the basis of gender." *Breest*, 115 N.Y.S.3d at 330. There, the plaintiff "need[ed] not allege any further evidence of gender-based animus,"

because "[t]hat the alleged rape and sexual assault was 'due, at least in part, to an animus based on the victim's gender' [was] sufficiently pleaded by the nature of the crimes alleged." *Id.* Defendants' own authority—*Eckhart v. Fox News Network*—even acknowledges this: there, a GMVPL claim by Fox News employee against Ed Henry survived. The court specifically highlighted the *Breest* opinion. *Eckhart*, 2021 WL 4124616, at \*25. It concluded that "regardless of whether the act of rape is sufficient . . . [t]he totality of [the victim's] allegations" were sufficient, since they included "not only the alleged sexual assaults [] but also numerous claims that Henry acted inappropriate with and used degrading language toward other women." *Id.* The Court must accept the allegations of gender motivated animus as true on a motion to dismiss. *See Walker v. Triborough Bridge & Tunnel Auth.*, 198 N.Y.S.3d 46, 49 (2023).

## **CONCLUSION**

The Court should deny Defendants' motion to dismiss in all respects.[7]

---

[7] If necessary, Plaintiffs should be granted leave to amend their complaint. Courts should "freely give leave [to amend the complaint] when justice so requires." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012) (quoting Fed. R. Civ. P. 15(a)(2)). Defendants' futility argument is unavailing. "In addressing the proposed futility of an amendment, the proper inquiry is comparable to that required upon a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) . . . That is, the court must accept the facts alleged by the party seeking to amend as true and construe them in the light most favorable to that party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005). In *Absolute Activist*, the defendants—much like Defendants here—argued that the court lacked subject matter jurisdiction over plaintiffs' claims. The Second Circuit "direct[ed] the district court to grant the plaintiffs leave to amend their complaint in order to plead additional factual allegations to support their claim." 677 F.3d at 71. The panel explained that an amendment would not be futile, because of the plaintiffs' "representations made both in their briefs and at oral argument that additional facts could be alleged" to fix any jurisdictional defects. *Id.* To the extent that is the case here, any amendments would not be futile.

DATED:  May 23, 2024                              Respectfully submitted,

                                                  /s/ *Sigrid McCawley*
                                                  David Boies
                                                  Boies Schiller Flexner LLP
                                                  55 Hudson Yards
                                                  New York, NY
                                                  Telephone: (212) 446-2300
                                                  Facsimile:  (212) 446-2350
                                                  Email: dboies@bsfllp.com

                                                  Sigrid McCawley
                                                  Boies Schiller Flexner LLP
                                                  401 E. Las Olas Blvd. Suite 1200
                                                  Fort Lauderdale, FL 33316
                                                  Telephone: (954) 356-0011
                                                  Facsimile:  (954) 356-0022
                                                  Email: smccawley@bsfllp.com