UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIELLE BENSKY and JANE DOE 3, *individually and on behalf of all others similarly situated*,

        Plaintiffs,

-against-

DARREN K. INDYKE and RICHARD D. KAHN,

        Defendants.

---

JANE DOE 3,

        Plaintiff,

-against-

DARREN K. INDYKE and RICHARD D. KAHN,

        Defendants.

24-cv-1204 (AS)
24-cv-2192 (AS)

OPINION AND ORDER

---

ARUN SUBRAMANIAN, United States District Judge:

    Plaintiffs Danielle Bensky and Jane Doe 3 allege that they were sexually abused by Jeffrey Epstein, who died in federal custody in 2019. In the first of these two related cases, Plaintiffs bring claims for themselves and on behalf of a putative class of victims against Darren Indyke, Epstein's lawyer, and Richard Kahn, Epstein's accountant. The complaint alleges that "[n]o one, except perhaps Ghislaine Maxwell, was as essential and central to Epstein's operation as these Defendants." Compl. ¶ 4, Dkt. 1 (24-cv-1204). In Jane Doe 3's separate case, she brings claims for herself against Indyke and Kahn, but solely in their capacities as co-executors of Epstein's estate. (For convenience, the Court will refer to these claims as being against the estate.) In both cases, Defendants have moved to dismiss the complaints and strike various allegations. The Court held a hearing on the motions on June 26, 2024.

## BACKGROUND

    Bensky's and Jane Doe 3's stories are horrific. Epstein lured them in, sexually abused them, and then threatened their careers, lives, and families to keep them quiet. *See* ¶¶ 72–125. And Epstein repeated this pattern "hundreds, perhaps thousands, of times" in this district alone, creating a vast "sex-trafficking venture" involving countless "young women and girls." ¶¶ 1, 41.

Bensky and Jane Doe 3 allege that Indyke and Kahn were critical to the venture; they were its moneymen. First, Indyke and Kahn ensured that "Epstein always had reliable access to resources from banks—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations, and to pay off persons who might otherwise reveal what was going on." ¶ 126. For instance, in one four-year period at one bank, Indyke made nearly one hundred cash withdrawals ($7,500 each) from Epstein's accounts. ¶¶ 128–129. And this cash was the lifeblood of Epstein's sex-trafficking ring: "Newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money. Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on those promises of large cash payments to keep his victims quiet and complicit." ¶ 133.

Second, Indyke and Kahn kept the flow of funds under the radar. Some examples: Indyke probed a bank's policies to figure out how to withdraw funds without triggering alerts, and he structured withdrawals accordingly. ¶¶ 135–139. When one bank terminated Epstein's account due to widespread allegations of sex trafficking, Indyke got the bank to write Epstein a reference letter for the next bank, falsely claiming that there were no issues with Epstein's account. ¶ 140. Kahn provided false reasons for massive withdrawals from one of Epstein's accounts, ¶ 138 ("SENT TO A FRIEND FOR TUITION FOR SCHOOL"), and he withdrew a request to open an account in Epstein's charity's name when it would've required an external due-diligence report, ¶ 141.

Third, Indyke and Kahn "directed, approved, enabled, and justified millions of dollars in payments" to keep victims quiet—or available. ¶ 143–144. They had power of attorney or signatory authority over Epstein's accounts and used this authority to make millions of dollars in payments to Epstein's victims. ¶¶ 145–149. From one account, Indyke and Kahn "oversaw over $2,500,000 in payments … to dozens of women with Eastern European surnames, purportedly for hotel expenses, rent, and other expenses, and to an immigration lawyer who was involved in forced marriages arranged among Epstein's victims to secure victims' immigration status." ¶ 148; *see also* ¶¶ 161–162 (describing the sham marriages and Defendants' roles in them).

Fourth, Indyke and Kahn controlled Epstein's business affairs. They were officers of Epstein's many corporations (whose only purpose was, allegedly, to conceal Epstein's sex-trafficking enterprise) and had signatory authority for them, Kahn oversaw the accounting and tax reporting for "many entities affiliated with the Epstein sex-trafficking enterprise," and both Indyke and Kahn were "deeply involved in the financial activities of the Epstein-owned entities." ¶¶ 150–156. They were both beneficiaries of and signatories on the "Butterfly Trust," for instance, and they signed "checks [from the trust] totaling over $1,00,000 made out to young women." ¶ 159. And just two days before Epstein's death, he appointed Indyke and Kahn to be co-executors of his estate and revised his will to transfer all his assets to the "1953 Trust," which is administered by Indyke and Kahn. ¶¶ 157–158.

Bensky and Jane Doe 3 allege that Indyke and Kahn did all this while knowing that they were facilitating Epstein's sex-trafficking operation. They were at the houses and villas, had offices "in structures where Epstein housed and abused his victims," flew on the private plane, were in close

communication with Epstein, handled the payments, dealt with settlements, were keenly aware of the criminal cases against Epstein, and on and on. ¶¶ 165–184, 208. And they were, of course, being paid every step of the way. ¶¶ 185–188.

The class complaint against Indyke and Kahn brings claims on behalf of Bensky, Jane Doe 3, and all women who were sexually abused or trafficked by Epstein between January 1, 1995, and August 10, 2019. ¶ 189. The claims are (1) aiding, abetting, and facilitating battery; (2) intentional infliction of emotional distress; (3) negligence; (4) participation in a sex-trafficking venture in violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1591(a)(2), 1595; (5) obstruction of the TVPA's enforcement in violation of § 1591(d); (6) conspiracy to violate the TVPA in violation of §§ 1594(c), 1591, 1595; and (7) violations of the Victims of Gender-Motivated Violence Protection Law ("Victim-Protection Law"), N.Y.C. Admin. Code § 10-1104.

Jane Doe 3's separate complaint is against Epstein's estate. It alleges (1) sex trafficking in violation of the TVPA, 18 U.S.C. §§ 1591(a)(1), 1595; (2) participation in a sex-trafficking venture in violation of the TVPA, §§ 1591(a)(2), 1595; (3) violations of the Victim-Protection Law; (4) battery; and (5) intentional infliction of emotional distress.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint need not contain "detailed factual allegations," but it must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## DISCUSSION

### I. The class claims against Indyke and Kahn

#### A. Bensky's release bars her claims

Defendants first argue that Bensky's claims, as well as those of 135 other class members (but not Jane Doe 3), were released. Through the Epstein Victims' Compensation Program (EVCP), Epstein's estate paid these alleged victims "over $121 million" in exchange for releases. Dkt. 30 at 5. Defendants add that another 52 victims (again, not Jane Doe 3) released their claims in separate settlement agreements executed with the estate.

##### 1. The Court can consider Bensky's release on this motion

The Court must first decide whether it can consider these releases on a motion to dismiss. They are not mentioned in the complaint. But Defendants say they must be considered now because they present an issue of subject-matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court … may refer to evidence outside the pleadings," and "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists").

The Court disagrees that the releases present a jurisdictional issue. Defendants say a dispute is mooted when it is settled. Dkt. 30 at 8–9 (citing Edward H. Cooper, *Federal Practice and Procedure (Wright & Miller)* § 3533.2 (3d ed. 2024)). But the mootness lens makes sense only when the defendant has already provided all the relief that the plaintiff seeks, the plaintiff abandons her claims, or something else happens that "remove[s] this Court's ability to affect the rights of the parties" or "removes the necessary element of adversariness." *N.Y.C. Emps.' Ret. Sys. v. Dole Food Co.*, 969 F.2d 1430, 1434 (2d Cir. 1992); *Federal Practice and Procedure* § 3533.2.

In this case, by contrast, Bensky seeks relief beyond what was provided in her settlement. So the case isn't moot. Instead, whether her claims are barred by the settlement's release is a contract-law question that goes to the merits. *Cf. Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017) ("In civil litigation, a release is an affirmative defense to a plaintiff's claim for relief, not something the plaintiff must anticipate and negate in her pleading. In that light, the [agency's] jurisdiction should be determined by [the claims]; the settlement releasing [the] claims would figure as a defense to [the] complaint, it would not enter into the determination whether the [agency] has jurisdiction over [the] claims." (citations omitted)).

Yet even though the releases aren't jurisdictional, they can still be considered on a motion to dismiss under certain circumstances. A release is an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1); *Perry*, 582 U.S. at 435 n.9. So to consider it on a motion to dismiss, Defendants must show that "'the facts supporting the defense appear on the face of the complaint' and other materials a court may consider." *SitNet LLC v. Meta Platforms, Inc.*, 2024 WL 1178300, at *2 (S.D.N.Y. Mar. 19, 2024) (quoting *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 142 (2d Cir. 2023)). These materials include documents attached to, incorporated in, or integral to the complaint. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016). The Court may also take judicial notice of certain facts. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Here, Defendants have made the required showing as to Bensky's release. (The Court addresses the other class members' releases later.) True, Bensky's release is not in the complaint, attached to it, mentioned in it, or relied on by it. But Federal Rule of Evidence 201(b) permits courts to take judicial notice of an adjudicative fact "that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See also Hoffman v. Kraft Heinz Foods Co.*, 2023 WL 1824795, at *2 n.1 (S.D.N.Y. Feb. 7, 2023). And in two other Epstein-related cases, courts have held that releases were subject to judicial notice on a motion to dismiss. *See Doe I v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 401 (S.D.N.Y. 2023) (considering a release when "[t]he authenticity of the Settlement Agreement is not disputed, and neither party has suggested that extrinsic evidence would inform the Court's interpretation of it"); *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 438 (S.D.N.Y. 2022) (similar).

Here, too, Bensky doesn't dispute the release's authenticity or that she signed it. Nor does she argue that extrinsic evidence is needed to interpret the release's terms. She just says that the release, by its terms, shouldn't apply to the claims here. So, consistent with *Doe I* and *Giuffre*, the Court may consider the release on a motion to dismiss.

4

### 2. *The release covers Bensky's claims*

Bensky's release was executed in January 2021 by both Bensky and her counsel in this case. Dkt. 31-1 at 7. She released, among others, "the Co-Executors of the Estate of Jeffrey E. Epstein … and any entities or individuals who are or have ever been engaged by (whether as independent contractors or otherwise), employed by, worked in any capacity for, or provided any services to Mr. Epstein … or the Epstein Estate" from "any and all claims," "whether now existing, hereafter existing or revived in the future," "including without limitation any and all claims or causes of action that arise or may arise from or which otherwise concern acts of sexual abuse by Mr. Epstein." *Id*. at 1–2. The release goes on, making clear that it covers claims that "Releasor does not know or suspect to exist in her favor, which, if known by Releasor, would have materially affected her decision to enter into this General Release." *Id*.; *see also Centro Empresarial Compresa S.A. v. Am. Movlip S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011) (observing that "a release may encompass unknown claims … if the parties so intend and the agreement is 'fairly and knowingly made'").[1] To put it bluntly, the release is about as broad and categorical as it gets.

Nevertheless, Bensky says the release doesn't apply for a few reasons. *First*, she says that the release applies to Indyke and Kahn only in their capacities as co-executors of the Epstein estate, not in their individual capacities. Dkt. 60 at 15–16. This argument can't be squared with the release's plain text, which covers not only the "Co-Executors of the Estate of Jeffrey E. Epstein," but also "any entities or individuals who are or have ever been engaged by (whether as independent contractors or otherwise), employed by, worked in any capacity for, or provided any services to Mr. Epstein" and "any and all claims or causes of action that arise or may arise from or which otherwise concern acts of sexual abuse by Mr. Epstein." Dkt. 40-5 at 1–2. Without evidence or argument that the parties shared a narrower understanding, this language can't be read to apply solely to claims against Indyke and Kahn in their capacities as co-executors of the Epstein estate.

Perhaps recognizing this issue, Bensky points to cases allowing claims to proceed even when a release's text would seem to bar them. But in those cases, the settlements were unrelated to the claims at hand, raising ambiguities about the parties' intent. *See In re Clinton Street Food Corp.*, 254 B.R. 523, 534–35 (Bankr. S.D.N.Y. 2000) (general release resolving lien did not clearly cover collusion claim); *Lucent Techs., Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1195, 1202 (S.D. Cal. 2007) ("Gateway has provided no relationship between the telecommunications dispute and any disputes over patent infringement, other than some overlap in the time period in which the interactions took place.… It would be beyond the bounds of New York law to interpret the Release drafted to cover a telecommunications equipment billing dispute beyond its context to cover 'unknown' patent infringement claims.").

---

[1] While she does not directly argue that the release was not "fairly and knowingly made," Bensky cites one case in which a release was not enforced on these grounds. Dkt. 60 at 14–15 (citing *Huang v. Llerena-Salazar*, 203 N.Y.S.3d 341 (2d Dep't 2023)). However, *Huang* involved a plaintiff who had difficulty understanding English, was unrepresented at the time the release was executed, and may not have been told that the document he was signing was a release. *Id*. at 344. None of those circumstances applies here.

5

Here, Bensky's claims are squarely covered by the release. The settlement agreement's stated purpose was to address Bensky's claims that "she is a victim of sexual abuse by Jeffrey E. Epstein," and the release covers "any and all claims or causes of action that arise or may arise from or which otherwise concern acts of sexual abuse by Mr. Epstein" and anyone who "worked in any capacity for, or provided any services to Mr. Epstein." Dkt. 40-5 at 1–2. That is this case. Contrast this with the settlement considered in *Doe I*. There, in holding that a settlement agreement did not foreclose Epstein-related claims against JP Morgan and Deutsche Bank, the court relied on specific carve-out language applicable to financial institutions. *Doe I*, 671 F. Supp. 3d at 401–02. There is no such carve-out language here.

Finding little support in the text, Bensky turns to purpose. She argues that it would make no sense for the estate to release claims against Indyke and Kahn in their individual capacities. But as *Clinton Street* (one of Bensky's main cases) observed, releases often extend beyond the parties to the agreement for sound reasons: "If the principals … intended a global release, it would be reasonable to also release groups like officers, employees and agents who, if sued by the [plaintiff], might assert indemnity claims against their principal." 254 B.R. at 534. Here, counsel for Indyke and Kahn confirmed that the estate has indemnity obligations to them. Hr'g Tr. 5:8–25. And even if the estate had no direct liability, it might be subject to discovery and other ancillary proceedings that it would rather avoid. The only way to ensure global peace with Epstein's victims would be to make sure that no one in the estate's orbit could be sued. In sum, there's no reason to think that the agreement's terms are ambiguous or absurd.

*Second*, Bensky says the release doesn't apply to her revived claims. Some of her claims were time-barred at the time she signed the release, but they became timely in 2022 through the New York Adult Survivors Act and the amendments to the Victim-Protection Law. Dkt. 60 at 12. Bensky says these are future claims subject to a covenant not to sue, not existing claims subject to a release. That's not right. Unlike covenants not to sue as to *future conduct*, all of Bensky's claims here concern *prior conduct*. Legal changes don't transform them into future claims. *See M.M. v. Church of Our Lady of the Annunciation*, 162 N.Y.S.3d 598, 601 (3d Dep't 2022) ("[T]he fact that the statute of limitations was modified following the 2016 release to remove a bar to pursuing those claims does not alter that conclusion, as plaintiff may not reopen a voluntary settlement agreement to take advantage of a subsequent change in the law." (internal quotation marks omitted)); *J.M. v. Church of Our Lady of the Anunciation*, 160 N.Y.S.3d 674, 675 (3d Dep't 2022) (similar).

In any event, it's not clear why the distinction—release versus covenant not to sue—matters. Whatever the label, Bensky doesn't argue that she couldn't have voluntarily given up time-barred claims that might be revived in the future if she wanted to. And the agreement makes clear that she did give them up: it expressly releases claims "whether now existing, hereafter existing *or revived in the future* whatsoever in law." Dkt. 31-1 at 2 (emphasis added).

*Third*, Bensky says there was no consideration for the release (or covenant). But there's no dispute that there was consideration for the agreement as a whole, and there's no requirement that separate consideration be doled out for each promise in a contract. *Williston on Contracts* § 7:54

6

(4th ed. 2024) ("The formation of a contract with multiple clauses only requires consideration for the entire contract, and not for each individual clause; so long as the overall contract is supported by sufficient consideration, there is no requirement of consideration for each promise within the contract[.]"); *see also Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 561 (S.D.N.Y. 2009) ("[U]nder New York law, no consideration is required to make a written release binding." (citing N.Y. Gen. Oblig. Law § 15-303)). And Bensky's only authority for her no-consideration argument barely mentions consideration at all; it certainly doesn't stand for the proposition that New York law requires separate consideration for each release or covenant not to sue in a settlement agreement. *See West Chelsea Buildings, LLC v. United States*, 109 Fed. Cl. 5, 17 (2013).[2]

*Fourth*, Bensky argues that the release is unenforceable due to Defendants' fraud. She says "Defendants procured [her] … assent to the EVCP Agreement through fraudulent inducement in the form of public and private denials as to their role in the Epstein Enterprise." Dkt. 60 at 8. Specifically, Bensky points to Indyke and Kahn's pleadings in another suit, in which they publicly denied their involvement in Epstein's sexual abuse. Bensky says these denials were fraudulent.

Fraudulent inducement requires, among other things, that the defendant made a "material" false representation and that the plaintiff "reasonably relied" on it. *Wall v. CSX Transp. Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006). Bensky doesn't explain how she could satisfy these requirements. Nothing in the agreement suggests that it was based on Bensky's understanding that Indyke and Kahn had nothing to do with Epstein's abuse. And by its nature, a settlement compromises claims that could otherwise be brought against the released parties. If a settlement could be defeated solely on the basis that a released party was more liable than they previously let on, then there would be no point to settling cases at all—the releasor could just keep digging for dirt. *See VeroBlue Farms USA Inc. v. Canaccord Genuity LLC*, 2021 WL 3913555, at *7 (S.D.N.Y. Sept. 1, 2021) ("This argument fails under well-established New York law. Put simply, a signatory need not disclose all facts to make a release valid."), *aff'd*, 2022 WL 2133780 (2d Cir. June 14, 2022); *id.* (collecting cases).[3]

Bensky's release clearly covers this case, and there is no plausible basis to hold that the release unenforceable here. Defendants' release defense is established by the complaint and the materials the Court may consider on this motion, so Defendants' motion to dismiss Bensky's claims is granted.

---

[2] Bensky also says the consideration was for the release of claims against only the estate, "its beneficiaries, and others tied to the Estate in their *official* capacity." Dkt. 60 at 13. This is just a repeat of the argument that the release doesn't cover Indyke and Kahn in their individual capacities. For the reasons above, that argument also fails.

[3] If this case were to move forward, the fraud allegation would face other serious hurdles. Just to give one example, Bensky's complaint itself relies on a consent order issued by the New York Department of Financial Services in July 2020, more than six months before Bensky took her EVCP deal. The complaint relies on that order for several of the allegations concerning Defendants' culpable conduct. Nevertheless, Bensky and her counsel assert that they were duped into believing that Defendants were not involved.

### B. Defendants' motion to strike the class allegations is denied

Defendants next argue that the complaint's class allegations should be stricken. "Motions to strike are generally disfavored." *Mazzola v. Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012) (citation omitted); *see also Reynold v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015) ("Motions to strike under Rule 12(f) are rarely successful."). And "a motion to strike class allegations … is even more disfavored." *Mazzola*, 849 F. Supp. 2d at 410 (citation omitted). That is because it asks a "reviewing court to preemptively terminate the class aspects of … litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Id.* (citation omitted). So for this motion to succeed, Defendants must (1) "address[] issues separate and apart from the issues that will be decided on a class certification motion," *Blagman v. Apple Inc.*, 2013 WL 2181709, at *2–3 (S.D.N.Y. May 20, 2013) (internal quotation marks omitted), or (2) "demonstrate from the face of the complaint that it would be impossible to certify the alleged class regardless of the facts the plaintiffs may be able to obtain during discovery," *Reynold*, 136 F. Supp. 3d at 511 (cleaned up).

Here, Defendants rely on the second ground, arguing that "the Complaint cannot plausibly meet the requirements for class certification" because many of the class members have executed releases. Dkt. 30 at 14. The Court disagrees. To start, Defendants haven't explained how the Court could consider potential nonparty class members' releases at this stage. As noted, courts typically can't consider materials outside the pleadings on a motion to strike. *See Cadet v. All. Nursing Staffing of N.Y., Inc.*, 2023 WL 3872574, at *2 (S.D.N.Y. Jan. 6, 2023) (collecting cases); *Federal Practice & Procedure* § 1380 ("Matter outside the pleadings normally is not considered on a Rule 12(f) motion[.]"). The Court considers Bensky's release based on the "narrow exception for documents the authenticity of which are not disputed by the parties." *Giuffre*, 579 F. Supp. 3d at 438 n.34 (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)). That exception doesn't apply to potential class members not currently before the Court, and Defendants haven't pointed to another one.

And even if those who executed releases were excluded, Defendants haven't shown that it would be "impossible" to certify the class. On numerosity and superiority, the complaint alleges that the class involves "dozens of women, making joinder impracticable." Compl. ¶¶ 191; *see Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) ("A leading treatise concludes, based on prevailing precedent, that the difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable."). The Court takes this allegation as true, and there's no definitive proof that all these women executed binding releases. *See* Hr'g Tr. 37:16–21 (Defendants' counsel admitting that he doesn't know the size of the potential class after accounting for releases).

Defendants' typicality argument raises the same issue. They say releases present individualized issues, but that argument presumes that the class members executed releases. Nor is maintaining a class action impossible just because there are some individualized issues. That issue is better framed as one of predominance, which the Court will be better able to address at class certification

when all the cards are on the table. And even if the proposed class could not be certified in all respects, Rule 23 makes clear that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Among others, issues common to all class members are Indyke's and Kahn's knowledge and conduct during the class period.

The Court is prejudging none of this. Defendants "may or may not be able to establish affirmative defenses against only some of the putative class members based on the existence of [settlement] agreements, and this fact may bear on the appropriateness of Rule 23 class certification. But this speculative possibility does not warrant striking all of [Plaintiffs'] class allegations at this stage of the litigation pursuant to Rule 12(f)." *Sullivan v. Study.com LLC*, 2019 WL 1299966, at *7 (S.D.N.Y. Mar. 21, 2019). Here, the Court is not going to deviate from the normal course of permitting Jane Doe 3 to file an appropriate motion for class certification at the right time and with the right record.

### C. Jane Doe 3's aiding, abetting, or facilitating battery claim survives

Defendants argue that Jane Doe 3's claim for aiding, abetting, or facilitating battery should be dismissed for "failure to establish Defendants' knowledge of, or substantial assistance in any battery." Dkt. 30 at 18 (internal quotation marks omitted). Defendants rely mainly on *Doe I*, in which the court dismissed the battery claim. The court held that "actual knowledge" is required. *Doe I*, 671 F. Supp. 3d at 416. And it held that "substantial assistance … requires 'committing some overt act, either by words or conduct, in furtherance of the battery of Plaintiff,'" *id*. (quoting *McKiernan v. Vaccaro*, 91 N.Y.S.3d 478, 481 (2d Dep't 2019)), which in turn requires "intentional or deliberate acts directed at causing harm which would rise to the level of actionable conduct in relation to the subject assault," *id*. (quoting *Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 503 (3d Dep't 1993)). *Doe I* concluded that the complaint in that case failed to allege that the banks' acts were "specifically and intentionally directed at causing harm to the Jane Does." *Id*.

But banks are one thing; Epstein's closest advisors are another. At the threshold, knowledge is always tricky prior to discovery. As Defendants themselves acknowledge, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge," Dkt. 30 at 4 n.2; *see also* Fed. R. Civ. P. 9(b), because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987); *see also DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (noting that courts are typically "lenient in allowing scienter issues to withstand [motions to dismiss] based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact"); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir. 1979). Plaintiffs must simply allege facts that they claim give rise to an inference of knowledge. *See Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985); *Ross*, 607 F.2d at 558; *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021).

Here, the complaint plausibly alleges Defendants' knowledge and substantial assistance. According to the complaint, Defendants got the cash and paid the victims, kept the books, managed

9

the companies, hired immigration lawyers for sham marriages, were in direct contact with Epstein, were aware of his criminal and civil cases, dealt with the settlements, and were at the houses and on the plane, all while "Epstein was sexually abusing three to four young females every single day of his life." Compl. ¶ 173. These allegations permit the reasonable inference that Indyke and Kahn knew what was going on and had a hand in keeping it going. *See Maurizi v. Callaghan*, 2022 WL 1446500, at *14 (W.D.N.Y. Feb. 25, 2022) (sustaining an aiding-and-abetting-battery claim where defendants suspected sexual abuse but nevertheless recommended abuser for coaching position, noting that "[t]hese allegations, if proven at trial, would sufficiently establish Defendant BSC knew of Callaghan's alleged abuse, yet took no action to stop the abuse"), *report and recommendation adopted*, 2022 WL 1444182 (W.D.N.Y. May 5, 2022); *Wilson v. DiCaprio*, 717 N.Y.S.2d 174, 175 (1st Dep't 2000) (holding that allegations of a "close relationship" and a shout of encouragement were enough for an aiding-and-abetting-battery claim to survive a motion to dismiss); *Halberstam v. Welch*, 705 F.2d 472, 482 (D.C. Cir. 1983) (noting that "the contributing activity itself need not be so obviously nefarious as cheering a beating or prodding someone to drive recklessly" and that "the aiding-abetting action may also be more distant in time and location and still be substantial enough to create liability," and collecting cases).

### D. Jane Doe 3's intentional-infliction-of-emotional-distress claim survives

Defendants argue that Jane Doe 3's intentional-infliction-of-emotional-distress claim should be dismissed. New York's "tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). Defendants make three arguments: first, this claim is duplicative of Jane Doe 3's negligence claim; second, Defendants' alleged conduct is not sufficiently "extreme" and "outrageous"; and third, the alleged conduct was not "directed at" the victims, including Jane Doe 3. Dkt. 30 at 20–21.

As to the first argument, the intentional-infliction and negligence claims are supported by different facts and have different potential damages, so they aren't duplicative here. *See Novak v. Sisters of Heart of Mary*, 180 N.Y.S.3d 187, 190 (2d Dep't 2022) (holding, in a sexual-abuse case, that "this [intentional-infliction] cause of action is not duplicative of the cause of action seeking damages for negligence" and collecting cases); *Warner v. Druckier*, 697 N.Y.S.2d 610, 611 (1st Dep't 1999) ("We perceive no merit to defendants' contention that plaintiff's cause for intentional infliction of emotional distress is duplicative of other causes in his complaint or that the allegations of the cause would be more appropriately asserted under the rubric of a different tort."). And if they are duplicative, Defendants will suffer no prejudice since the negligence claim is proceeding anyway. *Cf. Giuffre*, 579 F. Supp. 3d at 452 ("As it stands, any risk of duplicative recovery may be resolved by jury instructions. It is for these reasons that battery and IIED claims routinely proceed in tandem under New York law.").

The second argument also fails. The conduct must "go beyond all possible bounds of decency … and [be] utterly intolerable in a civilized community." *Howell v. N.Y. Post Co.*, 612 N.E.2d 699,

702 (N.Y. 1993) (citation omitted). Covering up sexual abuse can, depending on the facts, be "sufficiently outrageous." *Eskridge v. Diocese of Brooklyn*, 180 N.Y.S.3d 179, 181 (2d Dep't 2022).

Nor does the third argument justify dismissal. Defendants say they didn't even know who Jane Doe 3 was, so their conduct could not have been "directed" to her. But the Court can't consider that assertion on a motion to dismiss. And as noted above, "intent … may be alleged generally," Fed. R. Civ. P. 9(b), and state-of-mind issues are rarely grounds for dismissal. Here, the complaint alleges that "Defendants intended to cause, and did cause … Jane Doe 3 … severe emotional distress." Compl. ¶ 218. Given the complaint's allegations of Defendants' extensive involvement in Epstein's sex-trafficking ring, that allegation is plausible.

### E. Jane Doe 3's TVPA claim survives

As noted at the outset, Jane Doe 3 pleaded three violations of the TVPA as three separate counts: participation in a sex-trafficking venture, obstruction of the TVPA's enforcement, and conspiracy to violate the TVPA. *See* Compl. ¶¶ 235–303. These violations line up with different sections of the criminal statute. *See* 18 U.S.C. §§ 1591, 1594. But the civil cause of action doesn't distinguish between different violations. It permits "a victim of a violation" of the TVPA to sue "the perpetrator (or whoever knowingly benefits … from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPA])." § 1595. So if the complaint plausibly alleges one violation, the § 1595 claim survives, and the Court need not address the others at this time. *Cf. Oneida Indian Nation v. County of Oneida*, 617 F.3d 114, 139 (2d Cir. 2010) ("[T]he essence of a cause of action is found in the facts alleged and proven by the plaintiff, not the particular legal theories articulated.").

Jane Doe 3 plausibly pleads that Indyke and Kahn knowingly benefited from participation in a sex-trafficking venture.[4] Defendants say she "fail[s] to plead that Defendants knew, or should have known, that Epstein was causing any person to engage in commercial sex acts by force, fraud, or coercion." Dkt. 30 at 22. This argument fails. As noted throughout, the complaint robustly alleges Defendants' intimate involvement with the sex-trafficking enterprise. Those allegations are more than enough to permit the reasonable inference that Defendants knew or should have known that Epstein was coercing women to engage in commercial sex acts.

### F. Jane Doe 3's claim under the Victim-Protection Law is dismissed

Defendants next move to dismiss Jane Doe 3's claim under the Victim-Protection Law. Before 2022, the Law provided a cause of action against a "party" who "commits" a "crime of violence" against the plaintiff. *See Eckhart v. Fox News Network LLC*, 2021 WL 4124616, at *25 (S.D.N.Y. Sep. 9, 2021) (to plead a crime of violence, "a plaintiff must plead that (1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) presenting a serious risk of physical injury;

---

[4] Defendants also say that Bensky's TVPA claims are procedurally barred for several reasons. Because Bensky's claims are dismissed on other grounds and Defendants don't direct those arguments at Jane Doe 3, the Court need not address these arguments.

11

(3) that was perpetrated because of plaintiff's gender; (4) in part because of animus against plaintiff's gender; and (5) resulted in injury").

But in 2022, the statute was expanded to cover parties who "direct[], enable[], participate[] in, or conspire[] in" a crime of violence. Jane Doe 3 says this expansion applies retroactively. Yet where "legislation 'would impair rights a party possessed when he [or she] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed,' a presumption against retroactivity applies." *Whitehead v. Pine Haven Operating LLC*, 201 N.Y.S.3d 697, 700 (3d Dep't 2023) (alteration in original) (quoting *Regina Metro. Co., LLC v. N.Y. State Div. of Hous. & Community Renewal*, 154 N.E.3d 972, 988 (N.Y. 2020)). Jane Doe 3's only response is that the 2022 amendments also revived time-barred claims. *See* N.Y.C. Admin Code § 10-1105. Yet reviving a time-barred claim is not the same as making new substantive obligations retroactive. Put differently, the former revives claims that were complete, while the latter makes a claim complete. Jane Doe 3 has pointed to nothing else to overcome the presumption against retroactivity, so this claim is dismissed.[5]

## II. Jane Doe 3's claims against the estate

### A. Punitive damages cannot be recovered from the estate

Defendants say punitive damages can't be recovered from an estate. Jane Doe 3's first response is that this argument is premature: it goes to a prayer for a relief, not a substantive claim. Yet a "motion to dismiss under Rule 12(b)(6) alternatively can be treated as a motion to strike under Federal Rule of Civil Procedure 12(f)," and "ample authority permits striking prayers for punitive damages where such relief is unavailable as a matter of law." *Mary Doe v. Indyke*, 457 F. Supp. 3d 278, 284 (S.D.N.Y. 2020). "[W]here courts have declined to resolve motions to dismiss aimed at prayers for relief … those cases were not based on categorical preclusions of punitive damages. In contrast, where punitive damages have been unavailable as a matter of law, courts have not hesitated to dismiss prayers for such damages at the threshold." *Id.* at 283. So the Court can consider on this motion whether punitive damages are entirely unavailable.

On the merits, barring punitive damages against an estate "is the majority position." Barry A. Lindahl, *Modern Tort Law: Liability and Litigation* § 20:24 (2d ed. 2022). And several recent decisions in this district considering Epstein-related claims have held that such damages aren't

---

[5] In Jane Doe 3's brief, she seemed to focus solely on the post-amendment law. *See* Dkt. 60 at 28–30. But at the hearing, she suggested that one case she cited also held that the pre-amendment law applied to enablers. Hr'g Tr. 55:7–15. Yet in that case, where the defendant himself allegedly raped the plaintiff, "[t]he parties d[id] not dispute that the allegations … set forth 'crime[s] of violence.'" *Breest v. Haggis*, 115 N.Y.S.3d 322, 326 (1st Dep't 2019). The court didn't address whether the pre-amendment law's requirement that a defendant have "commit[ted] a crime of violence" applied to those who enable such conduct. Nor has Jane Doe 3 offered any other explanation or support for reading the pre-amendment law this way. This is not to foreclose a future plaintiff from making the case for such a reading (or to argue that the 2022 amendments are retroactive). It's just to say that Jane Doe 3 hasn't done so here.

recoverable from the estate. *See, e.g.*, *Mary Doe*, 457 F. Supp. 3d at 282–89; *Jane Doe 15 v. Indyke*, 457 F. Supp. 3d 263, 264–65 (S.D.N.Y. 2020); *Lisa Doe v. Indyke*, 465 F. Supp. 3d 452, 469–72 (S.D.N.Y. 2020); *Jane Doe v. Indyke*, 468 F. Supp. 3d 625, 630–36 (S.D.N.Y. 2020). And though Jane Doe 3 invokes several jurisdictions' laws,[6] cases addressing each of them hold that punitive damages are not available against estates. *See Mary Doe*, 457 F. Supp. 3d at 285–89 (New York and U.S. Virgin Islands law); *Jane Doe*, 468 F. Supp. 3d at 630–36 (same); *Jane Doe 15*, 457 F. Supp. 3d at 264–65 (New Mexico law); *West v. Zacharzewski*, 2018 WL 6620480, at *3 (S.D. Fl. Nov. 5, 2018) (citing *Lohr v. Byrd*, 522 So. 2d 845 (Fla. 1988), and its progeny) (Florida law); *Lisa Doe*, 465 F. Supp. 3d at 469–72 (federal common law).

Jane Doe 3 quibbles with whether the law is settled in these various jurisdictions. But she can muster only one case that she says supports her on this point, *Snyder v. Bell*, 746 So. 2d 1096 (Fla. 2d DCA 1999). Dkt. 23 at 9 (24-cv-2192). But *Snyder* involved treble damages, which it specifically distinguished from punitive damages. 746 So.2d at 1098. In fact, *Snyder* acknowledged that Florida law didn't permit a plaintiff to recover punitive damages after a tortfeasor's death. *Id.*

As to the TVPA, the issue is controlled by federal common law. *See Lisa Doe*, 465 F. Supp. 3d at 471. So on top of the authorities above and the fact that they represent the majority position, the Court adds the Restatement to the side disfavoring punitive damages against estates. Restatement (Second) of Torts § 926(b) (1979) ("[T]he death of the tortfeasor terminates liability for punitive damages."); *see Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 780–81 (7th Cir. 2011) (noting that the Restatement of Torts "has been a common reference point for courts considering cases arising under federal common law"); *see also* Hr'g Tr. 58:9–19 (Plaintiffs' counsel admitting that they have no case allowing punitive damages against an estate under federal common law).

Jane Doe 3 says this Court should depart from these authorities, citing a few cases going the other way under various states' laws. Dkt. 23 at 7 (citing *Perry v. Melton*, 299 S.E.2d 8, 12 (W. Va. 1982); *Hofer v. Lavender*, 679 S.W.2d 470, 475 (Tex. 1984); *Farrell ex rel. Bennett v. Gordon*, 770 A.2d 517, 521 (Del. 2001)). The logic of these decisions is that punitive damages not only punish and deter the tortfeasor, but they also deter others from similar wrongdoing. Jane Doe 3 emphasizes the latter rationale, characterizing Epstein as having committed suicide to avoid his estate's being erased through punitive-damages awards. But "[i]t is highly doubtful that a would-be TVPA violator would be less dissuaded to violate the statute by the prospect that punitive damages could be avoided if he committed suicide." *Lisa Doe*, 465 F. Supp. 3d at 472. Plus, plaintiffs can still pursue punitive damages against those who are alive and are partly responsible for the harm. So the Court finds the third-party-deterrence rationale unpersuasive in the face of treatises and decades of cases across jurisdictions on the other side.

---

[6] Jane Doe 3 says that New York's choice-of-law rules would apply the laws of the places where Epstein abused her. Dkt. 23 at 5.

For these reasons, Jane Doe 3's prayer for punitive damages is stricken from the complaint against the estate.

### B. Defendants' limitations argument is premature

Defendants next say the Court should dismiss "in whole or in part" Jane Doe 3's battery, intentional-infliction, and TVPA claims as time-barred. The statute of limitations is an affirmative defense, so the Court can grant Defendants' motion only if the defense is apparent on the face of the complaint and other permissible materials.

For the battery and intentional-infliction claims, Jane Doe 3 makes equitable arguments to overcome the defense. These equitable doctrines are inherently fact-bound and are rarely fit for a motion to dismiss; this case is no different. *See Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) ("Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." (internal quotation marks omitted)); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1184 (N.Y. 2012) ("[I]t is fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." (internal quotation marks omitted)); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 173 (S.D.N.Y. 2019) ("[C]ertain extreme forms of intimidation, such as specific threats of violence, could trigger equitable estoppel[.]"); *id.* at 174–75 (discussing duress tolling); Compl. ¶ 24, Dkt. 1-1 (alleging that the limitations bar is "tolled due to the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims").

As for the TVPA claim, the limitations period is ten years. And "[c]ourts have held that the statute involves a continuing tort, [so] a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern." *Schneider v. OSG, LLC*, 2024 WL 1308690, at *5 (E.D.N.Y. Mar. 27, 2024). Here, the complaint was filed on March 13, 2024, and it alleges that at least some abuse occurred "[i]n 2014." Compl. ¶ 50. So it isn't clear from the face of the complaint whether the claim is time-barred.

### C. Jane Doe 3's TVPA claim survives

Against the estate, too, Jane Doe 3 pleaded two separate TVPA violations: participating in a sex-trafficking venture under § 1591(a)(1) and knowingly benefiting from a sex-trafficking venture under § 1591(a)(2). Defendants challenge only the latter theory. Dkt. 18 at 16–18. As explained above, so long as the complaint alleges one violation, the claim survives. So Jane Doe 3's TVPA claim is not dismissed.

### D. Jane Doe 3's Victim-Protection claim survives

The parties appear to agree that New York City's Victim-Protection Law applies only to conduct occurring in New York City. Dkt. 23 at 17. Jane Doe 3 alleges that she was abused in Manhattan and that "the majority of Epstein's abuse of Plaintiff occurred in New York City." *Id.*; *see also* Compl. ¶ 69. For that reason, the claim survives.

### E. Jane Doe 3's intentional-infliction claim survives

Defendants say that the intentional-infliction claim should be dismissed as duplicative of the battery and Victim-Protection claims. As noted above, however, "battery and [intentional-infliction] claims routinely proceed in tandem under New York law." *Giuffre*, 579 F. Supp. 3d at 452; *see also Chiesa v. McGregor*, 176 N.Y.S.3d 687, 691–92 (2d Dep't 2022) (holding that a battery claim wasn't duplicative of an intentional-infliction claim). The same logic applies to the Victim-Protection claims. Although there might be some overlap, an actor could commit a "crime of violence motivated by gender" without intending to cause emotional distress, and vice versa. N.Y.C. Admin. Code § 10-1104. So both claims can proceed. *See Warner*, 697 N.Y.S.2d at 611.

## CONCLUSION

For these reasons, Defendants' motions to dismiss are GRANTED IN PART AND DENIED IN PART. The Clerk of Court is directed to terminate Dkt. 29 and plaintiff Danielle Bensky from the 24-cv-1204 docket. The Clerk of Court is directed to terminate Dkt. 17 from the 24-cv-2192 docket.

SO ORDERED.

Dated: August 5, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge