# EXHIBIT B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Jane Doe 3, individually and on behalf of
all others similarly situated,

     Plaintiff,

       v.

Darren K. Indyke and Richard D. Kahn,

     Defendants.

Case No. 1:24-cv-01204-AS
[rel: Case No. 1:24-cv-02192-AS]

## REBUTTAL EXPERT REPORT OF JANE KHODARKOVSKY

1.     My name is Jane Khodarkovsky.  Plaintiff in the above-captioned matters has retained me as an expert in sex trafficking and how shell companies and funnel accounts can be used by gatekeepers, such as lawyers, bankers, and accountants, to  support and promote sex trafficking networks, including the methods and means used by traffickers to engage in money laundering and other financial and tax crimes.  I am qualified to opine on human trafficking, including sex trafficking, and the ways that sex traffickers, sex trafficking networks, and their co-conspirators exploit victims for financial gain, including through the use of shell companies, straw men[1], funnel accounts and third party gatekeepers, such as lawyers, accountants and bankers.

2.     My resume is attached as Exhibit 1 and a list of the materials I have reviewed in this matter is attached as Exhibit 2.  I am being compensated at my standard rates, which are attached as Exhibit 3.

3.     I reserve the right to supplement or amend my opinions in light of any further allegations, additional discovery, depositions, expert reports, etc. that may occur subsequent to this report.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

     A.  Current Activities

4.     I am a member in good standing of the New York, New Jersey, and the District of Columbia Bar.  I am currently a Partner at Arktouros pllc, a boutique firm focused on emergent technology, financial integrity and civil society.  Prior to Arktouros, I was the General Counsel and Head of Risk and Compliance for the Celo Foundation, which is a nonprofit, nonstock corporation incorporated in Delaware, supporting the use of open-source cryptographic networks to create

---

[1] https://collections.unu.edu/eserv/UNU:6232/BreakingtheFinancialChains_FullBooklet_Web.pdf at page 13.

conditions of prosperity for all through financial inclusion, environmental health and sustainability.

5.       In January 2023, I founded Chazak Consulting LLC, a sole member limited liability consulting firm focused on providing consulting services related to anti-money laundering and human trafficking, child exploitation, and blockchain related matters.  I also serve as a Board Member for Freedom Collaborative, Inc. a nonprofit organization focused on closing the gap to real world challenges in combating human trafficking, forced labor, and child exploitation.  I am also a Board Member for Chrysalis DAE and Advisor to Heimdall Labs, Inc. (aka Predicate).

6.       I continue to serve as a subject matter expert on combating illicit finance, human trafficking and child exploitation. In November 2023, I testified before the U.S. House Financial Services Committee, Subcommittee on Digital Assets, Financial Technology and Inclusion.[2]   In this testimony, I discussed how the U.S. Department of Justice as well as other U.S. law enforcement and regulatory agencies identify those directly committing crimes, such as human trafficking, but also third party facilitators or "gatekeepers" such as lawyers and bankers, who facilitate and conceal those crimes.  In fact, the Money Laundering and Asset Forfeiture Unit[3], where I served as a Trial Attorney and Human Trafficking Finance Specialist, specifically "investigates and prosecutes professional money launderers and gatekeepers who provide their services to serious criminal organizations. . . as well as individuals and entities using the latest and most sophisticated money laundering tools and techniques."[4]  I also conduct training and presentations on how to investigate and follow the money in sex trafficking and forced labor cases for the public and private sector partners.  These trainings also focus on asset forfeiture and restitution for survivors of human trafficking and related crimes.

    B.   Experience in Human Trafficking, including Sex Trafficking and Financial
         Crimes Investigations and Prosecutions

7.       I spent almost a decade as a state and federal prosecutor.  I served as a Trial Attorney and Human Trafficking Finance Specialist for the U.S. Department of Justice, Money Laundering and Asset Recovery Section (DOJ/MLARS) from December 2018- April 2022.  For almost three years, I served as the sole Human Trafficking Finance Specialist for the entire DOJ, whereby I: (a) investigated and prosecuted human trafficking, child exploitation and other victim crimes from the financial crimes perspective; (b) collaborated and worked with other federal agencies, including the Department of State, Treasury and Commerce; (c) created and conducted trainings and presentations domestically and internationally focused on how to use financial investigations to enhance human trafficking and child exploitation cases, and to seek forfeiture and restitution; and (d) worked on policy and legislative proposals related to these issues.

8.       I was the subject matter expert supporting U.S. Attorney's Offices on best practices to investigate financial crimes, including money laundering, how to gather evidence from financial institutions and money service businesses, tax preparers, accounting firms and independent

---

[2] https://www.congress.gov/118/meeting/house/116579/witnesses/HHRG-118-BA21-Wstate-KhodarkovskyJ-20231115.pdf.
[3] https://www.justice.gov/criminal/mlars/units.
[4] https://www.justice.gov/criminal/mlars/units.

auditors, and how to present such evidence to victim witnesses, including in the grand jury and at trial.  I regularly provided subject matter expertise on investigating and prosecuting financial crimes and money laundering to federal, state, and local law enforcement.

9.      I worked on multijurisdictional white- collar investigations, including an investigation into non-profit organizations allegedly hiding child sexual abuse for financial gain and defrauding the United States government.  I also conducted dozens of investigations into sex trafficking criminal networks, including those operating illicit massage businesses[5] across the United States and internationally.  I interviewed accountants, auditors and financial professionals.  I subpoenaed and analyzed domestic and foreign incorporation records, foundation or charity filings, financial reports, independent and third- party audit reports, tax records, Foreign Bank and Financial Accounts (FBAR) filings and disclosure forms, and other relevant conflict of interest and code of ethics filings.

10.     As a federal and state prosecutor, I worked collaboratively with various law enforcement agencies.  While at DOJ, I worked with the Internal Revenue Service - Criminal Investigations, and conducted dozens of witness interviews, grand jury presentations, and wrote briefs and memoranda related to financial crimes, human trafficking, and child exploitation.  I worked closely with the DOJ's Human Trafficking Prosecution Unit and the Child Exploitation and Obscenity Section, where we worked with law enforcement partners from the Federal Bureau of Investigations and Department of Homeland Security, including Customs and Border Protection.

11.     I investigated the use of the financial service industry and digital asset exchanges to facilitate money laundering or process proceeds from illicit crimes, including human trafficking and child exploitation.   As the subject matter expert, I worked with prosecutors and law enforcement teams, including long term investigations in the District of Arizona and Northern District of Texas. I provide the subject matter expertise to the trial team on money laundering and bitcoin seizure in *United States v. Backpage et al.* (18-CR-422, D.AZ 2018), and *United States v. Wilham Martono,* (20-CR-274, N.D.TX 2020), respectively.

12.     In 2018, Backpage.com and its executives, including the Chief Executive Officer and Chief Financial Officer, were charged with money laundering, conspiracy to commit money laundering, and other financial crimes for facilitating interstate and foreign travel or transportation in aid of racketeering enterprises.[6]   The allegations against the defendants involved establishing shell companies that were used to help launder proceeds of the criminal activity,[7] including internationally.[8]  In these and other corporate cases, I worked with Assistant U.S. Attorneys and federal investigators in analyzing voluminous financial records, suspicious activity reports,

---

[5] Corporate Secrecy Fuels Human Trafficking in the United States: (https://polarisproject.org/press-releases/corporate-secrecy-fuels-human-trafficking-in-united-states/) ("Shielding the "beneficial ownership" information on individual massage parlor business records makes it much harder, and sometimes impossible, for law enforcement to piece together that illicit massage parlors are often part of much larger organized crime networks.") (https://polarisproject.org/wp-content/uploads/2018/04/How-Corporate-Secrecy-Facilitates-Human-Trafficking-in-Illicit-Massage-Parlors.pdf).

[6]      *United States v. Backpage et al.* (18-CR-422, D.AZ 2018).

[7]      Id. at 4:22-5:13.

[8]      Id. at 5:12-13; 50:63-68.

3

currency transaction reports, third party audit reports, electronic correspondence and other documentary evidence to determine appropriate charges related to both sex trafficking and potential other financial charges, as well as seizures of real property and financial accounts of the accused defendants to use for restitution for the sex trafficking victims.

13.     At DOJ, I also investigated, prosecuted, and served as the subject matter expert for investigations into sex trafficking, sexual assault and abuse in the illicit massage business and similar industries.  I interviewed dozens of victims, both foreign and domestic born, and reviewed hundreds of thousands financial records, utility and phone records, physical surveillance footage, pole camera footage, trash pull returns, GPS records, and much more. In one such case, *United States v. Kyong Burgos,* (18-CR-126, S.D. Miss.), financial records were critical in identifying and charging the defendant, who operated illicit massage businesses in Mississippi, Alabama and Georgia, and exploited women, who were forced to engage in commercial sex for her financial benefit.

14.     In the *Burgos* case and others like it, I routinely reviewed hundreds of bank records, including accounts that were opened or maintained in the names of co-conspirators, from which cash was withdrawn, bills could be paid for utilities, transportation, flights, food, rent or mortgages, licenses, and in certain instances legal fees.  The bank records, including mortgage and loan documents were key to proving that Burgos was responsible for operating the trafficking enterprise and ultimately the financial records helped prove the amount of restitution owed to the victims.

15.     The facts in *Burgos* about the recruitment process and coercion were not unique in my experience at DOJ. Multiple other money laundering and sex trafficking investigations had the same common facts, issues, and laws.  Victims were recruited by other women in the trafficking network with promises of employment, education, and training.  Victims would disclose and were corroborated by financial and other documentary records wherein traffickers maintained bank accounts, opened credit cards in victims' names, instructed them to deposit cash into the accounts the trafficker controlled, paid for their flights to and from different cities to ensure isolation from others and ensured that the victims entire lives were dependent on the trafficking network.  In certain instances, traffickers used funnel accounts or shell companies to obfuscate the source of funds from the trafficking enterprises. *See United States v. Michael Morris, et al.* (17-CR-107, D. Minn. 2017); *United States v. Sumalee Intarathong, et al.* (16-CR-257, D. Minn. 2017); *United States v. Peter Griffin et al.* (22-CR-1828, S.D. Cal. 2022).

16.     In 2021, I was designated as the lead MLARS prosecutor to support DOJ's Joint Task Force Alpha[9], wherein the DOJ aimed to dismantle human trafficking and human smuggling organizations exploiting migrants and other vulnerable populations, like women and children.  I investigated and traced financial transactions, including those related to bank, wire, and mortgage fraud, the use of a *hawala* and unlicensed money service businesses*,* and conspiracy to commit money laundering.  In certain investigations, we identified the use of funnel accounts, where the network would have victims or victims' family members open bank accounts that were used to deposit and withdraw cash. Furthermore, in my experience in conducting these investigations, it

---

[9] https://www.justice.gov/opa/pr/attorney-general-announces-initiatives-combat-human-smuggling-and-trafficking-and-fight.

was common to have traffickers involve the victims in illegal activity to further coerce the victims into fearing law enforcement or contacting others for help.

C. Trainings and Presentations on Human Trafficking and Money Laundering

17.     Over the last year I have conducted many trainings and presentations for government funded programs and nonprofit organizations.  I am the "Prosecutor Field Coach" for the Department of Justice's Office of Victims of Crime (OVC) funded Enhanced Collaborative Model (ECM).[10]  In this role, every three months, I teach state and federal prosecutors on various topics related to following the money to combat sex trafficking and forced labor, asset forfeiture and restitution, investigative techniques and trial work.

18.     I have also been teaching different courses.  In May 2024, I taught a three part webinar for Collective Liberty focused on following the money to combat human trafficking, asset forfeiture and restitution in human trafficking cases, and using emergent technology to combat human trafficking.  In April 2024, I taught a class at Georgetown University related to human trafficking, illicit finance and blockchain technology.  In January 2024, I taught a three part Financial Crime and Human Trafficking webinar for NW3C, an organization funded by the Bureau of Justice Assistance, Office of Justice Programs, U.S. Department of Justice, where I focused on "Making the Case", "Framing the Investigation" and "Asset Forfeiture" as it relates to human trafficking investigations and financial crime prosecutions.

19.     I also regularly present at different conferences, including at Moody's conferences related to combating human trafficking using financial tools, including with the recent trends of cyber scams that are being perpetrated by organized crime networks abroad who use forced labor and forced criminality to force victims to engage in romance, investment, elder fraud and other forms of cyber scams.[11]

20.     Previously during my tenure at the DOJ, I conducted dozens of training and presentations related to financial crimes and human trafficking.  In May 2021, I served as DOJ's delegate at the Organization of American States plenary session to discuss the importance of financial investigations and how to follow the money to restrain, seize, and forfeit assets in trafficking cases. In March 2021, I collaborated with DOJ's Office of Overseas Prosecutorial Development to train Malaysian Police and Prosecutors on how to conduct financial crime and money laundering investigations.  In November 2020, I presented at the Financial Action Task Force's Joint Expert Group Panel on Illicit Finance and Money Laundering as the U.S. representative with co-panelists, including members from Israel, Malaysia, Singapore, and Europol, and over 115 member states participating.  In June 2020, I presented on anti-money laundering, asset forfeiture, and human trafficking at the ABA's International Law Section's conference.  In February 2020, I presented at the ACAMS conference in Washington D.C. to discuss anti-money laundering and human trafficking.

D. Experience Representing Victims of Human Trafficking

---

[10]     https://cops.usdoj.gov/html/dispatch/01-2024/OVC_task_force.html.
[11]     ACAMS Boston Chapter, February 2024 (virtual) and Association of Certified Fraud Examiners June 2024 (New Hampshire).

21.    Between 2009-2011, I represented victims of human trafficking in the University of Michigan Law School's Human Trafficking Clinic, under the supervision of Professor Bridgette Carr.  I represented victims in matters related to T- and U- visa and green card applications, reunification with family applications through the U.S. Citizenship and Immigration Services, meeting with the law enforcement conducting the criminal investigations, and coordinating education, housing and other survivor needs.  Through this direct service work, I learned much about victims' recruitment, coercion, fear or lack of understanding about law enforcement or the justice system, and methods by which traffickers profit from their victims.

22.    Two specific cases are helpful to discuss for purposes of this pending matter.  First, *U.S. v. Maksimenko*, (05-CR-80187, E.D. Mich), wherein I represented two of the victims (there were multiple victims).   Both victims were young women, who were recruited by the traffickers from Eastern Europe on the promise of student summer visas, J-1, from what appeared to be a legitimate beauty agency.   The traffickers' false promises and lies resulted in the women being forced to engage in commercial sex acts and working in an exotic dance club in Detroit, Michigan.

23.    The traffickers used coercive methods by depositing cash earned by the victims into the allegedly legitimate beauty agency account and commingling the assets to disguise the true source of the funds.  Once the funds were commingled in the beauty agency account, defendants would then send cash through Western Union to their co-conspirators in Eastern Europe. As a result of tracing the financial records, the traffickers were not only charged with sex trafficking offenses but also with international money laundering charges.

24.    I also learned more about the vulnerabilities and use of non-physical coercion when I represented young women, who were human trafficking victims in *U.S. v. Afolabi* (07-CR-785) (D.N.J.) (forced labor of young girls from West Ghana in hair braiding salons in Newark, N.J.).  In this case, the victims described how their families were deceived into believing that the girls and young women would be safe under the traffickers' care and would receive an opportunity for good education in the United States.  Based on these false promises and misrepresentations, the victims and their families were indebted to the traffickers, and the fraudulent visas added to the coercion and threats of deportation or law enforcement action by the traffickers.  While the victims could in theory leave at any time (they were not physically restrained) their ages (10-17 years old), lack of education, lack of housing or access to independent sources of funds, made it impossible for them to leave.

E.    Published Work

25.    I co-authored the "Prosecuting Sex Trafficking Cases in the Wake of the Backpage Takedown and the World of Cryptocurrency," which was published in the Department of Justice's Journal of Federal Law and Practice (May 2021).  I worked with the MLARS Policy Unit to draft and contribute to the National Defense Authorization Act of FY2021, and regularly provided training to DOJ components and U.S Attorney colleagues on the specific changes mandated by the Anti-Money Laundering Act (AML Act).  I also drafted responses related to human trafficking, human smuggling, and child exploitation on behalf of DOJ for the 2020 Department of the Treasury's National Anti-Money Laundering Risk Assessment.  Furthermore, I served as MLARS representative on numerous interagency working groups on illicit finance, money laundering and human trafficking.  I co-led the small working group from DOJ, Treasury, and State to draft DOJ's

section of the 2020 *Anti-Money Laundering Efforts Related to Human Trafficking,* which was Congressionally mandated by the FIGHT ACT.


## METHODOLOGY

26.    In this matter, I am offering my expert testimony regarding sex trafficking and how shell companies, funnel accounts, and other tools can be used by gatekeepers, such as lawyers, bankers and accountants, to support and promote sex trafficking networks, including the methods and means used by traffickers to engage in money laundering and other financial and tax crimes.

27.    I offer such expert testimony based on my knowledge, skill, education, experience and training while I was a prosecutor, who investigated and prosecuted sex trafficking and money laundering and financial crimes cases, and interviewed dozens of victims of crimes, and as an expert in anti-money laundering and financial integrity matters representing clients in the private sector.  I also based my expert testimony on my experience investigating complex white collar investigation for almost a decade, which required the analysis of hundreds of corporate records, financial records, credit card reports, peer to peer transfer information, wire details, currency transaction reports, suspicious activity reports and other financial records (FBARs, 990s, W2s, 1099s, etc.).

28.    It is my experience that conducting a financial investigation is critical in any human trafficking cases because in complex and sophisticated sex trafficking networks, like other sophisticated criminal networks, traffickers use all tools available to them, including through third party gatekeepers that help facilitate and conceal the criminal activity.

29.    I have presented at numerous trainings, webinars, and presentations on how sex trafficking networks use financial institutions and financial instruments to perpetrate their crimes, including by establishing shell companies, funnel accounts and use of cash, which is not easy to trace.  I continue to present and train the private and public sector using this methodology.





### SEX TRAFFICKING IN THE UNITED STATES AND ABROAD

32.    In 2000, the United States enacted the Trafficking Victims Protection Act (TVPA), where "severe forms of trafficking" was defined as:

A. Sex trafficking in which commercial sex act is inducted by force, fraud or coercion or in which the person induced to perform such an act has not attained 18 years of age; or,

B. The recruitment, harboring, transportation, provision or obtaining of a person for labor or services, through the use of force, fraud or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage or slavery.

22 U.S.C. § 7102(11).

33.    The above sex trafficking definition establishes that for an individual who is under the age of 18 years old and induced to engage in a commercial sex act that alone is sufficient to satisfy the definition. Force, fraud or coercion (or a combination of these three elements) needs to be present for an individual induced to engage in a commercial sex act when over the age of 18 years of age. By this definition sex trafficking requires a commercial sex act. The commercial sex act is a sex act where anything of "value" is given or received by any person. "Value" does not require an exchange of money (or cash).

34.     The TVPA further established that sex trafficking could be perpetrated through psychological abuse and non- violent coercion.  22 U.S.C. § 7101(b)(13).  There is also no requirement in the TVPA that a trafficker must withhold funds (or anything at all) to show that coercion was used to force a victim to engage in commercial sex acts.  The statute is clear that "commercial sex act" means "any sex act, on account of which anything of value is given or received by any person." The case law is also clear that the TVPA broadly covers what constitutes "value" including promise (even if false and deceptive) of professional opportunities, payments for rent and education.

35.     In my experience investigating and prosecuting sex trafficking cases, and representing victims of human trafficking, including sex trafficking, and training other law enforcement and prosecutors, there are different typologies that emerged, but these typologies are not exhaustive. In my experience, because sex trafficking is exploitative, multiple typologies could best describe a case or an experience of a certain victim.

36.     The White House states that "human trafficking takes many forms…  . [T]raffickers often manipulate adults and children victims' difficult economic conditions, instability in housing, substance abuse issues, or lack of family support to isolate victims and make them wholly dependent upon their traffickers…. [V]ictims frequently fall prey to traffickers who lure them in with an offer of food, clothes, attention, friendship, love, and a seemingly safe place to sleep…."[12]

37.     The Department of State's Office to Monitor and Combat Human Trafficking states that "combating human trafficking requires a comprehensive, multidisciplinary effort."[13]

38.     The Department of Homeland Security (DHS) also states that "not all indicators listed … are present in every human trafficking situation…"[14]  DHS includes a few questions to consider for common indicators and an excerpt of those questions include:

- Does the person appear disconnected from family, friends, community organizations, or houses of worship?
- Has a child stopped attending school?
- Has the person had a sudden or dramatic change in behavior?
- Is a juvenile engaged in commercial sex acts?
- Is the person disoriented or confused, or showing signs of mental or physical abuse?
- Is the person fearful, timid, or submissive?
- Does the person have bruises in various stages of  healing?
- Does the person show signs of having been denied food, water, sleep, or medical care?
- Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?
- Does the person appear to be coached on what to say?

---

[12] https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf page 9.
[13] https://www.state.gov/humantrafficking/.
[14] https://www.dhs.gov/blue-campaign/indicators-human-trafficking.

39.     My experience interviewing victims of human trafficking, including sex trafficking, and investigating these cases, is consistent with the description of the above, especially as it relates to the difficulty of victims after being groomed by their traffickers to process the trauma that they endured and identify as victims.  In fact, I had cases where victims came forward during the pendency of an already filed case, including when victims feel safer coming forward because they know that their trafficker is incarcerated, and in some cases years after the conclusion of the criminal case as part of restitution or forfeiture proceedings.

40.     In addition, I have investigated and prosecuted cases wherein victims were exploited for commercial sex in residential homes and apartments; in brick and mortar massage parlors, inside strip clubs, in nail[15]/hair salons[16], and in geographical regions from bustling cities like New York City and Detroit to small towns in areas of Mississippi and Alabama in domestic cases.  I have also investigated and helped to train and investigate trafficking networks that recruit young women and girls in foreign nations[17] (the country of origin), and who are ultimately exploited in the United States (destination country).

<u>Federal Legislation and Regulation to Combat Money Laundering,
Shell Companies, Funnel Accounts and More</u>

41.     The Defendants' expert, Gail Cohen, opined that incorporating many companies is regularly done by ultra wealthy individuals, who are: (1) trying to protect his other unrelated assets from liability;[18] (2) ease of administration of a "single purpose" entity[19]; (3) estate purposes;[20] (4) avoidance of of local estate tax at death;[21] (5) follow "best practices" to track expenses.[22]   Ms. Cohen also testified in her deposition that she does not have thoughts on whether Plaintiffs are alleging that the use of the alleged sham companies is in itself wrongdoing.[23] While conceding in her deposition that "potentially, yes"[24] someone could disguise the ownership of an asset by setting up a company,[25] Ms. Cohen fails to acknowledge in her report that criminal networks use shell companies[26], funnel accounts, straw men and other techniques to disguise and conceal source of funds, purpose of transactions, ownership of funds and comingle dirty and legitimate funds to facilitate and conceal criminal behavior.

42.     In fact, Ms. Cohen also believes that using corporate structures cannot be used to commit tax crimes.[27]  This is interesting because despite Ms. Cohen's forty years of experience[28] and prior

---

[15]     https://www.justice.gov/usao-wdnc/pr/north-carolina-nail-salon-owner-charged-forced-labor-employee.
[16]     *U.S. v. Afolabi* (07-CR-785) (D.N.J.).
[17]     https://www.nj.com/news/2024/10/a-not-so-secret-sex-business-continues-to-thrive-in-nj-state-watchdog-reports html; https://www.justice.gov/usao-sdca/pr/former-san-diego-police-officer-and-three-others-sentenced-crimes-stemming-years-long;
[18]     Cohen expert report, par. 11, pg 5.
[19]     Cohen expert report, par. 12, pg. 5.
[20]     Cohen expert report par. 13, pg. 6.
[21]     Id. par. 14, pg. 6.
[22]     Id. par. 15 pgs. 6-7.
[23]     Cohen deposition page 142 7-12.
[24]     Cohen deposition page 155 21-24.
[25]     Cohen deposition page 155 21-24.
[26]     Cohen deposition page 156 lines 21-22 (Ms. Cohen does not know what is meant by term "shell company").
[27]     Cohen deposition page 157 lines 10-16.
[28]     Cohen deposition page 158 lines 22-24; page 159 line 1.

to Ms. Cohen's retirement in January 2024[29], in 2022 Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) stated that the beneficial ownership rule "will enhance U.S national security by making it more difficult for criminals to exploit opaque legal structures to launder money, **traffic humans** and drugs, and **commit serious tax fraud** and other crimes that harm the American taxpayer."[30] (emphasis added). Moreover, FinCEN stated that this new beneficial rule will help "to shed light on criminals who **evade taxes**, **hide their illicit wealth**, and defraud employees and customers and hurt honest U.S. businesses through their misuse of shell companies." (emphasis added).[31]



44.     The backbone of the United States' efforts to combat money laundering and financial crime comes from the Bank Secrecy Act of 1970 (BSA).[41] It was designed to help prevent criminals from

---

[29]     Cohen deposition page 21, line 19.
[30]     FinCEN's Beneficial Ownership Information Reporting Rule Fact Sheet September 29, 2022
         https://www.fincen.gov/beneficial-ownership-information-reporting-rule-fact-sheet#:~:text=Beneficial%20Ownership%20Information%20Reports%20*%20When%20filing,of%20the%20required%20information%20about%20the%20individual.
[31]     FinCEN's Beneficial Ownership Information Reporting Rule Fact Sheet September 29, 2022
         https://www.fincen.gov/beneficial-ownership-information-reporting-rule-fact-sheet#:~:text=Beneficial%20Ownership%20Information%20Reports%20*%20When%20filing,of%20the%20required%20information%20about%20the%20individual.



Palm Beach Police Report; 2008 Civil Complaint; 2010 Civil Complaint.
[41]     31 U.S.C. § 5311, *et seq*.

exploiting the U.S. financial institutions, especially from the use of cash.[42]   Under the BSA, financial institutions, including banks, money service businesses (MSBs), payment processors, casinos and others are required to report: (1) currency transactions by any person of more than $10,000 in cash each day; and (2) suspicious activity when they believe that a financial transaction or series of transactions (a) involves funds derived from illegal activity or is an attempt to disguise funds derived from illegal activity; (b) is designed to evade regulations promulgated under the BSA; or (c) lacks a business or apparent lawful purpose.   The BSA and its implementing regulations require domestic banks and other financial institutions to establish and maintain programs to detect and report suspicious activity, and to maintain certain records where "they are highly useful . . .  in criminal, tax, or regulatory investigations and proceedings."[43]

45.     Financial institutions must make certain disclosures, including filing Currency Transaction Reports (CTRs), Suspicious Activity Reports (SARs), and other reports pursuant to their BSA obligations.   In addition, financial institutions are required to maintain programs of compliance against money laundering.[44] In 2021, Congress also passed the Anti-Money Laundering Act (AML Act),[45] which included several provisions related to beneficial ownership.[46]

46.     The U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN)[47] has introduced new Beneficial Ownership Reporting (BOR) requirements that directly impact companies that operate in the United States.[48] FinCEN's new regulations mandate that, with certain exceptions, U.S. businesses and non-U.S. businesses registered to do business in the U.S. must disclose information to FinCEN about their beneficial owners. These are not only individuals, who hold a significant ownership stake (25% or more), but also those that exercise "substantial control" over the business (broadly defined to include, e.g., senior officers and any individuals with substantial influence over important decisions of the reporting company).   This was done to help combat money laundering and illicit financing that was being conducted through shell companies.[49]

47.     These are important because these actions by the U.S. government further demonstrate the significant risk that shell companies, funnel accounts, and other methods of obscuring ownership

---

[42]     *See, e.g.*, 31 CFR § 1022.210(a); Steven M. D'Antuono, *Combating Money Laundering and Other Forms of Illicit Finance: Regulator and Law Enforcement Perspectives on Reform*, Statement Before the Senate Banking, Housing, and Urban Affairs Committee, Washington, D.C. (Nov. 29, 2018) ("Cash transactions are particularly vulnerable to money laundering. Cash is anonymous, fungible, and portable; . . . it is used and held around the world; and is difficult to trace once spent.").

[43]     31 U.S.C. § 5311(1)(A).

[44]     31 U.S.C. § 5318(a)(2).

[45]     *See* Pub. L. No. 116–283, §§ 6001-6511, 134 Stat. 3388 (2021).

       *See* Pub. L. No. 107-56, § 302(b)(4), 115 Stat. 272, 297 (2021).

[46]     Pub. L. No. 116–283, §§ 6001-6511, 134 Stat. 3388 (2021).
[47]     https://www.fincen.gov/boi
[48]     https://www.fincen.gov/sites/default/files/shared/BOI-Informational-Brochure-April-2024.pdf
[49]     https://www.fincen.gov/news/news-releases/fact-sheet-beneficial-ownership-information-access-and-safeguards-final-rule.

and control over a business can cause risk of money laundering, national security and other crimes, including human trafficking..

<u>Use of Financial Levers to Facilitate Human Trafficking, including Sex Trafficking</u>

48.     U.S. DOJ's National Action Plan indicates that "when insufficient controls are in place, human traffickers benefit from ready access to the financial system to maintain their enterprises."[50] In my investigations and prosecutions of human trafficking case, including sex trafficking, from a financial crimes perspective and when I conducted trainings to law enforcement, prosecutors and private sector partners, I discussed how human trafficking networks, including sex traffickers, used financial institutions and financial instruments to facilitate and benefit from the exploitation of the trafficking victims. In cases and trainings, I focused on how traffickers use money to exploit trafficking victims:

- Obscure payments to victims of trafficking;
- Purchase of goods, including real property, vehicles, goods, upgrades to property, etc.;
- Use limited liability companies or other companies as shell companies to move funds used in human trafficking schemes to obfuscate law enforcement detection, and conceal the source or nature of the funds; and
- Conceal the source of funds by putting the financial accounts or real property in third party names (nominees), including names of the victims.

49.     More specifically, as the Trial Attorney and Human Trafficking Finance Specialist in the Money Laundering and Asset Recovery Section, and as a state and local prosecutor focused on white collar money laundering and financial crimes cases, where I reviewed subpoenaed records from financial institutions, credit card companies, formation documents to understand the scope of criminal networks and the web of financial transactions.

     A.     Following the money, helped to identify the methods by which sex traffickers supported and facilitated their trafficking venture including which vehicles were used to recruit, transport or further the trafficking scheme; homes or residences used to perpetuate the sex trafficking activities, house the victims, or co-conspirators.

     B.     The coercive nature of human trafficking, and specifically sex trafficking, is ultimately what keeps victims under the control and exploitation of their trafficker or trafficking network. Trafficking victims may feel:

          i.   they cannot leave because they are financially indebted to the trafficker;

          ii.  have formed emotional or psychological bonds with the traffickers;

          iii. fear or shame about what has happened;

          iv.  they do not have a place to go or a way to escape or seek shelter; and/or

          v.   fear of law enforcement or immigration consequences.

     C.     I have had cases where women feared because of the power dynamic between them and the perpetrator including when in one case the ringleader of the exploitation was a former vice

---

[50] https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf page 15

detective, who also had access to funds (including bank accounts), the use of credit cards, multiple business accounts, including potentially using shell companies to disguise the true nature of the source of funds or use of those funds for illicit activity.

      D.        In my experience as a prosecutor and educator of others in combating human trafficking I would focus on:

- Whether there were payments for transportation
  - High frequency of travel purchases or spending on behalf of third parties
- Whether there were payments for multiple women, especially if not aligned with the nature of the purported businesses
- Payments by males on behalf of women or through accounts set up for women, who would be making beauty related expenses (such as lingerie, beauty needs, etc), especially if not aligned with the purported business
- Signatories on accounts that do not appear appropriate for the purported business
- Payments for rent or utilities on behalf of third parties (including payments for many women)
  - Payments for mortgage or purchase of real property or vehicles (to determine if any were used to facilitate or support trafficking network)
- High volume of credit card payments without a business purpose
- Large number of business accounts with the same address, telephone number or e-mail address
- International wire transfers that were not aligned with the purpose of the purported business needs
- Business accounts that do not have consistent or lacked payroll expenditures
- Frequent payments for immigration fees, student fees, "recruitment" of "job placement" that are not aligned with the purported business of the account or account owner
- Loan or other financial documents related to beneficiaries that do not appear to have a legitimate familial or business relationship

      E.        When I am doing trainings now for public and private sector participants on human trafficking and financial crimes, similar to what I did previously at DOJ, I focus on the following information:

- Know your customer (or counterparty) information
  - Phone number or e-mail address associated with a customer or client related to multiple limited liability corporations (LLC)?
  - Who incorporated the LLC; how many; and for what purpose?
  - Who was identified as an accountant or banker for the accounts?
  - Were there any large number of bank accounts opened (or closed)?
  - Are there funnel accounts?
  - Were there any shell companies?
- When opening accounts
  - Was the individual opening the account present at the time the account was present? Was the individual(s) accompanied by someone or did it seem they were being watched when opening the account?
  - Deposits money always with someone else present?

- If deposits are funded electronically, and there is suspicion that something may be appropriate for the purported nature of a personal or business(es) account, what is the IP that is accessing the account? Who controls that account?
- Does the individual have identification and is it up to date?
- Transactions are in lower dollar amounts (cash in/out)?
- Duplicative or questionable accounts?
- Transaction activity
  - Round numbers in cash deposits?
  - Number of credit cards or debit cards?
  - Payroll records?
  - Insurance (or lack there of)?
  - Structuring (below reporting requirement deposits (less than $10,000)?
- Indicators in the accounts
  - Housing (rent, lease, purchase, mortgage, deed)
  - Sponsors such as foster or shelter or immigration status
    - Lawyers (immigration)
  - Recruiting agencies
    - Student or job placements
  - Vehicles (rent, lease, purchase)
    - Whether in nominee's account

50.     The information described above is based not only on my own experience investigating and prosecuting these types of cases, but also based on the guidance from other U.S government agencies.  For example, in 2020 FinCEN released a supplemental advisory related to human trafficking[51] wherein it described that traffickers and trafficking networks "routinely establish and use front companies, sometimes legal entities, to hide the true nature of a business, and its illicit activities, owners, and associates."[52]

51.     FinCEN also discusses that exploitative employment practices and funnel accounts are also used regularly by trafficking networks.[53] Importantly, one of the case examples that FinCEN uses was the *United States v. Michael Morris, et al.* (17-CR-107, D. Minn. 2017); *United States v. Sumalee Intarathong, et al.* (16-CR-257, D. Minn. 2017)[54] case and FinCEN highlighted that the traffickers " move funds to and from Thailand, the organization *employed third-party money launderers who made bank accounts available and coordinated cash deposits and withdrawals."[55]* (emphasis added).

---

[51] https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf
[52] https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf
[53] Id.
[54] U.S. Department of Justice, "Twenty-One Additional Defendants Indicted for their Roles in Thai Sex Trafficking Enterprise," (May 25, 2017); see also U.S. Department of Justice, "Thirty-Six Defendants Guilty for their Roles in International Thai Sex Trafficking Organization," (December 13, 2018).
[55] https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf.

52.     Even prior to the 2020 FinCEN guidance, the Financial Action Task Force in 2018[56] stated that one of the "[i]ndicators of money laundering identified in suspected human trafficking cases which common across different predicate crimes…" was

- "Account appears to function as a funnel account
- Cash-intensive business with unclear source of cash or capital
- Media or other reliable sources suggest that a client may be linked to criminal activity which could generate proceeds of crime
- Transactions with apparent front, shell or shelf companies
- Use of a third party, with no apparent relationship to client, to conduct financial transactions
- Use of third-party accounts…."

53.     Defendants' expert, who only focused on the alleged legitimate purposes of establishing a corporation, did not review the New York Department of Financial Services (NYDFS) Consent Order against Deutsche Bank related to Mr. Epstein and his criminal network.  In my review of the consent order, I identified many of the indicia of suspicious activity.  NYDFS found red flag indicators (similar to what is described above) for the bank and the bank's interactions with the defendants in this case.  ███████████████

- "After submitting the questions to ACCOUNTANT-1, RELATIONSHIP MANAGER-2 forwarded ACCOUNTANT-1's response to the compliance officer, w"SENT TO A FRIEND FOR TUITION FOR SCHOOL." When the compliance officer followed up, asking "[w]hy is this client using this account to . . . pay school tuition?," RELATIONSHIP MANAGER-2 replied "[g]enerally, Jeffrey has separate 15 accounts to manage each of his properties. This is one of them. However, when making one-off transfers to people, he and his finance staff have the flexibility to use any account they like that is funded."[57]

54.   In addition, NYDFS's consent order ███████████████████████

- "One of them, Mr. Epstein's personal attorney (herein, "ATTORNEY-1"), was active in withdrawing cash for Mr. Epstein. ATTORNEY-1, on behalf of Mr. Epstein, made a total of 97 withdrawals from the Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Mr. Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (i.e., withdrawals made by an authorized user who is not a primary account holder). When Bank personnel asked ATTORNEY-1 why Epstein needed cash, ATTORNEY-1 replied Epstein used it for travel, tipping and expenses."[58]

---

[56] https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Human-Trafficking-2018.pdf.coredownload.inline.pdf page 69-70.
[57]        NYDFS Consent Order, page 15, paragraph 46.  ████████████████████████
[58]        NYDFS par. 48.  ██████████████████

- "Under federal regulations, banks and other financial institutions must file Currency Transaction Reports ("CTRs") with the U.S. Treasury Department when there are cash transactions with an individual in excess of $10,000 in one day. Breaking up transactions to avoid the CTR reporting is a criminal offense commonly referred to as "structuring." When ATTORNEY-1's cash activity triggered reporting requirements, the Bank complied and filed the 16 requisite CTRs. The Bank also monitored ATTORNEY-1's activity for suspicious activity reporting."[59]

- "In May 2014, ATTORNEY-1 inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert. The record is unclear as to whether anyone from the Bank ever responded to ATTORNEY-1's inquiry. RELATIONSHIP COORDINATOR1 sent an email to the branch manager stating that ATTORNEY-1 "asked how often they could come in to withdraw cash without creating some sort of alert," and asking "Is it once a week? Twice a week? Once every other week?" The Bank has represented that it has no record of any response. RELATIONSHIP COORDINATOR-1 has since represented that she understood ATTORNEY-1's inquiry related to ATTORNEY-1's desire to withdraw more than the $7,500 limit for third-party withdrawals, and not to CTR filing requirements."[60]

- "In 2017, ATTORNEY-1 again inquired about triggering an alert. Specifically, in July 2017, ATTORNEY-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days. In July of that year, members of the Bank's Wealth Management AML transaction monitoring team, including AML OFFICER-2, met to discuss suspicions of cash structuring to avoid currency transaction reports ("CTRs") by ATTORNEY-1. AML OFFICER-2, among others, spoke with ATTORNEY-1 and advised that (a) his patterns gave the appearance of structuring, (b) this pattern was unacceptable, and (c) he would be provided with additional information about CTR reporting requirements. ATTORNEY-1 represented that he had not intended to structure cash withdrawals. Bank personnel found ATTORNEY-1 credible and permitted him to continue to withdraw cash from his own and Epstein's accounts. In 2018, just prior to the Bank's closing of the Park Avenue 17 Branch, which was located nearby Mr. Epstein's house, ATTORNEY-1 withdrew $100,000.00 in cash on behalf of Mr. Epstein. When later questioned why ATTORNEY-1 withdrew these sums from the Bank, ATTORNEY-1 reported that Mr. Epstein needed the funds for tipping and household expenses."[61]

- "In total, in a roughly four-year period, ATTORNEY-1 withdrew on Mr. Epstein's behalf more than $800,000 in cash from Mr. Epstein's personal accounts. Throughout the Epstein relationship the Bank filed CTRs appropriately, but there is no indication that the Bank ever sought or received any explanation for Epstein's cash activity beyond the travel, tipping, and expenses explanation provided by ATTORNEY-1."[62]

---

[59] Id. par. 49.
[60] Id. par. 50.
[61] Id. par. 51.
[62] Id. par. 52.















the NYDFS noted the Butterfly Trust financial payments as part of the suspicious activity by Mr. Epstein, stating:

- "On January 24, 2014, Deutsche Bank opened checking and money market accounts for an Epstein-related trust named "The Butterfly Trust." The Butterfly Trust included a number of beneficiaries, including, among others, CO-CONSPIRATORS 1-3, and a number of women with Eastern European surnames. When Bank personnel asked Epstein and Epstein's representatives about his relationship with the beneficiaries, Epstein represented that they were employees or friends. The Bank's KYC records state that the purpose of the money market account was "to pay all expenses/disbursements related to the trust [such as] taxes, trust fee [SIC], etc."

- "The Butterfly Trust accounts were, like the overall Epstein relationship itself, approved for onboarding based on the earlier Approval Email from EXECUTIVE-1, despite apparent reputational and possible financial crime risks. Specifically, the beneficiaries of the Butterfly Trust included, among others, CO-CONSPIRATORS 1-3. The existence of coconspirators as beneficiaries of the trust created the very real risk that payments through the Trust could be used to further or coverup criminal activity and perhaps even to endanger more young women.

- "At the time of onboarding of the Butterfly Trust accounts, Bank personnel were aware that one of the Trust's beneficiaries was an alleged co-conspirator of Epstein's prior offenses. In October 2013, a compliance officer performed background checks on the



beneficiaries of the trust and flagged for RELATIONSHIP COORDINATOR-1 that one of the beneficiaries, CO-CONSPIRATOR-2, had been alleged to be one of Epstein's co-conspirators. In reply RELATIONSHIP COORDINATOR-1 confirmed that "[CO-CONSPIRATOR-2] was accused as a co-conspirator in a case but was never brought to trial nor ever convicted. . . . The account for which she will be associated is a trust account which names her as a beneficiary." The alert was cleared citing the Approval Email from Executive-1."

- "While Epstein held accounts at Deutsche Bank, he used the Butterfly Trust account and various other accounts to send over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust, including some transfers to alleged co-conspirators or women with Eastern European surnames, for the stated purpose of covering hotel expenses, tuition, and rent."

- "Although payments related to legal expenses are not inherently suspicious, Mr. Epstein also used his various accounts for what appear to have been multiple settlement payments totaling over $7 million to law firms, as well as dozens of payments to law firms totaling over $6 million for what appear to have been the legal expenses of Mr. Epstein and coconspirators."





Dated: October 26, 2024.

Jane Khodarkovsky

Jane Khodarkovsky

# Exhibit 1

**Jane Khodarkovsky**
Jane.khodarkovsky@chazakconsulting.com

*Experience*
**Arktouros pllc**
*Partner*                                                                    Oct. 2023 - Present

Represent corporations, nonprofits, and individuals in criminal and regulatory matters related to Bank Secrecy Act (BSA), anti-money laundering, and U.S. economic sanctions, including forfeiture related investigations and enforcement actions

Lead representation of companies and individuals in the emergent technology space in the U.S. and broad, including financial integrity risk management, including securities and commodities laws, and money transmission licensing regimes on the federal and state level

Regularly provide compliance counseling, crisis management, risk assessments, policy and regulatory strategic advice to financial services firms and individuals, banks, insurance companies, digital asset, and crypto-adjacent companies

Engage in general litigation and advocacy, including representing individuals, organizations, and banks in responding to Department of Justice (DOJ) investigations and Department of the Treasury's Office of Foreign Asset Control's enforcement actions, administrative subpoenas and requests for information

Serve as subject matter expert related to countering illicit finance and digital asset/cryptocurrency, including privacy preserving technology

Panelist, U.S. House Financial Services Committee, Subcommittee on Digital Assets, Financial Technology and Inclusion, "Crypto Crime in Context: Breaking Down the Illicit Activity in Digital Assets", Nov. 15, 2023, Washington D.C.

Develop strategic guidance for industry and industry leaders to proactively shape and respond to government regulatory proposals;

Respond to proposed rule making and comments related to anti-money laundering, illicit finance, counter terrorist financing, and digital currency/emergent technology by U.S. government agencies, including Financial Crimes Enforcement Network (FinCEN), Department of Commerce and others

**Celo Foundation**

*External Counsel and Regulatory & Policy Advisor*                          Sept. 2023 - Present

Serve as external counsel and subject matter expert on global legal and regulatory oversight and provide guidance related to anti-money laundering, sanctions, money service businesses, securities/commodities regulations, virtual currency, blockchain technology, non-fungible tokens, carbon credits/offsets, voluntary carbon markets, decentralized autonomous organizations, staking, and web3 related issues in US and abroad

Direct and manage internal and external compliance team related to Bank Secrecy Act, anti-money laundering and U.S. economic sanctions

Spearhead and educate thoughtful web3 and blockchain technology policy with stakeholders in U.S. and Europe

*General Counsel, Head of Risk and Compliance*                              May 2022 -Sept. 2023

Led global legal and regulatory oversight and provide guidance related to anti-money laundering, sanctions, money service businesses, securities/commodities regulations, virtual currency, blockchain technology, non-fungible tokens, carbon credits/offsets, voluntary carbon markets, decentralized autonomous organizations, staking, and web3 related issues in US and abroad

Served as subject matter expert on using decentralized ledger technology (DLT) for supply chain, financial inclusion, and regenerative finance for real world use cases in a compliant and lawful manner

Oversaw and enhanced risk and compliance program, including trainings for Foundation, Board of Directors, grant recipients, strategic investments, private equity, and other Celo ecosystem partners • Negotiate and draft all contracts, joint ventures, strategic partnerships between Foundation and third parties from legal, regulatory, compliance and business perspective

Directed, managed, and reviewed Intellectual Property (patent and trademark, general proprietary information), privacy policies (GDPR); security, safety and incident response; and all employment and human resources matters (contracts, consultants, visas, trainings, dispute resolution) in US and abroad

Counseled corporations in Cayman Islands and ensure compliance with legal and compliance regulatory requirements; due diligence; and collaborate with Head of Finance related to tax law and filings; provide guidance and support to the Foundation's Board of Directors

Retained, oversaw, and managed outside legal counsel, compliance, analytic firms, and vendors; and manage and oversee legal and policy budget

**Chazak Consulting LLC**                                                   Jan. 2023 – Present
*Founder & President*

Serve as human trafficking and financial crimes expert witness, including writing expert reports, deposition testimony, Daubert hearing

Consult on issues related to money laundering, sanctions, human trafficking, including sex trafficking and forced labor, supply chain, and blockchain technology

Provide subject matter expertise to projects, nonprofits, corporations and universities related to blockchain

technology

Conduct webinars related to how to conduct financial and money laundering investigations to more effectively combat human trafficking, child exploitation, and human rights crimes

Subject matter expert for litigation matters related to human trafficking, anti-money laundering, financial crimes and blockchain technology

**Freedom Collaborative**                                                                                                    Oct. 2024 - Present
*Board of Directors Member*

Serve as subject matter expert at the intersection of human trafficking and financial crimes, including supply chains, cyber scams, and national security.

Co-lead strategy efforts with CEO and Board of Director members on how to combat forced labor in cyber scam related cases and collaborate with public and private sector to combat these crimes.

**Heimdall Labs, Inc. (Aka Predicate)**                                                                          April 2023 - Present
*Advisor*

Provide subject matter expertise and guidance related to Bank Secrecy Act (BSA), anti-money laundering and U.S. economic sanctions to increase compliance in emergent technology

Support navigating evolving legislative and regulatory policies in the US and Europe related to blockchain technology

**U.S. Department of Justice, Washington D.C.**                                                          Dec. 2018 –Apr. 2022
*Trial Attorney, Human Trafficking Finance Specialist,* Money Laundering and Asset Recovery Section, Criminal Division Held Top Secret/Sensitive Compartmented Information (TS/SCI) Clearance

Led investigations and prosecutions of complex money laundering and financial crimes, including bank, wire, and mortgage fraud; corporate and nonprofit malfeasance; sanctions violations; virtual currency and exchanges, specifically for human trafficking, smuggling, and child exploitation, including criminal and civil forfeiture seizures and cases

Subject matter expert to DOJ senior leadership, U.S. Attorneys' Offices, federal, state, and local law enforcement on financial crimes, money laundering investigations; virtual currency and blockchain investigations; using forfeiture theories (including tracing); and seeking restitution

Directed and provided expert interpretive analysis on anti-money laundering, illicit finance, regulatory controls, focused on human trafficking, child exploitation, and other victim crimes to interagency partners including: Departments of the Treasury (including OFAC, TFFC, FinCEN, IRS), State, Homeland Security, Labor, Commerce and Federal Deposit Insurance Corporation; and write legislative and policy responses to Government Accountability Office related to anti-money laundering compliance, including Bank Secrecy Act, 2021 AML Act, and virtual currency

Speaker and panelist at international and national conferences (including Organization of American States, Financial Action Task Force, Association of Certified Anti-Money Laundering Specialists, American Bar Association, Eradicate Hatred Global Summit – Oct. 2021) on financial crimes and virtual currency, including human trafficking, human smuggling, child exploitation, and forfeiture/restitution for same

Prepared briefings for senior DOJ leadership on money laundering, financial crimes, virtual currency, and asset recovery, including Strategic Dialogue on Illicit Finance – U.S.- Mexico; Xinjiang Business Advisory

**New York County District Attorney!s Office, New York, N.Y.**                                    Sept. 2016 – Nov. 2018
*Assistant District Attorney*, Rackets Bureau

Led investigations and prosecutions, including: enterprise corruption, grand larceny, scheme to defraud in the heating oil industry in New York City and State (including indictments of 60 individual defendants and seven corporate defendants); corporate tax fraud in the construction and heating oil industry; stock manipulation schemes by single family office, hedge fund in New York City; cigarette smuggling; and use of unlicensed money service businesses (MSB) in New York and New Jersey

Special Prosecutor to the Richmond County District Attorney's Office for trial of *People v. Elvis Moreno* (Ind. 145/15)– led multi-defendant conspiracy trial; conducted opening statement; direct/cross examination

**Office of the New Jersey Attorney General, Whippany, N.J.**                                        Oct. 2013-Aug. 2016
*Deputy Attorney General*, Official Corruption Bureau

First and second chaired jury trials to successful guilty verdict

Indicted councilman on bribery and obstruction charges (*State v. Elias Chalet*); Presented *State v.
Ernest Dubose* at annual N.J. Attorney General's Corruption Bureau Training

**Genova Burns, Attorneys-at-Law, Newark, N.J.**                                                        Sept. 2012- Sept. 2013
*Associate*, Employment Law and Litigation Group

Co-wrote articles about the Family Medical Leave Act and employer surveillance: "Last Resort: Using Private Investigators to Combat FMLA Abuse"; and "NJ Law Prohibits Institutions of Higher Education from Requiring the Disclosure of Social Media Passwords by Students and Applicants"

Drafted pleadings, interrogatories, cross and indemnification claims, discovery requests, argued motions to

dismiss and for sanctions; conducted witness interviews; conducted depositions, mediations

**The Honorable Ronald D. Wigler, Presiding Criminal Court Judge, Newark, N.J.**          Sept. 2011-Aug. 2012
*Legal Clerk*

Researched and wrote memoranda and opinions on motions to suppress statements and evidence; sanitize the record; Wade hearings; compel discovery; municipal court appeals; post-conviction relief petitions
Wrote opinions for termination of parental rights and abuse and neglect cases; sentencing memoranda

*Education*

**University of Michigan Law School,** AnnArbor,
MI Juris Doctor, May 2011

Activities: Executive Editor, *Michigan Journal of Race and Law* (selected via writing competition) Quarterfinalist, Campbell Moot Court
Presented at United Nations Office on Drugs and Crime Experts Meeting in Vienna, Austria Student Attorney, Human Trafficking Clinic
Honors: Women Law Association of Michigan (WLAM) Foundation Outstanding Woman Law Student Award 2011;
Dean!s Fellow Recipient 2010; Student Funded Fellowship Recipient 2009

**Barnard College, Columbia University,** New York, NY

Bachelor of Arts, *summa cum laude*, May 2008, Majors: Political Science and History
Honors: Senior Thesis Distinction: "The Fragility of Democracy: Russia 1991-2008" Recipient,Arthur Liman Public Interest Fellowship; Barnard College Bear Pin Leadership Award; William R. Solomon Scholarship; Joyce and Irving Goldman Fellowship

**BarAdmission:** New York, 2012 and New Jersey, 2011
**Languages:**      Native fluency in Russian (speaking, reading and writing); beginner to intermediate French

**Publications:**

Co-authored, "The Policy and Legal Implications of Inclusion Lists," October 2024.

Co-authored, "Comparing Apples to MNGOs: Government Actions Against Avi Eisenberg Show How Poorly Digital Assets Are Classified in the US, April 17, 2024.

Co-author "Prosecuting Sex Trafficking Cases in the Wake of the Backpage Takedown and the World of Cryptocurrency," 69 DOJ J. FED L. & PRAC, no. 3 (May 2021).

Contributor, Human Trafficking Law and Policy, LexisNexis or Matthew Bender & Company, Inc., 2014.

Contributor, Trafficking in Persons Report 2011, Office to Monitor and Combat Human Trafficking in Persons, 2011 Research and draft, Bridgette Carr, "Examining the Reality of Foreign National Child Victims of Human Trafficking in the United States," 37 WASH. U.J.L.& POL'Y 183 (2011).

Interview, Alice Rhein, "Shining Light on a Dark Crime," University of Michigan Law SchoolAlumni Association (and "The Global Fight Against Human Trafficking: One Student's Experience").

Contributor, United Nations Office of Drugs and Crime Human Trafficking Knowledge Portal and University of Michigan Law School, Human Trafficking Database, 2010.

**Teaching:**

Presented, "Decentralization, Illicit Finance and Privacy", Fintech Law Course, Duke Law School, Mar. 6, 2024.
Presented, "Digital Assets, Blockchain & Human Trafficking", Georgetown Law School, Apr. 15, 2024.
Presented, "AML/Sanctions and Tornado Cash", FinTech 101, New York Law School, Sept. 3, 2024.
Upcoming, Technology and Ethics, Stanford Engineering School, Nov. 4, 2024.

**Speaking Engagements 2019- Present:**

Panelist, "DeFi Session on Risks", Practicing Law Institute (PLI), Oct. 9, 2024, New York, NY

Panelist, Moody's Asset Management Compliance Workshop, Oct. 3 2024, New York, NY

Presenter, Financial Grooming and Human Trafficking Schemes, ACFE, New Hampshire, June 12, 2024

Presenter, "How FCRM Can Prevent Human Trafficking and Financial Crime, FCRM Summit, Booking Holding, July 22, 2024 (virtual)

Panelist, Moody's Analytics Summit - Mar. 11, 2024, Phoenix, AZ Shell Companies and Fraud (Panel 1)
            Financial Grooming Scams and Fraud (Panel 2)

Speaker, Digital Assets and Financial Integrity (Sanctions, NPRM), Chainalysis Webinar, Mar. 6, 2024 Panelists,

ACAMS Boston Chapter - Cupid's Arrow - Focused on Financial Grooming Scams and Beneficial
            Ownership - Feb. 14, 2024, virtual

Presenter, Financial Crimes and Human Trafficking, Webinar, International Association of Chiefs of Police - Jan. 23, 2024, virtual course

Panelist, ACAMS, Privacy-Enhancing Blockchains, Privacy Coins and Mixers — Fact and Fiction,
            Dec. 5, 2023, webinar

Panelist, U.S. House Financial Services Committee, Subcommittee on Digital Assets, Financial Technology
            and Inclusion, "Crypto Crime in Context: Breaking Down the Illicit Activity in Digital Assets", Nov.
            15, 2023, Washington D.C.

Panelist, New York Arbitration Week - Arbitration of Fintech Disputes, Nov. 14, 2023, New York, NY

Panelist, Cryptocurrency Disputes and Digital Asset Regulation: Recent Developments in the U.S. and Abroad,

Oct. 24, 2023 Co-presenter, Association of Certified Financial Crime Specialists (ACFCS) " – Web3 and Crypto Compliance
            Symposium" – New York State Bar Association - Blockchain Technology and Humanitarian Aid- Speaker –
            July 13, 2023, Webinar

Panelist, Financial Crime Academy – Circumventing Sanctions with Cryptos and Digital Assets – July
            11, 2023, Webinar

Panelist, Association of Certified Financial Crime Specialists (ACFCS) – "Combating Modern-Day Slavery from
            KYB to KYC", May 24, 2023, Webinar

Participant, Cambridge Forum, "Risk Regulation & Enforcement" panelist – May 8-10, Washington

D.C. Panelist, "Fintech & Emerging Payment Systems", American Conference, Apr. 18, 2023, New

York, NY Speaker, Chainalysis Links, "Best of Private Sector," Apr. 5, 2023, New York, NY

Panelist, Moody's Analytics Summit, "How Regulators and Criminal Investigators Combat Financial
            Crime", Panelist, Mar. 5, 2023, Phoenix, AZ

            Panelist, Moody's Analytics Summit, Compliance and Blockchain Technology, Mar. 6, Phoenix,

AZ Panelist, "Democratizing Finance for Real in the Age of Blockchain", University of Pennsylvania, The Andrea
            Mitchell Center for the Study of Democracy, Jan. 19, 2023, Philadelphia, PA

Co-Presenter, "Winter is Coming: Crypto regulation and enforcement in the United States-current regulation
            or lack thereof, and what's coming next", Dec. 21, 2022, New York, NY

Moderator, D.C. Women's Bar Association - Web3 & Crypto: Applying Old Law to New Tech, Dec. 7,
            2022, Washington D.C.

Panelist, International Anti-Corruption Conference (IACC) – "Putting the Pieces Together – Collaborating to Tackle
            Violent Kleptocracies" – Dec. 7, 2022, Washington D.C.

Panelist, Reinventing Bretton Woods Committee - IMF Annual Meetings - "Crossborder Payments, A Global
            Public Good?" – Oct. 15, 2022, Washington D.C.

Panelist, "Human Trafficking, Child Exploitation, Human Rights, and Violations & Sanctions" -
            Effective Strategies Series – Thomson Reuters Special Services, Panelist, July 27, 2022, New
            York, NY

Panelist, Consensus 2022 – "Web3ackathon – Disaster Response and Relief" – June 11, 2022, Austin, TX

Panelist, Eradicate Hate Global Summit " – Cryptocurrency and the Financing of Hate" – Oct. 19, 2021,

Pittsburg, PA Speaker, 10th Annual International Association of Human Trafficking Investigators – "How to Conduct a Money
            Laundering and Financial Crimes Investigation" – Sept. 9, 2021, Clearwater, FL

U.S. Department of State and NEXIS Institute " – How to Conduct a Financial Crimes and Money
            Laundering Investigation for Child Sex Trafficking" for Jamaica 's Prosecutors and Law Enforcement
            –Aug. 19, 2021, Virtual

Speaker, Organization of American States – Plenary Session – "Financial Traceability as an Essential Part of
            Any Investigation to Trace, Seize, and Forfeit Illicit Proceeds"- May 13-14, 2021, Virtual

Presenter, Office of the N.J. Attorney General, N.J. State Police, and 21 N.J. County Prosecutor's Office – "How to Conduct a Financial Crimes and Money Laundering Investigation to Combat Human Trafficking" – May 13, 2021

Presenter, U.S. Department of Justice and Federal Bureau of Investigations " ─How to Conduct a Financial Crimes and Money Laundering Investigation" – May 12, 2021, Virtual

Presenter, U.S Department of Justice and Department of the Treasury with American Gaming Association (AGA) – Intersection of Money Laundering and Human Trafficking at Casinos – Apr. 27, 2021, Virtual

Presenter, U.S. Department of Justice – OPDAT –Money Laundering and Financial Crimes Training for Malaysian Police and Prosecutors – Mar. 23, 2021, Virtual

Presenter, U.S. Department of Justice - Law Enforcement Victim Advocate Program – "Money Laundering and Asset Forfeiture Training" – Feb. 24, 2021, Virtual

Co-presenter, Indiana Legal Services –Asset Forfeiture and Restitution Training – Jan. 29, 2021, Virtual

Panelist, Financial Action Task Force - "Joint Expert Group" Panel on Illicit Finance and Money Laundering and Asset Recovery – Nov. 26, 2020, Virtual

Presenter, U.S. Attorney's Office for District of Columbia – "Financial Investigations and Asset Forfeiture for Human Trafficking and Child Exploitation Cases" – Nov. 17, 2020, Virtual

Co-presenter, International Association of Chiefs of Police – "Conducting Money Laundering and Financial Crimes Investigations" – Sept. 23, 2020, Virtual

Co-presenter, U.S. Department of Justice -Attorney General Advisory Counsel – "Illicit Massage Business and Money Laundering Presentation" – Invited U.S. Attorneys – Sept. 22, 2020, Virtual

Co-presenter, Internet Crimes Against Children Task Force Conference – "Following the Money to Enhance Human Trafficking and Child Exploitation Cases" – Sept. 17, 2020, Virtual

Panelist, ABA International Law Annual Meeting, "Follow the Money to Combat Human Trafficking", June 29, 2020, Virtual Presenter, 9th International Association of Human Trafficking Investigators Conference – "How to Conduct a Financial and Money Laundering Investigation" – May 27-29, 2020, Virtual

Co-presenter, Denver District Attorney's Office – "Follow the Money"–Apr. 6, 2020, Virtual

Presenter, U.S. Department of Justice, Project Safe Childhood Seminar – "Forfeiture and Restitution in Child Exploitation and Child Sex Trafficking Cases" – Mar. 4-6, 2020, Columbia, SC

Co-panelist, U.S. Department of Justice and White House - Legal Aid Interagency Roundtable – "Importance of financial investigations, forfeiture, and restitution in human trafficking" – Feb. 21, 2020, Washington D.C.

Co-panelist, ACAMS – Anti-Financial Crime and Public Policy Conference, Feb. 6, 2020, Washington D.C. Presenter, U.S. Attorney's Office for the Middle District of Florida – "Financial Crimes, Money Laundering and Asset Forfeiture Training"– Criminal Division – Feb. 3-4, 2020, Tampa, FL St. Petersburg/Tampa Human Trafficking Task Force Training – St. Petersburg Police Department – "Financial Investigations to Enhance Human Trafficking Prosecutions"

Presenter, U.S. Attorney's Offices for Middle, Northern, and Southern Alabama – "How to Use Financial Crimes and Money Laundering" – Jan. 24, 2020, Montgomery, AL

Presenter, U.S. Department of Justice - Financial Investigations Seminar, Money Laundering and Asset Recovery Section - Facilitator/Instructor – Jan. 6-10, 2020, New York, NY

Presenter, U.S. Department of Justice's Human Trafficking Coordinators Training - Two Presentations: Anti-Money Laundering and Financial Crimes; Asset Forfeiture & Restitution – Oct. 23-25, 2019, Columbia, SC

Presenter, Columbia Law School – "Money Laundering and Asset Recovery Prosecutions" – Oct. 10, 2019, NY Presenter, Gulf Coast Anti-Money Laundering Forum Speaker – "Financial Investigations and Red Flags for Financial Institutions"- Sept. 17, 2019, Houston, TX

Presenter, U.S. Department of State Human Trafficking Symposium Panelist – "Illicit Financial Flows" – Sept. 4, 2019, Washington D.C.

Panelist, Cook County Human Trafficking Task Force Panelist – "Putting Our Best Foot Forward: Financially Disrupting Human Trafficking Through Collaboration" – Aug. 7-9, 2019, Chicago, IL

Presenter, U.S. Attorney's Office for the Eastern District of Michigan - Training on anti-money laundering and asset forfeiture for human trafficking – June 21, 2019, Detroit, MI

Presenter, Internet Crimes Against Children Task Force (ICAC) – "Following the Money to Enhance Your Human Trafficking and Child Exploitation Cases" – June 11-13, 2019, Atlanta, GA

Presenter, Midwest Regional Human Trafficking Training – "How to Follow the Money to Enhance Your Human Trafficking Cases" – May 22, 2019, Springfield, IL

Department of Homeland Security – "Money Laundering and Asset Forfeiture Training in Human Trafficking" – Mar. 27, 2019, Brunswick, GA

# Exhibit 2

**Jane Khodarkovsky's Rebuttal Expert Report**

<u>List of review:</u>

1.  Jane Doe's Complaint
2.  Jane Doe's Deposition
3.  Motion to Dismiss Court's Opinion August 2024
4.  Indyke Deposition & exhibits
5.  Kahn Deposition & exhibits
6.  Bella Klein's Deposition & exhibits
7.  Corporate formation records
8.  Ghislaine Maxwell's Indictment
9.  Maxwell's conviction
10. Jeffrey Epstein Indictment
11. Defendants' Expert Report - Gail Cohen (and biography) and exhibits
12. Expert Gail Cohen's deposition and exhibits
13. Certain 990s
14. Certain Taxes
15. Palm Beach Police Report (that was part of exhibit)
16. 2008 Civil Complaint  (that was part of exhibit)
17. 2010 Civil Complaint (that was part of exhibit)

<u>All citations in the report (and included below which may not be in the report)</u>







Corporate Transparency Act

90. https://www.fincen.gov/news/news-releases/fact-sheet-beneficial-ownership-information-access-and-safeguards-final-rule

91. FinCEN's Beneficial Ownership Information Reporting Rule Fact Sheet September 29, 2022   https://www.fincen.gov/beneficial-ownership-information-reporting-rule-fact-sheet#:~:text=Beneficial%20Ownership%20Information%20Reports%20*%20When%20filing,of%20the%20required%20information%20about%20the%20individual.

92. https://www.fincen.gov/boi

93. https://www.fatf-gafi.org/content/dam/fatf-gafi/reports/Human-Trafficking-2018.pdf
Discussion of shell companies - page 70 (& examples)

94. https://www.fatf-gafi.org/en/publications/Methodsandtrends/Human-trafficking.html

95. FinCEN 2019 Guidance

96. Funnel accounts- https://www.fincen.gov/sites/default/files/advisory/FIN-2014-A005.pdf

97. Third party money launderers:
https://www.ice.gov/sites/default/files/documents/Report/2017/CSReport-13-4.pdf

98. https://www.justice.gov/d9/press-releases/attachments/2022/01/31/doj_ht_strategy.pdf

99. https://www.justice.gov/criminal/mlars/units

100.    DHS/HSI: https://www.dhs.gov/blue-campaign/indicators-human-trafficking

101.    FAST Initiative Report (2019): https://www.fastinitiative.org/wp-content/uploads/Blueprint-DIGITAL-3.pdf

102.    Jane Khodarkovsky's hearing:
https://www.congress.gov/118/meeting/house/116579/witnesses/HHRG-118-BA21-Wstate-KhodarkovskyJ-20231115.pdf

103.    White House National Action Plan: https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf

104.    https://polarisproject.org/wp-content/uploads/2018/04/How-Corporate-Secrecy-Facilitates-Human-Trafficking-in-Illicit-Massage-Parlors.pdf

105. https://polarisproject.org/resources/hidden-in-plain-sight-how-corporate-secrecy-facilitates-human-trafficking-in-illicit-massage-parlors/

106. https://polarisproject.org/press-releases/corporate-secrecy-fuels-human-trafficking-in-united-states/

107. https://www.nj.com/news/2024/10/a-not-so-secret-sex-business-continues-to-thrive-in-nj-state-watchdog-reports.html

108. 25 keys to unlock the Financial Chains of Human Trafficking and Modern Slavery: https://collections.unu.edu/eserv/UNU:6232/BreakingtheFinancialChains_FullBooklet_Web.pdf

109. White House National Action Plan: https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf

110. USDOJ Resources (federal cases): https://www.justice.gov/humantrafficking/resources

111. FBI Resources: https://www.fbi.gov/investigate/violent-crime/human-trafficking#:~:text=If%20you%20are%20a%20human,373%2D7888%20or%20text%20202 33733.

112. DHS Resources: https://www.dhs.gov/dhs-center-countering-human-trafficking

113. Department of State Resources: https://www.state.gov/policy-issues/human-trafficking/

114. Department of Labor: https://www.dol.gov/agencies/oasp/resources/trafficking

115. Department of the Treasury - Guidance and Advisories (related to human trafficking):
    a. 2020 Supplemental Guidance: https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf
    b. 2014 Guidance: https://www.fincen.gov/sites/default/files/advisory/FIN-2014-A008.pdf

116. Department of the Treasury -  Money Laundering and Illicit Finance – Related to Human Trafficking: https://home.treasury.gov/system/files/136/Report-Money-Laundering-Human-Trafficking.pdf

117. Steven M. D'Antuono, *Combating Money Laundering and Other Forms of Illicit Finance: Regulator and Law Enforcement Perspectives on Reform*, Statement Before the Senate Banking, Housing, and Urban Affairs Committee, Washington, D.C. (Nov. 29, 2018) ("Cash transactions are particularly vulnerable to money laundering. Cash is anonymous, fungible, and portable; . . . it is used and held around the world; and is difficult to trace once spent.").

Cases:

118. *United States v. Backpage et al.* (18-CR-422, D.AZ 2018),
119. *United States v. Kyong Burgos,* (18-CR-126, S.D. Miss.)
120. *United States v. Wilham Martono,* (20-CR-274, N.D.TX 2020)
121. *United States v. Michael Morris, et al.* (17-CR-107, D. Minn. 2017);
122. *United States v. Sumalee Intarathong, et al.* (16-CR-257, D. Minn. 2017);

123. *United States v. Peter Griffin et al.* (22-CR-1828, S.D. Cal. 2022)
124. *U.S. v. Maksimenko*, (05-CR-80187, E.D. Mich)
125. *U.S. v. Afolabi* (07-CR-785) (D.N.J.)
126. https://www.justice.gov/usao-wdnc/pr/north-carolina-nail-salon-owner-charged-forced-labor-employee

Statutes:
127. 31 U.S.C. § 5311, *et seq*.
128. 31 CFR § 1022.210(a)
129. 31 U.S.C. § 5311(1)(A).
130. Pub. L. No. 116–283, §§ 6001-6511, 134 Stat. 3388 (2021)
131. Pub. L. No. 107-56, § 302(b)(4), 115 Stat. 272, 297 (2021).
132. Pub. L. No. 116–283, §§ 6001-6511, 134 Stat. 3388 (2021).
133. 22 U.S.C. § 7101(b)(13)
134. 22 U.S.C. § 7102(11)
135. 31 U.S.C. § 5318(h)(1)
136. 12 C.F.R. § 21.21

# EXHIBIT 3

<u>Fee Schedule</u>

Expert Consultation, Report and Testimony – Jane Khodarkovsky (Chazak Consulting LLC)

- Review of records and other materials, along with all research in support of the retaining party:  $400/hour.

- Remote work, including preparation of expert report, emails, video conferencing, telephone: $400/hour.

- In-person work of up to 5 days in aggregate, including expert consultation, investigation assistance, policy consultation, etc: $2,000/day domestic United States, $3,000/day International (regardless of hours).

- Testimony (deposition or trial): $2,000 per day (regardless of hours) plus review/preparation at $400/hour.

- Transportation and lodging: transport, hotels, and rental cars will be billed to retaining party at cost; use of personally-owned vehicle to be reimbursed at GSA rate; business class for all air travel over five hours.
- Travel Time: $200 per hour, not to exceed $1,000 per day.

- Per diem (meals and incidental expenses): current U.S. Federal (GSA schedule) locality rate.

- Cancellation: cancellation of services less than 72 hours from time of service/flight will result in payment for one day's services, plus any associated cancellation fees or penalties from carriers and/or lodging.

- Tax ID number: 92-2147853