UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 3, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>DARREN K. INDYKE and RICHARD D. KAHN,<br><br>*Defendants*. | Civil Action No. 1:24-cv-01204 (AS) |
| JANE DOE 3,<br><br>*Plaintiff*,<br><br>v.<br><br>DARREN K. INDYKE and RICHARD D. KAHN, in their capacities as co-executors of the ESTATE OF JEFFREY EDWARD EPSTEIN,<br><br>*Defendants*. | Civil Action No. 1:24-cv-02192 (AS)<br>(*consolidated with Case No. 1:24-cv-01204 (AS) for pre-trial purposes*) |

**DECLARATION OF DEFENDANT RICHARD KAHN
IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Richard Kahn, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am one of the Co-Executors of the Estate of Jeffrey E. Epstein and a defendant in the case *Jane Doe, individually and on behalf of all others similarly situated, v. Darren K. Indyke et al.*, 24-cv-1204 (AS) (S.D.N.Y.).

2. I performed accounting work for Jeffrey Epstein from October 2005 until August 2019, and, based on that work, I am familiar with the ways in which Epstein's personal and

business expenses were tracked for accounting purposes.

3. During the time I worked for him, Epstein owned a townhouse in New York, a home in Palm Beach, an apartment in Paris, two private islands in the U.S. Virgin Islands, and a ranch in New Mexico. Epstein employed more than thirty full-time staff at these properties, and regularly engaged dozens more for specific projects (such as construction and renovations).

4. Epstein also owned a plane and helicopter and employed multiple (three to four) pilots during the time I worked for him.

5. Epstein spent millions of dollars per year on the upkeep and staffing of his residences and planes alone. He also spent significant amounts on gifts and personal expenses, although the vast majority of his spending—more than 90%–was related to his residences and planes.

6. Epstein's spending was tracked by various accounting professionals, including Bella Klein, Daphne Wallace, Una Pascal, and Jeanne Brennan. Bella Klein was a bookkeeper who maintained Epstein's personal books and records as well as the books and records for some of his corporate entities. Daphne Wallace and Una Pascal were bookkeepers who maintained the books and records for other of Epstein's corporate entities, including Southern Trust Company (the entity that operated Epstein's financial consulting business), and the entities that managed Epstein's residences and planes. Jeanne Brennan was, like myself, a Certified Public Accountant. Brennan oversaw accounting of financial transactions involving some of Epstein's corporate entities.

7. Bella Klein, Daphne Wallace, and Una Pascal recorded transactions using the accounting software QuickBooks. To the best of my knowledge, they recorded each transaction conducted by one of Epstein's corporate entities or by Epstein personally, and indicated the general

category in which each transaction fell, such as "Art," "Insurance," "Bank Fees," "Electronics," "Groceries," "Capital Gains," "Interest Income," "Dividends," or "Gifts."  This was the case for all transactions, including expenses for which Epstein's employees used petty cash and expenses charged on credit cards paid for by Epstein.

8.      Klein, Wallace, and Pascal allocated expenses in QuickBooks to specific corporate entities for which the expenses were associated.  For example, if household supplies for Epstein's New Mexico residence were purchased, those expenses would be accounted for on the books of Zorro Management, LLC, the corporate entity that managed the upkeep and staffing of that property.  Klein accounted for expenses that were not associated with any specific corporate entity in Epstein's personal QuickBooks ledger.

9.      In my experience, it is important to maintain accurate books and records reflecting individual transactions for each corporate entity or individual.  Accurate books and records are necessary to assess how money is being spent.  For example, accurate books and records allocating expenses to specific corporate entities allowed Epstein to determine how much it cost him to maintain each of his residences on an annual basis.  Moreover, accurate books and records were important to minimize the risk that Epstein would be the victim of theft, fraud, or unauthorized use of funds.

10.     Prior to Epstein's arrest in 2019, it was my understanding that Epstein carried cash to pay for personal spending and tips.  It was Epstein's employees' job (including sometimes mine) to deliver cash to Epstein from the safe maintained by Bella Klein.  That was the same safe from which cash was dispensed to Epstein's property managers, assistants, pilots, and other employees.

11.     When I delivered spending cash to Epstein, I would carry it with me to a meeting with Epstein at his townhouse in New York.  I did not deliver cash to Epstein outside of New York.

12. Cash delivered to Epstein for Epstein's personal use was accounted for in Epstein's books and records as Epstein's personal spending money ("JEE Spending"). Epstein did not provide, and, to my knowledge, no accounting professionals requested, receipts or other backup showing how Epstein spent his own cash.

13. I was not a signatory on any of Epstein's personal bank accounts or the bank accounts of his corporate entities.

14. I never requested withdrawals of cash by other people or delivered cash to any person—including Epstein—with the understanding, awareness, or intent that the cash would be used to promote sex trafficking or to facilitate sexual abuse.

15. The majority of cash withdrawn from Epstein-related accounts was distributed to Epstein's pilots, property managers, assistants, and other employees as petty cash for expenses, not dispensed to Epstein for his personal spending.

16. As part of my accounting work for Epstein, I reviewed invoices and bills for projects for which I was responsible, such as capital improvements for Epstein's real properties. I also prepared annual budgets for various corporate entities belonging to Epstein, including all of the entities that managed his residences and planes. These budgets accounted for regular expenses (like staff salaries) as well as one-time expenses (like capital improvements on his properties).

17. I submitted a brokerage account application to Deutsche Bank for Gratitude America Ltd., a charitable organization, in 2016. At that point, Epstein and his entities had a number of bank accounts at Deutsche Bank, including a checking and money market account for Gratitude America Ltd. No one ever told me that Deutsche Bank intended to run an additional due diligence report on Epstein as a result of the Gratitude America Ltd. brokerage account application, nor did I think that withdrawing the application would stop Deutsche Bank from running a due

diligence report. To the best of my recollection, I never withdrew the Gratitude America Ltd. brokerage account application from Deutsche Bank.

18. I have known Darren Indyke since October 2005, when we both worked for New York Strategy Group. At no point have Darren Indyke and myself ever shared an office or worked regularly out of the same room.

19. At no point did Epstein and I ever share an office or work regularly out of the same room. Other than the time period when Epstein was incarcerated in Florida, I met with Epstein approximately every three weeks for about one hour at his home in New York.

20. My relationship with Epstein was strictly professional. With the exception of a single conversation following his conviction for solicitation of a minor in 2008, which I described at my deposition, I never discussed his sex life with him or heard him discuss it with others. I did not ever see him engaged in any sexual activity, consensual or otherwise.

21. Prior to my work as a Co-Executor of the Epstein Estate, I was not aware that Epstein had committed any act of sexual abuse other than the incidents that led to his 2008 conviction for soliciting a minor for prostitution. I was not aware that he ever committed an act of sexual abuse that involved threats, fraud, or force, or any act that would constitute sexual abuse if directed at an adult woman.

22. I was unaware that Epstein was under federal investigation until he after entered a Non-Prosecution Agreement ("NPA") with the U.S. Attorney's Office for the Southern District of Florida in 2008.

23. I was not aware of any government investigation into Epstein during the period between the NPA and Epstein's arrest in July 2019.

24. As far as I am aware, no woman has ever accused me or Darren Indyke of

committing an act of sexual abuse.

25. As far as I am aware, no woman has ever asserted that I or Darren Indyke witnessed Epstein commit an act of sexual abuse.

26. As far as I am aware, prior to Epstein's death, no woman has ever alleged that she informed I or Darren Indyke personally that Epstein abused or trafficked her.

27. Prior to Epstein's death, no woman ever informed me that Epstein abused her, or paid her for sex.

28. I was not aware in advance that ▮▮▮ were getting married, and I did not assist with the wedding or the marriage.

29. At no point, prior to Epstein's death, did I suspect that ▮▮▮ marriage was coerced or that Epstein had pressured ▮▮▮ to get married.

30. Neither ▮▮▮ ever told me that they had gotten married for immigration purposes, nor did either ▮▮▮ tell me that they did not consent to the marriage or had been pressured or coerced by Epstein into getting married.

31. In October 2016, at ▮▮▮ request, I prepared a letter of support for her and ▮▮▮ This letter was based on a model that ▮▮▮ provided me, and I provided the completed letter directly to ▮▮▮ At the time, ▮▮▮ thanked me for my support.

32. I learned of the allegation that ▮▮▮ did not consent to marry ▮▮▮ and/or was pressured to marry ▮▮▮ for the first time after Epstein's death.

33. I was not aware in advance that ▮▮▮ were getting married, and I did not assist with the wedding or the marriage.

34. At no point, prior to Epstein's death, did I suspect that ▮▮▮ marriage was coerced or that Epstein had pressured ▮▮▮ to get married.

6

35. Neither ▮▮▮▮▮ ever told me that they had gotten married for immigration purposes, nor did either ▮▮▮▮▮ tell me that they did not consent to the marriage or had been pressured or coerced by Epstein into getting married.

36. I learned of the allegation that ▮▮▮▮▮ did not consent to get married and/or were pressured to get married for the first time after Epstein's death.

37. To the best of my knowledge, I have never met or spoken with Jane Doe 3.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/4/2024          Signed: *Richard D. Kahn*
                                 Richard D. Kahn