UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 3, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DARREN K. INDYKE and RICHARD D. KAHN,<br><br>*Defendants*. | Civil Action No. 1:24-cv-01204 (AS) |
| JANE DOE 3,<br><br>*Plaintiff*,<br><br>v.<br><br>DARREN K. INDYKE and RICHARD D. KAHN, in their capacities as co-executors of the ESTATE OF JEFFREY EDWARD EPSTEIN,<br><br>*Defendants*. | Civil Action No. 1:24-cv-02192 (AS)<br>(*consolidated with Case No. 1:24-cv-01204 (AS) for pre-trial purposes*) |

**<u>DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants Darren K. Indyke and Richard D. Kahn submit the following statement of undisputed material facts in support of their motion for summary judgment:

## I. JEFFREY EPSTEIN AND HIS FINANCES

1. Jeffrey E. Epstein was an ultrahigh net worth individual. (Ex.[1] 1 (Aug. 15, 2019 Petition for Probate and for Letters Testamentary, *In re Estate of Jeffrey E. Epstein*, Probate No. ST-2019-PB-80 (V.I. Super. Ct.)) at 2 (showing total personal property of more than $577.6 million); Ex. 2 (Indyke Dep. Tr.) at 275:3-8.)

2. Epstein owned many valuable assets, including real property, and established and operated numerous corporate entities.

3. Epstein's property holdings included a New York City townhouse, a home in Florida, a large ranch in New Mexico, two private islands in the U.S. Virgin Islands (the "USVI"), and seven units in an apartment building in Paris. (Ex. 1 (Aug. 15, 2019 Petition for Probate and for Letters Testamentary, *In re Estate of Jeffrey E. Epstein*, Probate No. ST-2019-PB-80 (V.I. Super. Ct.)) at 2.)

4. Epstein established separate entities to hold and manage his real estate and certain luxury assets. For example:

[1] References to "Ex." are to the exhibits to the Declaration of Daniel H. Weiner in Support of Defendants' Motion for Summary Judgment, dated November 4, 2024 and filed concurrently herewith.



5. Epstein also formed entities for various business purposes. For example:

6. Epstein employed more than 30 staff members at his various properties, including property managers, chefs, gardeners, chauffeurs, housekeeping staff, and others. (Ex. 3 (Kahn Dep. Tr.) at 278:9-16; Ex. 8 (Alessi Dep. Tr.) at 65:7-67:7; Kahn Decl.[2] ¶ 3.) He also hired contractors, designers, and architects to make extensive improvements on his properties.

7. Epstein spent millions of dollars per year on upkeep of his residences and luxury assets and staff compensation. He also spent significant amounts on gifts and personal expenses,

[2] References to "Kahn Decl." are to the Declaration of Defendant Richard Kahn in Support of Defendants' Motion for Summary Judgment, dated November 4, 2024 and filed concurrently herewith.

although the vast majority of his spending—more than 90%—was related to his residences and planes. (Kahn Decl. ¶ 5.) Epstein's spending took many forms, including cash spending, credit card charges, and wire transfers.

8.      Epstein paid multiple bookkeepers to maintain the books and records for his corporate entities and personal finances, so as to document how his money was being spent and also to minimize the risk of theft or fraud. (Ex. 3 (Kahn Dep. Tr.) at 45:2-20; 55:6-56:10; 252:1-18; Kahn Decl. ¶¶ 6-9.) Bella Klein was responsible for maintaining books and records for Epstein personally and for some of his corporate entities, and Daphne Wallace and Una Pascal were responsible for maintaining the books and records for Epstein's other corporate entities. (Ex. 3 (Kahn Dep. Tr.) at 55:6-57:13, 112:1-17; Kahn Decl. ¶ 6.)

9.      Epstein's property managers and other employees used petty cash (that is, green bills) to pay for household and operational expenses related to his various properties, including expenses for food, cleaning, maintenance, landscaping, repairs, and tips for service providers. (*See, e.g.*, Ex. 2 (Indyke Dep. Tr.) at 221:7-223:6; *see also, e.g.*, Ex 8 (Alessi Dep. Tr.) at 70:14-74:4; Ex. 3 (Kahn Dep. Tr.) at 226:14-227:6 (describing the different types of people who would pick up petty cash); Ex. 10 (JEE_Doe3_057946-058181) (expense records showing cash payments for, *inter alia*, groceries, cable, an employee's uniform, dry cleaning, and tips).)

10.      When individuals working for Epstein received petty cash, they were subsequently required to and did provide "backup"—that is, receipts or other proof of the expense. (Ex. 10 (JEE_Doe3_057946-058181) (expense records showing cash payments for, *inter alia*, groceries, cable, an employee's uniform, dry cleaning, and tips).) The expenses would then be entered in Epstein's QuickBooks by the appropriate bookkeeper: Daphne Wallace, Una Pascal, or Bella Klein. (Ex. 11 (Report as of December 31, 2006) (KAHN_00098602) (

[redacted]); Ex. 12 (Report as of December 31, 2008) (KAHN_00090724) (showing similar backup); Ex. 13 (Report as of December 31, 2011) (KAHN_00090731) (showing similar backup).) Petty cash expenditures by Epstein's employees were generally tracked, regardless of whether they were only for a few dollars [redacted] or for thousands of dollars [redacted]. (*See* Ex. 12 (Report as of December 31, 2008) (KAHN_00090724) (showing backup for petty cash used for range of expenses).) The majority of cash withdrawn from Epstein-related accounts was accounted for as petty cash distributed to Epstein's pilots, property managers, employees, and assistants, rather than cash given directly to Epstein. (Kahn Decl. ¶ 15.)

11. The requirement of backup for petty cash withdrawals was intended to keep accurate books and records regarding spending and to prevent theft from Epstein—that is, people taking "petty cash," purportedly for Epstein-related expenses, and using it for their own personal expenses without Epstein's approval. (Ex. 3 (Kahn Dep. Tr.) at 252:1-18; Kahn Decl. ¶ 9.)

12. Epstein's cash reserves, which were used to distribute petty cash to individuals who worked for him, were periodically replenished by employees tasked with withdrawing cash from Epstein's accounts. (*See* Ex. 8 (Alessi Dep. Tr.) at 70:14-71:5); Ex. 11 (KAHN_00098602) ([redacted]); Kahn Decl. ¶ 10.) Those reserves were managed primarily by Bella Klein. (Ex. 3 (Kahn Dep. Tr.) at 221:4-12.)

13. Epstein also used cash to pay for his own personal expenditures. (*See, e.g.*, Ex. 14 [redacted] (HBRK_JD3_223608) (use of cash for tip

on Epstein's haircut).) Epstein regularly took cash as spending money that had been withdrawn from his own accounts, which was then reflected on his personal ledger as "JEE Spending." (Kahn Decl. ¶¶ 8, 10.)

14. Because cash withdrawn from his accounts belonged to him and there was no theft risk or other risk of unauthorized use, Epstein did not provide receipts or other backup to his bookkeepers itemizing his expenses or how the cash he received directly was used. (*Id.* ¶ 12.)

15. Epstein used wire transfers for many types of transactions, including paying contractors for work they conducted on his behalf, sending money to friends (both men and women), and making charitable donations. (*See e.g.*, Ex. 15 [redacted] (JEE_Doe3_003017) (showing wire transfers for pilot services, aircraft maintenance, and related expenses); Ex. 16 [redacted] (HBRK_JD3_100637); Ex. 17 [redacted] (HBRK_JD3_106516); Ex. 18 [redacted] (KAHN_00067320).)

16. Nothing in any wire transfer, or in Epstein's request for any wire transfer, indicated that such transfer was connected to any sexual activity or trafficking.

17. Epstein's property managers and pilots, and some of his longstanding assistants, were issued credit cards, which they used to pay for Epstein-related expenses, ranging from travel to jet fuel to food and supplies. (*See, e.g.*, Ex. 19 [redacted] (HBRK_JD3_072326); Ex. 20 [redacted] (HBRK_JD3_040429); Ex. 21 [redacted]



[redacted].) Monthly credit card spending for Epstein's properties regularly surpassed $50,000. (Ex. 22 [redacted] (HBRK_JD3_035989); Ex. 23 [redacted] (HBRK_JD3_039024); Ex. 24 [redacted] (HBRK_JD3_039042); Ex. 25 [redacted] (HBRK_JD3_072337).)

18. Epstein's bookkeepers allocated charges made using Epstein-supplied credit cards to specific corporate entities, where appropriate, for recordkeeping purposes. For example, charges on the credit card of the property manager for Epstein's Zorro Ranch property in New Mexico associated with management and upkeep of the Ranch were recorded on Zorro Management, LLC's books. (Ex. 26 (Report as of August 10, 2018) (HBRK_JD3_072322) (showing credit card charges from B. Gordon for, *inter alia*, landscaping supplies, appliances and assorted groceries).) Credit card charges that were not associated with any specific corporate entity were accounted for on Epstein's personal ledger. (Kahn Decl. ¶ 8.)

19. Epstein's bookkeepers used the accounting software QuickBooks to keep track of Epstein's personal and corporate books and records. This involved recording cash, wire, and credit card expenditures, and allocating them to the appropriate ledger: either a specific corporate entity, or Epstein's personal ledger. The bookkeepers would indicate the category into which each transaction fell, such as "Art," "Insurance," "Bank Fees," "Electronics," "Groceries," "Capital Gains," "Interest Income," "Dividends," or "Gifts." (*Id.* ¶¶ 7-8.) The bookkeepers also tracked expenses associated with a particular corporate entity, or Epstein's personal expenses, on the appropriate ledger. If a payment was made out of one bank account but was associated with

a different entity, the appropriate bookkeeper would make a journal entry in QuickBooks to move the expense to the correct ledger. (Ex. 3 (Kahn Dep. Tr.) at 44:6-45:20, 112:1-17.)

20. Epstein's ledgers included a category for payments characterized as "gifts," which referred to "payments that were not for Epstein." (Ex. 3 (Kahn Dep. Tr.) at 275:11-17.) Those transactions encompassed payments made in a variety of ways, including gifts of cash, credit card charges for which Epstein ultimately footed the bill, and wire transfers (either directly to the gift recipient or to a third party on the recipient's behalf). "Gifts" were tracked for the purpose of assisting Epstein's tax accountant (not Kahn) in preparing Epstein's tax returns, so that he would be sure to pay appropriate gift taxes if necessary. The classification of a "gift" did not give rise to a *deduction* on Epstein's taxes, but to an *additional* tax on gifts to an individual that exceeded the annual allowable amount in a given year. (*Id.* at 254:14-255:24.)

21. Epstein's records show extensive gifts to a variety of people, including men. (*See* Ex. 17 [redacted] (HBRK_JD3_106516); Ex. 27 (HBRK_JD3_018959) [redacted]; Ex. 28 (HBRK_JD3_004908) at HBRK_JD3_004930 [redacted]; Ex. 29 (HBRK_JD3_003784) at HBRK_JD3_003803 [redacted].)

22. Epstein's ledgers also reflect gifts of all kinds to prominent individuals who were not young or vulnerable women. [redacted]

## II. DEFENDANTS' WORK FOR EPSTEIN

23. In connection with the management of his business, personal assets, properties, and investments, Epstein employed numerous professionals in different roles. (Ex. 2 (Indyke Dep. Tr.) at 223:22-23; Ex. 3 (Kahn Dep. Tr.) at 55:10-24; Ex. 8 (Alessi Dep. Tr.) at 65:15-67:4.)

24. Darren K. Indyke, a corporate transactional attorney, provided legal services to Epstein from 1996 until Epstein's death in August 2019. (Ex. 2 (Indyke Dep. Tr.) at 60:9-14.)

25. Richard D. Kahn, an accountant, provided accounting and bookkeeping services to Epstein from October 2005 until Epstein's death in August 2019. (Ex. 3 (Kahn Dep. Tr.) at 54:14-59:11.)

26. Neither Indyke nor Kahn ever worked out of the same office as Epstein, nor did they socialize with him. (*Id.* at 78:10-18; Ex. 2 (Indyke Dep. Tr.) at 97:21-98:4.) Indyke and Kahn never shared an office with each other. (Indyke Decl.[3] ¶ 3; Kahn Decl. ¶ 18.)

27. Indyke and Kahn met with Epstein only infrequently and did not typically have access to Epstein's calendar. (Ex. 2 (Indyke Dep. Tr.) at 92:22-93:15; 135:12-20; Ex. 3 (Kahn Dep. Tr.) at 136:16-137:10.)

28. Neither Indyke nor Kahn ever witnessed Epstein sexually abuse anyone. (Indyke Decl. ¶ 4; Kahn Decl. ¶¶ 20, 25.)

29. With the exception of the incident that led to Epstein's 2008 conviction for felony solicitation of prostitution and procuring a minor for prostitution, which Epstein stated would never happen again, neither Indyke nor Kahn were aware, prior to their work as co-executors for

[3] References to "Indyke Decl." are to the Declaration of Darren K. Indyke in Support of Defendants' Motion for Summary Judgment, dated November 4, 2024 and filed concurrently herewith.

the Estate of Jeffrey E. Epstein (the "Estate"), that Epstein had sexually abused anyone. (Ex. 3 (Kahn Dep. Tr.) at 80:14-82:15; 270:10-21; 274:16-25; Indyke Decl. ¶ 5; Kahn Decl. ¶¶ 20-21.)

30. No claimant, including Jane Doe 3, has ever alleged that Indyke sexually abused or trafficked them. (Indyke Decl. ¶ 6.)

31. No claimant, including Jane Doe 3, has ever alleged that Kahn sexually abused or trafficked them. (Kahn Decl. ¶ 24.)

32. No claimant, including Jane Doe 3, has ever alleged that either Indyke or Kahn witnessed any sexual abuse by Epstein. (Indyke Decl. ¶ 7; Kahn Decl. ¶ 25.)

33. No claimant, including Jane Doe 3, has ever alleged that she informed Indyke or Kahn that she was sexually abused by Epstein. (Indyke Decl. ¶ 8; Kahn Decl. ¶¶ 26-27.) To the contrary, a number of women who, after Epstein's death, claimed that Epstein sexually abused them sent messages to Defendants during Epstein's life with positive messages that gave no indication that they were being abused. (Ex. 31 [REDACTED] (KAHN_00098999); Ex. 32 [REDACTED] (KAHN_00104773); Ex. 33 [REDACTED] (KAHN_00035428); Ex. 34 [REDACTED] (KAHN_00058720); Ex. 35 [REDACTED] (KAHN_00057617); Ex. 36 [REDACTED] (Indyke_Doe3_010303).)

**A. <u>Indyke's Work for Epstein</u>**

34. In 2008, Indyke founded his own law firm named Darren K. Indyke, PLLC, which counted Epstein among its clients. (Ex. 2 (Indyke Dep. Tr.) at 63:7-9.)

35. From 2008 to 2010, in addition to working out of his own office in New York City, Indyke worked out of an apartment at 301 East 66th Street in Manhattan. (*Id.* at 97:10-17.)

36. The building located at 301 East 66th Street is a large apartment complex consisting of approximately 200 apartments. (Ex. 3 (Kahn Dep. Tr.) at 219:16-220:19.) Epstein had access to a handful of apartments in the building and allowed friends and acquaintances to stay there. (*Id.* at 232:4-233:12; Ex. 37 [REDACTED] (JEE_Doe3_103242) [REDACTED]; Ex. 38 [REDACTED] (JEE_Doe3_101770) [REDACTED]; Ex. 39 [REDACTED] (JEE_Doe3_105170) [REDACTED].)

37. [REDACTED]

38. Indyke was not Epstein's only attorney. (Ex. 2 (Indyke Dep. Tr.) at 93:10-15.) Epstein engaged several other attorneys to assist him in various matters, including other corporate attorneys to handle transactional matters in various jurisdictions, and litigation and trial attorneys to represent him in civil and criminal lawsuits. (*See, e.g.*, *id*. at 36:22-24, 55: 20-22, 58:2-6.)

39. Throughout his tenure as counsel for Epstein, the legal work that Indyke performed for Epstein primarily consisted of corporate transactional work, such as drafting and negotiating agreements related to Epstein's investments; assisting with Epstein's purchases of helicopters, yachts, and other luxury assets; advising on real estate matters; and forming entities related to Epstein's purchases of real estate and luxury assets, and operation of his properties.

(*Id.* at 54:1-56:2, 55:11-22, 251:15-252:6.)

40. From late 2013 to 2017, Epstein or his accountants would periodically request that Indyke assist in withdrawing cash from Epstein's account. (*Id.* at 224:8-13, 225:9-10; Ex. 41 [redacted] (Indyke_Doe3_001022-1023).)

41. In or around May 2014, Indyke asked an employee at Deutsche Bank about Deutsche Bank's maximum daily cash withdrawal allowance. That employee informed Indyke that there was a maximum daily withdrawal limit of $7,500 for an authorized user of an account who is not the primary account holder; to comply with that limit, Indyke withdrew no more than $7,500 in cash in response to any withdrawal request from Epstein or his accountants. (Ex. 2 (Indyke Dep. Tr.) at 195:13-196:4, 220:13-221:3; Ex. 41 [redacted] (Indyke_Doe3_001022-23).)

42. At some point during his tenure as Epstein's attorney, Epstein gave Indyke authority to sign checks and send wire transfers from bank accounts owned by Epstein or entities beneficially owned by Epstein. (Ex. 2 (Indyke Dep. Tr.) at 65:5-22, 73:4-10.)

43. Indyke did not independently decide when to withdraw cash or how much to withdraw, nor did he independently decide when to write checks or authorize wires, the amounts of those checks or wires, or to whom those wires or checks should be directed. (*Id.* at 65:5-22; 66:1-68:6, 69:16-71:25; Ex. 42 [redacted] (HBRK_JD3_244874-244875) [redacted]; Ex. 43 [redacted] (Indyke_Doe3_004751) at Indyke_Doe3_004753 (same); Ex. 44 [redacted] (Indyke_Doe3_007708) [redacted]

[REDACTED].)

44. To the extent Indyke was asked to authorize wire transfers to women, nothing in those requests indicated that the wires were in connection with any sexual activity or trafficking, as opposed to the payment of salaries for women who worked for Epstein or gifts for friends or women whom Epstein was seeing. (*See, e.g.*, Ex. 45 [REDACTED] (Indyke_Doe3_006754); Ex. 46 [REDACTED] (Indyke_Doe3_006763).)

**B. Kahn's Work for Epstein**

45. Kahn is a professional accountant. He received his Bachelor's degree in Accounting from Syracuse University in 1994, and worked for three public accounting firms between 1994 and 2005. (Ex. 3 (Kahn Dep. Tr.) at 120:14-121:8.)

46. After spending a decade at accounting firms, Kahn began searching for a job outside of public accounting. The hours at accounting firms were long, and he hoped to find something with more work-life balance. (*See id.* at 121:20-122:9.)

47. To aid in his job search, Kahn contacted a recruiter who had advertised in The New York Times. In October 2005, that recruiter arranged for Kahn to interview with Jeffrey Epstein, who already employed one accountant (Harry Beller) and was looking to hire another. Kahn had not ever met, or even heard of, Jeffrey Epstein prior to his October 2005 interview. (*Id.* at 121:20-122:17.)

48. After Epstein interviewed him, Kahn was hired to work at New York Strategy Group, which employed individuals who provided professional services to Epstein. (*Id.* at 121:20-122:2; 238:1-2.)

49. Kahn understood that Epstein was an ultra-high-net worth individual who made money by providing financial, tax, and estate planning services for his clients, in addition to making profitable investments with his own wealth. (*Id.* at 53:21-54:13; *see also* Ex. 47 [REDACTED] (HBRK_JD3_132498); Ex. 48 [REDACTED] (KAHN_00037348).)

50. Kahn worked out of an office at 457 Madison Avenue in Manhattan from October 2005 until June 2010. (Ex. 3 (Kahn Dep. Tr.) at 237:24-238:2.)

51. Kahn worked out of an apartment at 301 East 66th Street in Manhattan from June 2010 through May 2012. (*Id.* at 216:15-19; 238:3-8.) The apartment where Kahn worked was on the tenth floor, and Epstein did not utilize any other tenth floor apartments as "guest apartments" during that time. (*Id.* at 216:20–217:7; 219:16–220:19.)

52. Kahn worked out of an office at 575 Lexington Avenue from May 2012 until Epstein's death. (*Id.* at 238:3-8.) At the 575 Lexington Avenue office, Kahn worked in a small room by himself with a window, which was separate from a larger windowless room, accessible by a separate hallway, from which other accounting professionals Bella Klein, Ehmad Hanna, and Harry Beller worked. (*Id.* at 239:18-240:3.)

53. At New York Strategy Group—and, later, at HBRK Associates Inc. ("HBRK")—Kahn oversaw Epstein's life, dental, health, and property insurances. He also kept track of, and maintained records relating to, investments that Epstein made in non-public companies, and significant purchase, construction, and renovation projects related to Epstein's homes, plane, and automobiles. (*Id.* at 58:12-59:11; 124:12-125:8; *see also, e.g.*, Ex. 49 [REDACTED] (HBRK_JD3_131539) [REDACTED].) In 2014, Kahn took on responsibilities related to tracking and maintaining records related to

Epstein's investments in public companies. (Ex. 3 (Kahn Dep. Tr.) at 124:1-5.)

54. As part of his role, Kahn also reviewed invoices and bills for projects for which he was responsible. (*Id.* at 251:16-252:18; *see also, e.g.*, Ex. 50 [REDACTED] (KAHN_00085338); Kahn Decl. ¶¶ 20-21.)

55. In 2008, Kahn co-founded HBRK with [REDACTED], another accountant who performed work for Epstein. In 2009, Kahn's employment switched from New York Strategy Group to HBRK. Kahn worked at HBRK, providing accounting services to Epstein, until Epstein's death on August 10, 2019. (Ex. 3 (Kahn Dep. Tr.) at 124:6-11.)

56. HBRK employed other accounting professionals, including [REDACTED]. (*Id.* at 57:23-59:11.)

57. Kahn was not responsible for and did not prepare or file tax returns for Epstein or Epstein-owned entities; Epstein had separate, outside accountants who provided those services. (*Id.* at 254:22-255:1.) Kahn did, however, occasionally coordinate with Epstein's outside accountants to provide access to the records Epstein's tax accountants needed to prepare tax returns for Epstein and his various corporate entities. (*Id.* at 255:5-13; Ex 51 [REDACTED] (KAHN_00059897) (concerning tax issues related to 11 corporate entities).)

58. Epstein and his entities engaged in 1,000 to 2,000 transactions every month. (Ex. 3 (Kahn Dep. Tr.) at 181:3-12.) Kahn was not familiar with every transaction involving an Epstein account. (*Id.* at 180:25-181:12).)

59. Kahn was not responsible for providing petty cash to individuals; maintaining QuickBooks files logging transactions entered by Epstein, his entities, or his assistants; or

processing checks or wires. (*Id.* at 57:3-13; 58:8-11; 220:20-21:21; 246:24-47:2.)

60. Kahn did not have signatory authority for any of Epstein's accounts. In other words, he could not sign a check or authorize a wire transfer to anyone from an Epstein account. (*Id.* at 251:6-25.) Accordingly, if Epstein sent Kahn a request to initiate a wire transfer, Kahn would pass that request on to the appropriate individual. (*Id.*)

61. Kahn periodically brought cash to Epstein from a safe in HBRK's office, which served as a petty cash repository (and was managed by Bella Klein), when he met with Epstein in New York City. (Kahn Decl. ¶¶ 10-11.) Because Epstein was a resident of the USVI and traveled frequently, Kahn and Epstein usually met in person only once or twice per month. (*Id.* ¶ 19.)

**C. <u>New York Department of Financial Services Report</u>**

i. <u>Paragraph 44</u>

62. Gratitude America was a not-for-profit organization under the laws of the USVI. Jeffrey Epstein was the President of Gratitude America until October 1, 2015. (Ex. 52 (Articles of Incorporation of Gratitude America) (KAHN_00081171); Ex. 53 (Oct. 1, 2015 Unanimous Written Consent of Directors of Gratitude America, Ltd.) (KAHN_00012728).)

63. Prior to 2016, Jeffrey Epstein held (directly or indirectly) multiple accounts—brokerage and otherwise—at Deutsche Bank. Deutsche Bank was aware of Epstein's affiliation with those accounts. (Ex. 48 [REDACTED] (KAHN_00037348); Ex. 55 [REDACTED] [REDACTED] (KAHN_00094442); Ex. 56 [REDACTED] [REDACTED] (KAHN_00094448); Ex. 57 [REDACTED]

[redacted] (KAHN_00094456); Ex. 58 [redacted] (KAHN_00094464); Ex. 59 [redacted] (KAHN_00094474).)

64. In February 2015, [redacted] applied for a checking account for Gratitude America at Deutsche Bank. In her application, she explained that [redacted]. (Ex. 60 [redacted] (KAHN_00081170).) Deutsche Bank thus was informed and aware of Gratitude America's affiliation with Epstein.

65. In March 2015, Deutsche Bank opened a checking and money market deposit account for Gratitude America. (Ex. 61 [redacted] (HBRK_JD3_244663) (regarding opening of Gratitude America account); Ex. 62 [redacted] (KAHN_00077017) [redacted].)

66. Kahn became the President of Gratitude America on October 1, 2015, [redacted]. (Ex. 53 [redacted] (KAHN_00012728).)

67. Gratitude America held approximately $[redacted] in cash by the end of 2015, which could have been invested in stocks and bonds through a Gratitude America brokerage account. (Ex. 3 (Kahn Dep. Tr. at 17:9-18:13); Ex. 54 [redacted] (KAHN_00094262).)



68. On January 5, 2016, Kahn submitted an application to Deutsche Bank for a brokerage account for Gratitude America. (Ex. 63 [REDACTED] (KAHN_00012731).)

69. That application accurately identified Richard Kahn as the President of Gratitude America. (Ex. 63 (Deutsche Bank account agreement for Gratitude America, Ltd.) (KAHN_00012732) at KAHN_00012737.)

70. On January 27, 2016, in response to an inquiry from a Deutsche Bank employee, Kahn provided Gratitude America's most recently-filed Form 990-PF tax return. (Ex. 64 [REDACTED] (KAHN_00110052); Ex. 65 [REDACTED] (KAHN_00107978).) That was Gratitude America's 2014 Form 990-PF, which listed Epstein as the President (the position he held when the return was filed). (Ex. 65 (Apr. 29, 2015 Gratitude America Ltd. 2014 Federal Return) (KAHN_00107979) at KAHN_00107982.)

71. No one at Deutsche Bank told Kahn that Deutsche Bank sought to run an additional due diligence report on Epstein as a result of the Gratitude America brokerage application, or that withdrawing it would stop the diligence report from being run. (Kahn Decl. ¶ 17.)

72. Deutsche Bank did not open a brokerage account for Gratitude America for reasons that were never explained to Kahn. (Ex. 3 (Kahn Dep. Tr.) at 26:3-12).)

73. Kahn did not withdraw Gratitude America's brokerage account application to Deutsche Bank and never took any action with the intent of stopping Deutsche Bank from running a due diligence report on Epstein. (Kahn Decl. ¶ 17.)

74. In February 2016, Kahn submitted an application to [REDACTED] for a

brokerage account for Gratitude America. That application included [REDACTED], clearly disclosing Epstein's affiliation with the entity. (Ex. 66 [REDACTED] (KAHN_00028451) at KAHN_00028458 (sharing Gratitude America documents and attaching Gratitude America application documents).)

75. [REDACTED] opened a brokerage account for Gratitude America on the same day that Kahn submitted account application materials. (Ex. 67 [REDACTED] (KAHN_00026104) (sharing Gratitude America's Account Number and IPO Certification Document).)

76. Gratitude America continued to use its checking and money market accounts at Deutsche Bank after opening a brokerage account at [REDACTED]. Kahn periodically arranged for money in the [REDACTED] brokerage account to be transferred to Gratitude America's Deutsche Bank checking account, from which charitable donations were made. (Ex. 68 (Nov. 13, 2017 Email from Kahn to B. Klein) (KAHN_00047021) [REDACTED]; Ex. 69 [REDACTED] (KAHN_00046846) [REDACTED]; Ex. 70 [REDACTED]) (KAHN_00046910) [REDACTED]; Ex. 71 [REDACTED] (KAHN_00047388); Ex. 72 (Apr. 26, 2017 Deutsche Bank Wire Confirmation) (KAHN_00051722) [REDACTED].)

77. Epstein continued to have multiple brokerage accounts at Deutsche Bank, as well as brokerage accounts at [REDACTED], through 2017. (*See* Ex. 73 (Brokerage Account Analysis Report as of October 31, 2017) (KAHN_00046941) (showing accounts at Deutsche Bank, [REDACTED]).)

78. Gratitude America's bank accounts were never used to transfer money to Jane Doe 3 or any other women who alleged that Epstein sexually assaulted them. (Ex. 74 (Gratitude America, Ltd. General Ledger as of August 10, 2019) (JEE_Doe3_003003).)

ii. <u>Paragraph 46</u>

79. On August 11, 2015, [REDACTED] an employee of Deutsche Bank, emailed HBRK employee [REDACTED], asking for additional information about specific wire transfers. [REDACTED] forwarded the request to Kahn, who asked [REDACTED] [REDACTED] [REDACTED] [REDACTED]" (Ex. 3 (Kahn Dep. Tr.) at 31:5-32:3; Ex. 75 [REDACTED] [REDACTED] (KAHN_00063115) [REDACTED] [REDACTED].)

80. On May 10, 2018, [REDACTED] from Deutsche Bank sent an email to Kahn stating, [REDACTED] [REDACTED] (Ex. 76 [REDACTED] (KAHN_00014130).)

81. The May 10, 2018 compliance inquiries sought explanations for four wire transfers from March 2018 to two men and two women: [REDACTED] [REDACTED]

[REDACTED]. (*Id.*) Nothing in that email or otherwise suggested that the compliance inquiries regarding the wires to [REDACTED] were due to their Eastern European-sounding names or suggested that they could be victims of sex abuse or sex-trafficking. (*See id.*)

82. On May 11, 2018, Kahn provided the following explanations for the transfers: [REDACTED] (Ex. 76 [REDACTED] (KAHN_00014130).)

83. Epstein paid for [REDACTED] (Ex. 77 [REDACTED] (JEE_Doe3_089360); Ex. 78 [REDACTED] (KAHN_00020342).)

84. Kahn was aware that Ms. [REDACTED] was in school and that Epstein had agreed to pay her tuition. (Ex. 79 (Sept. 15, 2017 Email from Kahn to Epstein) (JEE_Doe3_109219); Ex. 80 [REDACTED] (KAHN_00020337); Ex. 81 [REDACTED] (KAHN_00098737).)

85. Ms. [REDACTED] sent multiple emails to Kahn seeking support in her attempt to attend school in [REDACTED] (*See, e.g.*, Ex. 82 [REDACTED] (KAHN_00098711); Ex. 83 [REDACTED] (KAHN_00098720); Ex. 84 [REDACTED] (KAHN_00050265); Ex. 85 [REDACTED]

(KAHN_00050281); Ex. 86 [redacted] (KAHN_00098735); Ex. 87 [redacted] (KAHN_00098736).) At her request, Kahn prepared a letter to [redacted]. (Ex. 88 [redacted] (KAHN_00098627).) At no point did [redacted] tell Kahn that she was being abused, assaulted, or trafficked, or that Epstein's payments were for sex rather than to support her studies. (Kahn Decl. ¶ 27.) To the contrary, she told him that she [redacted] (Ex. 89 [redacted] (KAHN_00098742).)

86. There is no evidence in the record that [redacted] was abused, assaulted, or trafficked by Epstein.

87. Epstein paid for [redacted]. (Ex. 90 [redacted] (HBRK_JD3_204309).)

88. Kahn was aware that Ms. [redacted] was in school, and that Epstein had agreed to pay her tuition. (Ex. 91 [redacted] (KAHN_00101874).)

89. There is no evidence in the record that Ms. [redacted] was abused, assaulted, or trafficked by Epstein.

90. When Deutsche Bank asked for more information about wire transfers, including the wires to [redacted], Kahn asked Epstein for additional information and provided that information to Deutsche Bank. (Ex. 3 (Kahn Dep. Tr.) at 38:3-21; Ex. 92 [redacted] (KAHN_00013241).) Epstein told Kahn that the [redacted] were for tuition. (Ex. 93 [redacted]

[redacted] (JEE_Doe3_097259).) Kahn did not doubt Epstein's explanation and believed that the payments were for expenses related to [redacted] schooling. (Ex. 3 (Kahn Dep. Tr.) at 42:1-43:12, 44:2-5, 46:3-47:14, 106:12-21.)

91. Epstein paid tuition expenses for a number of people, including many people who worked for him and who have never accused him of sexual misconduct. (Ex. 94 (Dec. 20, 2017 Wire Transfer Record) (HBRK_JD3_101886) [redacted]; Ex. 8 (Alessi Dep. Tr.) at 101:25-102:5.)

**C. [redacted] and [redacted] Marriages**

92. On or about [redacted], [redacted]—two women who worked with Epstein—got married. (Ex. 95 (Jan. 4, 2019 Verified Complaint for Divorce) (Indyke_Doe3_003638) at Indyke_Doe3_003642.) Neither Indyke nor Kahn facilitated or assisted with their marriage, or were aware in advance that it was taking place. (Ex. 2 (Indyke Dep. Tr.) at 150:15-16; Ex. 3 (Kahn Dep. Tr.) at 228:25.)

93. Several months after their marriage, Ms. [redacted] asked Indyke to help her prepare for an interview with immigration authorities related to either the permanent residency or naturalization of Ms. [redacted] Indyke told Ms. [redacted] that he did not have experience in immigration law. (Ex. 2 (Indyke Dep. Tr.) at 161:1-12, 162:11-163:7.)

94. A few years later, on June 6, 2017, Ms. [redacted] asked Indyke for advice regarding getting a divorce from [redacted] (*Id.* at 161:1-162:6); Ex. 96 (June 6-9, 2017 Emails between [redacted] and Indyke) (Indyke_Doe3_006674) at Indyke_Doe3_006676.) Indyke advised Ms. [redacted] that he was not a matrimonial lawyer, but, in his view, the reasons she would assert in support of a divorce (such as irreconcilable differences) were likely inconsistent with what she had

presented to immigration authorities and that she should consider waiting to file for divorce. (Ex. 2 (Indyke Dep. Tr.) at 161:22-162:6.) Indyke never told Ms. [REDACTED] not to get a divorce. (*Id.* at 174:17, 166:9-19.)

95. In early 2019, when Ms. [REDACTED] and Ms. [REDACTED] initiated uncontested divorce proceedings, they asked Indyke to look over some divorce paperwork. Indyke reviewed the paperwork and provided comments, which he sent directly to Ms. [REDACTED] counsel. (*Id.* at 167:17-23; Ex. 97 (Mar. 6, 2019 Email from Indyke to [REDACTED] (Indyke_Doe3_002668).)

96. At [REDACTED] request, Kahn requested a joint account application from Deutsche Bank and provided it to [REDACTED]. (*See* Ex. 3 (Kahn Dep. Tr.) at 229:6-17; 235:21-237:1.)

97. In October 2016, Kahn prepared a short (less than one page) letter of support for [REDACTED], describing his interactions with the couple in connection with his preparation of their tax returns. (Ex. 98 (Oct. 25, 2016 Letter from Kahn) (KAHN_00005858).) He prepared the letter at Ms. [REDACTED] request, based on a model that she provided to him, and she thanked him for his support. (Kahn Decl. ¶ 31.) At that time, Kahn did not suspect that [REDACTED] [REDACTED] marriage was coerced or the result of pressure from Epstein. (*Id.* ¶ 29.)

98. In or around [REDACTED], [REDACTED]—two women who also worked with Epstein—got married. Neither Indyke nor Kahn facilitated or assisted with their marriage, or were aware in advance that it was taking place. (Ex. 2 (Indyke Dep. Tr.) at 150:15-16; Ex. 3 (Kahn Dep. Tr.) at 235:9-18.)

99. At Ms. [REDACTED] request, Indyke reviewed certain documents relating to her immigration. For example, in March 2016, Ms. [REDACTED] asked Indyke to review letters supporting her immigration application. (Ex. 99 (Mar. 6, 2016 Email from [REDACTED] to

Indyke) (Indyke_Doe3_010353).)

100. At [REDACTED] request, Kahn requested a joint account application from Deutsche Bank and provided it to [REDACTED]. (*See* Ex. 3 (Kahn Dep. Tr.) at 235:21-237:1.)

101. Neither Indyke nor Kahn were ever told by [REDACTED] [REDACTED] that their marriages were coerced or "sham" marriages, or that they did not consent to enter into their marriages or were pressured into their marriages by Epstein. (*See* Ex. 2 (Indyke Dep. Tr.) at 173:20-174:4; Kahn Decl. ¶¶ 29, 35.)

102. Neither Indyke nor Kahn heard until after Epstein's death any allegation that any of [REDACTED] did not consent to enter into their marriages or were pressured into their marriages by Epstein. (*See* Ex. 2 (Indyke Dep. Tr.) at 173:20-174:4; Kahn Decl. ¶¶ 32, 36.)

## III. LITIGATION AGAINST EPSTEIN

103. In July 2006, following an investigation by police in Palm Beach, Florida, Epstein was charged with felony solicitation of prostitution. (Ex. 100 (Jul. 19, 2006, Palm Beach County Indictment) (JEE_Doe3_064407).)

104. On July 24, 2006, at the request of the Palm Beach Police Department, the Federal Bureau of Investigation ("FBI") began a federal investigation into allegations against Epstein. (Ex. 101 (Dec. 6, 2006 FBI Report regarding Investigation of Jeffrey Epstein) (JEE_Doe3_098476).)

105. Public reporting regarding the criminal charges against Epstein focused on the minor victims and did not reflect any allegation that Epstein had forced, defrauded, or coerced any women into commercial sex acts. *See, e.g.*, Larry Keller, *Epstein camp calls female*

*accusers liars*, The Palm Beach Post (Aug. 8, 2006), https://www.palmbeachpost.com/story /news/2006/08/08/epstein-camp-calls-female-accusers-liars/2622733007/; *Money Manager Said to Plan to Plead Guilty to Prostitution Charges*, ABC News (Oct. 11, 2007), https://abcnews.go.com/TheLaw/story?id=3717303&page=1.

106. On August 8, 2006, the *Palm Beach Post* reported that a grand jury, in indicting Epstein for solicitation of a minor, had concluded that there was not enough evidence to charge Epstein with the more serious charge of sexual activity with minors, despite "an 11-month investigation that included sifting through Epstein's trash and surveilling his home." The article quoted a state's attorney spokesman as saying that the office "refers cases to the grand jury when there are issues with the viability of the evidence or witnesses' credibility." Larry Keller, *Epstein camp calls female accusers liars*, The Palm Beach Post (Aug. 8, 2006), https://www.palmbeachpost.com/story/news/2006/08/08/epstein-camp-calls-female-accusers-liars/2622733007/.

107. Epstein engaged criminal defense attorneys to represent him in connection with the Palm Beach investigation and the FBI investigation. Indyke did not represent Epstein in those investigations. (Ex. 2 (Indyke Dep. Tr.) at 293:6-10; Indyke Decl. at ¶ 9.)

108. On February 1, 2007, Epstein's criminal defense attorneys submitted a letter to the U.S. Attorney's Office for the Southern District of Florida, contesting the grounds for the federal investigation against Epstein. (Ex. 102 (Feb. 1, 2007 Letter from G. Lefcourt to A. Villafana) (Indyke_Doe3_022991-3015).)

109. In their February 1, 2007 letter, Epstein's defense attorneys asserted, *inter alia*, that (1) Epstein did not know or believe that any women were under 18 years old, (2) there were contradictory statements in the Palm Beach Police Report, and (3) there were material omissions

from the Palm Beach Police Report, including Epstein's submission of a May 2, 2006 polygraph examination, showing that he believed the women were over 18 years old. (*Id.*)

110. In July and August 2007, Epstein's defense attorneys submitted additional letters to the U.S. Attorney's Office, contesting federal charges. (Ex. 103 [REDACTED] (Indyke_Doe3_025585-607); Ex. 104 (*Jane Doe 1 & Jane Doe 2 v. United States*, Docket No. 9:08-cv-80736-KAM (S.D. Fla. Feb. 10, 2016), ECF No. 361-48 (Aug. 2, 2007 Letter from L. Sanchez to M. Menchel)).

111. On September 24, 2007, after negotiations between Epstein's defense attorneys and the U.S. Attorney's Office, the parties signed a Non-Prosecution Agreement, which required Epstein to plead guilty in state court to the state indictment and to serve 18 months in jail. (Ex. 105 (Sep. 24, 2007 Non-Prosecution Agreement, In re: Investigation of Jeffrey Epstein).)

112. Prior to Epstein's entry into the Non-Prosecution Agreement, Kahn was unaware of the FBI investigation. (Kahn Decl. ¶ 22.)

113. On June 30, 2008, Epstein pled guilty, pursuant to the Non-Prosecution Agreement, to one count of procuring a prostitute and one count of procuring a prostitute under the age of 18. (Ex. 106 (Plea in the Circuit Court, *State of Florida v. Jeffrey Epstein*, No. 2006036744 (Fla. Cir. Ct. Jun. 30, 2008)) (JEE_Doe3_070526).) Epstein began serving his sentence immediately and was released after 13 months of that sentence, which included extensive work release. (Ex. 107 (Aug. 12, 2010 Letter from Deputy K. Smith to Epstein) (JEE_Doe3_129325); Ex. 108 (July 21, 2010 Letter from C. Elkins to Epstein) (JEE_Doe3_129326).)

114. In 2008, after news of Epstein's conviction became public, Epstein faced civil lawsuits based on various allegations of sexual misconduct prior to 2008.

115.    None of those civil lawsuits resulted in any findings or judgment against Epstein.

116.    On July 2, 2019, the U.S. Attorney's Office for the Southern District of New York obtained a federal grand jury indictment, charging Epstein with one count of sex-trafficking of minors and one count of conspiracy to commit sex-trafficking of minors. (Ex. 109 (*USA v. Epstein*, Docket No. 1:19-cr-00490 (S.D.N.Y. July 2, 2019)).) The conduct described in the indictment was alleged to have taken place between 2002 and 2005. (*Id.*)

117.    On July 6, 2019, Epstein was arrested on those charges. (Ex. 110 (July 8, 2019 Press Release, U.S. Attorney's Office, Southern District of New York), https://www.justice.gov/usao-sdny/pr/jeffrey-epstein-charged-manhattan-federal-court-sex-trafficking-minors.)

118.    Prior to Epstein's arrest, neither Indyke nor Kahn were aware of any pending government investigation into Epstein. (Indyke Decl. at ¶ 10; Kahn Decl. at ¶ 23.)

## IV.    EPSTEIN'S DEATH AND THE EPSTEIN ESTATE

119.    On August 10, 2019, Epstein was found dead while in federal custody. (Ex. 1 (Petition for Probate and for Letters Testamentary, *In re Estate of Jeffrey E. Epstein*, Probate No. ST-2019-PB-80 (V.I. Super. Ct. Aug. 15, 2019)).)

120.    On September 6, 2019, the Honorable Carolyn P. Hermon-Percell of the USVI Superior Court appointed Indyke and Kahn as co-executors of the Estate and authorized them to administer the Estate in the proceeding entitled *In re Estate of Jeffrey E. Epstein*, Probate No. ST-2019-PB-80 (V.I. Super. Ct.).

121.    Epstein's conviction and death triggered a cascade of new allegations and individual lawsuits related to his sexual abuse and sex-trafficking crimes. (*See, e.g.*, *VE v. Nine East 71st Street, et al.*, No. 1:19-cv-07625-AJN-DCF (S.D.N.Y.); *Araoz v. The Estate of Jeffrey E. Epstein, et al.*, 950010/2019 (N.Y. Sup. Ct.); *Doe 1, et al. v. Epstein, et al.*, No. 1:19-cv-

07675-GBD-DCF (S.D.N.Y.); *Doe v. Indyke, et al.*, 1:19-cv-07771-PKC-DCF (S.D.N.Y.); *Doe v. Indyke, et al.*, 1:19-cv-07772-ALC-DCF (S.D.N.Y.).)

122.    Indyke and Kahn worked to establish an independent and voluntary claims resolution program as an alternative to litigation, and sought input about the terms of that program from multiple counsel for civil claimants, including counsel for Plaintiff in this action. (Ex. 111 (Co-Executors' Expedited Motion for Establishment of a Voluntary Claims Resolution Program, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (V.I. Super. Ct. Nov. 14, 2019)); Ex. 112 (Co-Executors' Request for Ruling on *Expedited* Motion for Establishment of a Voluntary Claims Resolution Program, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (V.I. Super. Ct. Dec. 4, 2019)); Ex. 113 (Co-Executors' Request for *Immediate* Hearing or Conference Regarding *Expedited* Motion for Establishment of a Voluntary Claims Resolution Program, Probate No. ST-19-PB-80 (V.I. Super. Ct. Dec. 13, 2019)); Ex. 114 (Mar. 26, 2020 Email from A. Tomback to D. Boies et al.); Ex. 115 (Apr. 7, 2020 Email from D. Boies to B. Edwards).)

123.    On June 2, 2020, the USVI court approved establishment of the independent and voluntary claims resolution program, now known as the Epstein Victims' Compensation Program ("EVCP"). (Ex. 116 (Action for Testate Administration Order, *In re the Estate of Jeffrey E. Epstein*, Probate No. ST-2019-PB-80 (V.I. Super. Ct. June 2, 2020)).)

124.    The EVCP set "no cap or limitation on the aggregate amount of funds available to compensate all eligible Claimants or on the amount of compensation to be made to each Individual Claimant." (Ex. 117 (May 29, 2020 Independent EVCP Protocol) at 1.)

125.    Under the terms of the EVCP, Indyke and Kahn engaged independent, nationally recognized experts in the field of victim compensation funds, who developed and implemented a

detailed EVCP protocol. (*Id.* at 1-2.) Individuals who had suffered sexual abuse by Epstein could voluntarily choose to submit their claims to the EVCP and meet with and provide evidence on a strictly confidential basis to the independent Program Administrator. (*Id.* at 4-7.) The Program Administrator then evaluated each claim based on criteria identified in the EVCP protocol and, if the claim met those criteria, offered a compensation award to the claimant, differing in amount depending on the claimant's individual experiences. (*Id.* at 5-6.)

126. Indyke and Kahn had no control over or input into the awards offered by the Program Administrator (who had discretion to award any amount of compensation with no cap or limitation), and any award was final and binding on the Estate. (*Id.* at 2, 6-7.) Each claimant was free to accept the award or decline the amount offered and proceed with litigation. (*Id.* at 7.)

127. In total, 136 women received over $121 million in compensation from the EVCP—including women whose claims were barred by statutes of limitation or releases entered prior to Epstein's death. The Co-Executors also settled with 55 additional women outside of the EVCP process. (Declaration of Daniel S. Ruzumna in Support of Defendants' Opposition to Class Certification, Exhibits D-I (ECF Nos. 184-4-184-9).)

## V. JANE DOE 3'S CONTACT WITH EPSTEIN

208.    Neither Indyke nor Kahn ever witnessed Epstein abusing Doe.

209.    Until Doe filed this litigation, neither Indyke nor Kahn knew that Epstein had allegedly abused Doe.

Dated: November 4, 2024
New York, New York

| */s/ Daniel H. Weiner* | */s/ Daniel S. Ruzumna* |
| --- | --- |
| Daniel H. Weiner<br>Marc A. Weinstein<br>Fara Tabatabai<br>HUGHES HUBBARD & REED LLP<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone: (212) 837-6000<br>daniel.weiner@hugheshubbard.com<br>marc.weinstein@hugheshubbard.com<br>fara.tabatabai@hugheshubbard.com | Daniel S. Ruzumna<br>Amy N. Vegari<br>Tara J. Norris<br>PATTERSON BELKNAP WEBB & TYLER LLP<br>1133 Avenue of the Americas<br>New York, New York 10036<br>Telephone: (212) 336-2000<br>druzumna@pbwt.com<br>avegari@pbwt.com<br>tnorris@pbwt.com |
| *Attorneys for Defendant Darren K. Indyke* | *Attorneys for Defendant Richard D. Kahn* |