UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE Doe 3, individually and on behalf of all others similarly situated,<br><br>       *Plaintiff*,<br><br>v.<br><br>DARREN K. INDYKE and RICHARD D. KAHN,<br><br>       *Defendants*. | Civil Action No. 1:24-cv-01204 (AS)<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MEMORANDUM OF LAW IN
<u>SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

| | |
|---|---|
| HUGHES HUBBARD & REED LLP | PATTERSON BELKNAP WEBB & TYLER LLP |
| Daniel H. Weiner, Esq. | Daniel S. Ruzumna, Esq. |
| Marc A. Weinstein, Esq. | Amy N. Vegari, Esq. |
| Fara Tabatabai, Esq. | Tara J. Norris, Esq. |
| One Battery Park Plaza | 1133 Avenue of the Americas |
| New York, New York 10004 | New York, New York 10036 |
| Telephone: (212) 837-6000 | Telephone: (212) 336-2000 |
| daniel.weiner@hugheshubbard.com | druzumna@pbwt.com |
| marc.weinstein@hugheshubbard.com | tnorris@pbwt.com |
| fara.tabatabai@hugheshubbard.com | avegari@pbwt.com |
| *Attorneys for Defendant Darren K. Indyke* | *Attorneys for Defendant Richard D. Kahn* |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................1

SUMMARY OF FACTS ........................................................................................2

          A.     Jeffrey Epstein and His Finances ...............................................3

          B.     Defendants' Work for Epstein ...................................................5

          C.     Epstein's Non-Prosecution Agreement and Civil Lawsuits........................6

          D.     Epstein's Death and Defendants' Service for the Epstein Estate..........................................................................................7

          E.     Doe's Contact with Epstein ......................................................8

ARGUMENT ....................................................................................................10

    I.     DOE'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW.....................10

          A.     There Is No Evidence to Support Key Elements of Doe's IIED Claim.............................................................................10

          B.     Doe's Claim for Aiding and Abetting Battery Fails as a Matter of Law ........................................................................13

          C.     Doe's Negligence Claim Fails as a Matter of Law ...................................15

               1.     Neither Indyke Nor Kahn Owed a Duty to Doe ...........................15

               2.     Neither Indyke Nor Kahn Caused Doe's Alleged Injuries .......................................................................16

          D.     Unless the Putative Class Is Certified, Doe's State-Law Claims Should Be Dismissed as Time-Barred..........................17

    II.     DOE'S TVPA CLAIMS FAIL AS A MATTER OF LAW................................18

          A.     There Is No Evidence that Indyke or Kahn Knew of or Recklessly Disregarded Epstein's Use of Force, Fraud, or Coercion...................................................................................18

          B.     There is No Evidence that Defendants Obstructed Enforcement of the TVPA .......................................................21

          C.     Doe Cannot Assert a Claim for Conspiracy to Violate the TVPA ....................................................................................22

III.    DOE IS NOT ENTITLED TO PUNITIVE DAMAGES........................................23

CONCLUSION....................................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Abadi v. Am. Airlines, Inc.*,
    No. 23-cv-4033, 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024)..............................................10

*Abafita v. Aldukhan*,
    No. 16-cv-06072, 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019), *report and
    recommendation adopted*, No. 16 Civ. 6072, 2019 WL 4409472 (S.D.N.Y.
    Sept. 16, 2019) ....................................................................................................................24

*Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*,
    737 F.3d 166 (2d Cir. 2013)................................................................................................16

*Barbagallo v. Marcum LLP*,
    820 F. Supp. 2d 429 (E.D.N.Y. 2011) .................................................................................23

*Beare v. Millington*,
    No. 07-cv-3391, 2014 WL 1236750 (E.D.N.Y. Mar. 25, 2014)...........................................21

*In re Blackwood Assoc., L.P.*,
    153 F.3d 61 (2d Cir. 1998)..................................................................................................10

*Callahan v. City of New York*,
    90 F. Supp. 3d 60 (E.D.N.Y. 2015) .....................................................................................12

*Collins v. Giving Back Fund*,
    No. 18 Civ. 8812, 2019 WL 3564578 (S.D.N.Y. Aug. 6, 2019) ..........................................10

*D'Amico v. Christie*,
    71 N.Y.2d 76 (1987) ...........................................................................................................15

*David v. Weinstein Co. LLC*,
    No. 18-cv-5414, 2019 WL 1864073 (S.D.N.Y. Apr. 24, 2019) ...........................................15

*Desrameaux v. Delta Air Lines Inc.*,
    No. 15-CV-347, 2018 WL 1224100 (E.D.N.Y. Mar. 8, 2018)..............................................12

*Doe 7015 v. Elektra Ent. Grp. Inc.*,
    No. 21 Civ. 6868, 2023 WL 2744102 (S.D.N.Y. Mar. 31, 2023) .........................................14

*Doe (G.N.C.) v. Uniquest Hosp., LLC*,
    No. 23-cv-7980C, 2024 WL 4149251 (S.D.N.Y. Sept. 11, 2024).............................18, 19, 20

*Doe I v. Deutsche Bank Aktiengesellschaft*,
    671 F. Supp. 3d 387 (S.D.N.Y. 2023)............................................................................ *passim*

*Doe v. Yeshiva Univ.*,
    703 F. Supp. 3d 473 (S.D.N.Y. 2023)........................................................................13

*Eskridge v. Diocese of Brooklyn*,
    180 N.Y.S.3d 179 (2d Dep't 2022)..........................................................................13

*Ford v. Grand Union Co.*,
    268 N.Y. 243 (1935)...........................................................................................15, 16

*Gottlieb v. Cnty. of Orange*,
    84 F.3d 511 (2d Cir. 1996)......................................................................................10

*Hamilton v. Beretta U.S.A. Corp.*,
    96 N.Y.2d 222 (2001).............................................................................................15

*Jean-Charles v. Perlitz*,
    937 F. Supp. 2d 276 (D. Conn. 2013)....................................................................21

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005).....................................................................13

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)................................................................................................22

*Lawson v. Rubin*,
    No. 17-cv- 6404, 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018)............................18

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)....................................................................................13

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................................12

*Macolor v. Libiran*,
    No. 14-cv-4555, 2016 WL 1488121 (S.D.N.Y. Mar. 25, 2016), *report and
    recommendation adopted*, No. 14-cv-4555, 2016 WL 1453039 (S.D.N.Y. Apr.
    13, 2016) .................................................................................................................24

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018).....................................................................20

*Ponticelli v. Zurich Am. Ins. Grp.*,
    16 F. Supp. 2d 414 (S.D.N.Y. 1998).......................................................................12

*Rabin v. Dow Jones & Co.*,
    No. 14-cv-4498, 2014 WL 5017841 (S.D.N.Y. Sept. 23, 2014) ............................15

*Ratha v. Phatthana Seafood Co.*,

35 F.4th 1159 (9th Cir. 2022) ..........................................................................................22

*Ratha v. Phatthana Seafood Co.,*
No. CV 16-4271, 2023 WL 2762044 (C.D. Cal. Mar. 3, 2023) ............................................22

*Romero v. City of New York,*
839 F. Supp. 2d 588 (E.D.N.Y. 2012) ................................................................................11

*Ross v. Louise Wise Servs., Inc.,*
8 N.Y.3d 478 (2007) .........................................................................................................23

*Segretti v. Shorenstein Co., E., L.P.,*
256 A.D.2d 234 (1st Dep't 1998) .......................................................................................16

*Seltzer v. Bayer,*
272 A.D.2d 263 (1st Dep't 2000) .......................................................................................12

*Shea v. Cornell Univ.,*
59 N.Y.S.2d 502 (3d Dep't 1993).......................................................................................14

*Tesoriero v. Syosset Cent. Sch. Dist.,*
382 F. Supp. 2d 387 (E.D.N.Y. 2005) ...........................................................................10, 11

*United States v. Alessi,*
638 F.2d 466 (2d Cir. 1980)...............................................................................................23

*United States v. Epstein,*
Case No. 1:19-cr-00490-RMB (S.D.N.Y.) ............................................................................3

*United States v. Evans,*
476 F.3d 1176 (11th Cir. 2007) .........................................................................................20

*United States v. Farah,*
766 F.3d 599 (6th Cir. 2014) .............................................................................................21

*Velez v. Sanchez,*
693 F.3d 308 (2d Cir. 2012)...............................................................................................22

*Willick v. Varet & Fink, P.C.,*
No. 120796/94, 1995 WL 17962227 (N.Y. Sup. Ct. July 10, 1995) ......................................12

**Statutes and Rules**

18 U.S.C. § 1591(a)(2).......................................................................................................17

18 U.S.C. § 1591(d) ..........................................................................................................21

18 U.S.C. § 1591(e)(2).................................................................................................18, 20

18 U.S.C. § 1595(a) ................................................................................................22

CPLR § 213-c ........................................................................................................17

CPLR § 214-j .........................................................................................................17

Pub. L. 117-347, Title I, § 102 ..............................................................................22

Rule 56.1 ..................................................................................................................3

Trafficking Victims Protection Act ................................................................. *passim*

Defendants Darren K. Indyke and Richard D. Kahn submit this memorandum of law in support of their motion for summary judgment dismissing the claims of Plaintiff Jane Doe 3 in their entirety.

## PRELIMINARY STATEMENT

In this litigation, Doe seeks to hold Indyke, one of Jeffrey Epstein's former lawyers, and Kahn, one of Epstein's former accountants, responsible for Epstein's alleged crimes against her, despite having never interacted substantively, if at all, with either of them. Doe makes sweeping allegations that Defendants knowingly participated in Epstein's sex-trafficking scheme, but can present no evidence to support those allegations despite months of intensive discovery.

It is undisputed that Defendants never participated in any sexual abuse of women and never witnessed Epstein abuse or traffic anyone. There is no evidence that Doe or any other alleged victim ever told Indyke or Kahn (or anyone else) that she had been abused or trafficked. Because Doe has elicited no evidence that either Defendant intended or knew that services he provided to Epstein were used to facilitate sex-trafficking, her claims must be dismissed.

Doe's claims for intentional infliction of emotional distress ("IIED") and aiding and abetting battery require evidence that Indyke and Kahn engaged in extreme and outrageous conduct directed specifically at Doe with the intent to cause her severe emotional harm, or that they had actual knowledge of her alleged abuse and took overt acts directed at furthering Epstein's sexual assault of her. But neither Defendant even knew Doe, and there is not a shred of evidence that either of them knew of her alleged abuse or intentionally directed any conduct at her or any other woman. There is also no evidence that their conduct was the proximate cause of Doe's alleged harm. Those claims therefore fail.

Doe's claim for negligence fares no better. Under New York law, neither Defendant had a duty to protect Doe from the actions of a third party like Epstein, and Doe cannot establish that

Defendants' conduct proximately caused her alleged abuse. To the contrary, none of Defendants' conduct is connected with Doe's alleged abuse. In particular, because Doe testified unequivocally that Epstein never paid her for sex, any alleged involvement by Indyke or Kahn in cash withdrawals or wire or cash transfers cannot have had any causal relationship to Doe's abuse.

Doe's claims under the Trafficking Victims Protection Act ("TVPA") also fail. There is no evidence that Indyke or Kahn knew or recklessly disregarded that Epstein was using force, fraud, or coercion to engage in commercial sex acts, as required for Doe's claim for participation in a sex-trafficking venture. Nor is there any evidence that Indyke or Kahn knew that Epstein was the subject of any then-pending government investigation, much less that they took any action specifically intended to obstruct such an investigation. Doe cannot maintain a TVPA claim for conspiracy because—even setting aside the lack of evidence that Indyke or Kahn agreed with Epstein to enter into a joint sex-trafficking venture—the 2023 amendment to the TVPA that created a civil claim for conspiracy does not apply retroactively.

Finally, punitive damages are not available here. There is simply no evidence that establishes conduct by Indyke or Kahn that evinces a fraudulent or evil motive, or otherwise meets the extraordinarily high level of wrongdoing and malice required for imposition of punitive damages. Accordingly, Doe's claims should be dismissed in their entirety.

## SUMMARY OF FACTS

In this litigation, Doe lobs a plethora of explosive accusations at Indyke and Kahn, whom she calls "Epstein's bagmen and fixers" (ECF No. 128) and accuses of "personally participat[ing]" in "every step" of Epstein's sex-trafficking operation "knowingly and intentionally." *See* ECF No. 1 (Compl.) ¶¶ 5–12. Now, having gone through extensive discovery, Doe's conclusive allegations have fallen apart, and the specific facts she cited in her Complaint to bolster those allegations have been shown to be inaccurate or incomplete. The reality is that Defendants provided innocuous

professional services to a wealthy man, who committed sex crimes in his private life.

███████████████████████████████████ Ex.[1] 40 (Doe Dep.

Tr.) at 226:8-9. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* at 136:10-137:1, 203:17-19. Another of Epstein's

victims testified, "I didn't even know I was a victim until I spoke with my lawyers." Ex. 167 (Aug.

27, 2019 Hearing Tr. in *United States v. Epstein*, Case No. 1:19-cr-00490-RMB (S.D.N.Y.)) at

38:25-39:1. But Doe contends that Indyke and Kahn—who did not witness any sexual activity

involving Epstein and received no complaints from any women related to Epstein's sex-trafficking

venture (SUMF[2] ¶¶ 28-33)—nonetheless knew, or should have known, about Epstein's personal

life as an abuser. Those claims, fueled by hindsight, seek to spread blame and liability for Epstein's

actions far too wide.

     A.     **Jeffrey Epstein and His Finances**

     Epstein was a very wealthy individual, due to his personal investments and work consulting

for ultrahigh-net-worth clients on financial, tax, and estate planning matters. SUMF ¶ 1.

Unsurprisingly given his great wealth, he owned many valuable assets (including real property)

and established and operated numerous corporate entities. *Id.* ¶¶ 2-5. Each corporate entity held

by Epstein between 1995 and his death in 2019 had a business purpose other than facilitation of

sex-trafficking. *See id.* ¶¶ 4-5.

     Epstein's property holdings—including a New York City townhouse, a home in Florida, a

---

[1] References to "Ex." are to the exhibits to the Declaration of Daniel H. Weiner in Support of Defendants' Motion for Summary Judgment, filed concurrently herewith.

[2] References to "SUMF" are to Defendants' Rule 56.1 Statement of Undisputed Material Facts, filed concurrently herewith.

large ranch in New Mexico, two private islands in the U.S. Virgin Islands, and an apartment in Paris—required substantial resources to maintain. *Id*. ¶ 3. Epstein employed staff at his various properties (including property managers, chefs, gardeners, housekeeping staff, chauffeurs, and others), in addition to hiring contractors, designers, and architects to make extensive improvements on his properties. *Id*. ¶ 6. Most of Epstein's spending went toward the upkeep of his properties and the payment of salaries and fees to his staff and other service providers. *Id*. ¶ 7.

Epstein's employees used a variety of tools to execute the thousands of financial transactions that Epstein and his corporate entities directed every month.

First, Epstein's property managers and other employees kept petty cash on hand to pay operational expenses such as food, cleaning, maintenance, repairs, and tips. *Id*. ¶ 9. When individuals working for Epstein received petty cash, they provided "backup" for how they spent that cash—that is, receipts or other proof of the expense—to document how money was being spent and to minimize the risk of theft or fraud. *Id*. ¶ 10. Because there was no fraud or theft concern if Epstein used his own cash, he did not provide "backup" showing how he spent it; thus, for cash held by Epstein, the books and records reflect only that Epstein received cash. *Id*. ¶ 14. The majority of cash withdrawn from Epstein-related accounts can be traced to petty cash used by Epstein's employees for expenses, rather than as cash handed directly to Epstein. *Id*. ¶ 10.

Second, Epstein's property managers, pilots, and some longstanding assistants also had, at various times, credit cards paid for by Epstein, which they used to pay for Epstein-related expenses ranging from travel to jet fuel to food and supplies. *Id*. ¶ 17.

Third, Epstein arranged for payments to be sent via wire transfer. *Id*. ¶ 15. Epstein sent thousands of wire payments that had nothing to do with any sex-trafficking venture. *Id*. ¶¶ 15-16. Nothing in any transfer, or in Epstein's requests for any transfer, indicated that that transfer was

connected to any sexual activity or trafficking, as opposed to payment for work or gifts.[3]  *Id.* ¶ 16.

### B.    Defendants' Work for Epstein

Indyke and Kahn were two of many professionals who provided Epstein with legal and accounting services to manage his personal assets and business dealings.  Neither Indyke nor Kahn ever worked out of the same office as Epstein,[4] nor did they socialize with him, and any meetings they had with him were infrequent because he resided in the U.S. Virgin Islands.  *Id.* ¶¶ 26-27.

Indyke provided legal services for Epstein from 1996 until Epstein's death in August 2019, primarily doing corporate transactional work, such as drafting and negotiating agreements related to Epstein's investments; assisting with Epstein's purchases of helicopters, yachts, and other luxury items; advising on real estate matters; and forming entities in connection with Epstein's purchases of real estate and luxury assets, and operation of his properties.  *Id.* ¶¶ 24, 39.  Indyke was not Epstein's only attorney; Epstein engaged other attorneys to handle transactions in various jurisdictions and to represent him in any lawsuits.  *Id.* ¶ 38.

Kahn provided accounting services to Epstein from 2005 until Epstein's death, keeping track and maintaining records relating to, among other things, (a) Epstein's life, dental, health, and

---

[3] Some payments from Epstein to women, including (but by no means exclusively) those who subsequently alleged that Epstein sexually abused them, are recorded in Epstein's books and records as "gifts."  Epstein kept track of the value of gifts paid to individuals so that he could report them on gift tax returns and pay appropriate gift taxes if necessary.  *Id.* ¶ 20.  (The classification of a "gift" did not give rise to a *deduction* on Epstein's taxes, but to an *additional* tax on gifts to an individual that exceeded the annual allowable amount in a given year.)  Many such gifts appear in the form of credit card charges, for which an employee charged a personal expense on an Epstein-provided credit card and was not asked to or otherwise did not repay the charge.  *Id.*  Epstein's records reflect gifts to both men and women.  *Id.* ¶¶ 21-22.

[4] Indyke worked from his own office in New York City and, from 2008 to 2010, out of an apartment at 301 East 66th Street.  *Id.* ¶ 35.  Kahn worked out of a separate apartment at that building from June 2010 through May 2012.  *Id.* ¶ 51.  301 East 66th Street is a large building consisting of approximately 200 apartments, and none of Epstein's guest apartments were on the same floor as Indyke's or Kahn's offices.  *Id.* ¶ 36. ███████████████████
████████████████████████████████████████████████████████
*Id.* ¶ 37.

property insurances; (b) Epstein's significant purchases and capital or renovation projects involving his homes, plane, and automobiles; and (c) for a time, Epstein's investments in non-public companies (such as his investment in Radar Magazine). *Id*. ¶ 53.  In his role, Kahn also reviewed invoices for the projects for which he was responsible, though he was not personally responsible for recording any specific transaction into Epstein's QuickBooks files or ensuring that those records were up-to-date. *Id*. ¶¶ 54, 59.

For a period of time, Indyke had signatory authority on Epstein bank accounts and withdrew cash or authorized checks and wires at Epstein's request. *Id*. ¶¶ 40, 42.  Kahn never had signatory authority for any of Epstein's bank accounts, although he did sometimes forward requests from Epstein for wires or checks to a colleague who did the mechanical work of initiating transfers. *Id*. ¶ 60.  Kahn also occasionally delivered cash from the petty cash repository to Epstein at Epstein's request.  *Id*. ¶ 61.  Neither Indyke nor Kahn made independent decisions regarding any cash, checks, or wires from Epstein or Epstein's corporate entities. *Id*. ¶¶ 43, 60.

Neither Indyke nor Kahn ever witnessed Epstein abuse anyone. *Id*. ¶ 28.  No woman who worked for Epstein or was otherwise associated with him ever told Indyke or Kahn that Epstein had sexually abused her or that she had witnessed any sexual abuse. *Id*. ¶¶ 32-33.  To the contrary, a number of women who, after Epstein's death, claimed that Epstein had sexually abused them sent positive messages to Indyke and Kahn during Epstein's life that gave no indication that they were being abused. *Id*. ¶ 33.

**C.    Epstein's Non-Prosecution Agreement and Civil Lawsuits**

In 2006, Epstein was charged with soliciting a minor for prostitution, following an investigation by police in Palm Beach, Florida.  *Id*. ¶ 103.  Shortly afterward, the Federal Bureau of Investigation began an investigation into the allegations against Epstein.  *Id*. ¶ 104.  From February to August 2007, Epstein's criminal defense attorneys made submissions to the U.S.

Attorney's Office for the Southern District of Florida, contesting the grounds for the federal investigation and threatened federal criminal charges against Epstein. *Id*. ¶ 108.

On September 24, 2007, Epstein entered into a Non-Prosecution Agreement with the U.S. Attorney's Office, pursuant to which he agreed to plead guilty to two state charges: one count of felony solicitation of prostitution and one count of soliciting a prostitute under the age of 18. *Id*. ¶¶ 111, 113. Epstein was released from prison after serving 13 months of an 18-month sentence, which included extensive work release. *Id*. ¶ 113.

Beginning in 2008, after news of Epstein's conviction became public, Epstein faced various civil lawsuits based on allegations of pre-2008 sexual misconduct. *Id*. ¶ 114. None of those lawsuits resulted in any findings or judgment against Epstein. *Id*. ¶ 115.

### D.    Epstein's Death and Defendants' Service for the Epstein Estate

On July 2, 2019, the U.S. Attorney's Office for the Southern District of New York obtained an indictment, charging Epstein with sex-trafficking of minors and one count of conspiracy to commit sex-trafficking of minors. *Id*. ¶ 116. The indictment was based on conduct that purportedly took place between 2002 and 2005. *Id*. At the time, neither Defendant was aware that any government entity had been investigating Epstein. *Id*. ¶ 118. On July 6, 2019, Epstein was arrested. *Id*. ¶ 117. On August 10, 2019, Epstein was found dead while in federal custody. *Id*. ¶ 119.

On September 6, 2019, Indyke and Kahn were appointed co-executors of Epstein's estate. *Id*. ¶ 120. Epstein's arrest and death triggered a cascade of new allegations and individual lawsuits related to his sexual abuse and sex-trafficking crimes. *Id*. ¶ 120. In early 2020, Indyke and Kahn established the Epstein Victims' Compensation Program ("EVCP") to resolve claims against Epstein in a fair, non-adversarial, and confidential manner. *Id*. ¶¶ 121-22. The EVCP set "no cap or limitation on the aggregate amount of funds available to compensate all eligible Claimants or

7

on the amount of compensation to be made to each Individual Claimant." *Id*. ¶ 124.  In total, 136 women received over $121 million in compensation from the EVCP—including (at Indyke's and Kahn's insistence) women whose claims were barred by statutes of limitation or releases entered prior to Epstein's death. *Id*. ¶ 127.  Indyke and Kahn also settled 55 cases with women who asserted claims against Epstein's Estate outside of the EVCP process. *Id*.

E.    **Doe's Contact with Epstein**



## ARGUMENT

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." *In re Blackwood Assoc., L.P.*, 153 F.3d 61, 67 (2d Cir. 1998). To defeat a summary judgment motion, the opposing party must come forward with "specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "[A] plaintiff cannot defeat summary judgment based solely on the unsupported allegations in her pleadings, her conclusory statements, or 'the mere incantation of intent or state of mind.'" *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 403 (E.D.N.Y. 2005) (citation omitted).

## I.    DOE'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW.

The Court should grant summary judgment with respect to Doe's IIED, aiding and abetting battery, and negligence claims because of the absence of evidence to support critical elements of each of those claims. There is no issue of material fact that allows those claims to survive.

### A.    There Is No Evidence to Support Key Elements of Doe's IIED Claim.

To prove her IIED claim, Doe must establish that Defendants engaged in extreme and outrageous conduct with the intent to cause her, or in disregard of the substantial likelihood of causing her, severe emotional distress, and that their conduct did cause her severe emotional distress. *Doe I v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 415-16 (S.D.N.Y. 2023) ("*Doe I*"); *Abadi v. Am. Airlines, Inc.*, No. 23-cv-4033, 2024 WL 1346437, at *43 (S.D.N.Y. Mar. 29, 2024). Doe cannot satisfy critical elements of her IIED claim.[6]

First, despite massive document productions by Defendants, the Estate of Jeffrey Epstein,

---

[6] IIED is a "highly disfavored cause of action under New York law, one that is almost never successful." *Collins v. Giving Back Fund*, No. 18 Civ. 8812, 2019 WL 3564578, at *14 (S.D.N.Y. Aug. 6, 2019).

and third parties HBRK, Deutsche Bank, and JPMorgan Chase, there is no evidence that Indyke

or Kahn ever intended to cause Doe emotional distress, or that they disregarded a substantial

likelihood of doing so. *See Tesoriero*, 382 F. Supp. 2d at 403-04 (granting summary judgment on

IIED claims against teacher and school district where there was "no evidence to support the second

element of the cause of action:  that [teacher] (or the District, for that matter) ever *intended* to

cause [plaintiffs] severe emotional distress"); *Romero v. City of New York*, 839 F. Supp. 2d 588,

629 (E.D.N.Y. 2012) (dismissing IIED claim against education department that knowingly

employed sexual abuser where there were no allegations that the department intended to cause

severe emotional distress).  Further, to satisfy the intent element, Doe must prove that Defendants

"intentionally directed" their conduct at her.  *See Doe I*, 671 F. Supp. 3d at 416 (dismissing IIED

claim against banks "alleged to have financed Jeffrey Epstein, who then harmed JPM Jane Doe,

DB Jane Doe, and others").  No evidence permits a finding that Defendants acted with such intent.

Both Defendants testified that they never met Doe.  SUMF ¶ 203.  ███████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████    *Id*. ¶¶ 207-08.

Doe can point to nothing in any legal or accounting records to suggest that Defendants intended to

cause her severe emotional distress or disregarded a substantial likelihood of doing so.  And even

if Doe's abuse was a "foreseeable consequence" of any actions by Defendants—which it was not—

that would not suffice to show conduct intentionally directed at Doe.  *Doe I*, 671 F. Supp. 3d at

416.

Second, Doe cannot prove through any admissible evidence that *Defendants'* actions—as

opposed to *Epstein's* actions—caused her severe emotional distress. *Desrameaux v. Delta Air Lines Inc.*, No. 15-CV-347, 2018 WL 1224100, at *9 (E.D.N.Y. Mar. 8, 2018) (granting summary judgment on IIED claim where a third party's action caused the alleged injury). Doe and her expert, Dr. Chitra Raghavan, identify Epstein's alleged sexual abuse as the cause of her emotional distress (Compl. ¶ 125; ECF No. 98, at 1-2); there is no evidence tying Doe's emotional injury to any conduct by Defendants. Defendants' legal, accounting, and other services for Epstein are "too removed to support common law claims" for Doe's alleged emotional distress. *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 590-91 (E.D.N.Y. 2005) (dismissing IIED claims against defendant bank based on conduct "supporting those who are responsible for carrying out the [terrorist] attacks"); *see also Willick v. Varet & Fink, P.C.*, No. 120796/94, 1995 WL 17962227 (N.Y. Sup. Ct. July 10, 1995) (requiring proximate cause for IIED claim). ███████████

███████████████████████████████████████

████████████████████████████████ SUMF

¶ 206; Ex. 40 (Doe Dep. Tr.) at 23:2-24:22.

<u>Third</u>, the record does not allow a finding that either Defendant's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized society," *Callahan v. City of New York*, 90 F. Supp. 3d 60, 76 (E.D.N.Y. 2015)—a "standard [that] is extremely difficult to satisfy," *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 440 (S.D.N.Y. 1998). "Those few claims of intentional infliction of emotional distress that have been upheld by [New York courts] were supported by allegations detailing a longstanding campaign of deliberate, systematic and malicious harassment of the plaintiff." *Seltzer v. Bayer*, 272 A.D.2d 263, 264-65 (1st Dep't 2000).

In its August 5, 2024 Opinion and Order ruling on Defendants' motion to dismiss, the Court

noted that "[c]overing up sexual abuse can, depending on the facts, be 'sufficiently outrageous,'" (ECF No. 38 at 11), citing *Eskridge v. Diocese of Brooklyn*, 180 N.Y.S.3d 179, 181 (2d Dep't 2022). But in *Eskridge*, the court specifically focused on allegations that "the defendants had knowledge of the priest's sexual abuse of the plaintiff and other children, yet concealed the abuse and permitted it to continue." *Id*. Here, there is no evidence that Indyke or Kahn knew of Epstein's alleged abuse of Doe; that they engaged in deliberate, systematic, and malicious conduct towards her; or that they covered up any abuse. Nothing about Defendants' professional services for Epstein rises to the level of extreme or outrageous. *See, e.g.*, *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 498 (S.D.N.Y. 2023) (dismissing IIED claim against university for covering up rape allegations and conducting a sham investigation into the allegations).

**B.    Doe's Claim for Aiding and Abetting Battery Fails as a Matter of Law.**

With respect to her aiding, abetting, and facilitating battery claim, Doe must prove, among other things, that each Defendant was aware of his role in the alleged illegal or tortious activity—specifically, Epstein's sexual abuse of Doe—at the time he provided assistance, and that each Defendant knowingly and substantially assisted in that abuse. *See Doe I,* 671 F. Supp. 3d at 416. She cannot do so.

First, proving that Defendants were aware of their assistance in the alleged battery of Doe requires Doe to establish their "actual knowledge" of Epstein's abuse *of Doe* at the time it occurred. *See Doe I*, 671 F. Supp. 3d at 416 (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005). It is undisputed that Indyke and Kahn did not witness Doe's alleged abuse. SUMF ¶ 208. Defendants testified that they were not aware of the alleged abuse, and Doe testified that she never told *anyone* about it—not even her husband, parents, or close friend. *Id*. ¶¶ 175, 209. Absent evidence of actual knowledge, Doe's claim for aiding and abetting battery fails. *See, e.g.*, *Doe 7015 v. Elektra*

*Ent. Grp. Inc.*, No. 21 Civ. 6868, 2023 WL 2744102, at *4 (S.D.N.Y. Mar. 31, 2023).

Second, proving the substantial assistance needed for an aiding and abetting claim requires demonstrating that Indyke and Kahn committed an overt act in furtherance of Epstein's alleged battery of Doe, which in turn demands proof of an "intentional or deliberate act[] directed at causing harm which would rise to the level of actionable conduct in relation to the subject assault." *Doe I*, 671 F. Supp. 3d at 416. Specifically, the law requires Doe to prove that each Defendant committed an overt act "to further the underlying tort itself—in this case, [the] alleged sexual battery *of Plaintiff*." *Elektra*, 2023 WL 2744102, at *4 (emphasis added); *see also Doe I*, 671 F. Supp. 3d at 416 (overt act must be "specifically and intentionally directed at causing harm to the Jane Does"). In *Elektra*, for example, the plaintiff sued the record label and manager of James Euringer, a musician who publicly identified as a pedophile and allegedly sexually abused the plaintiff for years while she was a minor. 2023 WL 2744102, at *1-2. Despite the plaintiff's allegations that the defendants substantially assisted Euringer's access to her by furthering his music career and facilitating her attendance at recording sessions and other events, the court held that those allegations were insufficient to render the defendants liable for aiding and abetting battery because the defendants' actions were not "directed at the tort itself." *Id.* at *4. The court found that even "turning a blind eye" to sexual assault would not constitute a cognizable overt act. *See Elektra*, 2023 WL 2744102, at *4 n.9; *Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 503-04 (App. Div. 1993).

Here, Doe cannot show "substantial assistance" because neither Defendant ever took any overt action that helped Epstein cause her harm—much less substantially helped him to cause that harm. The mere fact that Indyke and Kahn provided support services for Epstein's professional activities falls far short of even the type of assistance that was found insufficient in *Elektra*, in

which the defendants invested in the alleged abuser's music career, helped him sign a distribution and promotion agreement, and released albums from the abuser that contained "sexual themes … related to underage girls." *See Elektra*, 2023 WL 2744102, at *3.

### C.    Doe's Negligence Claim Fails as a Matter of Law.

To prevail on her negligence claim, Doe must prove that each Defendant breached a duty owed to her, and that such breach proximately caused her injury. *See David v. Weinstein Co. LLC*, No. 18-cv-5414, 2019 WL 1864073, at *6 (S.D.N.Y. Apr. 24, 2019). Doe can show neither.

#### 1.    Neither Indyke Nor Kahn Owed a Duty to Doe.

"Absent a duty running directly to the injured person there can be no liability in damages [for negligence], however careless the conduct or foreseeable the harm." *Id*. Unless there is a "special relationship" between the defendant and the plaintiff—*e.g.*, a master-servant, parent-child, or common carrier-passenger relationship—"a defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter [the] defendant can exercise such control." *Rabin v. Dow Jones & Co.*, No. 14-cv-4498, 2014 WL 5017841, at *2 (S.D.N.Y. Sept. 23, 2014); *see also Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233, 235-36 (2001) (finding that gun manufacturers owe no duty to exercise reasonable care in marketing and distributing handguns); *D'Amico v. Christie*, 71 N.Y.2d 76, 81-82 (1987) (holding alcoholic beverage providers not liable to those injured by drunk drivers). Here, neither Indyke nor Kahn had a "special relationship" with Doe or a duty running directly to her on which Doe can predicate a valid negligence claim.

Nor can Doe succeed by contending that Indyke or Kahn breached a purported "ordinary" duty owed to "everyone" to avoid injury resulting from "forces set in motion" by a defendant. *See Doe I*, 671 F. Supp. 3d at 414 (citing *Ford v. Grand Union Co.*, 268 N.Y. 243, 248-49 (1935)). Under New York law, an ordinary duty of care does *not* extend to "the control of others"

*unless* such control "can be effectively exercised"—as in the case of an employer who can control an employee acting within the scope of his or her employment. *Ford*, 268 N.Y. at 248-49 (finding no duty to control the actions of an employee acting outside the scope of his employment). Here, Epstein was not an employee of Indyke or Kahn, and Doe adduced no evidence that either Defendant could have exercised "effective control" over Epstein to stop him from abusing her.

Doe also cannot prove that Indyke or Kahn "'set in motion' Jeffrey Epstein's sex-trafficking venture," as Judge Rakoff accepted as true at the motion to dismiss stage in the bank litigations, *Doe I*, 671 F. Supp. 3d at 414; to the contrary, there is no evidence that Defendants' conduct initiated or set in motion events leading to her alleged abuse. Doe was introduced to Epstein by ███████████████████, and she and Epstein subsequently interacted wholly independent of any involvement by either Defendant. SUMF ¶¶ 129-32. Neither Indyke nor Kahn "set in motion" any venture of which Doe's alleged abuse was a part. Even if Doe had adduced evidence in discovery that Epstein regularly hired assistants with the intention of abusing them (she has not), the record is devoid of any suggestion that Indyke or Kahn "set in motion" that pattern of behavior with respect to Doe or anyone else. There is simply no basis to find that Indyke or Kahn had a duty under New York law to prevent Epstein from injuring Doe.

### 2.    Neither Indyke Nor Kahn Caused Doe's Alleged Injuries.

There is also no evidence that any conduct by Indyke or Kahn caused Doe's injuries. Causation requires a plaintiff to demonstrate that the defendant's conduct was both a "substantial factor" in causing the plaintiff's injury and the "cause-in-fact" of that injury. *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013). "[M]ere speculation regarding causation is inadequate to sustain [a] cause of action" for negligence. *Segretti v. Shorenstein Co., E., L.P.*, 256 A.D.2d 234, 235 (App. Div. 1998). Causation fails if the injury would have occurred regardless of the defendant's conduct. *Aegis*, 737 F.3d at 179.

Neither Indyke's nor Kahn's professional services to Epstein were substantial factors in causing Doe's alleged abuse. Withdrawing cash, facilitating cash or wire transfers, or recording such transactions did not cause Doe's alleged damages—Epstein's sexual abuse did. She was not trafficked or harmed through the use of purported "shell" entities, nor involved in any purportedly coerced or "sham" marriage. ████████████████████████████

████████████████████████████████████████████████ SUMF ¶ 173.

There is no evidence to permit a finding that either Defendant's conduct was a "substantial factor" in Doe's alleged abuse, and Doe's mere speculation that Epstein would not have abused her but for Indyke's and Kahn's services is insufficient to prove causation.

### D. Unless the Putative Class Is Certified, Doe's State-Law Claims Should Be Dismissed as Time-Barred.

The longest statute of limitations potentially applicable to Doe's state-law claims is five years, meaning that those claims—which accrued in 2014—expired at the latest in March 2019. *See* CPLR § 213-c (five-year statute of limitations for civil actions relating to certain sexual offenses). Under New York's Adult Survivors Act, Doe's claims were revived for a limited period from November 24, 2022 to November 24, 2023. CPLR § 214-j. On November 21, 2023 and January 17, 2024, former class representative Danielle Bensky entered into tolling agreements with Indyke and Kahn, agreeing to toll the applicable limitations period through February 19, 2024 for claims belonging to "Bensky and the Putative Class"—*not* for individual claims belonging to Doe. Ex. 168 (November 21, 2023 and Jan. 17, 2024 Agreements to Toll Statute of Limitations) at Recitals. Because the limitations period was tolled only for *class* claims, in the event that the Court denies class certification, the tolling agreement would not permit any state-law claim by Doe against Indyke and Kahn, and those claims should be dismissed as untimely.

## II.    DOE'S TVPA CLAIMS FAIL AS A MATTER OF LAW.

Doe alleges that Defendants violated the TVPA by (1) participating in a sex-trafficking venture; (2) obstructing the TVPA's enforcement; and/or (3) conspiring to violate the TVPA.  *See* Compl. ¶¶ 235-303.  Although she styles these claims as three discrete causes of action, they are more properly considered three different bases for bringing a civil claim under the TVPA.  *See* ECF No. 80 at 11 (explaining that Doe's TVPA claims amount to a single "civil cause of action"). Neither the evidence nor the law supports Doe's claim that Defendants violated the TVPA.

### A.    There Is No Evidence that Indyke or Kahn Knew of or Recklessly Disregarded Epstein's Use of Force, Fraud, or Coercion.

To prove that Defendants participated in a sex-trafficking venture under the TVPA, Doe must establish that Indyke and Kahn knew, or recklessly disregarded, that Epstein was engaging in commercial sex acts by "force, fraud, or coercion."  18 U.S.C. § 1591(a)(2); *Doe I*, 671 F. Supp. 3d at 405 ("[T]he defendant must have known (or recklessly disregarded) that force, fraud, or coercion would be used in the sex-trafficking venture."); *Lawson v. Rubin*, No. 17-cv- 6404, 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018) (defendant must have "kn[own] or acted in reckless disregard of the fact that 'force, threats of force, fraud, or coercion' would be used to cause plaintiffs to engage in a commercial sex act").  "The 'knew or should have known' standard applies to the sex trafficking of *the particular victim-plaintiff*."  *Doe (G.N.C.) v. Uniquest Hosp., LLC*, No. 23-cv-7980C, 2024 WL 4149251, at *4 (S.D.N.Y. Sept. 11, 2024) (emphasis added). Coercion, as used in the TVPA, extends only to threats of "serious harm" or "physical restraint," or "the abuse or threatened abuse of law or the legal process."  18 U.S.C. § 1591(e)(2).

Here, there is no evidence that Indyke or Kahn knew or recklessly disregarded that Epstein was using force, fraud, or coercion to engage in commercial sex acts—much less that he was doing so with respect to Doe in particular.  Defendants never witnessed Epstein sexually assault anyone.

SUMF ¶ 28; *see Lawson*, 2018 WL 2012869, at *12 (dismissing TVPA claim where complaint did not allege that defendant was "present for any of the alleged assaults" or "told about them before or after they occurred"). While they were aware of Epstein's arrest in 2006 and subsequent guilty plea for felony soliciting a prostitute and procuring a minor for prostitution, the charges set out in the plea agreement did not indicate the use of any force, fraud, or coercion. SUMF ¶¶ 29, 113. Nor did the civil lawsuits filed against Epstein after his guilty plea result in any finding that Epstein had engaged in any of the alleged conduct, let alone that he had done so by force, fraud, or coercion. *Id*. ¶ 115. And regardless, knowledge of something learned after the fact does not equate to participation in the act at the time it happened.

At most, the record suggests that Indyke and Kahn knew Epstein made payments to or on behalf of women, as well as men. After Epstein opened accounts at DB in 2013, Indyke, as the signatory on the account, periodically withdrew cash from the account, which he provided to the accounting group. He understood that cash was used for many different purposes, including payments by and to the staff Epstein employed at his properties, meals, tips for service providers, and costs of travel. *See supra* at 4-5. Although Kahn did not record expenses in Epstein's QuickBooks files, he had access to and reviewed Epstein's financial recordkeeping, and the QuickBooks files included gift reports—maintained for gift-tax reporting purposes—that reflected gifts to both women and men. *See id*. While some of the gift reports reflected expenses for what could be personal or intimate relationships (*e.g.*, payments for lingerie, spa treatments, haircuts, and travel), those gifts represented a small fraction of the total expenses recorded in Epstein's books, which included tens of thousands of other entries related to mundane expenses such as household maintenance costs, salaries for staff, and myriad other items, and never reflected sexual abuse or payment for sex. SUMF ¶¶ 9, 15. ██████████████████████

███████████████████████████████████

████ *Id*. ¶ 22. The mere fact that a woman (or a man) received a payment or gift from Epstein

is not by itself evidence that they had a commercial sexual relationship with Epstein that was

forced, coerced, or induced by fraud.

Further, *even if* Defendants knew Epstein engaged in paid-for sex with some of the women

who received cash or gifts from him, that fact alone is insufficient to establish that they knew or

recklessly disregarded that Epstein was using force, fraud, or coercion. Courts have held that even

a defendant's knowledge of *overt acts of prostitution* is not enough to establish knowledge or

reckless disregard that force, fraud or coercion was "used to cause the person to engage in [the]

commercial sex act." *Uniquest Hosp.*, 2024 WL 4149251, at *2. In *Uniquest*, for example, the

plaintiff claimed that the defendant, the manager of "a low-end hotel," was liable under the TVPA

for knowingly benefitting from a sex-trafficking scheme that took place on hotel premises. *Id.*

The plaintiff claimed, among other things, that the defendant saw her "enter[] the hotel lobby in

lingerie to meet 'johns' and bring them to her room," and that "'heavy foot traffic' flowed in and

out of her room." *Id.* The court found that those facts were "consistent with prostitution," but

emphasized that "prostitution and sex trafficking by force or fraud are *not* coterminous." *Id.*

(emphasis added). Because the plaintiff could not show that the defendants knew or recklessly

disregarded that force, fraud, or coercion had been used to facilitate those acts of prostitution, the

plaintiff's TVPA claim failed. *Id.*; *see also, e.g.*, *United States v. Evans*, 476 F.3d 1176, 1179 n.1

(11th Cir. 2007) (the TVPA "does not criminalize all acts of prostitution"); *Noble v. Weinstein*,

335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (allegations that Harvey Weinstein's brother paid for

Weinstein's travel, benefitted financially from Weinstein's alleged sex-trafficking venture, and

paid for prior settlements of claims made by women insufficient to show that Weinstein's brother

knew of or participated in a sex-trafficking scheme).

Doe's claims here are even weaker than those in *Uniquest* and similar cases.  Far from witnessing Doe or others engage in acts of prostitution, Indyke and Kahn knew only that Epstein paid women, including women he employed, and Kahn knew that those payments were sometimes in cash and sometimes recorded as gifts.  In Doe's case, ███████████████████████████ ████████████████████████████████████.  SUMF ¶ 173.  She nevertheless insists that Defendants' knowledge of payments to women should have led them to infer that: (i) Epstein had a sexual relationship with those women; (ii) that sexual relationship was commercial; (iii) that commercial sexual relationship involved force, fraud or coercion; *and* (iv) Doe herself was among those women who engaged in commercial sex with Epstein through force, fraud or coercion.  18 U.S.C. § 1591(e)(2); *see also Uniquest*, 2024 WL 4149251, at *4 (the knowledge element of TVPA claims "applies to the sex trafficking of the particular victim-plaintiff").  There is no record evidence to support such an extraordinary chain of unsupportable inferences.  *See Beare v. Millington*, No. 07-cv-3391, 2014 WL 1236750, at *5 (E.D.N.Y. Mar. 25, 2014) (courts "cannot and will not allow a plaintiff to defeat summary judgment with conclusory statements and unsubstantiated leaps in logic").  Doe cannot sustain her TVPA claim for participation in a sex-trafficking venture in the absence of evidence that Indyke or Kahn knew or recklessly disregarded that Epstein was forcing women, including Doe, to engage in commercial sex acts through force, fraud, or coercion.

### B.    There is No Evidence that Defendants Obstructed Enforcement of the TVPA.

Under the TVPA, a defendant is liable for obstruction only where that defendant (1) knows about an effort by the government to enforce the TVPA, and (2) intentionally obstructs or attempts to obstruct that effort.  18 U.S.C. § 1591(d); *see also, e.g.*, *United States v. Farah*, 766 F.3d 599, 612-13 (6th Cir. 2014); *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 287-88 (D. Conn. 2013).

Here, there is no evidence that Indyke or Kahn knew before Epstein's arrest in July 2019 of any pending government investigation, let alone that they acted intentionally to obstruct such investigation.[7]  SUMF ¶ 118.  To the contrary, with the entry of Epstein's Non-Prosecution Agreement and state guilty plea in 2008, Indyke and Kahn understood that any government investigation of Epstein had concluded.  *Id*. ¶¶ 111, 118.  Accordingly, Doe's TVPA claim for obstruction fails.

### C.      Doe Cannot Assert a Claim for Conspiracy to Violate the TVPA.

Doe's claim for conspiracy to violate the TVPA relies on a 2023 amendment to that statute that created, for the first time, a civil claim based on conspiracy.  *See* Pub. L. 117-347, Title I, § 102 ("Section 1595(a) of title 18, United States Code, is amended by inserting 'or attempts or conspires to benefit,' after 'whoever knowingly benefits.'").  Prior to that amendment, no claim for conspiracy was available under the statute where a defendant had not committed a substantive violation of the TVPA.  *See id*.  Here, Doe's claim concerns conduct that took place nearly a decade before the 2023 amendment.  Because that amendment does not apply retroactively, Doe cannot maintain a cause of action for conspiracy.

There is a "well-established presumption" against retroactive application of a statute, "including amendments creating a private cause of action."  *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) (holding that a 2003 TVPA amendment did not apply retroactively).  Absent "clear congressional intent" to the contrary, a statute that "increase[s] a party's liability for conduct" will *not* apply retroactively.  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

---

[7] By contrast, in *Doe I*, Plaintiffs alleged that JP Morgan and Deutsche Bank knew of government investigations into Epstein's sex-trafficking operation and intentionally failed to file suspicious activity reports or "SARs" in order to frustrate those investigations. 671 F. Supp. 3d at 409.  Here, there are no facts showing that Indyke or Kahn knew of any government investigation of Epstein or took any action with the intent to obstruct that investigation.

The 2023 amendment to the TVPA expressly created a conspiracy claim, thereby expanding potential liability for past conduct,[8] and Congress did not indicate any intent for that amendment to apply retroactively; accordingly, the TVPA cannot have retroactive effect. *See* Pub. L. 117-347, Title I, § 102. The only court to have considered whether the 2023 amendment to the TVPA applies retroactively found that it does not. *Ratha v. Phatthana Seafood Co.*, No. CV 16-4271, 2023 WL 2762044, at *4 (C.D. Cal. Mar. 3, 2023) (holding that the 2023 TVPA amendment "cannot be applied retroactively in the absence of a clear statement from Congress, which it lacks").

In any event, even if the 2023 amendment did apply retroactively, an essential element of a TVPA conspiracy claim is an agreement with the perpetrator of a sex-trafficking venture to further that operation. *See Doe I*, 671 F. Supp. 3d at 412. There is no evidence that Indyke or Kahn entered into such an agreement with Epstein; as discussed in Section II.A above, there is no evidence that either even *knew* such an operation existed. And even if they knew, or recklessly disregarded, that Epstein was engaged in sex-trafficking and agreed to provide ancillary services to him—which is not the case here—"that agreement is different from an actual agreement to participate in a sex-trafficking venture." *Id.*; *see United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980) (to be liable, each defendant must have "entered into a joint enterprise with consciousness of its general nature and extent"). Without evidence that Indyke or Kahn knowingly agreed with Epstein to enter into a joint sex-trafficking venture, Doe's conspiracy claim fails.

## III.    DOE IS NOT ENTITLED TO PUNITIVE DAMAGES.

Punitive damages are an extraordinary remedy available only in cases of "exceptional"

---

[8] That amendment followed a Ninth Circuit decision in 2022 that limited the scope of liability under the TVPA, finding that "the phrase 'knowingly benefits' as used in § 1595(a) does not encompass attempts to benefit." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1176 (9th Cir. 2022).

misconduct where "the defendant's wrongdoing is not simply intentional but evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations." *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489 (2007) (cleaned up) (granting summary judgment dismissing punitive damages claim); *see also, e.g.*, *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 448 (E.D.N.Y. 2011) (an award of punitive damages requires "circumstances of aggravation or outrage, such as spite or malice, or a fraudulent or evil motive on the part of the defendant").

Even intentional wrongdoing, on its own, does not suffice for punitive damages. For example, in *Macolor v. Libiran*, No. 14-cv-4555, 2016 WL 1488121 (S.D.N.Y. Mar. 25, 2016), *report and recommendation adopted*, No. 14-cv-4555, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016), this Court declined to award punitive damages where the defendant fraudulently enticed the plaintiff into a trafficking scheme, finding that "[e]ven knowing and intentional fraud . . . does not rise to the level of wanton dishonesty" required for punitive damages. *Id.* at *6 (internal quotation mark omitted). And in *Abafita v. Aldukhan*, No. 16-cv-06072, 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019), *report and recommendation adopted*, No. 16 Civ. 6072, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019), the Court awarded punitive damages only against a trafficking scheme's "primary abuser," who lured the plaintiff to the United States and forced her to work under inhumane conditions for the abuser and others, but declined to award punitive damages against the defendants who confined plaintiff in the country, withheld her passport, and forced her to work "gruelingly long hours under inhumane conditions for little to no pay," on the basis that those defendants were not "the primary malefactor" in the trafficking scheme. *Id.* at *5-6.

Here, neither Indyke's nor Kahn's conduct remotely approaches the extraordinary level of wrongdoing required for punitive damages. It is undisputed that Indyke and Kahn did not

personally engage in (or even witness) any sexual abuse or trafficking and that they were not the "primary malefactors" in Epstein's sex-trafficking scheme. As discussed *supra*, there is no evidence that Indyke or Kahn had actual knowledge of any sexual abuse by Epstein of Doe or any other person. Instead, Indyke and Kahn interacted with Epstein in a professional capacity, with Indyke acting as one of Epstein's corporate transactional attorneys and Kahn acting as one of Epstein's accountants. Nothing about their conduct smacks of "spite or malice" or suggests that it was undertaken with "fraudulent or evil motive." Accordingly, punitive damages are not available as a matter of law.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants Indyke and Kahn respectfully request that the Court grant their motion for summary judgment.

Dated:  November 4, 2024
       New York, New York

  */s/ Daniel H. Weiner*                                */s/ Daniel S. Ruzumna*

Daniel H. Weiner                                     Daniel S. Ruzumna
Marc A. Weinstein                                 Amy N. Vegari
Fara Tabatabai                                       Tara J. Norris
HUGHES HUBBARD & REED LLP        PATTERSON BELKNAP WEBB & TYLER LLP
One Battery Park Plaza                       1133 Avenue of the Americas
New York, New York 10004              New York, New York 10036
Telephone: (212) 837-6000             Telephone: (212) 336-2000
daniel.weiner@hugheshubbard.com     druzumna@pbwt.com
marc.weinstein@hugheshubbard.com     avegari@pbwt.com
fara.tabatabai@hugheshubbard.com      tnorris@pbwt.com

*Attorneys for Defendant Darren K. Indyke*    *Attorneys for Defendant Richard D. Kahn*