UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Allyson Chambers and Jane Doe 3, individually and on behalf of all others similarly situated | ) ) ) ) ) | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | Case No.: 1:24-cv-01204-AS |
| Darren K. Indyke and Richard D. Kahn, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## <u>AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT</u>

Plaintiffs Allyson Chambers and Jane Doe 3 file this individual and civil class action complaint against Defendants Darren K. Indyke's and Richard D. Kahn for damages and other relief under (among other provisions of law): the Trafficking Victim Protection Act, 18 U.S.C. § 1591, *et seq.* ("TVPA"); common law causes of action as described below; the New York Adult Survivors Act, N.Y. CPLR §214-j; and the Victims of Gender-Motivated Violence Protection Act ("GMVPA"), New York City Administrative Code § 10-11.

Chambers and Jane Doe 3 make the following allegations on information and belief and believe that substantial additional evidentiary support will exist for the claims set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE CASE

1.    Beginning in the early 1990s, Jeffrey Epstein created a complex, sophisticated sex-trafficking venture (the "Epstein Enterprise") with the help of many influential individuals and entities who both knew he was sexually abusing and sexually trafficking young women and girls, and knowingly provided support to facilitate the Epstein Enterprise.  Epstein's co-conspirators not only facilitated his sex trafficking and abuse, but were also integral in allowing Epstein to escape justice for years by concealing his litany of crimes.

2.    The manner of operation for the Epstein Enterprise has been widely publicized.  Epstein would lure young girls or women to one of his luxurious mansions under the guise of being a wealthy philanthropist, able to advance careers, education, or provide other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would cause each of his unsuspecting victims to engage in a variety of commercial sex acts.

3.    From its inception until Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the

Epstein Enterprise operated both (1) to lure young women and girls into a position where Epstein could coerce them to engage in commercial sex acts and commit sexual offenses against them and (2) to conceal its sex trafficking from law enforcement organizations. The Epstein Enterprise provided financial and other benefits to those who assisted and enabled both of the Epstein Enterprise's purposes.

4.    The Epstein Enterprise would not have existed for the duration it did and at its scope and scale, without the collaboration and support of others. No one, except perhaps Ghislaine Maxwell, was as essential and central to Epstein's operation as these Defendants.

5.    Darren Indyke and Richard Kahn were Epstein's personal lawyer and accountant, respectively. They personally participated in the Epstein Enterprise from approximately 1995 onward. After Epstein's death, they were executors of Epstein's estate.

6.    Indyke and Kahn were personally essential to the Epstein Enterprise's success—among other things, they helped structure Epstein's bank accounts and cash withdrawals to give Epstein and his associates access to large amounts of cash in furtherance of sex trafficking.

7.    Indyke and Kahn also personally assisted with creating the Epstein Enterprise's complex financial infrastructure, which involved dozens of bank accounts at various banking institutions, many of which were held in the name of

3

corporate entities with no legitimate business purpose and that appear to have been created to simply facilitate the illegal sex-trafficking venture.

8.      Defendants were well aware of the Epstein Enterprise's purposes, effects, and operations. Defendants were on Epstein's payroll for years, and they knowingly and intentionally personally benefited and received things of value from Epstein and his sex-trafficking operation.

9.      Knowing that they would earn millions of dollars in exchange for facilitating Epstein's sex abuse and trafficking, Indyke and Kahn chose money and power over following the law. Indyke and Kahn chose participating in and facilitating the Epstein Enterprise for many years, all for their own financial gain. At each step, Defendants denied and concealed their personal involvement in the Epstein Enterprise to evade prosecution and civil liability from individuals such as Chambers and Jane Doe 3.

10.     Indyke and Kahn's knowing facilitation, participation, and concealment of Epstein's illegal conduct allowed Epstein to successfully rape, sexually assault, and coercively sex traffic Chambers and Jane Doe 3 and the numerous other members of the Class alleged below (the "Class").

11.     For many years, Indyke and Kahn intentionally concealed the extent of their personal involvement in the sex-trafficking venture including specific false denials of their role in the Epstein Enterprise, making themselves out to be mere

4

outside advisors to Epstein—but as further described below, Indyke and Kahn have since been exposed as part of Epstein's inner most circle, and key facilitators of sex trafficking.

12.    As further detailed below, Indyke and Kahn worked closely with Epstein through every step of the sex trafficking operation's expansion and growth. Defendants hid their integral involvement with the Epstein Enterprise from Chambers, Jane Doe 3, and the Class through concealments, false denials, and other efforts.

## II.    JURISDICTION, VENUE, AND TIMELINESS

13.    This action is brought pursuant to various federal and state statues, including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. §1331 because Chambers and Jane Doe 3—individually and on behalf of the other Class members—proceed under the federal TVPA statute.

14.    This Court also has supplemental jurisdiction over the state law claims recounted below pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

15.    This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action.  Venue is proper in

this District under 28 U.S.C. § 1391(b)(2), because Epstein, his co-conspirators, and Defendants all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Chambers and Jane Doe 3 and members of the Class in this District.

16.    Often these acts of sexual abuse and commercial sex acts, committed by Jeffrey Epstein and certain select friends of his, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street in New York City. Epstein also used his New York mansion and numerous apartment units he owned at 301 East 66th Street in New York City to harbor his victims and as a base from which to transport them to other locations outside of New York.

17.    A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

18.    This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking. This action is also timely because the conspiracy, including the conspiracy to conceal the illegal conduct and

Defendants' role in it, continued until and after Jeffrey Epstein's death in 2019. This action is also timely under New York's Adult Survivors Act, N.Y. CPLR § 214-j.

### III.    PARTIES

19.    Chambers is a citizen of the State of Florida.

20.    At relevant times, she was abused in the State of New York and the State of Florida.

21.    Jane Doe 3 is a citizen of the European Union, but at relevant times was abused in the State of New York.

22.    Jane Doe 3 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

23.    Jane Doe 3 is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause them serious harm.

24.    Jane Doe 3's safety, right to privacy, and security outweigh the public interest in her identification.

25.    Jane Doe 3's legitimate concerns outweigh any prejudice to Defendants by allowing her to proceed anonymously.

26.    Defendant Darren K. Indyke is co-executor of the Estate of Jeffrey E. Epstein and Administrator of The 1953 Trust and was a participant in Epstein's

sex-trafficking operation. Darren K. Indyke was Jeffrey Epstein's advisor and personal lawyer for many years, handling all of his personal affairs and business operations relating to his sex-trafficking operation. Epstein referred to Indyke as his in-house counsel. For many years, Indyke hid the extent of his personal involvement in the sex-trafficking operation. Indyke is domiciled in Florida.

27.    Defendant Richard D. Kahn is co-executor of the Estate of Jeffrey E. Epstein and Administrator of The 1953 Trust and was a participant in Epstein's sex-trafficking operation. Richard D. Kahn was Jeffrey Epstein's advisor and personal accountant who handled all of his personal accounting and financial services relating to his sex-trafficking operation. For many years, Kahn hid the extent of his personal involvement in the sex-trafficking operation. Kahn is domiciled in New York.

28.    Defendants' financial activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

## IV.    FACTUAL ALLEGATIONS

### A.    <u>The Epstein Sex-Trafficking Enterprise and Conspiracy</u>

29.    During all times relevant to this complaint, Jeffrey Epstein was an extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a Palm Beach mansion, an apartment in France, and an island in the U.S. Virgin Islands.

30.    Beginning in and around 1995 and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture and conspiracy in violation of 18 U.S.C. §§ 1591–95. As part of the Epstein Enterprise, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from many different states, and all over the world, to engage in commercial sex acts and to sexually abuse them.

31.    Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cell phones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

32.    For example, the Epstein Enterprise owned multiple private planes that it used to transport victims around the world and to Epstein's various homes. On

these planes, and through other means, the Epstein Enterprise transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce between the United States and Europe, especially Eastern Europe.

*(i) The Enterprise's Key Conspirators*

33.     In creating and maintaining this network of victims to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, securing the cash to finance the venture's operations; concealing the venture's operations; recruiting victims; housing and caring for victims; coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.  Epstein and these other individuals also conspired to violate 18 U.S.C. § 1591.

34.     By (at the latest) 1995, Epstein's sex trafficking venture had crystalized into criminal conspiracy.  By 1995, each victim was being forced to recruit other vulnerable victims and being paid, typically in cash, for each recruitment, creating a pyramid scheme of abuse. A Florida criminal investigation uncovered that the number of victims of Epstein's sex-trafficking conspiracy grew exponentially in and around the early 2000s.

35.     At all times relevant to this complaint, the Epstein sex-trafficking enterprise was a group of two or more individuals associated in fact, even if they were not a formal legal entity.  Indeed, members of the Epstein sex-trafficking enterprise referred to it as "The Organization."

36.     Some of the key members of the Epstein Enterprise included Ghislaine Maxwell, who recruited girls for Epstein for many years, resulting in her later federal conviction, and Defendants Indyke and Kahn, Epstein's trusted attorney and accountant.  Other members included Sarah Kellen, who also recruited girls for Epstein for many years and was in charge of scheduling young girls for Epstein's massages and arranging for their travel; Lesley Groff, Epstein's secretary who made travel arrangements for the girls, tended to their living needs, and scheduled massage sessions; and Jean-Luc Brunel, a French modeling agent who assisted Epstein in procuring young girls from overseas by promising the girls, often from poor backgrounds, modeling opportunities.

*(ii) The Epstein Enterprise's Recruitment Methods*

37.     Epstein and his co-conspirators used Epstein's vast (yet mysterious) wealth and connections to other rich and powerful individuals to lure victims into his home for seemingly innocuous activity.  Victims were initially recruited to speak with an allegedly philanthropic Epstein and provide "massages" to him.

38.     As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose.  The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed.  At times, the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation.

39.     Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house. They would also strategically place photographs of very powerful political and social figures amongst photographs and paintings displaying nude females in an effort to normalize the sexual abuse.

40.     Epstein and his co-conspirators would normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur.

41.     Once at the home and trapped in Epstein's bedroom, the victims would be instructed to remove their clothing.  Epstein would then force the massages to become increasingly sexual in nature, typically including one or more forced sex acts.  Epstein would use means of force, threats of force, and fraud to coerce and

induce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him.

42.    In this District and at his various residences, Epstein perpetuated this pattern of abuse in similar ways, hundreds, perhaps thousands, of times.

43.    Epstein actively coerced his victims to become recruiters themselves, forcing them to recruit additional girls to be similarly sexually abused and causing the number of victims to grow exponentially.  Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein.  In so doing, Epstein, through this system of paying victims to recruit others whom he would in turn pay to recruit others, maintained a steady supply of new victims to exploit.

44.    This scheme of paying victims to recruit other victims worked effectively for Epstein, allowing expansion through the recruitment of other victims in a pyramid scheme or spiderweb fashion.

*(iii)        The Enterprise's Coercion Methods*

45.    Once in his presence, each victim knew there was no option to disobey Epstein.  It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims and capable and willing to seriously harm any of his victims if they disobeyed him.

46.    Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

47.    Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims.  He then closed the trap on his victims with false offers of money, food, shelter, medical care for them or family members, travel, schooling, and career opportunities.

48.    Epstein groomed the young women and girls, indoctrinating them to believe that the sexual abuse was normal.  For example, Epstein constantly exposed the girls to nudity and sex to normalize his perverse sexual preferences. The walls of his homes were lined with photographs and paintings displaying nude females. A search of his Palm Beach mansion revealed that Epstein kept soap in the shape of penises and vaginas in multiple bathrooms.   The Palm Beach police also found numerous sex toys in the trash and around the mansion as well as an Amazon receipt for the purchase of three sex slave books about erotic servitude that Epstein likely kept in plain view for the girls to see.

49.    Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, select others, as well as to create the opportunity for Epstein to sexually abuse them.  Victims were told that

they should always act grateful and often received rewards and gifts for making Epstein orgasm, but were also scolded and threatened if they did not.

50.    Epstein and his associates paid his victims hundreds of dollars in cash for each sexual encounter.  Epstein also promised his victims with other things of value, including educational and career advancement, a place to live, and promises that Epstein would provide various forms of assistance.  Epstein provided things of value to his victims in order to coerce them to engage in sex acts with him and on occasion his friends, co-conspirators, or other victims.

51.    As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises were a quid pro quo for the sex acts that occurred.

52.    Epstein and his co-conspirators also dangled coveted opportunities in front of their victims to keep them compliant.  Once they understood their victims' pasts and future aspirations, they would use that knowledge to get the girls to submit the sexual desires of Epstein and others.  Epstein provided housing to many girls and aspiring models in a building on East 66th Street in Manhattan, along with car services and cell phones so he could track their every move.

53.    As one means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would give his victims money to stay quiet about the

assault or as a "finder's fee" for bringing other young women.  Epstein would also provide them with living accommodations, clothing, education, or other necessities, exploiting the vulnerabilities of his often poor and underprivileged victims.

54.     As another means of coercing victims to engage in commercial sex acts, Epstein and his co-conspirators often directly threatened the safety and livelihoods of their victims and any witnesses to their crimes.  Epstein's co-conspirators threatened any victim who attempted to cooperate with law enforcement.  Epstein and his lawyers would gather information about the girls to use against them if they ever disobeyed him.   His homes were also under constant surveillance, and his New York mansion had a room in which men that Epstein hired monitored what was happening in the home.

55.     Epstein also utilized his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse into compliance and silence. Epstein and his co-conspirators constantly bragged to the girls about his friendships with powerful people to remind them of his power and the consequences of disobeying him.

(iv)     *The Government's Failed Attempts at Ending the Enterprise*

56.     In 2005, the Palm Beach Police Department ("PBPD") received a complaint from parents of a 14-year-old girl involving sexual abuse by Jeffrey

Epstein. After an investigation, the PBPD identified approximately 20 girls between the ages of 14 and 17 who Epstein sexually abused at his Palm Beach mansion.

57.    During that investigation, the government concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of the TVPA and other federal laws, including 18 U.S.C §§ 2422(b), 2423(f), 2423(b), 2424 (e); 18 U.S.C § 371; 18 U.S.C §§ 1591(c)(1), 1591(a)(1), 1591(a)(2); as well as state crimes in violation of Florida Statutes §§ 796.07 and 796.03, against dozens of young women.

58.    As a consequence of the Florida investigation, Epstein pled guilty to soliciting a minor for prostitution, a second-degree felony, and to felony solicitation of prostitution, a third-degree felony; was permanently labeled a "Registered Sex Offender"; and agreed to serve 18 months in the county jail with work release for 12 hours a day, six days a week. Epstein entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of Florida barring his prosecution (and prosecution of his co-conspirators) for violations of the TVPA and other sex offenses in Florida.

59.    Epstein's criminal case in Florida and the many related news reports made clear Jeffrey Epstein's extraordinary penchant for sex abuse and trafficking of young females. For instance, it was reported that up until the time of his Florida

17

arrest in July 2006, Epstein had been sexually abusing during that year and the previous year *three to four young females per day*.

60.    Beginning with his 2006 Florida arrest and for years moving forward, Epstein was embroiled in dozens of public lawsuits detailing his sexual abuse of females, and thousands of news stories circulated worldwide about his illegal sexual proclivities.  These public allegations further made clear that Epstein was operating a sex-trafficking enterprise.

61.    In one publicly filed 2008 complaint in Palm Beach County Circuit Court, the plaintiff alleged:

> The Defendant, Jeffrey Epstein, developed a plan, scheme, and criminal enterprise that included an elaborate system wherein the then minor Plaintiff was brought to the Defendant, Jeffrey Epstein's residence by the Defendant's employees, recruiters, and assistants. When the assistants and employees left the then minor Plaintiff and other minor girls alone in a room at the Defendant's mansion, the Defendant, Jeffrey Epstein, himself would appear, remove his clothing, and direct the then minor Plaintiff to remove her clothing. He would then perform one or more lewd, lascivious, and sexual acts, including, but not limited to, masturbation, touching of the then minor Plaintiff's sexual organs, coercing or forcing the then minor Plaintiff to perform oral sex on him, using vibrators or sexual toys on the then minor Plaintiff, coercing the then minor Plaintiff into sexual acts with himself or others, and digitally penetrating the then minor Plaintiff. He would then pay the Plaintiff for engaging in this sexual activity.

62.    In another complaint publicly filed in the United States District Court for the Southern District of Florida in 2010, the plaintiff alleged:

> Defendant's plan and scheme reflected a particular pattern and method. Defendant  coerced  and  enticed  impressionable,  vulnerable,  and

relatively economically less fortunate minor girls to participate in various acts of sexual misconduct that he committed upon them. Defendant's scheme involved the use of underage girls, as well as other individuals, to recruit underage girls. Defendant and/or an authorized agent would call and alert Defendant's assistants shortly before or after he arrived at his Palm Beach residence. His assistants would call economically disadvantaged and underage girls from West Palm Beach and surrounding areas who would be enticed by the money being offered and who Defendant and/or his assistants perceived as less likely to complain to authorities or have credibility issues if allegations of improper conduct were made. The then minor Plaintiff and other minor girls, some as young as 14 years old, were transported to Defendant's Palm Beach mansion by Defendant's employees, agents, and/or assistants in order to provide Defendant with "massages."

63.    Epstein paid millions of dollars to settle sexual abuse lawsuits filed against him by many victims.  And while he was paying to settle these claims, Epstein continued to abuse new victims—all facts known to Defendants, Epstein's trusted advisors.

64.    In addition to the many civil lawsuits seeking damages for sexual abuse, Epstein's victims also filed a public lawsuit against the Unites States under 18 U.S.C. § 3771, the Crime Victim's Rights Act ("CVRA"), further exposing Epstein's sexual crimes as well as his secret Non-Prosecution Agreement with the Federal Government.

65.    Epstein's aptitude as a sex-trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008.  Even while he was in jail in Florida, Epstein brazenly continued to sexually abuse young girls and women from his work-release office.

66.    Once out of jail and off work release, Epstein continued to collect young women and lure them through force, fraud, and coercion into one of his mansions, primarily his townhouse located at 9 East 71 Street, New York, NY, where he would sexually abuse each one.

67.    After his guilty plea in Florida, Epstein began to focus on procuring and abusing women from Eastern Europe.  These women's immigration status and language barriers made them more isolated, dependent, and vulnerable to Epstein's abuse and manipulation.

68.    On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of sex trafficking conspiracy and one count of sex trafficking for violations of 18 U.S.C. § 1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street.  *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-00490 (S.D.N.Y.).

69.    On July 8, 2019, Epstein was arrested pursuant to the New York Indictment.

70.    On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where was awaiting trial on the federal sex trafficking charges.  He was later pronounced dead from apparent suicide.

71.     In July 2020, Epstein's co-conspirator in the sex-trafficking venture, Maxwell, was arrested on federal sex-trafficking charges filed in the Southern District of New York.  The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex-trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims, including in New York City.  *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

72.     On December 29, 2021, after a weeks-long jury trial during which witnesses testified about Epstein's sex-trafficking operation in some detail, Maxwell was found guilty on five federal sex-trafficking counts and is now serving nearly 20 years in federal prison for these crimes.

**B.     Allyson Chambers's Abuse**

73.     In approximately late 1994 or early 1995, Chambers met Ghislaine Maxwell at a chiropractor's office Chambers was working at in Florida.

74.     Maxwell recruited Chambers to work as a massage therapist for Epstein.

75.     As part of her work, Chambers was required to provide Epstein with massages on a repeated basis.

76.     During many of the massages Epstein sexually abused and assaulted Chambers without her consent.

77.     Epstein paid for Chambers to fly to New York and New Mexico.

21

78.    Epstein assaulted Chambers while she was in New York.

79.    As was common practice in the Epstein sex trafficking venture, Epstein intimidated Chambers through the knowledge that Epstein had powerful friends.

80.    Chambers's contact with Epstein ended in approximately 2015.

81.    Until Chambers's contact with Epstein ended in approximately 2015, Chambers felt threatened and controlled by Epstein.

**C.    <u>Jane Doe 3's Abuse</u>**

82.    Under the ruse that he was interested in helping her, Epstein paid for Jane Doe 3 to fly from Europe to New York, where he instructed her to stay in one of his 301 East 66th Street apartments.

83.    While in New York, she was constantly badgered by Epstein and his employees to "loosen up" and "relax" when she declined to talk explicitly about sex.

84.    On one occasion while in Epstein's New York home, Jane Doe 3 was riding in an elevator with Epstein and another woman.   When they got out of the elevator and entered into Epstein's massage room, Epstein had the other girl perform oral sex on him while forcing Jane Doe 3 to watch in close proximity.  Epstein kept trying to get Jane Doe 3 to join in on the oral sex and kiss the other girl.  When Jane Doe 3 refused, Epstein started to forcibly touch Jane Doe 3 without her consent on her breasts and below the waist.

85.    On another occasion, Epstein and Jane Doe 3 were in one of the rooms in Epstein's New York home.  Suddenly, Epstein pushed Jane Doe 3 down and forced her to perform oral sex on him.  Epstein also touched her below the waist and digitally penetrated her without her consent.

86.    On another occasion, Epstein and Jane Doe 3 were riding in Epstein's car in New York.  Suddenly, Epstein touched Jane Doe 3 below the waist and digitally penetrated her without her consent.

87.    While in New York, Jane Doe 3 was directed to go to Epstein's office in New York to receive cash from Epstein's employees on more than one occasion.

88.    Epstein would frequently become angry with Jane Doe 3 when she would refuse his sexual advances.

89.    In 2014, Epstein lured Jane Doe 3 to travel with him to several locations where either he or Ghislaine Maxwell had homes.

90.    On one occasion, Jane Doe 3 agreed to watch a movie with Epstein and another woman.  Epstein began touching the other woman's breasts and then started touching Jane Doe 3's breasts without her consent.

91.    Epstein also lured Jane Doe 3 to a secluded location and instructed Jane Doe 3 to allow Epstein to be her "sex mentor."  When Jane Doe 3 declined, Epstein held her down and pressed a sex toy on her genitals while she cried, refusing to stop until he was satisfied she had orgasmed.

92.    On another trip, Epstein snuck into Jane Doe 3's room at night while she was sleeping and forced his fingers inside her genitals.

93.    Later, Epstein again lured Jane Doe 3 to meet him abroad.  During that trip, Epstein again snuck into Jane Doe 3's room at night while she was sleeping and raped her, forcing her to perform oral and vaginal sex.

94.    After this final abuse, Jane Doe 3 cut off contact with him and his co-conspirators.

95.    Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 3.  Epstein and his co-conspirators constantly reminded Jane Doe 3 how powerful and important Epstein was.  Jane Doe 3 was chastised if she refused Epstein's sexual demands and told she should be grateful that Epstein was willing to help her.  She came to believe what she was told.

96.    The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe 3 and other victims by Epstein and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, also included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) life necessities would be denied victims if they, including Jane Doe 3, failed to perform

commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 3's and other victims' life necessities such as shelter or housing if she or they failed to perform those acts.

97.    Epstein's sex-trafficking venture targeted vulnerable young women and Jane Doe 3 was soon indoctrinated and unable to extricate herself.  Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants (such as Defendant Kahn), lawyers (such as Defendant Indyke), and other important people, were aware of the sex abuse, Jane Doe 3 was coerced into a cult-like life controlled and manipulated by Epstein and others doing Epstein's bidding.

98.    Epstein's sexual abuse against Jane Doe 3 was in direct violation of Article 130 of New York's Penal Law and the GMVPA.

99.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to cause Jane Doe 3 to engage in commercial sex acts.

100.   Epstein recruited Jane Doe 3 to cause and force her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cell phones and means of interstate transportation (such as aircraft that he owned or controlled).

101.   Jane Doe 3 wanted to escape from the Epstein sex-trafficking enterprise, yet Epstein and his supporting team of co-conspirators used fraud, force, and coercion to cause her to remain compliant in fulfilling Epstein's sexual demands.

102.   Jeffrey Epstein controlled Jane Doe 3 financially, emotionally, and psychologically.  He used his knowledge of Jane Doe 3's aspirations, fears, and problems to manipulate her until she was completely controlled by and dependent upon him.

103.   Epstein and his co-conspirators, including Defendants, withdrew large sums of cash to make payments to victims, including Jane Doe 3, in furtherance of the sex-trafficking operation.

104.   Jane Doe 3 was paid cash by Epstein or one of his co-conspirators that was withdrawn from one of Epstein's accounts Defendant Indyke was a signatory on.

105.   Jane Doe 3 was deeply affected by the assault, and she suffers severe emotional distress from an experience that has affected her for her entire life.

**D.**   **Defendants' Roles in the Epstein Sex-Trafficking Enterprise**

*(i) Access to Cash*

106.   One of the functions of Indyke and Kahn was to ensure that Epstein always had reliable access to resources from banks—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in

commercial sex acts and other degradations, and to pay off persons who might otherwise reveal what was going on.

107.  Indyke and Kahn themselves repeatedly obtained large stacks of cash for Epstein—including through ATMs, checks, or by converting currency—which, funded Epstein's cash payments for his sex-trafficking enterprise.

108.  A 2020 Consent Order from the New York State Department of Financial Services ("DFS Consent Order") highlighted Defendants' role as to Epstein's bank accounts.  The DFS Consent Order included various specific findings about the conduct of two individuals referred to as "ACCOUNTANT-1" and "ATTORNEY-1."  Plaintiffs believe ACCOUNTANT-1 is either Defendant Kahn or another accountant working under Kahn's direction at his small accounting firm, and ATTORNEY-1 is Defendant Indyke.

109.  As described by the DFS Consent Order:

Mr. Epstein's personal attorney (herein, 'ATTORNEY-1'), was active in withdrawing cash for Mr. Epstein. ATTORNEY-1, on behalf of Mr. Epstein, made a total of 97 withdrawals from the Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Mr. Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (i.e., withdrawals made by an authorized user who is not a primary account holder). When Bank personnel asked ATTORNEY-1 why Epstein needed cash, ATTORNEY-1 replied Epstein used it for travel, tipping and expenses.

110.   Between 2014 to 2016 alone, Indyke made over 40 separate check-cashing withdrawals at a pace of two to three per month, each for the amount of $7,500, which was the bank's limit for third-party withdrawals.

111.   On January 17, 2018, Indyke cashed a check for $100,000, and Kahn coordinated with the bank to make sure to have cash ready for pick up.  As described by the DFS Consent Order:

> In 2018, just prior to the Bank's closing of the Park Avenue Branch, which was located nearby Mr. Epstein's house, ATTORNEY-1 withdrew $100,000.00 in cash on behalf of Mr. Epstein.  When later questioned why ATTORNEY-1 withdrew these sums from the Bank, ATTORNEY-1 reported that Mr. Epstein needed the funds for tipping and household expenses. . . .  In total, in a roughly four-year period, ATTORNEY-1 withdrew on Mr. Epstein's behalf more than $800,000 in cash from Mr. Epstein's personal accounts.

112.   In addition, from June 2018 to February 2019, there was a series of at least 97 separate withdrawals of $1,000 made from an Epstein account for which Indyke was a signatory, all taken from an ATM a short walk from Indyke's law office at the time.  From this same account, Indyke wrote 11 checks, between April 2016 and April 2019, for the purpose of converting U.S. dollars to Euros totaling over $126,000.

113.   Without exorbitantly large amounts of cash procured by Defendants, Epstein's operation could not effectively operate.  Newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.  Each victim was also informed that she would be paid

hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on those promises of large cash payments to keep his victims quiet and complicit.

114.   If Epstein paid every victim with wire transfers or checks and left a documented money trail, his illegal sexual abuse and sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash procured by Defendants, Epstein was able to commit the most egregious sexual crimes many times a day without leaving a paper trail.

*(ii) Evading Law Enforcement*

115.   Indyke and Kahn also assisted Epstein in concealing Epstein's illegal activity and avoiding detection by law enforcement, including by repeatedly structuring their cash withdrawals for Epstein to evade banking reporting requirements.  Defendants' concealment was knowingly and explicitly to permit the continuing expansion of Epstein's sex trafficking.

116.   The DFS Consent Order highlighted Defendants' role in seeking to avoid detection by law enforcement of his illegal activities.

117.   On July 20, 2016, Indyke brought two checks to a branch teller window for withdrawal, one for $7,500 drawn on Epstein's personal account and one for $4,000 drawn on Defendant Indyke's business account.  However, Defendant Indyke

only cashed the $7,500 check that day and returned the next day to cash the $4,000

check, to avoid reporting paperwork.

118.   On another occasion, and despite numerous publications describing

Epstein's sex trafficking, ACCOUNTANT-1 provided false reasons for massive

cash withdrawals from Epstein's accounts:

> In a May 2018 email, a compliance officer submitted an inquiry to
> RELATIONSHIP MANAGER-2 about payments to the accounts of
> women with Eastern European surnames at a Russian bank, and asking
> for an explanation of the purpose of the wire transactions and Epstein's
> relationship with the counterparties. After submitting the questions to
> ACCOUNTANT-1,    RELATIONSHIP    MANAGER-2    forwarded
> ACCOUNTANT-1's response to the compliance officer, which read
> "SENT TO A FRIEND FOR TUITION FOR SCHOOL.

119.   The DFS Consent Order documents how ATTORNEY-1 probed the

bank's policy on how closely it monitored cash withdrawals:

> In May 2014, ATTORNEY-1 inquired into how often he could
> withdraw cash on behalf of Mr. Epstein without triggering an alert."
> Then, "[i]n 2017, ATTORNEY-1 again inquired about triggering an
> alert. Specifically, in July 2017, ATTORNEY-1 had, among other
> things, asked a teller whether a withdrawal transaction in excess of
> $10,000 would require reporting and, upon being advised that it would,
> broke up the withdrawal transaction over two days.

120.   When Epstein was terminated from one of his banking institutions due

to the widespread allegations of sex trafficking against him, Indyke conspired to get

the bank to write Epstein a reference letter for Epstein's next banking institution and

to falsely claim that there were no issues detected with Epstein's account.

Defendants were integral to ensuring that Epstein always had access to large amounts of cash.

121.    Indyke and Kahn also conspired to assist Epstein in evading banks running diligence reports on him for the purpose and effect of concealing Epstein's sex trafficking and permitting that sex trafficking to continue.  As described in the DFS Consent Order, in one instance, ACCOUNTANT-1 withdrew Epstein's name from a non-profit's brokerage account to avoid a due diligence report being run on Epstein:

> On January 4, 2016, an accountant representing Mr. Epstein (herein, 'ACCOUNTANT-1') requested that the Bank open a brokerage account for Gratitude America, Mr. Epstein's private charity. COVERAGE TEAM MEMBER-1 escalated the request to AML OFFICER-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Mr. Epstein. In response to the request for additional information, ACCOUNTANT-1 informed the Bank of Mr. Epstein's resignation from Gratitude America and withdrew the request to open the account. As a result, no due diligence report was run on Mr. Epstein.

122.    These specific instances illustrate Defendants' practice of facilitating and protecting Epstein's ability to use his various bank accounts (under various sham entities) to continue his sex-trafficking enterprise.

123.    Indyke and Kahn conspired to assist Epstein in settling with many victims who he harmed over the years to keep the sex-trafficking operation quiet.

*(iii)*     *Facilitation of Payments*

124.   Defendants also directed, approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking enterprise, including payments to women who were forced to have sex with Epstein and/or recruited others to be victimized, recruiters, and, Plaintiffs believe, to maintain the immigration status of victims of the Epstein sex-trafficking enterprise.

125.   Defendants (at least one of them, but often both) had power of attorney or signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition.

126.   At least one Defendant was a signatory on over 130 different bank accounts for Epstein and Epstein-owned entities, many of which existed only to transfer payments to other entities and other expenses.

127.   Between 2016 and 2019, Indyke made wire transfers from Epstein's personal accounts to victims and entities to facilitate the Epstein sex-trafficking enterprise.

128.   Defendants oversaw over $2,500,000 in payments from a single account (and millions more from other accounts) in which Defendant Indyke was a signatory to dozens of women with Eastern European surnames, purportedly for

hotel expenses, rent, and other expenses, and to an immigration lawyer who was involved in forced marriages arranged among Epstein's victims to secure victims' immigration status.

129.   Indyke and Kahn signed checks for LSJE, LLC—an entity for which they were authorized signatories—for combined value of almost $300,000 made out personally to young women or, as further described below, to the immigration lawyer in New York who was involved in one or more forced marriages arranged among Epstein's victims to secure a victim's immigration status.

*(iv)      Control over Corporate Entities*

130.   Defendants organized, controlled, and directed almost every aspect of the Epstein sex-trafficking enterprise. They were officers of virtually every corporate entity that Epstein created to fund and conceal his activities and had signatory authority as to those entities. They were deeply involved in the financial activities of the Epstein-owned entities and were paid for their loyalty and assistance.

131.   Indeed, Epstein paid for Indyke to go to law school and obtain a license to practice law for the sole purpose of obtaining his assistance with carrying out the Epstein Enterprise.

132.   Corporate filings indicate that one, and frequently both, Defendants were involved in the creation and/or management of several of Epstein's sham entities, including the C.O.U.Q. Foundation, Gratitude America Ltd., the J. Epstein

Virgin Islands Foundation; FT Real Estate Inc.; Hyperion Air, Inc.; Jeepers, Inc.; Mort, Inc.; and Zorro Development Corporation.  Just as Epstein himself had no discernible profession, none of these sham entities had any real business purpose other than facilitating sex trafficking.

133.  Indyke and Kahn were also officers of the corporate entities that held the real estate on which Epstein abused countless victims:

    a.  Nautilus, Inc., is the corporate entity that owned Epstein's private island "Little St. James" in the U.S. Virgin Islands, where countless of Epstein's victims were transported, harbored, and abused. Epstein engaged in a pattern and practice of trafficking and sexually abusing victims on this private, secluded island where Epstein and his associates could avoid detection of their illegal activity and prevent victims from leaving freely and escaping the abuse. Thus, Nautilus, Inc. participated in carrying out, facilitating and concealing Epstein's crimes.  At all relevant times, Indyke and Kahn were the secretary and treasurer of Nautilus, Inc., respectively.

    b.  Poplar, Inc., is a corporate entity that had signatory authority over Great St. Jim, LLC, which held title to another set of properties that Epstein owned in the U.S. Virgin Islands, which were the islands closest to Little St. James.  Epstein purchased these properties to

further shield his conduct on Little St. James from view, prevent his detection by law enforcement or the public, and allow him to continue and conceal his criminal enterprise. Thus, Poplar, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were the secretary and treasurer of Poplar, Inc., respectively.

c. Cypress Inc. is a corporate entity that owned the property 49 Zorro Ranch Road in Stanley, New Mexico, which the Epstein New Mexico property at which he transported, harbored, and abused countless victims. Thus, Cypress, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Cypress, Inc.

d. Maple, Inc., is a corporate entity that owned the property at 9 East 71st Street in New York—Epstein's New York townhome at which he transported, harbored, and abused countless victims. Thus, Maple, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were

listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Maple, Inc.

    e.   Laurel, Inc., is a corporate entity that owned the property at 358 Brillo Way in Palm Beach, Florida—Epstein's Palm Beach mansion at which he transported, harbored, and abused countless victims. Thus, Laurel, Inc. participated in carrying out, facilitating and concealing Epstein's crimes. At all relevant times, Indyke and Kahn were listed, respectively, as Vice President/Secretary/Director and Treasurer/Director of Laurel, Inc.

    f.   Indyke and Kahn were also the secretary/director and treasurer/director of Southern Trust Company, Inc. Epstein used Southern Trust Company to open many of his bank accounts with his bank institutions, which Indyke and Kahn also controlled.

134. Kahn oversaw the accounting and tax reporting for many entities affiliated with the Epstein sex-trafficking enterprise and was aware of their purpose.

135. Defendants were appointed as officers in various 501(c)(3) organizations affiliated with the Epstein sex-trafficking enterprise. Defendants used the 501(c)(3) organizations to make payments to support the Epstein sex-trafficking enterprise – payments that were designed to service the criminal activities of Epstein and that were inconsistent with the charitable purpose of any such foundations.

136.   Defendants controlled entities that were funded entirely by money transferred from Epstein's personal bank accounts.  Such entities were then utilized to facilitate the Epstein sex-trafficking enterprise by putting victims on the payroll and providing false reasons for the compensation to obscure the existence of the Epstein sex-trafficking enterprise.   Additionally, entities were used to pay for immigration legal fees and to pay various costs associated with the forced marriages used to keep victims available for Epstein's ongoing abuse.

137.   Defendants are also in sole control of Epstein's estate and have been since his death.  On August 8, 2019, two days before his death and after his arrest, Epstein executed a last will and testament appointing his long-time co-conspirators Indyke and Kahn as the executors of his estate.  On August 15, 2019, five days after Epstein's death, Indyke and Kahn executed oaths of willingness to serve as executors of Epstein's estate.  As executors, Indyke and Kahn have approved the release of estate funds to pay for the legal fees and costs of other co-conspirators.

138.   Indyke and Kahn are also administrators and co-trustees of The 1953 Trust.  The 1953 Trust was created by Epstein, who "amended and restated" its terms only two days before his suicide—the same day on which he revised his last will and testament. Epstein's last will and testament transferred all of his "property, real and personal, wherever situated" to The 1953 Trust.  Indyke and Kahn, filed a Certificate of Trust in the Superior Court of the Virgin Islands for The Trust on August 26,

2019.  Plaintiffs believe that Indyke and Kahn are compensated for their role as co-trustees of The 1953 Trust.

139.   The Butterfly Trust was a trust created for the benefit of numerous persons who performed work for Epstein, including known co-conspirator Ghislaine Maxwell, young women with Eastern European surnames, and Defendants themselves.  In addition to themselves being beneficiaries of the Butterfly Trust, Defendants were authorized signatories on the Butterfly Trust's checking account, a privilege they used to sign for checks totaling over $1,000,000 made out to young women, or their associated entities.

*(v) Arranging Sham Marriages*

140.   Defendants participated with Epstein in coercing and inducing his sex-trafficking victims, in at least three cases, to enter into arranged and forced sham marriages in order to obtain immigration status for the foreign women so that they could continue to be available to Epstein for his abuse.

141.  For example, Indyke assisted in placing one victim—who was repeatedly abused by Epstein and was forced to have sex with Epstein's friends—into an arranged marriage to another victim to prevent the other victim from being deported.   Indyke and an immigration lawyer prepared the victim for communications with U.S. immigration officials almost immediately after the wedding.  Kahn provided a letter of reference for the immigration proceeding.  When

the victim inquired about getting divorced and leaving Epstein, Indyke tried to talk her out of a divorce and threatened that she would lose Epstein's protection.

142.    Various other victims were similarly forced into sham marriages to foreign victims to prevent their deportation.   In each instance, Indyke and Kahn facilitated these sham marriages with their legal and accounting work.

(vi)        *Concealment of the Venture After Epstein's Death*

143.    The Epstein sex-trafficking enterprise operated throughout the world from in and around (at least) 1995 through (at least) in and around August 10, 2019, when Epstein died by apparent suicide.   Through at least July 2020, and thereafter to and including the date of this complaint, members of the Epstein Enterprise, including Defendants, continued to further the Epstein Enterprise by concealing the activities and extent of the Epstein Enterprise from Chambers, Jane Doe 3, and the Class.

144.    For many years, Chambers, Jane Doe 3, and the Class did not know the extent of Defendants' personal involvement in the sex-trafficking operation, including due to the intentionally complex web of entities and conspirators that Epstein and Defendants used to obfuscate his operation.   Moreover, Defendants publicly and privately denied their role in the Epstein Enterprise, including in March of 2020, when Defendants publicly, and falsely, denied allegations that they were an integral part of the Epstein Enterprise. These false denials, and Defendants' other

efforts and concealments, were made with the purpose and effect of being conveyed to and affecting, persons like Chambers, Jane Doe 3, and the Class, to conceal from such persons Defendants' complicity and liability. Defendants' false denials included denials that were made, and conspired to be made, under oath. Chambers, Jane Doe 3, and the Class learned of Defendants' personal involvement only through substantial additional litigation against Epstein's banking institutions.

### E.  **Defendants' Knowledge of the Epstein Sex-Trafficking Enterprise**

145.  There can be no doubt that Indyke and Kahn knew about the Epstein Enterprise and Epstein's sex-trafficking activities.

146.  At all relevant times, Epstein maintained numerous apartment units at 301 East 66th Street in New York City, where Epstein's co-conspirators often stayed and which operated as stash houses where numerous victims were kept over the years.

147.  Defendants knew of the 301 East 66th Street Epstein properties and knew that these units operated as victim stash houses. Defendants were frequent visitors to Epstein's various properties at all relevant times.

148.  Indyke and Kahn also traveled on Epstein's private plane, on which he also often flew young victims. As recent as 2018, air traffic controllers and other airport personnel reported seeing Epstein leave his plane with young girls some of whom appeared to be between the age of 11 and 18 years.

40

149.    As Epstein's lawyer and accountant, Defendants were personally aware that the majority of the corporate entities he had them create were shams created for the purposes of facilitating his sex-trafficking enterprise.  As individuals who created and/or managed several of those entities, and oversaw withdrawals and payments from their accounts, Defendants knew that there were no legitimate business reasons for those transactions.

150.    Not only did Defendants witness the trafficking firsthand, their constant proximity to Epstein, his residences, and his co-conspirators, together with the flood of public information concerning his illegal activities, make clear that they were well aware of Epstein's crimes.

151.    Moreover, in 2006 Epstein was publicly exposed for sexually abusing dozens of young women and girls, several as young as 14 years old.  There were hundreds of pages of police reports and news articles revealing that Epstein was a serial sexual abuser and trafficker, and that his operation depended on his accessing nearly unlimited cash to use as payments to his victims.

152.    With respect to the specific discoveries, the authorities found that some of the victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

153.   It was publicly revealed in the investigation that Epstein was sexually abusing three to four young females every single day of his life and that he was paying each victim hundreds of dollars in hush money, usually in cash.

154.   At this point (and earlier), Defendants knew that Epstein was an international sex trafficker.

155.   Defendants knew about Epstein's arrest in 2006 and his subsequent guilty plea for sex-related offenses and had been assisting with his trafficking operation prior to his arrest.

156.   During Epstein's imprisonment, Indyke visited Epstein nearly 40 times.

157.   After his arrest, dozens of public lawsuits were filed against Epstein, revealing greater details of Epstein's sexual abuse of young women.  The lawsuits detailed millions in payments that Epstein was making to recruiters, co-conspirators, and his victims.

158.   Through the civil lawsuits, evidence (such as the previously referenced message pads) taken from Epstein's trash by police or through prior search warrants, as well as flight logs and black books began to publicly surface, shedding further public light on the expansiveness of Epstein's sex-trafficking operation.

159.   Defendants (acting as Epstein's lawyer and accountant) were also personally involved in Epstein's civil settlements with victims.

160.  In the summer of 2008, Epstein's Non-Prosecution Agreement ("NPA") with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge to the NPA by two of his victims.  Among other things, the agreement outlined the possible federal sex offense charges that could have resulted from the investigation, including TVPA charges.

161.  Epstein's victims' court challenge against Epstein's federal NPA also continued between 2008 and 2013 (and beyond) and attracted significant media attention.  Indeed, between around 2006 and 2013, hundreds of press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators.

162.  Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped develop with his friend and known sexual abuser, Jean Luc Brunel, brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

163.  Defendants also assisted Epstein in hiding his sex-trafficking scheme from authorities, demonstrating their knowledge of Epstein's illegal activities.  For example, in addition to himself withdrawing massive amounts of cash for Epstein, Indyke helped Epstein structure those cash withdrawals from Epstein's banks so that

Indyke could withdraw cash for Epstein to pay his victims without triggering the bank's duty to report the highly suspicious activity to authorities.

164.    As DFS found, ATTORNEY-1—believed to be Indyke—was not only extremely active in making cash withdrawals for Epstein in rapid succession, but he also "inquired into how often he could withdraw cash on behalf of Mr. Epstein without triggering an alert" on multiple occasions, and provided Deutsche Bank with knowingly false explanations for the many cash transactions when bank employees inquired.

## F. **Defendants' Financial Incentives for Participating in the Epstein Enterprise**

165.    From about 1995, Defendant Indyke financially benefited from his participation in Epstein sex-trafficking operation.  From about 2005, Defendant Kahn financially benefited from his participation in Epstein sex-trafficking operation.  Both Defendants were on Epstein's payroll for years, earning large sums of money for their assistance in carrying out the operation.  Defendants chose to assist in carrying out and concealing the operation because they were getting paid by Epstein to do so.

166.    Defendants were paid through multiple entities, including but not limited to HBRK Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke), Harlequin Dane, LLC (Indyke), and Darren K Indyke, PLLC.

167.   Even after Epstein died, Defendants have continued to enrich themselves for their participation in the Epstein sex-trafficking enterprise, having approved the release of Epstein Estate funds through their role as Executors to pay their legal fees and costs.   Just last year, the U.S. Virgin Islands alleged that Defendants received $13 million to the Butterfly Trust—more fully described above—in April 2020 after the liquidation of another investment fund in which Epstein had a stake.

168.   Indyke and Kahn are each also entitled to compensation for serving as executors of Epstein's estate, pursuant to Epstein's last will and testament.   In addition, Indyke and Kahn have fraudulently and improperly used their control of Epstein's estate to attempt to conceal their participation in the Epstein Enterprise and to protect themselves, including from civil lawsuits.

## V.    CLASS ACTION ALLEGATIONS

169.   Jane Doe 3 and Chambers bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

> All women who were sexually abused or trafficked by Jeffrey Epstein between January 1, 1995 and August 10, 2019, both dates inclusive (the "Class Period").

170.   Jane Doe 3 and Chambers reserve the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

171.  <u>Numerosity</u>:  The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Class and the identities of the individual Class members are ascertainable through records maintained by the Epstein Estate and Defendants.

172.  <u>Typicality</u>:  Jane Doe 3 and Chambers's claims are typical of the claims of the other Class members they seek to represent.  The claims of Jane Doe 3 and Chambers and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' participation in, conspiring to join in and assisting the sexual abuse and Epstein's sex-trafficking enterprise.

173.  <u>Commonality</u>:  There are many questions of law and fact common to the claims of Chambers and Jane Doe 3's and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3).  Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

174.  Common questions of fact and law affecting Class members include, but are not limited to, the following:

a.  Whether Epstein ran a sex-trafficking venture;

b.  Whether Defendants knew (or recklessly disregarded) that such a venture existed;

c.  Whether Defendants participated in, and facilitated and conspired to facilitate, Epstein's sex trafficking;

d.  Whether Defendants benefited financially or by receiving things of value from their participation in the venture;

e.  Whether Defendants obstructed the enforcement of the TVPA with respect to Epstein's sex-trafficking venture;

f.  Whether Defendants concealed and conspired to conceal Epstein's sex trafficking and their participation in it;

g.  Whether Defendants owed a duty of care to Epstein's victims; and

h.  Whether Defendants breached their duty of care to Epstein's victims.

175.  Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

176.  <u>Adequacy</u>:  Chambers and Jane Doe 3 will fairly and adequately represent and protect the interests of the other Class members they seek to represent. Chambers and Jane Doe 3 have retained counsel with substantial experience in

prosecuting complex litigation and class actions, including class actions against others alleged to have facilitated Epstein's sex-trafficking enterprise. Chambers and Jane Doe 3 and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Chambers and Jane Doe 3 nor their counsel have any interests adverse to those of the other Class members.

177.   This action has been brought and may properly be maintained as a class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendants' records.

178.   <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

    a.  Joinder of all Class Members is impracticable;

    b.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

    c.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d.  Absent a class action, Class Members will continue to suffer losses and be aggrieved, and Defendants will escape liability for their criminal and tortious conduct and be able to continue to violate New York and federal law without remedy;

e.  Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.  Chambers and Jane Doe 3 and their counsel are unaware of any class action brought against Defendants by victims for the violations alleged in this action;

g.  The forum is desirable because Chambers and Jane Doe 3 conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h.  This action presents no difficulty that would impede its management by the Court as a class action.

## VI.    CAUSES OF ACTION

## COUNT I:  AIDING, ABETTING, AND FACILITATING BATTERY

179.  Plaintiffs Chambers and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 198, as if fully set forth in this Count.

180.  Chambers and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

181.  Between about 1995 and 2019, in this District in New York, Jeffrey Epstein intentionally committed batteries and other intentional tortious conduct, including crimes in violation of New York Penal Law Chapter 130 such as New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66 (hereinafter "Chapter 130 crimes"), against Chambers and Jane Doe 3 and the Class Members. Epstein committed the intentional tortious conduct and crimes against  Chambers and Jane Doe 3 and Class Members.  As described throughout this complaint, Epstein intentionally and non-consensually touched Chambers and Jane Doe 3 and the Class Members in a harmful and offensive manner that resulted in substantial injuries, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

182.  The resulting injuries that Chambers and Jane Doe 3 and the Class Members suffered include injuries directly and proximately suffered as a result of

sex offenses committed by Epstein and other co-conspirators and criminalized under article 130 of the New York Penal Laws.  The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20.  The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

183.    Regardless of when the tortious conduct (*e.g.*, battery) and Chapter 130 Crimes were committed by Epstein, the conduct and crimes are now civilly actionable, regardless of any statute of limitations to the contrary, because they are covered by the one-year "look back" window in New York Adult Survivors Act. *See* N.Y. C.P.L.R. § 214-j.

184.    Between about 1995 and 2019, Defendant Indyke, and between 2005 and 2019, Defendant Kahn, knowingly and intentionally aided, abetted, and facilitated Epstein's intentional tortious conduct (*e.g.*, battery), through Chapter 130 Crimes recounted in the preceding paragraphs of this Count.  Because Defendants criminally aided, abetted, and facilitated Epstein's conduct and crimes in violation of Chapter 130, they are vicariously and otherwise liable for damages caused by the conduct and crimes.

185. Defendants were well aware of their important, personal, and substantial role as a part of Epstein's intentionally tortious and illegal activity in committing Chapter 130 Crimes.

186. As a direct and proximate result of Epstein's tortious conduct and crimes, which Defendants knowingly and intentionally aided, abetted, and facilitated, Chambers and Jane Doe 3 and the Class Members have in the past suffered, and in the future will continue to suffer, substantial damages, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

187. At the time of Epstein's batteries, intentionally tortious conduct, and crimes against Chambers and Jane Doe 3 and the Class Members, Defendants were well aware of Epstein's sex-trafficking venture and that its concrete steps in furtherance of the venture were aiding, abetting, and facilitating his batteries, tortious conduct, and crimes.

188. At the time of Epstein's crimes against Chambers and Jane Doe 3 and the Class Members, Defendants knowingly provided substantial assistance in Epstein's tortious conduct and crimes. That knowing substantial assistance went beyond mere knowledge and approval of Epstein's wrongdoing. For example, Defendants had offices in structures where Epstein housed and abused his victims.

Additionally, Defendants were responsible both directly and indirectly for providing cash to victims, arranging legal and financial structures to obscure elements of the Epstein sex-trafficking venture, and arranging sham marriages and other immigration scrutiny avoidance tactics. Without that support, Epstein could not have committed his tortious conduct and crimes—a fact that Defendants knew and for which they were richly compensated.

189. In aiding, abetting, and facilitating Epstein's intentional tortious conduct and crimes, Defendants could readily foresee direct and proximate injury to Chambers and Jane Doe 3 and the Class Members. Defendants should have foreseen direct and proximate injury from its actions and inactions to Chambers, Jane Doe 3, and the Class Members. Indeed, Defendants did foresee injury to Epstein's victims, including Chambers, Jane Doe 3, and the Class Members.

190. In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, Defendants committed intentional torts directed against Chambers and Jane Doe 3 and the Class Members. Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. Defendants had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Chambers, Jane Doe 3, and the Class Members.

191.   As a result of the foregoing, Defendants are liable civilly for damages they directly, tortiously, and criminally caused to  Chambers and Jane Doe 3 and the Class Members.  Chambers and Jane Doe 3 and the Class Members according are entitled to bring a cause of action for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and crimes described above and for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Epstein's tortious conduct and crimes.

192.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to  Chambers and Jane Doe 3 and the Class for punitive damages.

## COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

193.   Plaintiffs Chambers and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 189, as if fully set forth in this Count.

194.    Chambers and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

195.   As a direct and proximate result of aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130, Defendants

54

intentionally inflicted emotional distress against Chambers and Jane Doe 3 and the Class Members.

196. Defendants' actions, described above, constitute extreme and outrageous conduct that shocks the conscience. For example, Defendants intentionally and knowingly participated in Epstein's sex-trafficking venture, as outlined above. Defendants had a legal duty not to participate in, facilitate, or aid and abet Epstein's sex-trafficking venture and Epstein's Chapter 130 Crimes.

197. Defendants' conduct was especially extreme and outrageous due to Chambers and Jane Doe 3 and the Class Members' particular vulnerabilities as targets of a sex-trafficking venture.

198. Defendants intended to cause, and did cause, Chambers and Jane Doe 3 and the Class Members severe emotional distress. Indeed, by having offices in structures where the abuse occurred and physically providing cash to victims, Defendants were especially aware of the severe emotional distress their conduct caused.

199. At the very least, Defendants recklessly disregarded a substantial probability that their actions in aiding, abetting, and facilitating Epstein's sex crimes would cause Chambers and Jane Doe 3 and the Class Members severe emotional distress.

200.   Because Defendants intentionally inflicted extreme emotional distress on Chambers and Jane Doe 3 and the Class Members, they are liable to Chambers and Jane Doe 3 and the Class Members for damages they suffered as a direct and proximate result.

201.   As a direct and proximate result of Defendants' conduct,  Chambers and Jane Doe 3 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Defendants' aiding, abetting, and facilitating Epstein's sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

202.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to Chambers and Jane Doe 3 and the Class for punitive damages.

## **COUNT III: NEGLIGENCE**

203.   Plaintiffs Chambers and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 189, as if fully set forth in this Count.

204.    Chambers and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

205.   Defendants owed a duty to Chambers and Jane Doe 3 and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them.  Defendants' duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's crimes, and permit Epstein's crimes, in violation of Chapter 130.

206.   Defendants' own conduct in providing legal, accounting services, business-related services, and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Chambers and Jane Doe 3 and the Class Members.  These forces that Defendants set in motion caused Epstein's intentional tortious conduct and Chapter 130 Crimes against Chambers and Jane Doe 3 and the Class Members, causing physical harm and in themselves constituted physical harm to Chambers and Jane Doe 3 and the Class Members.  Defendants owed Chambers and Jane Doe 3 and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

207.   Defendants reasonably could foresee, and did in fact foresee, that their negligent failure to prevent physical harm would result in physical harm to Chambers and Jane Doe 3 and the Class Members.  Defendants owed a duty to prevent that physical harm.

208.  Defendants failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Chambers and Jane Doe 3 and the Class Members.  If Defendants had acted reasonably to prevent physical harm, they would not have supported and allowed Epstein's tortious conduct and sex-trafficking and sex crimes to occur.  Defendants owed Chambers and Jane Doe 3 and the Class members a duty to act objectively reasonably.

209.  At the time of Defendants' own negligent conduct, Defendants both realized and should have realized the likelihood that they were creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130 Crimes against Chambers and Jane Doe 3 and the Class Members.  Indeed, Defendants knew that their own conduct was necessary to create Epstein's opportunities to engage in that conduct and commit those crimes.  Defendants owed Chambers and Jane Doe 3 and the Class Members a duty not to create those opportunities for Epstein.

210.  Defendants' breaches of their legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to Chambers and Jane Doe 3 and the Class Members.  Without Defendants' breaches of legal duties, those injuries would not have occurred.  The injuries that occurred were readily foreseeable to Defendants.

58

211.    Chambers and Jane Doe 3 and the Class Members were easily within the zone of foreseeable harm from the Defendants' negligent acts and omissions. Defendants' negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact.  Tragically, Chambers and Jane Doe 3 and the Class Members fell within that zone.

212.    Because of Defendants' negligent failure to prevent physical harm to Chambers and Jane Doe 3 and the Class Members, they are liable to  Chambers and Jane Doe 3 and the Class Members for damages suffered as a direct and proximate result.

213.    As a direct and proximate result of Defendants' negligent failure to prevent physical harm,  Chambers and Jane Doe 3 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.  Defendants' aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

214.    By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal

indifference to civil obligations, Defendants are liable to Chambers and Jane Doe 3 and the Class for punitive damages.

## COUNT IV: PARTICIPATION IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595

215.  Plaintiffs Chambers and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 189, as if fully set forth in this Count.

216.   Chambers and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

217.   Defendants knowingly and intentionally benefitted, financially and by receiving things of value, from participating in, assisting, supporting, and facilitating an illegal coercive sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

218.   Defendants took many concrete steps to aid and participate in Epstein's sex-trafficking venture.  Among the concrete steps that Defendants took to aid Epstein was providing legal, accounting services, and business-related services and support, which made the sex-trafficking venture possible.  Defendants' willingness to provide their legal, accounting and business services was a quid pro quo for them receiving financial benefit from Epstein.

219.   The services that Defendants provided was necessary for Epstein to coerce Chambers and Jane Doe 3 as well as other Class Members to engage in

commercial sex acts. The services directly formed part of the commercial nature of the sex acts. The services were also a necessary and required part of Epstein's recruitment of Chambers and Jane Doe 3 and other victims of his sex-trafficking venture. By providing legal, accounting and business services that Defendants knew would be used to facilitate the sex trafficking venture, Defendants actively participated in the recruitment of victims of the venture.

220.   The services that Defendants provided went far beyond providing routine legal, accounting and business services for a client.

221.   Defendants providing services like, for example, assisting in creating sham marriages, creating sham companies to hide cash for the trafficking, assisting with the withdraw of large sums of cash to facilitate the trafficking, and arranging payments for tuition for young girls all were entirely inconsistent with the ordinary duties of a lawyer and accountant.

222.   The reason that Defendants ignored the trafficking conduct was to receive financial benefits from Epstein and his sex-trafficking venture.

223.   Among the concrete steps that Defendants took to aid and participate in the Epstein sex-trafficking venture were opening numerous bank accounts and entities for Epstein, his related entities, and associates. By opening these accounts and entities, Defendants received many benefits from participating in Epstein's

venture.  The opening of these accounts and entities was affirmative conduct that caused Defendants to receive those benefits.

224.   By taking the concrete steps outlined above (along with the others alleged in this complaint), Defendants knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture.  The concrete steps above constituted taking part in the sex-trafficking venture and were necessary for its success.  The concrete steps above constituted active engagement by Defendants in Epstein's sex-trafficking venture.

225.   Defendants knowingly and intentionally benefited financially from, and received value for, their participation in the sex-trafficking venture, in which Epstein, with Defendants' knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Chambers and Jane Doe 3, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

226.   Defendants knew, and were in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

227.   Despite such knowledge, Defendants intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Chambers and Jane Doe 3, as well as other Class Members, to engage in commercial sex acts.

228.   Defendants' affirmative conduct was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash procured by Defendants, legal and accounting advice provided by Defendants, and other support provided by Defendants as a means of defrauding, forcing, and coercing sex acts from Chambers and Jane Doe 3 as well as other Class Members.   Defendants' conduct was outrageous and intentional.

229.   In addition to actual knowledge that they were participating in and facilitating the Epstein sex-trafficking venture, Defendants also should have known that they were participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

230.   Defendants' knowing and intentional conduct has caused Chambers and Jane Doe 3 and the other Class Members serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

231.   Defendants' knowing and intentional conduct has caused Chambers and Jane Doe 3 and the other Class Members harm that is sufficiently serious, under

all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

232.   This case does not involve mere fraud.  Instead, Defendants' criminal conduct in violating the TVPA was outrageous and intentional because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants' criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants' criminal conduct was directed specifically at  Chambers and Jane Doe 3 and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

233.   Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Defendants profiting by undertaking illegal "high risk, high reward" clients.

234.   By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Chambers and Jane Doe 3 and the Class for the damages they sustained and reasonable attorneys' fees.

235.   By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Chambers and Jane Doe 3 and the Class for punitive damages.

## COUNT V: OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)

236.   Plaintiffs Chambers and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 189, as if fully set forth in this Count.

237.   Chambers and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

238.   Defendants knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction."

239.   Defendants' obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Defendants thereby violated Chapter 77, Title 18. Defendants' obstruction described here and in the preceding paragraph directly, proximately, and foreseeably harmed Chambers and Jane Doe 3, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways.

240.   As outlined above, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on or about July 8, 2019. On

or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

241.  Defendants obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein.  To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by Defendants' actions.  Because of that delay, Chambers and Jane Doe 3 as well as other members of the Class, were coercively caused to engage in commercial sex acts.

242.  As one example of how Defendants obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Defendants structured withdrawals of large amounts of cash to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies.  Defendants provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

243.   By procuring large amounts of cash to Epstein and his associates, Defendants intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.  Defendants provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

244.   As another example, Defendants provided legal and accounting advice that created sham marriages and corporate structures that helped Epstein escape scrutiny.  But for Defendants' egregious, creative assistance of Epstein, he would not have been able to escape detection liability for violating the TVPA.

245.   Defendants' obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly.  For example, Defendants helped Epstein set up the Butterfly Trust to facilitate his abuse of women from Eastern Europe—specifically, to escape the increased scrutiny Epstein faced for U.S. based victims after his previous arrest and conviction, which made Epstein high risk to violate the TVPA through continuing criminal sex trafficking activities.

246.   Defendants were well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA.  Defendants were also well aware that there

were public allegations that his illegal conduct was facilitated by several named co-conspirators. Defendants continued their affirmative conduct supporting the Epstein sex-trafficking venture to continue receiving personal financial enrichment. Defendants' intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

247. Defendants' obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Chambers and Jane Doe 3 and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture. Defendants knew that Epstein and his other co-conspirators would use means of force, threats of force fraud, coercion, and a combination of such means to cause Chambers and Jane Doe 3 and Class Members to engage in commercial sex acts.

248. Defendants knew, acted in reckless disregard of the fact, and should have known, that their obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Chambers and Jane Doe 3 and other Class Members.

249.   Defendants' obstruction has caused Chambers and Jane Doe 3 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.  That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

250.   Defendants' obstruction has caused Chambers and Jane Doe 3 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

251.   This case does not involve mere fraud.  Instead, Defendants' criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants' obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants' obstruction was directed specifically at Chambers and Jane Doe 3 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

252.   By virtue of these violations of 18 U.S.C. § 1591(d), Defendants are liable to Chambers and Jane Doe 3 and the Class for the damages they sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Defendants perpetrated

an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

253.    By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), Defendants are liable to Chambers and Jane Doe 3 and the Class for punitive damages by operation of 18 U.S.C. § 1595.

### COUNT VI: CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595

254.    Plaintiffs Chambers and Jane Doe 3 reallege and incorporate by reference paragraphs 1 – 189, as if fully set forth in this Count.

255.    Chambers and Jane Doe 3 bring this Count individually and on behalf of the other Class Members they respectively seek to represent.

256.    Defendants intentionally conspired with others, by agreement and understanding, to violate 18 U.S.C. § 1591(a)(1) & (a)(2) & 1591(d), and to further Epstein's and his co-conspirators' sex-trafficking venture to coerce commercial sex acts from Chambers and Jane Doe 3 and other Class Members, all in violation of 18 U.S.C. § 1594(c). Defendants directly conspired with Epstein himself to further the sex trafficking venture.

257.    Defendants' conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Defendants thereby violated Chapter 77, Title

18. Defendants' conspiracy directly, proximately, and foreseeably harmed Chambers and Jane Doe 3, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Chambers and Jane Doe 3 and the other members of the Class.

258. Defendants' conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), thereby violated Chapter 77, Title 18. Defendants' conspiracy directly, proximately, and foreseeably harmed Chambers and Jane Doe 3, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Defendants' conspiracy victimized Chambers and Jane Doe 3 and the other members of the Class.

259. Defendants conspired with Epstein and his co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking. Defendants had actual knowledge of Epstein's sex-trafficking venture. Defendants acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's sex-trafficking venture and with the specific intent to further venture. Defendants and Epstein had a meeting of the minds as to the essential nature of the plan.

260. The Epstein sex-trafficking conspirators had a shared and common purpose—securing young women and girls for Epstein to sexually abuse and to

commercially sex traffic. Defendants and other members of Epstein's sex-trafficking venture associated together for this common purpose. As quid pro quo, in exchange for working toward this common purpose, Epstein rewarded Defendants.

261. The Epstein sex-trafficking conspiracy was an ongoing organization with the same hierarchy and regularity of function. Epstein was at the top of the hierarchy and effectively served as the CEO of the organization. Defendant Indyke served as Epstein's personal lawyer and accountant, handling all of his personal affairs and business operations relating to his sex trafficking organization. Defendant Kahn was Epstein's personal accountant who handled all of his personal accounting and financial services relating to the organization. The sex-trafficking conspiracy was itself in and affecting interstate and foreign commerce and involved overt acts that were in and affecting interstate and foreign commerce.

262. In or around 1995, Defendant Indyke purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. In or around 2005, Defendant Kahn purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. In so joining, each Defendant quickly ratified the previous actions, conduct, intentional torts, and crimes of the conspiracy, by joining the conspiracy, adopting its goals, and taking actions and committing overt acts in furtherance of it.

263.    Defendants' conspiracy with Epstein was part of their participation in his sex-trafficking venture.  Without Defendants agreeing to facilitate the venture (by, for example, masterminding a scheme of bank accounts, immigration scrutiny evasion, and payment systems), Epstein would not have been a position to move forward with his sex-trafficking venture.

264.    Defendants also conspired with Epstein to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d).  The conspiracy included an agreement to keep Epstein's sex-trafficking venture secret or, at least, concealed to the greatest extent possible.  Among the means for keeping the venture secret were paying for the commercial sex acts in cash, structuring cash withdrawals in a way to avoid detection, and providing legal and accounting advice that created sham marriages and corporate structures that helped Epstein escape scrutiny.

265.    Further actions regarding Defendants' conspiracy to obstruct TVPA enforcement are outlined in Count V (obstruction) above.

266.    Within this District, Defendants intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing  Chambers  and  Jane  Doe  3  and  other  Class  Members  to  engage  in

commercial sex acts, through providing financial support for the Epstein sex-trafficking venture.

267.   Among the many overt acts intentionally committed by Defendants in furtherance of the long-running Epstein sex-trafficking venture were providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to cause them to engage in commercial sex acts and other degradations within this District. Indeed, Defendants organized, controlled, and directed almost every aspect of the Epstein sex-trafficking venture.   Defendants approved, enabled, and justified millions of dollars in payments that fueled the Epstein sex-trafficking venture, including payments to women who were forced to have sec with Epstein and/or recruited others to be victimized.

268.   Acting within this District and in furtherance of the Epstein sex-trafficking venture, Defendants facilitated arranging sham marriages to keep Epstein victims available for his ongoing abuse.   As officers and signatories of the key entities in the Epstein sex-trafficking enterprise, Defendants facilitated cash payments for immigration legal fees and recruitment compensation.

269.   In furtherance of the Epstein sex-trafficking venture, Defendants were officers in virtually every corporate entity that Epstein created to fund and conceal his activities.   They were deeply involved in the financial activities of the Epstein-

owned entities.  In addition to being officer and directors of companies implicated in the Epstein sex-trafficking enterprise, Defendants (at least one of them, but often both) also had signatory authority over virtually all of the accounts held by Epstein, which allowed them to personally authorize and sign off on payments totaling hundreds of thousands of dollars to Epstein's victims, including but not limited to recruiting compensation, legal fees, apartment rent, and tuition.

270.  In furtherance of the Epstein sex-trafficking venture, Defendants routinely withdrew cash from Epstein accounts in various ways, including ATMs, checks, or by converting currency.  In many instances, Defendants structured these transactions to evade banking reporting requirements.  Defendants also worked together to make large cash withdrawals.

271.  Even after Epstein died, Defendants have continued to enrich themselves for their participation in the Epstein sex-trafficking conspiracy, having approved the release of Epstein Estate funds through their role as Executors to pay their legal fees and costs.

272.  Defendants' actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as the funding for the sex-trafficking venture (and particularly cash for the venture) were essential tools for Epstein to commit coercive commercial sex acts.

273.   It was part of the conspiracy that Defendants would financially benefit from providing financial support for the Epstein sex-trafficking venture.  Defendants did financially benefit from their participation in the venture, including receiving millions of dollars in compensation for their legal, accounting, business, and other services.  Defendants were paid through multiple entities, including but not limited to HBRK Associates, Inc. (Kahn), Coatue Enterprises, LLC (Kahn), Birch Tree BR, LLC (Indyke) Harlequin Dane, LLC (Indyke) and Darren K Indyke, PLLC.

274.  Defendants' participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendants intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Chambers and Jane Doe 3 and other Class Members through its affirmative and overt acts supporting Epstein.

275.   Defendants knew, acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Chambers and Jane Doe 3 and other Class Members.

276.   The conspiracy that Defendants joined had specific knowledge that Chambers and Jane Doe 3, as well as other Class Members, were being coercively sex trafficked by Epstein.  The conspiracy's knowledge extended to the names of

Epstein's victims, because Epstein and his co-conspirators knew the names of the victims.

277.   Defendants conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Chambers and Jane Doe 3 and other Class Members to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

278.   In addition to acting with knowledge that they were conspiring to support the Epstein sex-trafficking venture, Defendants benefited financially from conspiring to participate in the Epstein sex-trafficking venture, which Defendants knew and should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

279.   Defendants' conspiracy has caused Chambers and Jane Doe 3 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

280.   Defendants' conspiracy has caused Chambers and Jane Doe 3 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform

or to continue performing commercial sexual activity in order to avoid incurring that harm.

281.   This case does not involve mere fraud. Instead, Defendants' criminal conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization.  Defendants' conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants' conspiracy was directed specifically at Chambers and Jane Doe 3 and other Class Members, who were the victims of Epstein's sex trafficking organization.

282.   By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to  Chambers and Jane Doe 3 and the other Class Members for the damages they sustained and reasonable attorneys' fees.

283.   By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Chambers and Jane Doe 3 and other Class Members for punitive damages.

## COUNT VII: GENDER-MOTIVATED VIOLENCE PROTECTION ACT, ADMINISTRATIVE CODE OF CITY OF N.Y. §10-1101 *et seq.*

284.   Plaintiffs Jane Doe 3 and Chambers reallege and incorporates by reference paragraphs 1 – 198, as if fully set forth in this Count.

285.   The above-described conduct of Defendants constitutes a "crime of violence" and a "crime of violence motivated by gender" against Chambers and Jane Doe 3 and other Class Members as defined by the New York City Gender-Motivated Violence Protection Act, N.Y.C. Admin. Code § 8-903 (2017).

286.   The above-described conduct of Defendants constitutes a "crime of violence" against Chambers and Jane Doe 3 and other Class Members motivated: (i) by gender; (ii) on the basis of gender; and/or (iii) due, at least in part, to an animus based on gender.

287.   Defendants committed a "crime of violence" against Chambers and Jane Doe 3 and other Class Members because they are women and, at least in part, because Defendants willingly participated, enabled, and conspired in the Epstein Enterprise – an illegal operation steeped in unlawful animus towards women and engaged in violent sexual acts against Chambers, Jane Doe 3, and the Class in New York, including but not limited to rape; forced oral sex, digital penetration, and forcible touching; and sex trafficking.  Defendants' conduct as a part of the Epstein Enterprise show their gender-motivated animus towards women, as they knowingly,

individually, and personally facilitated a decades-long international sex-trafficking operation.

288.  As a direct and proximate result of the aforementioned gender-motivated violence Chambers and Jane Doe 3 and other Class Members have sustained in the past and will continue to sustain monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling the Class to an award of compensatory damages.

289.  Defendants' egregious and intentional gender-motivated violence against Chambers and Jane Doe 3 and other Class Members entitles the Class to punitive damages and an award of attorneys' fees and costs.

## VII.    REQUEST FOR RELIEF

Chambers and Jane Doe 3 respectfully request that the Court enter judgment in her favor, and against Defendants, as follows:

a.  That the Court certify the Class, name Chambers and Jane Doe 3 as Class Representatives, and appoint their lawyers as Class Counsel;

b.  That the Court award Plaintiffs and the other members of the Class compensatory, consequential, general, nominal, and punitive damages against Defendants in an amount to be determined at trial;

c.  That the Court award punitive and exemplary damages against Defendants in an amount to be determined at trial;

d.  That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.  That the Court grant all such other and further relief as it deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: August 22, 2025

Respectfully Submitted,

*/s/* David Boies

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com