**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Allyson Ward and Jane Doe 3, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Darren K. Indyke and Richard D. Kahn,<br><br>Defendants. | Case No. 1:24-cv-01204-AS<br><br>**CLASS ACTION LAWSUIT** |

**MARSH LAW FIRM OBJECTIONS TO PROPOSED SETTLEMENT**
**With Notice of Intent to Appear at Fairness Hearing**

## TABLE OF CONTENTS

**INTRODUCTION** ………………………………………………………………….………… 1

**STANDING** ………………………………………………………………………….……….. 2

**RELEVANT FACTS** ………………..……………………………………………………….….. 2

*Commencement and Prosecution of the Case Alleging Hands-On Sex Trafficking and Sex Abuse, Naming the Defendants as Individuals and not as Representatives of the Epstein Estate* ………………………………………………………………….….. 2

*The United States' July 2025 Memorandum Noting Epstein's Vast CSAM Collection and Significant Expansion of the Number of Epstein Victims to Over 1,000, Followed by Intense Backlash by Congress and the Public, the Release of the Epstein Files, and an Ongoing House Oversight Committee Investigation* ……………………………….……... 5

*Case Mediation, "Adamant" Insistence by the Defendants that the Estate Be Released from all Claims, and Agreement on Financial Terms on December 19, 2025, Before the Release of the Epstein Files and Other Information was Disclosed* ……………………. 7

*The Release of the Epstein Files Containing New Information about Over 1,000 Epstein Victims And the Ongoing Investigation by the House Oversight Committee* …………… 9

*Limited Notice Provided to Class Members* ……………………………….……………... 10

*Marsh Law Firm Objection in May 2026 to the Possible Extension of the Proposed Release to CSAM Claims and Request for a Carve-Ou to Which There Was No Substantive Response, and Class Counsel's Request for Final Court Approval* ……… 11

**ARGUMENT** …………………………………………………………………….……… 13

1. **The Proposed Release Is Overbroad and Impermissible to the Extent it Applies to CSAM Claims** ……………………………………………………………..…. 14

   **a.** By Including CSAM Claims, the Proposed Release Goes Far Beyond the Required Identical Factual Predicate of the Case, Presenting Different Facts, Injuries, Claims, Proof and Valuation ……………………………………….... 14

   **b.** The Class Representative and Class Counsel Do Not Adequately Represent CSAM Claimants ……………………………………………………….... 15

   **c.** Marsh Law Firm's Objection to the Extension of the Proposed Release and Request for a Carve-Out, Which Was Submitted Months Ago, was Ignored, Implicating Grinnell Factor 2 ………………………………………………...... 16

**d.** Proposed Remedy – Expressly Carve Out CSAM from the Proposed Release... 17

**2. The Proposed Release of the Estate Cannot Stand** ...................................... 17

**a.** The Proposed Release of the Estate Was Not the Product of Arm's Length Negotiation Since the Defendants Had An Impermissible Conflict of Interest... 18

**b.** The Class Was Not Adequately Represented For this Proposed Release of the Estate ..................................................................................... 21

**c.** The Proposed Release of the Estate Provides Inadequate Relief to the Class .... 22

**d.** The Proposed Release of the Estate exceeds the Identical Factual Predicate Requirement and Violates Grinnell Factors 8 and 9 ................................... 25

**e.** Notice was Inadequate ............................................................... 27

**f.** Remedy ........................................................................... 29

**CONCLUSION** ........................................................................... 30

## TABLE OF AUTHORITIES

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 16

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) .......... 14

*City of New York v. Exxon Corp.*,
697 F. Supp. 677 (S.D.N.Y. 1988) .......... 13

*Harrington v. Purdue Pharma L.P.,*
603 U.S. 204 (2024) .......... 24

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012) .......... 27

*In re Boy Scouts of America & Delaware BSA, LLC,*
No. 20-10343 (Bankr. D. Del. Sept. 8, 2022) .......... 29

*In re Boy Scouts of America & Delaware BSA, LLC,*
650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part on other grounds,*
137 F.4th 126 (3d Cir. 2025) .......... 29

*In re Fairbanks Co.,*
601 B.R. 831 (Bankr. N.D. Ga. 2019) .......... 29

*In re GSE Bonds Antitrust Litigation,*
414 F. Supp. 3d 686 (S.D.N.Y. 2019) .......... 13

*In re Iconix Brand Group, Inc.,*
No. 1:15-cv-04860-PGG, 2020 WL 6784181 (S.D.N.Y. Nov. 18, 2020) .......... 21

*In re Initial Public Offering Securities Litigation*,
243 F.R.D. 79 (S.D.N.Y. 2007) .......... 13

*In re Joint Eastern & Southern District Asbestos Litigation,*
14 F.3d 726 (2d Cir. 1993) .......... 24

*In re Merrill Lynch Tyco Research Securities Litigation,*
249 F.R.D. 124 (S.D.N.Y. 2008) .......... 27

*In re Michael Milken & Associates Securities Litigation,*
150 F.R.D. 57 (S.D.N.Y. 1993) .......... 13

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
827 F.3d 223 (2d Cir. 2016) .......................................................................................... 25

*In re Roman Catholic Archbishop of Portland in Oregon,*
339 B.R. 215 (Bankr. D. Or. 2006) ................................................................................ 29

*In re Roman Catholic Church of the Archdiocese of New Orleans*,
No. 20-10846, 2026 WL 688166 (Bankr. E.D. La. Mar. 10, 2026) .......................................... 29

*In re Roman Catholic Church of the Archdiocese of Santa Fe,*
No. 18-13027-T11, 2024 WL 3091482 (Bankr. D.N.M. June 21, 2024) .................................. 29

*In re Snively,*
42 Misc. 3d 1214(A), 986 N.Y.S.2d 868 (Sur. 2014) ............................................................ 18

*In re Wild,*
994 F.3d 1244 (11th Cir. 2021) .......................................................................................... 6

*Lewis v. S.L. & E., Inc.,*
629 F.2d 764 (2d Cir. 1980) .......................................................................................... 18

*Marshall v. Northrop Grumman Corp.*,
469 F. Supp. 3d 942 (C.D. Cal. 2020) ................................................................................ 26

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
196 F.3d 409 (2d Cir. 1999) .......................................................................................... 18

*Matter of Energetic Tank, Inc.*,
No. 18-cv-1359 (LAP), 2024 WL 3273796 (S.D.N.Y. July 2, 2024) ....................................... 19

*Moses v. New York Times Co.*,
79 F.4th 235 (2d Cir. 2023) .......................................................................................... 13, 20

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306 (1950) .......................................................................................... 27

*National Super Spuds, Inc. v. New York Mercantile Exchange*,
660 F.2d 9 (2d Cir. 1981) .......................................................................................... 25

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) .......................................................................................... 23

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .......................................................................................... 28, 29

*Presidential Life Insurance Co. v. Milken*,
946 F. Supp. 267 (S.D.N.Y. 1996) ........................................................................ 25

*Renz v. Beeman*,
589 F.2d 735 (2d Cir. 1978) ................................................................................ 19

*Reynolds v. Beneficial National Bank*,
288 F.3d 277 (7th Cir. 2002) .............................................................................. 17

*Stephenson v. Dow Chemical Co.*,
273 F.3d 249 (2d Cir. 2001), *aff'd in part, vacated in part*, 539 U.S. 111 (2003) .................... 16

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982) ................................................................................ 25

*United States v. Marin,*
No. 18-cv-9307 (VB), 2020 WL 378094 (S.D.N.Y. Jan. 23, 2020) ......................................... 18

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ........................................................................... 25, 27

**Statutes and Rules**

18 U.S.C. § 1591 ........................................................................................... 2

18 U.S.C. § 2252(a) ...................................................................................... 15

18 U.S.C. § 2255 .......................................................................................... 15

Bankruptcy Code § 362(a) ............................................................................... 24

Epstein Files Transparency Act, H.R. 4405, 119th Cong. (2025) ..................................... 7, 9, 10

Fed. R. Civ. P. 23 ......................................................................................... 27

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................... 27

Fed. R. Civ. P. 23(e) ...................................................................................... 27

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................... 27

Fed. R. Civ. P. 23(e)(2) ............................................................................. 1, 13-14

Gender Motivated Violence Act ......................................................................... 21

New York City Administrative Code § 10-11 ................................................................. 2

Trafficking Victims Protection Act .......... 2

Victims of Gender-Motivated Violence Protection Act .......... 2

**Other**

Dave Byrnes, *Epstein Victims Fund Shuts Down After Paying Out $121M to 150 Claimants*, Courthouse News Service (Aug. 9, 2021) .......... 6

David H. Lenok, *What's the Status of Jeffrey Epstein's Estate?*, WealthManagement.com (July 25, 2022) ... .......... 21

Juliette Jabkhiro, *France Opens Epstein Probes into Human Trafficking, Tax Fraud*, Reuters (Feb. 18, 2026) .......... 11

Matthew Goldstein, *Jeffrey Epstein's Trust Reveals Beneficiaries of His Fortune*, N.Y. Times (Feb. 3, 2026) .......... 4

Matthew Goldstein, *Judge Approves JPMorgan's $290 Million Settlement With Epstein Victims*, N.Y. Times (Nov. 9, 2023) .......... 6

Office of the Clerk, U.S. House of Representatives, Discharge Petition Details: Petition No. 9, 119th Congress .......... 7

Scott Wong & Julie Tsirkin, *House Oversight Committee to Subpoena DOJ for Epstein Files*, NBC News (July 23, 2025) .......... 7

U.S. Department of Justice, *The Epstein Files: Phase 1* (Feb. 27, 2025) .......... 9

U.S. Department of Justice, *Office of Public Affairs, Department of Justice Publishes 3.5 Million Responsive Pages in Compliance with the Epstein Files Transparency Act* (Jan. 30, 2026) .......... 10

U.S. Department of Justice, *Office of Professional Responsibility, Report of Investigation: Jeffrey Epstein* § IV (Nov. 2020) .......... 5

U.S. Department of Justice & Federal Bureau of Investigation, *Memorandum re: Jeffrey Epstein Files* (July 6, 2025) .......... 5

U.S. House Committee on Oversight & Government Reform, *Oversight Committee Releases Additional Epstein Investigation Transcripts* (Aug. 22, 2025) .......... 7

U.S. House Committee on Oversight & Government Reform, *Oversight Committee Releases Richard Kahn and Darren Indyke Deposition Videos* (Mar. 11 and Mar. 19, 2026) .......... 3

# INTRODUCTION

Marsh Law Firm PLLC, on behalf of and counsel to four class members, MLF 1, MLF 2, MLF 3, and MLF 4, and MLF 5 (the "Objectors"), hereby submits these limited individual and class-wide Objections to the Proposed Release in the proposed class action settlement with Darren K. Indyke ("Indyke") and Richard D. Kahn ("Kahn") (together the "Defendants"), arising from sex abuse and trafficking by Jeffrey Epstein ("Epstein"), and requests to appear at the upcoming hearing.

The Objectors support the proposed settlement in large part but nonetheless object under FRCP 23(e)(2) to two aspects of the settlement:

1. The proposed release of child pornography or child sex abuse images ("CSAM") claims produced, transported, distributed or possessed by Epstein – because CSAM claims present different facts, injuries, and proof contrary to the identical factual predicate and adequate representation requirements, with no notice being provided to CSAM survivors; and

2. The proposed release of Epstein's Estate – because:

    - the release was the subject of an impermissible conflict of interest due to Defendants' multiple, contradictory positions and inability to fulfill their mandatory fiduciary duties, which prevented the negotiation of a settlement at arm's length;

    - the release was the product of inadequate representation;

    - the release provides inadequate relief;

    - the release exceeds the identical factual predicate; and

    - notice was not sufficient to the Class, where the U.S. government announced in July 2025 and then detailed in the subsequently released Epstein Files that there were over 1,000 survivors, a far larger number than assumed when notice was designed.

To move this settlement forward, Objectors propose that (i) CSAM claims be carved out of the Proposed Release in this case and (ii) Epstein survivors who did not receive timely notice of the

settlement be permitted to either opt out of the settlement or apply to a Future Claims Fund, and that additional notice be issued so that all survivors have the chance to be informed of their rights.

## STANDING

Objectors MLF 1 through MLF 5 are females who were each sexually assaulted, abused or trafficked by Epstein, or suffered from abuse through his CSAM crimes, during the relevant period, and did not previously execute a release of the Estate and other parties and thus are Class Members. MLF 1 through 4 each submitted a timely questionnaire and release to the class action settlement fund. MLF 5 did not opt out or submit a questionnaire because she did not receive timely notice of the existence or settlement of the class action, as detailed in her accompanying Declaration. *See* MLF 5 Decl. ¶8-9.

## RELEVANT FACTS

*Commencement and Prosecution of the Case Alleging Hands-On Sex Trafficking and Sex Abuse, Naming the Defendants as Individuals and not as Representatives of the Epstein Estate*

1. This case was commenced on February 16, 2024 against Defendants Indyke and Kahn, Epstein's former lawyer and accountant, alleging their wrongdoing in connection with Epstein's sex trafficking and sexual abuse of girls and young women. Settlement Agreement, ECF No. 416-1, at 2; *see also* Amended Complaint, ECF No. 359. The Complaint alleged claims of hands-on sex abuse and trafficking under the Trafficking Victims Protection Act, 18 U.S.C. § 1591, *et seq.,* the Victims of Gender-Motivated Violence Protection Act ("GMVPA"), New York City Administrative Code § 10-11, and common law. Am. Compl., ECF No. 359. Nowhere in any of the pleadings was there any mention of Epstein's wrongdoing with respect to child pornography or child sex abuse images ("CSAM"), none of the serial class representatives alleged any experience or injuries relating to such CSAM, and no CSAM-related claims were alleged.

2. Class Counsel brought this case against Indyke and Kahn personally, who had worked with Epstein for many years, naming them as individuals, and alleging their personal wrongdoing in many activities fundamental to Epstein's sex trafficking and sex abuse. The complaint alleges Indyke and Kahn, who worked for many years in an office with Epstein, knowingly and intentionally structured cash withdrawals to avoid detection and evade bank reporting requirements, arranged sham marriages, quietly settled with many victims to maintain secrecy, held powers of attorney or signatory authority over Epstein's accounts through which they assisted Epstein's sex abuse and trafficking, personally served as officers and directors in Epstein's entities which benefited the Epstein Enterprise, and otherwise personally participated in the Epstein Enterprise. Am. Compl., ECF No. 359 at ¶¶121-128, 131-139, 142-161, 162, 140-141; U.S. House Comm. on Oversight & Gov't Reform, *Oversight Committee Releases Richard Kahn and Darren Indyke Deposition Videos* (March 11 and March 19, 2026, respectively), https://oversight.house.gov/release/oversight-committee-releases-richard-kahn-and-darren-indyke-deposition-videos/. Nothing was said about Defendants' wrongdoing relating to CSAM or the victims who were the subject of CSAM.

3. Indyke and Kahn were handsomely compensated by Epstein, both before and after his death, receiving tens of millions of dollars from Epstein and his entities in professional earnings as well as other ways, such as Epstein's forgiveness of $7 million in loans to Indyke and Epstein's $50,000 payment for 5 rounds of "expensive" fertility treatments for Indyke's wife. *Id.*, Darren K. Indyke Dep. Video at 2:12:08, 2:13:09, 2:16:20 (hereinafter "Indyke Dep."); Am. Compl., ECF No. 359 ¶136. Having received or benefited from such enormous compensation from Epstein, it is hardly surprising that Indyke testified that Epstein had "always been generous with me," and he saw no signs that Epstein engaged in any sexual wrongdoing. *See* Indyke Dep. at 2:05:10. In

addition, Indyke and Kahn were designated under Epstein's will as Co-Executors of Epstein's Estate and bequeathed a total of $75 million ($50 million to Indyke and $25 million to Kahn). Indyke Dep. at 4:16:29; *see also* Matthew Goldstein, *Jeffrey Epstein's Trust Reveals Beneficiaries of His Fortune*, N.Y. Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/business/jeffrey-epstein-trust-inherit-karyna-shuliak.html.

4. Defendants have been in "sole control" of the Epstein Estate, with authority to approve the release of Epstein Estate funds, pay Epstein debts, pay themselves, and also pursue claims on behalf of the Estate. *See* Am. Compl., ECF No. 359 ¶¶134, 164-165. Given their integral involvement with the Epstein Enterprise, and with enormous financial and other benefits received and to be received in the future, Defendants faced in this class action the prospect of substantial personal liability and financial exposure to Epstein survivors. *See* Am. Compl., ECF No. 359 Class Preliminary Memorandum of Law, ECF No. 415 at 4-5 (hereinafter "Preliminary MOL").

5. Plaintiffs could easily have named the Defendants not just in their individual capacities but also as representatives or Co-Executors of the Epstein Estate. Plaintiffs could also have named Epstein's Estate as a defendant. Plaintiffs did neither, suing Defendants only as individuals. If Plaintiff's had presented and pursued the case against the Defendants as Estate representatives or directly against the Estate, then the actions of the Defendants as Co-Executors and the liability of the Epstein Estate could and presumably would have been properly explored, litigated and valued in this litigation, including claims the Epstein Estate may have had against the Defendants. Had that litigation and analysis been performed, a release of the Epstein Estate as part of a settlement would have been commonplace.

6. For the next year or so, the litigation moved forward, engaging in discovery focused on the claims asserted in the Complaint – the alleged wrongdoing of the Defendants and their potential individual liability to the Class. *See* Preliminary MOL, ECF No. 415 at 4-5.

7. It is not alleged, and does not appear, that Plaintiff pursued Class claims against the Estate or against the Defendants as Co-Executors, and there is no discussion as to what claims the Estate may have had against the Defendants. Other than funding the settlement, the nature, extent, and specific chronology of the Estate's involvement in this case have not been disclosed to the public or potential claimants.

*The United States' July 2025 Memorandum Noting Epstein's Vast CSAM Collection and Significant Expansion of the Number of Epstein Victims to Over 1,000, Followed by Intense Backlash by Congress and the Public, the Release of the Epstein Files, and an Ongoing House Oversight Committee Investigation*

8. On July 6, 2025, while this case was rapidly moving towards resolution, the U.S. Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI") issued to the public a Memorandum regarding the Epstein conspiracy and files. *See* U.S. Dep't of Justice & Fed. Bureau of Investigation, Memorandum re: Jeffrey Epstein Files (July 6, 2025), https://www.justice.gov/opa/media/1407001/dl (the "July 6 Memorandum"). In that Memorandum, the United States for the first time acknowledged that Epstein had "over ten thousand downloaded videos and images of illegal child sex abuse material and other pornography." *Id*. Although over the years there had been prior anecdotal references to Epstein's possession and perhaps production of CSAM (e.g., U.S. Dep't of Justice, Office of Professional Responsibility, *Report of Investigation: Jeffrey Epstein* at § IV (Nov. 2020), https://www.justice.gov/opr/page/file/1336471/dl (noting one nude photograph of minor found when Epstein arrested)), this was the first time that the U.S. government acknowledged the enormous scope and breadth of Epstein's CSAM crimes.

9. In addition, in the July 6 Memorandum, the DOJ and FBI stated that, based on their review of the Epstein Files, it was "confirmed that Epstein harmed over one thousand victims." July 6 Memorandum at 1. Prior available figures indicated that in about 2007 the number of Epstein victims was believed to have been over 30 victims; *In re Wild*, 994 F.3d 1244, 1247 (11th Cir. 2021); that figure rose to approximately a few hundred, when approximately 150 claimants receiving compensation from the Epstein Victims Compensation Fund (Dave Byrnes, *Epstein Victims Fund Shuts Down After Paying Out $121M to 150 Claimants*, Courthouse News Serv. (Aug. 9, 2021), https://www.courthousenews.com/epstein-victims-fund-shuts-down-after-paying-out-121m-to-150-claimants/); followed by awards to approximately 200 survivors in the JP Morgan class action settlement. Matthew Goldstein, *Judge Approves JPMorgan's $290 Million Settlement With Epstein Victims*, N.Y. Times (Nov. 9, 2023), https://www.nytimes.com/2023/11/09/business/jeffrey-epstein-settlement-approved.html. The However, in the June 6 Memorandum, the U.S. government for the first time revealed a far larger count of potential victims—totaling over 1,000 -- demonstrating that many victims had remained unnoticed or unidentified for decades, and that the full scope and scale of the Epstein trafficking operation had not been previously known, understood or reported. *See* July 6 Memorandum at 1.

10. However, at that time, the DOJ and FBI concluded that "no further disclosure would be appropriate or warranted," and no files relating to Epstein would be released. *Id.* Thus, while the Epstein victim count had substantially risen, most of the Epstein Files and information about the locations and identities of these victims still remained hidden.

11. In response, there was an outcry by many members of the public, legislators, and others to hold those involved in the Epstein conspiracy to account for their crimes. Soon after, the U.S. House of Representatives Oversight Committee voted to compel the Department of Justice to

provide Epstein-related files. *See* Scott Wong & Julie Tsirkin, *House Oversight Committee to Subpoena DOJ for Epstein Files*, NBC News (July 23, 2025), https://www.nbcnews.com/politics/congress/house-oversight-committee-subpoena-doj-epstein-files-rcna220387. Subsequently, the House issued a discharge petition, requiring a bill to release the Epstein files to the House to be brought to the House floor for a vote. *See* Office of the Clerk, U.S. House of Representatives, *Discharge Petition Details: Petition No. 9, 119th Congress*, https://clerk.house.gov/DischargePetition/2025090209 (last visited Aug. 25, 2026). On November 18-19, 2025, the House, and then Senate. almost unanimously passed the Epstein Files Transparency Act, and the bill was signed into law, mandating the release of the Epstein Files within 30 days, or on or before December 19, 2025. *Epstein Files Transparency Act*, H.R. 4405, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/house-bill/4405. The House Oversight Committee also continued investigating the Epstein crimes, performing many interviews and even taking the depositions of the Defendants in March 2026. *See e.g.,* U.S. House Comm. on Oversight & Gov't Reform, *Oversight Committee Releases Additional Epstein Investigation Transcripts* (Aug. 22, 2025), https://oversight.house.gov/release/oversight-committee-releases-additional-epstein-investigation-transcripts/.

*Case Mediation, "Adamant" Insistence by the Defendants that the Estate Be Released from all Claims, and Agreement on Financial Terms on December 19, 2025, Before the Release of the Epstein Files and Other Information was Disclosed*

12. Meanwhile, as the release of the Epstein Files was being actively sought and the House Oversight Committee investigation was underway, this case barreled towards resolution. The "Parties" exchanged mediation statements, and on October 28, 2025, a mediation was held. McCawley Decl., ECF No. 426 ¶40; *see also* Preliminary MOL, ECF No. 415 at 6. At the mediation, the Defendants, invoking their role as Co-Executors, were "adamant," insisting that

they would not resolve their claims with the Class without the Estate being released from all future claims.

> [B]ecause the Co-Executors are adamant that they did not participate in or facilitate Epstein's sex-trafficking venture, at mediation, the Co-Executors expressed that they would not settle the existing claims against them absent an agreement to settle any remaining potential claims against the Estate stemming from Epstein's conduct and would continue to defend against the claims brought against them individually.

McCawley Decl., ECF No. 426 ¶40; *see also* Preliminary MOL, ECF No. 415 at 5. Thus, while, as noted above, the case had been filed against the Defendants only as individuals, by the time of the mediation, Defendants appear to have participated in the mediation not only as individuals but also as Co-Executors and representatives of the Estate, as to which Defendants unquestionably held conflicting fiduciary duties. Although the Mediator stated in her Declaration that the mediation involved "all sides of the case" (Lelchuk Decl., ECF No. 416-2 ¶5), it is not clear what role the Estate played in this case or whether anyone, other than Indyke and Kahn, at any time appeared or acted for the Estate.

13. On December 18, 2025, the Mediator submitted a proposal to settle the case, and the "Parties" reached an agreement on the financial terms of the settlement on December 19, 2025. Lelchuk Decl., ECF No. 416-2 ¶9. According to Class Counsel, the settlement was reached "between Plaintiff, on behalf of herself and Class members, the Estate," and the Defendants "as the Co-Executors of the Estate and in their individual and all other capacities…, on behalf of the Estate and themselves." Preliminary MOL, ECF No. 415 at 1. According to Class Counsel, a settlement was reached "[i]n the interest of finally resolving all claims that the Class may have against the Estate and/or the Co-Executors." *Id.* Thus, at some point, before the release of the Epstein Files, as the House Oversight Committee continued their investigation, and without prior notice to any non-litigant Class Member, the case had been expanded to cover and conclude all claims against the Defendants as Executors and also all claims against the Estate.

14. The Estate – presumably through the Defendants in their role as Co-Executors in "sole control" of the Estate – agreed to fund the Settlement. Am. Compl., ECF No. 359 ¶134; *see also* Settlement Agreement, ECF No. 416-1 § 2.2. It appears that the same counsel represented the Co-Executors and the Estate. McCawley Decl,. ECF No. 426 ¶39. Defendants, despite having received millions of dollars over the years from Epstein, agreed to pay nothing. *See* Settlement Agreement, ECF No. 416-1 §§ 2.3, 6.4, 6.5.

15. Without providing details, the Mediator specifically noted that the settlement was "consistent with prior cases" and that the deal was "based on the number of anticipated Class Members." Lelchuk Decl., ECF No. 416-2 ¶10. Thus, "at least approximately 160 potential Class Members" were provided Notice. McCawley Decl., ECF No. 426 ¶47. However, all of the "prior cases," such as the Epstein Victims Compensation Fund and the JP Morgan and Deutsche Bank class action settlements, were resolved in or before 2023, when it was thought that the number of Epstein victims was a few hundred, well before the United States government had identified over 1,000 Epstein victims.

16. The Plaintiff did not wait for the release of the Epstein Files, slated to be released the very same day the parties agreed to the financial settlement, before reaching a financial agreement with Defendants and the Estate.

*The Release of the Epstein Files Containing New Information about Over 1,000 Epstein Victims And the Ongoing Investigation by the House Oversight Committee*

17. On December 19, 2025, the very same day that the parties locked in the financial terms of the Settlement, the DOJ, as required by the Epstein Files Transparency Act, released approximately 500,000 pages of the Epstein Files. *See* U.S. Dep't of Justice, *The Epstein Files: Phase 1* (Feb. 27, 2025), https://www.justice.gov/opa/media/1434851/dl?inline. Then-Acting Assistant Attorney General Todd Blanche noted the "unprecedented disclosure" of documents. *Id.*

at 1. He also noted the fast-moving and expanding discovery of victim information – "Just this week one of the Department's components provided additional victim information requiring updated review of the materials," and "[s]everal components have just provided documents this week." *Id.* at 1. Consistent with the July disclosure by the DOJ and FBI of over 1,000 victims, then-Acting Assistant Attorney General Blanche announced that, based on the DOJ's review of this new and expanded information, "over 1,200 names [were] being identified as victims or their relatives." *Id.* at 3. On January 30, 2026, the second tranche of documents was released, spanning approximately 3 million additional pages, bringing the total number of pages to over 3.5 million pages. *See* U.S. Dep't of Justice, Office of Public Affairs, *Department of Justice Publishes 3.5 Million Responsive Pages in Compliance with the Epstein Files Transparency Act* (Jan. 30, 2026), https://www.justice.gov/opa/pr/department-justice-publishes-35-million-responsive-pages-compliance-epstein-files.

18. Thus, the financial terms of the class action settlement were determined well before anyone had any meaningful chance to review a single page of the "unprecedented disclosure" of over 3.5 million pages of Epstein Files or before the chance to review documents and transcribed interviews and depositions by the House Oversight Committee, including the depositions of the Defendants.

*Limited Notice Provided to Class Members*

19. On February 19, 2026, Class Counsel sought preliminary approval of the settlement and authorization for notice of the settlement to be given to the class, which the Court granted on March 3, 2026. *See* Order Granting Preliminary Approval, ECF No. 419.

20. Class Counsel provided the Fund Administrator with class-member information on March 9, 12, and 13, 2026; notice was then sent to identified potential Class Members, and

summary notice was published one time in USA Today and Polish newspaper *Gazeta Wyborcza*. Lelchuk Decl., ECF No. 421-1 ¶¶7, 10. However, as revealed in the Epstein Files, Epstein's abuse of victims was broad and wide, far larger than in the United States and Poland, spanning many other countries such as France, Sweden, those in Eastern Europe, Israel and South Africa. *See* McCawley Decl., ECF No. 426 ¶18 (their "investigation involved investigating Epstein's worldwide trafficking scheme..."); *see also* Am. Compl., ECF No. 359 ¶¶31, 66, 79, 115, 159; Juliette Jabkhiro, *France Opens Epstein Probes into Human Trafficking, Tax Fraud*, Reuters (Feb. 18, 2026), https://www.reuters.com/world/france-opens-epstein-probes-into-human-trafficking-tax-fraud-2026-02-18/.

21. In identifying potential class members, Class Counsel noted that they "contacted attorneys known to have represented survivors in previous Epstein-related litigation to obtain contact information and ensure that all known or suspected Class Members received proper notice." Class Final Memorandum of Law, ECF No. 423 at 9 (hereinafter "Final MOL"). However, no one at the Marsh Law Firm, well known to represent multiple survivors of Epstein for over a decade, received any form of contact. *See* Freeman Decl. ¶11.

22. Although Plaintiff claims that the Class's reaction to the Settlement ought to be considered perhaps the top factor in considering adequacy, suggesting that the "low number of objections and requests for exclusion . . . is itself a positive indication of general approval" (Final MOL, ECF No. 423 at 13), this presents a vicious circle – objections cannot be made where notice was not received.

*Marsh Law Firm Objection in May 2026 to the Possible Extension of the Proposed Release to CSAM Claims and Request for a Carve-Ou to Which There Was No Substantive Response, and Class Counsel's Request for Final Court Approval*

23. On May 7, 2026, the Marsh Law Firm emailed a letter to Class Counsel and, on May 11, 2026, to defense counsel, advising of concerns regarding the application of the settlement to CSAM claims. Freeman Decl. ¶¶8-9, Exs. 6, 8. In response, Class Counsel said that she did not think that such CSAM claims would be covered by the settlement, and defense counsel, in a phone conversation, stated that they had not intended to address CSAM claims in the Proposed Release. Freeman Decl. ¶8-9, Exs. 7, 9. However, no action was taken to carve CSAM claims out of the Proposed Release or otherwise respond to the CSAM concerns raised. Freeman Decl. ¶10. Accordingly, the Marsh Law Firm had no choice but to file this formal Objection regarding CSAM claims.

24. Despite these communications with the Parties, Class Counsel has claimed, in support of their papers seeking approval of the settlement, that no one previously objected to the settlement. *See* McCawley Decl., ECF No. 426 ¶9.

25. In June 2026, MLF 5 contacted the Marsh Law Firm to pursue her claims against Epstein. MLF 5 Decl. ¶8. By that time, the dates for opting out of the settlement and applying to the settlement fund had passed.

26. On August 12, 2026, Class Counsel filed papers seeking final approval of the class action settlement and plan of allocation, contending that the settlement was fair, reasonable and adequate. *See* Final Class MOL, ECF. No. 423 at 23. Nothing was said about CSAM claims against the Estate, any possible conflict the Defendants had by serving in their multiple roles as individual defendants, executors and beneficiaries, or the content or existence of over 3.5 million pages of Epstein-related documents that had not been considered in this settlement.

## ARGUMENT

While Objectors do not want to interfere in any way with the settlement of this case for Epstein survivors who suffered hands-on sexual abuse and trafficking, had notice of the settlement, and applied to the settlement fund, Objectors, individually and on behalf of the Class, challenge two aspects of the proposed settlement: (i) the inclusion of CSAM claims in the Proposed Release and (ii) the proposed release of the Estate.

When reviewing a class action settlement, the district court functions as a fiduciary that must serve as a guardian of the rights of the absent class members. City of New York v. Exxon Corp., 697 F. Supp. 677 (S.D.N.Y. 1988). Pursuant to FRCP Rule 23(e)(2), the Court may approve a proposal only upon a finding that it is "fair, reasonable, and adequate." See Moses v. New York Times Co., 79 F.4th 235 (2d Cir. 2023) (in evaluating settlement's fairness, reasonableness, and adequacy, court must consider Rule 23(e)(2)'s codification of core factors that guide the court's approval rather than applying a presumption of fairness based on negotiation at arm's length); In re GSE Bonds Antitrust Litig., 414 F. Supp. 3d 686, 691 (S.D.N.Y. 2019); In re Initial Pub. Offering Sec. Litig., 243 F.R.D. 79, 83 (S.D.N.Y. 2007) ("[u]nlike settlements in ordinary suits, the settlement of a class action must be approved by the court. The court owes a duty to class members to ensure that the proposed settlement is fair, reasonable, and adequate"); In re Michael Milken & Assocs. Sec. Litig., 150 F.R.D. 57, 65 (S.D.N.Y. 1993) ("[t]he ultimate test for the exercise of the Court's discretion in approving a settlement of a class action pursuant to Rule 23 is whether the settlement, taken as a whole, is fair, adequate, and reasonable").

In order to determine if a proposed settlement that binds class members is fair, reasonable, and adequate, the court must consider "whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial

and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." FRCP Rule 23(e)(2).

The settlement must also satisfy one or more of the Second Circuit fairness factors identified in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), including (1) Complexity, expense, and likely duration of litigation; (2) Reaction of the class; (3) Stage of proceedings and amount of discovery completed; (4) Risks of establishing liability; (5) Risks of establishing damages; (6) Risks of maintaining the class through trial; (7) Ability of defendants to withstand a greater judgment; (8) Range of reasonableness of the settlement fund in light of the best possible recovery; and (9) Range of reasonableness of the settlement fund in light of all attendant risks of litigation.

Class counsel bears the burden of demonstrating that the proposed settlement is approvable pursuant to FRCP Rule 23(e)(2), which requires that the settlement reveal all relevant information to show that it is fair, reasonable, and adequate.

**1. The Proposed Release Is Overbroad and Impermissible to the Extent it Applies to CSAM Claims**

**a. By Including CSAM Claims, the Proposed Release Goes Far Beyond the Required Identical Factual Predicate of the Case, Presenting Different Facts, Injuries, Claims, Proof and Valuation**

The Complaint in this case alleges Defendants contributed to the Epstein sex trafficking and sex abuse of girls and young women by assisting with sham marriages, improperly structuring cash withdrawals, quietly settling with victims, and otherwise personally participating in the Epstein Enterprise. Am. Compl., ECF No. 359 ¶¶121-126, 127-136, 137-139, 142-161, 162, 140-

141. Plaintiff alleges claims such as negligence, aiding and abetting, and intentional infliction of emotional distress. *Id.* The allegations of the Complaint appear to apply to hands-on sexual assault, abuse, and trafficking but there is no such express limitation.

The Complaint makes no factual allegations specific to CSAM, the Lead Plaintiff alleges no CSAM injury, the claims omit federal statutory and other CSAM claims (*e.g.*, 18 U.S.C. §§ 2255 and 2252(a)), and there is no discussion of CSAM-related discovery or evidence. CSAM causes of action and injuries are materially different from hands-on abuse injuries underlying the claims asserted against Defendants, and nowhere in the settlement papers is there any suggestion that CSAM claims have been examined or valued. No notice was provided to any known CSAM survivors, nor has any statement been made by the Parties to indicate that any effort to even identify who those survivors are. However, the Release provides for the release of all Defendant Parties, including Indyke, Kahn, and a very broad list of non-parties, including the Estate, from "any and all claims…of every nature and description." Settlement Agreement, ECF No. 416-1.

If the Proposed Release is permitted to release CSAM claims, such as those based on the production, possession, transportation or distribution of CSAM, or image-based exploitation, it would extinguish claims that do not share the same factual predicate as those pleaded in the Complaint. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997) (rejecting "sprawling" class action under FRCP 23). Thus, to the extent that the Proposed Release purports to apply to or extinguish CSAM claims, it violates the identical factual predicate requirement of FRCP 23.

**b. The Class Representative and Class Counsel Do Not Adequately Represent CSAM Claimants**

The Class Representative and Class Counsel do not and cannot adequately represent Epstein survivors with such CSAM claims. Those claims involve distinct facts, injuries, evidence, damages, and statutory and other remedies, different from those alleged in this case. *See Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 625-27 (1997) (settlement classes require careful scrutiny for divergent interests). CSAM claimants may have different future injuries due to the ongoing nature of impairment as their images may continue to be viewed or distributed, through the internet or otherwise, versus the finite nature of physical sexual abuse which has a tangible endpoint. Where class members possess differing interests from a class representative, courts are careful to scrutinize settlements. A class representative pursuing one category of claims cannot fairly compromise a materially different category of claims without adequate representation, valuation, and notice. *See Stephenson v. Dow Chem. Co.,* 273 F.3d 249, 261 (2d Cir. 2001), *aff'd in part, vacated in part*, 539 U.S. 111 (2003) (plaintiffs not adequately represented and not bound).

In this case, nowhere in the Complaint is it suggested that any of the lead Plaintiffs were the subject of CSAM, witnessed CSAM, or had any involvement with CSAM. There is no suggestion that any discovery was undertaken regarding CSAM claims or that Class Counsel, while experienced and knowledgeable in many subjects, has any experience or particular expertise regarding CSAM claims, or engaged in any analysis or valuation of CSAM claims. As such, the interests of CSAM claimants were not adequately represented.

**c. Marsh Law Firm's Objection to the Extension of the Proposed Release and Request for a Carve-Out, Which Was Submitted Months Ago, was Ignored, Implicating Grinnell Factor 2**

The Marsh Law Firm previously advised the Parties of their specific concerns to the possible release of CSAM claims in the Proposed Release. By letter dated May 7, 2026, sent to Class Counsel, and similar letter dated May 11, 2026, to defense counsel, the Marsh Law Firm detailed these objections and asked that CSAM claims be expressly carved out of the proposed release. *See* Exs. 6, 8. Although Class Counsel suggested her "view" that such CSAM claims weren't included in the settlement, and defense counsel verbally stated that they had not previously

thought about CSAM issues (*see* Freeman Dec. ¶10, Exs. 7, 9), the proposed release was not revised.

Thus, contrary to Class Counsel's claim that no one has made any objection to the settlement, (McCawley Decl., ECF No. 426 ¶9), these very same CSAM objections were raised months ago, and have been ignored. Under *Grinnell* Factor 2, regarding the reaction of the Class, at least four Objectors have now challenged the proposed settlement as to CSAM claims. Similarly, Class Counsel's suggestion that the Class has positively reacted to the settlement because only 16 potential Class Members submitted timely opt-outs, does not withstand analysis: when compared to the number of Class Members who were actually provided notice – 160 – ten percent is not an insignificant percentage. And, when it is realized that many potential class members did not receive notice of this settlement at all, such assertions of uniform positivity are not sustainable.

**d. Proposed Remedy – Expressly Carve Out CSAM from the Proposed Release**

Accordingly, we ask the Court, as we have previously asked the Parties, to revise the Proposed Release to carve out CSAM claims. Alternatively, if such claims are to be swept up in this class action, then we ask the Court to defer settlement approval to allow for the appointment of a proper CSAM Class Representative, appoint counsel experienced with such claims, and allow for the continuation of discovery and litigation in pursuit of fair, reasonable, and adequate claims compensation. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284 (7th Cir. 2002) (declining proposed settlement and disqualifying class counsel where evidence showed that class counsel attempted to settle action without first undertaking sufficient discovery to estimate class damages).

**2. The Proposed Release of the Estate Cannot Stand**

**a. The Proposed Release of the Estate Was Not the Product of Arm's Length Negotiation Since the Defendants Had An Impermissible Conflict of Interest**

The Proposed Release of the Estate was not the product of arm's length negotiation due to Defendants' serious conflict of interest.

It is well established that an executor owes fiduciary duties of undivided loyalty to the estate and beneficiaries. A significant and legally cognizable conflict of interest arises when an executor is required to evaluate, prosecute, defend, settle, release or compromise claims in which the executor has personal exposure to liability or a direct personal financial interest. Courts have recognized that an estate representative cannot properly administer an estate or fulfill his fiduciary duties with respect to evaluating issues related to a legally cognizable claim against the personal representative himself, because his self-interest conflicts with his fiduciary duties to the estate. *See United States v. Marin*, No. 18 CV 9307 (VB), 2020 WL 378094, at *6 (S.D.N.Y. Jan. 23, 2020) (breach of fiduciary duty where executor "utilizes estate property for her own benefit…."). New York courts have carefully scrutinized and voided estate transactions where self-dealing has been found without beneficiary consent. *See, e.g., In re Snively*, 42 Misc. 3d 1214(A), 986 N.Y.S.2d 868 (Sur. 2014) (objection by beneficiary to estate accounting granted and transfer of real estate by executor to herself and her husband voided where all beneficiaries were not consulted). Interested-party transactions are voidable unless shown by their proponent to be fair and reasonable. *See Lewis v. S. L. & E., Inc.*, 629 F.2d 764 (2d Cir. 1980) (burden shifts to defendants to demonstrate transactions with inherent conflict of interest issues were fair and reasonable); *Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999) (where an allegation of fraud, self-dealing, or conflict of interest is made against a fiduciary, the burden shifts to the fiduciary to prove that it acted fairly by clear and convincing evidence).

An executor who faces personal liability to the estate has competing incentives, such as protecting estate assets and maximizing beneficiary recovery versus minimizing their own liability

and maximizing any inheritance they may ultimately receive. Where an executor acts under such conflicts of interest, the executor is no longer acting solely as a fiduciary. The executor effectively sits on both sides of the transaction, which is improper. *See Matter of Energetic Tank, Inc.*, No. 18-CV-1359 (LAP), 2024 WL 3273796, at *4 (S.D.N.Y. July 2, 2024) (fiduciary has conflict of interest where personal interests conflict with duties owed to beneficiaries, especially where fiduciary also stands to benefit personally; such representative had competing incentives: to maximize the estate's recovery for all beneficiaries while also maximizing their own share of that recovery) ("It is very easy to anticipate that such a personal representative could not faithfully fulfill her fiduciary duty to recover the maximum amount possible for all other beneficiaries of the estate, lest their recoveries detract from her own."); *Renz v. Beeman*, 589 F.2d 735 (2d Cir. 1978) (trustees owe general duty of undivided loyalty to trust beneficiaries; trustee shall not place themselves in position where their interest is or may conflict with their duty). While serving as a beneficiary and executor alone may not seriously impair their ability to serve as a fiduciary, the conflict is heightened where that person also serves as a defendant with potential liability to the estate or others, especially where they alone determine which person or entity pays what amount in a settlement.

In this case, Indyke and Kahn's personal financial interest in the settlement outcome – as defendants, estate executors and estate beneficiaries – renders it virtually impossible to satisfy their undivided loyalty duty as co-executors of the Estate, especially without sufficient prior disclosure and court approval. As defendants, Indyke and Kahn have a personal interest in minimizing the settlement amount they would pay to the settlement and limiting their scope of liability. As co-executors of the Estate, however, they owe an undivided fiduciary duty of loyalty to administer the Estate in the best interests of all beneficiaries and to maximize recovery to the Estate. How can

Indyke and Kahn, consistent with their fiduciary duties, fairly and properly determine how much both they and the Estate contribute to the Settlement, and insist that both they and the Estate be released from liability, when their personal assets are at stake, they must maximize recovery to the Estate and, given their alleged wrongdoing and perhaps on other grounds, they have potential liability to the Estate? Their role as Estate beneficiaries, with an interest in maximizing their personal recovery from the Estate, further complicates their conflict: a larger settlement paid by the Estate reduces the assets available for distribution to beneficiaries, including Indyke and Kahn themselves. These competing incentives — to minimize personal liability as defendants, to protect estate assets as co-executors, and to maximize personal inheritance as beneficiaries — are structurally irreconcilable. This is especially suspect here where Defendants, after receiving millions of dollars from Epstein, foisted all liability onto the Estate.

Although Class Counsel and the Mediator state that the negotiations were "arm's length" (McCawley Decl., ECF No. 426 ¶8; Lelchuk Decl., ECF No. 421-1 ¶10; Preliminary MOL, ECF No. 415 at 12-13), this conflict of interest undermines this assertion. There has been no showing that the Estate was separately represented in this case or whether separate Estate counsel even participated. Moreover, courts are reluctant to presume fairness and reasonableness due solely to arm's length allegations. *See Moses v. New York Times Co.*, 79 F.4th 235 (2d Cir. 2023).

Moreover, this conflict of interest was not addressed, disclosed or even mentioned in either Class Counsel's preliminary or final papers in support of approval of the proposed settlement. Nor is there any mention that Indyke and Kahn were beneficiaries of the estate for a total of $75 million, the second and third largest bequests by Epstein.[1] None of these issues are raised in their papers,

[1] Any effort now by Indyke and Kahn to whitewash their triple conflicting roles by asserting that they are unlikely to recover under the estate due to the remaining sizeable claims on the Estate is self-interested, late, does not address potential claims by the Estate against them, and should be disregarded. Nor can it be fairly predicted at this time as to the ultimate value of the Estate, especially when the Estate previously received an unexpected tax refund of $112

much less analyzed, to demonstrate fairness or reasonableness. Instead, the discussion of the negotiation of the settlement is opaque and muddy. *See* Preliminary MOL, ECF No. 415 at 7-8. It is not known whether these issues were at any time even raised by the "Parties."

This Court has a duty to conduct a searching judicial inquiry into this conflict of interest, which cannot be overcome on this record. *See In re Iconix Brand Group, Inc.*, No. 1:15-CV-04860-PGG, 2020 WL 6784181, at *4 (S.D.N.Y. Nov. 18, 2020) (where conflict of interest exists, the Court is under an obligation "to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions").

**b. The Class Was Not Adequately Represented For this Proposed Release of the Estate**

For the same reason that the negotiations were not at arm's length, the Class Representative and Class Counsel did not adequately investigate, disclose, litigate or account for this conflict. Class Counsel has generally done excellent work, beneficial to the Class Members in many respects; however, in this respect of extending a release to the Estate at this early stage, without further investigation and sufficient disclosure, the representation was not adequate.

The release of the Estate was also unfair because it extinguished claims under the Gender Motivated Violence Act ("GMVA") against the Estate, newly revived only weeks earlier. The amended GMVA became effective in March 2026, opening a window and reviving expired claims of Class Members abused in New York City to sue the Estate, regardless of when the claims arose. However, the settlement was announced on February 19, 2026, requiring Class Members to opt out of the settlement by April 12, 2026, in order for them to pursue such GMVA claims. This tight time frame terminated Class Member rights to pursue such claims against the Estate before they

million. *See* David H. Lenok, *What's the Status of Jeffrey Epstein's Estate?*, WealthManagement.com (July 25, 2022), https://www.wealthmanagement.com/estate-planning/what-s-the-status-of-jeffrey-epstein-s-estate-.

had a meaningful opportunity to evaluate and pursue the very statutory rights that the New York City Council had just restored. Nor is there any valuation by Class Counsel as to the value of such rights that were being ripped away.

Class Counsel also looked to Grinnell Factor 7, or "The Co-Executors' Ability to Withstand a Greater Judgment," stating that this is "not a case brought against a large corporation that may be able to withstand a virtually limitless judgment, but a suit brought against two individuals." Preliminary MOL, ECF No. 415 at 27. However, even though the Estate appears to have played some – insufficiently disclosed – role in the negotiation of this settlement, there appears to have been little or no consideration of the Estate's ability to withstand a virtually limitless judgment, or the huge gift to the Estate of being released by all Epstein survivors without any direct litigation, discovery, analysis or valuation of the nature and extent of those claims. Nor is there any specific explanation, other than their self-interested, self-righteous "adamant" claim that they knew nothing about what Epstein was doing, as to why Defendants, having received tens of millions of dollars from Epstein over the years and having been bequeathed tens of millions more, contributed absolutely nothing to the settlement. Although Defendants claim that they had no knowledge of Epstein's crimes, the negligence claims against them required no specific knowledge or ill intent. Further, although Defendants were directors and officers of many Epstein entities, there is no discussion of the possible availability and perhaps contribution of D&O insurance, or that all such possible sources of funding had been examined and exhausted.

**c. The Proposed Release of the Estate Provides Inadequate Relief to the Class**

Plaintiff appears to have agreed to the settlement and release of the Estate (as well as provision of limited notice) "based on the number of anticipated Class Members." Lelchuk Decl., ECF No. 416-2 ¶10. The Mediator received notice information for 160 Epstein victims,

(McCawley Decl., ECF No. 426 ¶47) which appears to have been consistent with prior knowledge about the number of Epstein victims participating in the Epstein Victims Compensation Fund, the JP Morgan class action settlement and the Deutsche Bank settlement. However, the Proposed Release of the Estate fails to take into account the substantially larger number of victims – over 1,000 – revealed by the U.S. government for the first time in the summer of 2025, shortly before the commencement of mediation in this case, and then detailed in over 3.5 million pages of the Epstein Files released in December 2025 and January 2026. Indeed, as noted above, the Plaintiff committed to the financial terms of the settlement the very day that the first, smaller tranche of Epstein Files was released, before any review of these Files. There is no showing that the settlement amount is consistent with the substantially larger number of victims noted by the U.S. Government or any new contemporaneously available information available in the Epstein Files.

Under the Proposed Release, the Estate – a non-Party to this class action – would reap the enormous benefit of an extremely broad release barring any current, future, or unknown claims "of every nature and description" regarding Epstein's conduct, even if Class Members received no notice. Class Counsel has failed to demonstrate that the $35 million settlement fund constitutes adequate relief for the class in light of the unexpectedly large number of victims, the breadth of the claims being released, the number of potential class members affected by the release, the recent amendment of the GMVA, and the substantial benefit of a global release conferred upon the Epstein Estate, a non-party to this litigation.

The U.S. Supreme Court has cautioned against granting a comprehensive release of all claims to an estate that contributes only a fraction of its assets to a class action settlement fund. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (certification of mandatory settlement class on limited fund theory requires showing that fund is limited independently of agreement by parties,

and that class includes all those with claims unsatisfied at time of settlement, with intraclass conflicts addressed). In *Ortiz*, the Court warned that if limited fund certification is allowed when a company provides only a *de minimis* contribution to the ultimate settlement fund, the incentives such a resolution would provide to companies facing tort liability to engineer settlements would, in all likelihood, significantly undermine protections for creditors built into the Bankruptcy Code. *Id.* at 859-860 n. 34. *Cf. Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) (rejecting, under bankruptcy law, sweeping judicial release from all opioid-related claims for Sacklers, who were not themselves debtors but contributors to the bankruptcy estate, without the consent of affected claimants). Additionally, numerous non-party entities receive release protection without giving independent consideration.

Moreover, the Second Circuit in *In re Joint Eastern and Southern District Asbestos Litigation* (the "*Keene*" case), 14 F.3d 726 (2d Cir. 1993), looked to the Bankruptcy Code as the exclusive legal system Congress established for entities seeking relief from creditor claims, not class actions. In *Keene*, an asbestos manufacturer facing massive tort liability attempted to use a mandatory class action settlement, and declaratory and injunctive relief, to force all parties with personal injury claims to resolve their claims outside the Bankruptcy Code, arguing that such a settlement would be more efficient than bankruptcy. The Second Circuit rejected this approach as a self-evident evasion of the exclusive legal system established by Congress for debtors to seek relief. The court drew a precise structural parallel: the finding of a limited fund corresponds to a finding of insolvency; the preliminary injunction serves much the same function as the automatic stay under Section 362(a) of the Bankruptcy Code; the class representatives correspond to creditors' committees in Chapter 11 proceedings; and the proposed mandatory class settlement mirrors a reorganization plan and cram-down, followed by a discharge. *Id.* at 732. The Second

Circuit in *Keene* also warned of broader systemic danger in adopting such a position that would lead to further evasion of the Bankruptcy Code as other debtors sought relief in class actions. *Id.* Discharges are generally limited to debtors who commit virtually all assets to the estate. *Purdue*, 603 U.S. at 204-205 (Sacklers' release, which essentially amounted to a discharge, not proper without claimants' consent where Sacklers contributed only fraction of their wealth for distribution to creditors). Here, where FRCP 23 permits class representatives to bind all members without a class vote or other protections and safeguards provided through bankruptcy law, we urge the Court to carefully scrutinize the Proposed Release of the Estate that terminates all claims against the Estate in exchange for contributing only a fraction of its assets and with no contribution from Defendants. *See Presidential Life Ins. Co. v. Milken*, 946 F. Supp. 267 (S.D.N.Y. 1996).

**d. The Proposed Release of the Estate exceeds the Identical Factual Predicate Requirement and Violates Grinnell Factors 8 and 9**

The Proposed Release of the Estate should not be approved unless the release is narrowed to claims sharing the same factual predicate as the claims actually litigated and compensated in this action. The main criteria for approving releases in a federal class action settlement is whether the released claims would arise from the same factual predicate. *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460-62 (2d Cir. 1982) (allows settlement releases of claims not specifically pleaded where they arise from the same factual predicate as the settled claims); *Wal-Mart v. Visa*, 396 F.3d 96, 106-109 (2d Cir. 2005) (class settlements may release claims extending beyond the complaint, but only where released claims are based upon the identical factual predicate underlying the settled action); *National Super Spuds, Inc. v. NY Mercantile Exchange*, 660 F.2d 9, 18-19 (2d Cir. 1981) (class members may not be compelled to surrender materially different claims for which the settlement provides no identifiable compensation; court rejected settlement that released claims for which class members were required to relinquish claims that were not the

subject of the litigation and were not being compensated through the settlement); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) (Second Circuit vacated approval of settlement where structure unfairly affected portions of class and created representation concerns).

This case was brought against Defendants in their individual capacities only—not in their capacities as co-executors of the Estate, and not against the Estate itself. Although the Epstein Enterprise is discussed, the core of the suit centers on the actions of Indyke and Kahn, in aiding, participating, and facilitating the Epstein sex-trafficking Enterprise, not in their role as Co-Executors of the Epstein Estate. The Proposed Release should do the same. That Defendants were "adamant" in insisting that they not settle without a release to the Estate is not the standard or a proper justification for a release that extends well beyond the factual predicate and is based on a fundamental conflict of interest. While it may be permissible that a settlement preclude a Class Member from bringing a related claim in the future, even one not presented in the class action, and that a settling party may be extended a release, such a release is only allowed where the released claim is based on the identical factual predicate as the underlying claims in the settled class action. "Put another way, a release of claims that 'go beyond the scope of the allegations in the operative complaint' is impermissible." *Marshall v. Northrop Grumman Corp.*, 469 F.Supp.3d 942, 949 (C.D. Cal. 2020) (internal citation omitted).

Here, the Proposed Release sweeps in "all claims and potential claims" against not only Defendants but also the Estate, Defendants as Co-Executors, plus an unusually broad set of non-parties, including Epstein, the 1953 Trust, other Epstein trusts, Epstein entities, affiliates, accountants, attorneys, law firms, employees, agents, investigators, successors, assigns, and specifically identified businesses. In effect, without an express identical-factual-predicate

limitation, the Proposed Release thereby creates the risk of extinguishing materially different claims that were not pleaded, evaluated, valued, or compensated. Plaintiff does not even attempt to explain how the broad Proposed Release satisfies the "identical factual predicate" doctrine.

In addition, the Proposed Release of the Estate also violates *Grinnell* Factors 8 and 9, the range of reasonableness of the settlement fund in light of the best possible recovery and all attendant risks of litigation, since the settlement papers do not meaningfully quantify the value of those claims or explain why the settlement consideration is adequate for the rights being surrendered and the release of the Estate (as well as CSAM claims). The Proposed Release of the Estate, extinguishing claims that were not pleaded, litigated, or valued, cannot stand.

**e. Notice was Inadequate**

FRCP 23 requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B), and that it be directed to class members in a "reasonable manner," Fed. R. Civ. P. 23(e)(1)(B). Notice of a settlement satisfies Rule 23(e) and due process where it fairly apprises "members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114. Notice is adequate "if the average person understands the terms of the proposed settlement and the options provided to class members thereunder." *In re Merrill Lynch Tyco Rsch. Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); *see also Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218 (2d Cir. 2012) (prior class settlement did not bar later litigation because notice to absent class members was constitutionally inadequate and thus deprived absent class members

of due process); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) (absent class members bound only if they receive adequate representation, notice, and opportunity to be heard).

Here, the Notice is not reasonable where (1) direct notice was provided only to 160 individuals, nowhere near the many hundreds of then-known victims (over 1,000 victims less those who already settled with the Estate), (2) survivors in many countries where Epstein abused females – such as France, Sweden, Eastern Europe, Israel and South Africa – appear to have received no notice at all, (3) efforts to identify potential Class Members did not include review of the 3.5 million pages of the Epstein Files, and (4) there is no stated rationale for the media chosen to publish the Notice, where there were inexpensive alternatives such as via Instagram and other social media, more likely to be viewed by Epstein's model survivors and other survivors. *See* MLF 5 Decl. ¶8. In addition, there were clear instances of omissions of readily available notice, that were claimed to be provided but were not, such as ensuring that notice was provided to all known representatives of Epstein survivors like the Marsh Law Firm, that has been representing Epstein survivors for years. *See* Final MOL, ECF No. 423 at 9; Freeman Decl. ¶2.

The circumstances faced by MLF 5 dramatically illustrate the inadequacy of the Notice. MLF 5 followed the Epstein news as it was developing but did not see the notice in USA Today or the Polish paper since, like many models, it was not her practice to read those papers. Understandably, neither the Notice nor the handful of media pieces on the class action settlement reached her. Instead, she saw a reference to the class action in June 2026 through an Instagram post of Model Alliance, a non-profit group that provides information to models and other beauty-related personnel. She then promptly located and retained counsel, but by then, the deadline both for opting out or even joining the Class had passed. MLF 5 Decl. ¶¶8-9.

**f. Remedy**

Put simply, the overly broad Proposed Release of Estate is premature and unfair. To remedy this deficiency, we propose that for all Class Members who previously did not receive notice, they be given an opportunity to opt out or to participate in a newly established Future Claims Fund. To reach those additional Class Members, proper notice should be provided, including social media and targeting of beauty- and fashion-related personnel and others likely to be Class Members, including in known locations of Epstein's abuse such as France, Sweden, Eastern Europe, Israel and South Africa. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 801 (1985) (certified class excluded those identified as class members but where notice could not be delivered). Such Future Claims Funds have been frequently used in sex abuse bankruptcies. Indeed, when faced with the reality that the full universe of abuse survivors cannot be identified in advance, courts have favored mechanisms that preserve, rather than extinguish, future claims. The Boy Scouts of America Settlement Trust includes provisions for Future Abuse Claimants, and similar future-claimant protections have been employed in Catholic Diocese sexual-abuse bankruptcy cases to ensure that later-identified survivors are not deprived of a meaningful remedy. *See In re Boy Scouts of Am. & Del. BSA, LLC*, 650 B.R. 87, *164–65 (D. Del. 2023) (Future Abuse Claims), *aff'd in part, rev'd in part on other grounds*, 137 F.4th 126 (3d Cir. 2025); *In re Boy Scouts of Am. & Del. BSA, LLC*, No. 20-10343 (Bankr. D. Del. Sept. 8, 2022), Plan of Reorganization (Bankr. D.I. 10296); *In re Roman Catholic Church of the Archdiocese of Santa Fe*, No. 18-13027-T11, 2024 WL 3091482, at *1 (Bankr. D.N.M. June 21, 2024); *In re Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846, 2026 WL 688166, at *1 (Bankr. E.D. La. Mar. 10, 2026); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215, 219 (Bankr. D. Or. 2006); *cf. In re Fairbanks Co.*, 601 B.R. 831, 837 (Bankr. N.D. Ga. 2019).

## CONCLUSION

Pursuant to FRCP 23, the Court must independently evaluate a proposed class action settlement to ensure the interests of class members, including absent class members, are protected and that the proposed settlement is fair, reasonable and adequate. While for the most part, the Objectors support the proposed settlement and appreciate the hard work of the Parties to provide compensation for existing claimants, there are two problematic defects that must be remedied – (i) possible inclusion of CSAM claims and (ii) release of the Estate. For the reasons stated above, we respectfully propose the carve-out of CSAM claims from the Proposed Release, and the creation of a Future Claims Fund available to those who did not previously receive notice of the settlement, provision of more fulsome Class Member notice, and allowance of such Class Members to opt-out or apply to that Fund, and for such other further relief as the Court deems proper.

DATED: August 26, 2026

Respectfully submitted,

MARSH LAW FIRM PLLC

By______________________

Jennifer Freeman
James R. Marsh
Margaret Mabie
Gianna Elliott
31 Hudson Yards, 11th Floor
New York, New York 10001
212-372-3030
jenniferfreeman@marsh.law
Jamesmarsh@marsh.law
Margaretmabie@marsh.law
giannaelliott@marsh.law