# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JANE DOES,

Plaintiffs,

v. 25 Civ. 8520

BANK OF AMERICA,

Defendant.

Conference

------------------------------x

New York, N.Y.
August 27, 2026
11:00 a.m.

Before:

HON. JED S. RAKOFF,

District Judge

APPEARANCES

BOIES, SCHILLER & FLEXNER, LLP
Attorneys for Plaintiff
BY: SIGRID S. MCCAWLEY
ANDREW VILLACASTIN
SABINA MARIELLA

EDWARDS HENDERSON LEHRMAN, PLLC
Attorneys for Plaintiffs
BY: BRADLEY J. EDWARD
BRITTANY HENDERSON

JONES DAY
Attorneys for Defendant
BY: BETHANY K. BIESENTHAL

Also Present: Jennifer Freeman, Esq.

(Case called; appearances noted)

THE COURT: Good morning. All right. So we are here for the approval of the settlement. Let me deal with, first, some preliminary matters, and then we'll hear from a possible objector. So I guess the first thing I need to do is determine that the settlement class has been properly certified. Of course all this I gave preliminary approval to, but I've also looked further at the matter before giving final approval.

So far as certification is concerned, there are, first, the four required elements under Rule 23(a), commonly called numerosity, commonality, typicality, and adequacy. There is also an arguable fifth requirement that the Second Circuit has adopted in modified form, ascertainability. And, finally, there are the alternatives, at least one of which has to be satisfied under Rule 23(b).

Numerosity, which is Rule 23(a)(1), is "the class is so numerous that joinder of all members is impracticable." That's very clearly the case here.

Does anyone contend otherwise?

The Second Circuit has a presumption after at least 40 members of the class numerosity is satisfied here. There's many more than 40, so it's an easy decision.

Commonality is that there are questions of law or fact common to the class. Again, here there are many obvious common issues of law and fact, and there are issues under the

trafficking statutes, but, also, there are such obvious factual common issues, as whether Mr. Epstein was engaged in sex trafficking, whether Bank of America should have known of this, whether Bank of America financially assisted, directly or indirectly, his illegal ventures, et cetera.

I want to make clear I don't have to determine whether those issues are true or false. The parties have retained their positions on the merits. All I have to decide is that they are common issues, and they clearly are, so commonality is satisfied.

Typicality is that the claims or defenses of the representative parties are typical of the claims or defenses of the class, and so, prior to the settlement, when the original certification motion was being briefed, the bank contended that the plaintiff, known as Jane Doe, but who they had received information about under seal and in other respects, was subject to special defenses and, therefore, did not meet the requirements of typicality. All of those objections were withdrawn as part of the settlement.

I've reexamined that de novo, and I find that such special defenses, if any, involving Ms. Doe, are not of sufficient prominence or substance as to render her untypical of the other members of the class or inadequate to represent the class, and so I find that typicality is also satisfied.

That also applies to the fourth requirement, "the

represented parties will fairly and adequately protect the interests of the class." And, in fact, the settlements evidence, number one, how well Jane Doe and her counsel have fulfilled that requirement.

With respect to ascertainability, I should note, for the record, that it's nowhere contained in that wording in Rule 23. There's some circuits that say it's not a requirement at all. There's some circuits that say it's a very important requirement. The Second Circuit has taken a sort of middle position.

For example, in the recent of case of *Fikes Wholesale, Inc., v. HSCB Bank U.S.A.*, a Second Circuit decision reported at 62 F.4th 704, the Second Circuit stated, "ascertainability requires only that a proposed class is defined using objective criteria that establish a member with definite boundaries. This deposition, meaning the one in that case, meets that requirement by providing the timeframe in which a particular group was allegedly harmed. That is all that is needed." And that's true here. The class definition is a class consisting "of all women who were sexually abused or trafficked by Jeffrey Epstein, or by any person who's connected to or otherwise associated with Jeffrey Epstein, or any Jeffrey Epstein sex trafficking venture between June 30, 2008, and July 6, 2009, inclusive. This includes, but is not limited to, one, girls under the age of 18 who engaged in sexual contact with Epstein,

and/or a person connected to or otherwise associated with Epstein, and received money or something else of value in exchange for engaging in that sexual contact; two, women age 18 years or older who were forced, coerced, or defrauded into engaging in sexual contact with Epstein, or anyone connected with Epstein or otherwise associated with Epstein by, for example, using physical force, threatening harm or legal action, making false promises or causing them to believe that not engaging in sexual contact would result in harm, and who received money or something else of value in exchange for engaging in that sexual contact; and, three, girls or women of any age with whom Epstein personally connected to or otherwise associated with Epstein engaged in sexual contact without consent, even if the sexual content was perceived to be consensual provided that the girl or woman was under the age of 18 at the time of engaging in that contact."

So, there may be some issues regarding that that we'll hear about from the supposed objector later, but there's -- so far as ascertainability is concerned, it clearly meets the second surface stuff, gives us specific time, and defines quite particularly the nature, and members, and elements of the class.

I should add that even under the standard of those circuits that take a much broader view of ascertainability in the Second Circuit, that their requirements would be met here

as well. And the main difference is that some of the circuits talk about the need for more precise applicability and practice, or words to that effect. Here, the notice, at the Court's direction, was said in a way that virtually every possible potential class member was likely notified. I note in that regard the summary of that in the declaration of Simone Lelchuk, the claims administrator. This is set forth in her deposition in numerous paragraphs, but I'll just briefly summarize.

First, the people who've already been identified as class members in the previous litigations involving the same basic class. Second, there were notices published in not only such American publications as U.S.A. Today, but also various foreign publications such as Monde and Gazeta Wyborcza. I'm sure Ms. Lelchuk is a regular reader of that, but it is, to be serious, a Ukrainian publication, and there were indications that some of the victims were enticed from the Ukraine. These are just examples.

There's also a social media campaign on Facebook and Instagram that included, again, not only the U.S. and France, but also was set forth in such language as Czech, Polish, Romanian, Russian, Slovak, and Ukraine. So, very, very full notice in the form previously approved by the Court. And to make the point in total, I think that the ascertainability requirement, even under the more severe requirements required

by other circuits has been satisfied here.

Now, there also must be satisfied one of the three alternatives under Rule 23(b), and obviously the one that is suggested here is the so-called predominance requirement, that questions of law or fact common to class members predominate over any questions affecting all the individual members, and then a class action that's superior to other available methods for fairly and efficiently adjudicating the controversy. And the rule then sets forth various criteria that the Court should look at in that regard, which I have done.

And, again, without going into endless detail here where there would be otherwise, at best, lawsuits not just across the country, but across the globe, that it would be difficult for individual plaintiffs, many of whom have suffered severe psychological traumas, to come forward in a public lawsuit for their individual situations, and that the -- as I mentioned previously, there are common issues and law and fact that clearly overwhelm any individual differences. The predominance factor is satisfied.

So, thank you for bearing with all that, but for the reasons I've just mentioned, as well as the reasons set forth in the proposed order from counsel, I find that the settlement class has been and is properly certified.

Now, that brings us to a different question, which is whether the settlement should be approved under the factors set

forth in Rule 23(e), as supplemented by the Second Circuit's decision in *Detroit v. Grinnell Corporation*, at 495 F.2d 448, a famous 1974 decision that lists what have come to be known as the *Grinnell* factors. The factors listed in 23(e) include, A, class representatives and class counsel have adequately represented the class; B, the proposal was negotiated at arm's length; C, the remedy provided for the class is adequate taking into account, (i), the cost, direct, and delayed of trial appeal, (ii), the proposed method of distributing relief to the class, including the method of processing class members' claims, (iii), the terms of any proposed order for attorneys' fees, including time of payment, and you have, (iv), any equipment agreement required to be identified under Rule 23(e); and (D), the proposal treats class members equitably relative to each other.

The *Grinnell* factors, which basically supplement all that, are as follows: One, the complexity, expense and likely duration of the litigation; two, the reaction of the class to the settlement; three, the stage of the proceedings and the amount of discovery completed; four, the risks of an assumption of liability; five, the risk of establishing damages; six, the risk of maintaining class action through the trial; seven, the ability of the defendants to withstand greater judgment; eight, the range of reasonableness of the settlement fund in light of the best possible recovery; and, nine, the range of

reasonableness of the global settlement fund to a possible recovery in light of all the attendant risk of litigation. I should add that the Second Circuit has subsequently made clear that you don't have to satisfy each and every one of those, but that they should be looked at to determine, in their totality, whether the settlement is fair, reasonable and adequate.

Now, one of the factors is the reaction of the class to the proposed settlement. Some courts have said that should be among the most important factors, and here there was only one kind of objection submitted. It was submitted by an attorney, Jennifer Freeman.

So, Ms. Freeman, are you here?

MS. FREEMAN: I am, your Honor.

THE COURT: Would you please come forward to the podium.

MS. FREEMAN: I'm here.

THE COURT: Identify yourself for the record.

MS. FREEMAN: Jennifer Freeman with the Marsh Law Firm. I'm here with my colleague, Margaret Maybie.

THE COURT: So, I wasn't clear from your letter, which I should note that you set forth a letter giving various objections, and your -- the parties were given a certain time to respond. And now I want to give you an opportunity for rebuttal or to say anything further. But there's a preliminary question, which is are you making this objection, are you

authorized to make this objection on the part of your three clients who you say are members of the class, because the wording of your original letter made that a little unclear?

MS. FREEMAN: Thank you for allowing me to clarify that, your Honor. Yes, we are. I have, actually, two reference numbers to individuals who are really the objectors. I'm just their spokesperson for those objections, which I can submit to the parties and your Honor, if you'd like, so it would indicate who they are. One of them is a legacy CSAM person, who has her CSAM in many different collections of CSAM, like Jeffrey Epstein had. For example, her CSAM was found in the Larry Nassar collection. So she's very -- well, I guess part of the many, many collections of CSAM holders. And another one was, her images were stolen by Jeffrey Epstein. Her child images, nude images were stolen by Jeffrey Epstein.

So those are the two individuals who actually are making these objections. I'm just their spokesperson.

THE COURT: Okay. And did both of those individuals file claims timely?

MS. FREEMAN: Neither of them did.

THE COURT: Neither of them did.

MS. FREEMAN: Neither of them did.

THE COURT: Why not?

MS. FREEMAN: I can't really speak to that, your Honor, without disclosing things.

THE COURT: Okay. And did either of them file claims in the similar class actions involving --

MS. FREEMAN: Yes, they did.

THE COURT: -- JPMorgan?

MS. FREEMAN: Oh, no, your Honor, they did not. And one reason they did not is because, at least as to the legacy person, it was not understood until July 6, 2025, when the U.S. government issued their memorandum from the Department of Justice and the FBI, that there were, as the Court -- as the Department of Justice and FBI stated, "the files relating to Epstein include over 10,000 downloaded videos and images of illegal child sex material and other pornography."

So, a lot of these legacy people have no idea they even might be included in these collections. They didn't know the vast amount of information he had of child sex material, nor were the files released by the time of those class action settlements. So, for example, the existence of CSAM was not revealed in detail. So, for example, I'm just reading ETFA 4156, which notes 33 images of child CSAM, which were not obviously revealed but just noted in the files, and there are hundreds of these references. So, before then, there was no opportunity really to think that you had a claim.

THE COURT: So let's turn then to the specifics. If I understand your original letter, you don't object to the certification of the class.

MS. FREEMAN: Absolutely not.

THE COURT: You just object to particular aspects of the settlement itself.

MS. FREEMAN: Yes. Absolutely, your Honor. This is a very narrow, limited objection. We commend the parties, the counsel who have worked diligently to try to achieve this settlement, and we applaud them and praise them for what they've done. However, there is this one narrow issue, which is that it doesn't cover CSAM survivors. And what's interesting, for example, class counsel's response to my objection was that this is all speculative, that there's nothing here, yet, as I just revealed, annotated about what the FBI and the Department of Justice thinks there's something here. The files, Epstein files show that there's something here. So there's something here. This is not speculative. Rather, this is something that is really significant that has not been considered.

So, what's also perhaps the most interesting part of class counsel's response is what they don't say. They don't say anything about what they did to seek out CSAM survivors. Did they, for example, go to the government and find out who these people were? Did they take those images and submit them to NCMEC, the national -- to find out, to identify these people? Did they then give notice to those, what is it, tens of thousands -- 10,000 videos and images? What did they do? I

don't see anything that they did to actually deal with the CSAM survivors.

So, what we have suggested is simply to carve that out of the settlement, to make it clear that they're carved out. Frankly, I don't think they should have to be carved out because, really, as your Honor went through the various factors of certification, what's very clear is what this class is about is sexual contact, not CSAM, not video, not images. Sexual contact. There doesn't have to be any sexual contact for CSAM. You can have child pornography taken whether they know it or not. And that they should have known, these children should have known there were surreptitious pinpoint cameras in these rooms that they should have been worried about the CSAM being taken is kind of ludicrous.

THE COURT: Well, just so I understand more specifically, give me, from either of your clients, you know, the specific claim you would have against the bank relating to improprieties by Mr. Epstein, that they allegedly finance or participate in.

MS. FREEMAN: It's the same kind of claim as in the class action, the facilitation of the venture, the Epstein conspiracy. It's the same kind of claim. It's not -- there's no knowing intention --

THE COURT: Without getting, obviously, into identifying the information, because we don't want to have

that, but just give me in more general terms exactly what happened to your client that Mr. Epstein was responsible for, to either of your clients.

MS. FREEMAN: Well, he was responsible for possessing child pornography.

THE COURT: How did he obtain, if you know that, child pornography?

MS. FREEMAN: I don't know. He could have done it by downloading from the internet, as many people do that. We do know that. What he did do is also steal images of children, nude images of children. So those are the two areas we know, but the point is we don't know what he had. We know there are 10,000 images and videos, but we don't know what that consists of or who those people are. I know two of them. That doesn't mean that's 10,000.

THE COURT: So it sounds very different from anything that's been covered not just in this case but in previous similar cases involving --

MS. FREEMAN: That's correct.

THE COURT: -- other banks. So it's just not so much an objection, but you want a different lawsuit?

MS. FREEMAN: I'm totally good with that. We just want to make sure we are carved out of this one. We don't want to hear, if we file our own class action on CSAM, gee, it's already released in this class action. So we think the

protective thing to do is to raise this now, your Honor, when we have an able judge who can actually help us.

THE COURT: How, in what respects do you -- you know, the bank -- although, I want to make clear the bank denies liability.

MS. FREEMAN: Yes.

THE COURT: Denies many of the factual accusations. But the bank is accused of having, or at least having -- should have known that its money was being used to help Mr. Epstein in his sex trafficking and the like. How -- what would be the evidence that their money was being used, and that they should have known, to obtain pornographic images of children, including your client, when you -- as you just noted, you don't even know how he did it, let alone how it was financed?

MS. FREEMAN: Well, we know what's typically done, and what's typically done obtaining collections through other people, which it can be done downloading through the internet, or possession, distribution, could be a transaction, could be production. I mean, that he had these individuals there and he had images taken of these individuals in sexual positions or manners, and the -- and just as the banks are responsible for the enterprise of sex trafficking, sexual contact is responsible for the enterprise, that that's child sex material. It's very similar.

THE COURT: But I guess a part of it, no one,

including this Court, has ruled that the bank is subject under statute, that strict liability?

MS. FREEMAN: No.

THE COURT: That their money financed anything Epstein did, they're liable -- the claim is that they knew or at least should have known that the money was being used for some specific violation of the sex trafficking statute, and I'm not sure how this fits within that.

MS. FREEMAN: Because the same kind of situation can happen, your Honor. Sometimes people like Jeffrey Epstein use CSAM in order to facilitate sex trafficking. So if that's part of the -- that can be part of the facilitation. So it's the same kind of argument.

THE COURT: All right. Let me hear -- thank you very much. Let me hear, first, from plaintiff's counsel, and then from defendant's counsel.

MS. MCCAWLEY: Good afternoon, your Honor. Thank you for a moment to address this.

With respect to what Ms. Freeman just articulated, it's still unclear to me the individual that she referenced, whether they actually have standing in this lawsuit, whether they were actually part of the class as defined. You read the definition earlier today. This class is limited. It only covers individuals abused or trafficked by Epstein from June 30 of 2008 to July 6 of 2019. So it's unclear to me from the

definitions that she gave that these are really, actually class members that she's here on behalf of today versus people who may have been at an earlier time period for which we'd still have the ability to sue the bank or anybody else. They were being released by this --

THE COURT: I take it what she wants now, although there were other things mentioned in her original submission, but I think it's come down to that she wants to have it clear that if she or someone brings a lawsuit for her clients in a class fitting their situation, that the release here does not govern them. So if she doesn't have standing, she doesn't have standing, but if she doesn't have standing, isn't it a part because she's not covered, they're not covered? I mean, isn't that part of the answer to her question?

MS. MCCAWLEY: That would be, your Honor -- frankly, it would not be a problem for you. When she would file that lawsuit, which she has not filed, presumably the bank or whoever else she files against would come in and make objections based on various releases issued in many of these cases potentially, and she would have that argument before that judge in that case about whether or not the release had any effect at all on the case she's trying to bring. So it really depends how she defines that class, how the judge interprets this release or any other releases related to these individuals.

THE COURT: So are you saying, however, and this really -- well, maybe this is a question in part for the defendant. You know, I'm not sure anyone has to answer a hypothetical, but I'll phrase it as a hypothetical nonetheless.

Assuming, hypothetically, that she brings a lawsuit based on the situation she's just described, is it the contention of the parties to this case that, A, the release here bars that suit; B, the release here does not bar that suit; or, C, that it can't be determined until she brings the action?

I think those are the possibilities, so I'll hear, first, from plaintiffs, and then from defendants.

MS. MCCAWLEY: Your Honor, I think my position would be that it is C, we don't really at this point know exactly what she is -- what the class is. She has not defined it. She has not filed that lawsuit. So, you know, we're -- had this come in another context -- and it's with the judge who is assigned to that case to oversee any challenges to any release language, so at this point it is -- we're not even sure that these individuals fit within this class. But even if you assume they do, what those claims would be and whether they're fine and whether they would be covered by this release or not or any other judge is for that judge to determine and that counsel to address.

THE COURT: Okay.

MS. BIESENTHAL: Thank you, your Honor. I think we agree with class counsel, the answer is likely C, and, from our perspective, the reason we think the answer is C is because we can't, frankly, imagine what the claim would be based on Jeffrey Epstein's purported possession of CSAM as it relates specifically to the bank.

So, I think the questions the Court was asking are exactly the right ones, which is what's the claim there against the bank. So here we're dealing with a statute in this case, a statute that actually creates liability based on trafficking. There's no similar statute for just purely the possession of CSAM, so we really can't imagine what the claim would actually be. So the hypothetical's even more difficult I think to answer than in a typical situation, because I don't think there is a claim.

Second, I don't think we can even envision what the actual of factual support for any claim, were there one, would be, for purposes of the bank. So obviously the bank doesn't hold or possess CSAM. And, to the Court's point, there is no strict line that any kind of money flowed through the bank that touched CSAM would create liability sort of as a technical matter. I think counsel for the objectors just acknowledged that no one knew that Epstein even possessed CSAM until I believe she said July 6, 2025, so certainly the bank wouldn't have known before that that's a long way to say, I can't

imagine what the claim is. So I would say C is the right answer.

With that being said, we would object to there being a specific carve out, because it does give the impression there is a liability claim and there isn't. And to the extent, two, that any potential claim was tied in with Epstein's trafficking venture, I think we would argue the release covers that conduct, and we would want the opportunity to make that argument.

THE COURT: Okay. Ms. Freeman, I'll give you a brief opportunity to be heard.

MS. FREEMAN: Thank you. I think you raised a good question, your Honor. I'm not sure we have an answer, but you certainly raised a good question. In terms of what claims there are, there are very specific statutory and common law claims, such as 18 U.S.C. 2255, known as Masha's Law; such as 18 U.S.C. 2252(a) giving claims available to CSAM survivors. So there are specific claims that can be made here, and it's frustrating to me to not get a clear answer on this, because it seems like class counsel is simply saying "we just don't know," as opposed to "it's not in the class." So it should be something that should be able to be determined right now that these people are not in the class.

THE COURT: All right. Thank you very much.

MS. FREEMAN: Thank you.

THE COURT: Well, I appreciate having Ms. Freeman here and having the benefit of her arguments, but I think this is really a situation that involves so many unknowns and hypotheticals that no court should try to answer it now. If a lawsuit is brought, that will by its very nature specify in realtime actual claims that are being made, and then whether or not they are subject to this settlement at all, whether or not they are subject to the release of this settlement, whether they are subject to the same time period of the settlement, et cetera, et cetera, et cetera, can all be determined in a real way.

I think it is Judging 101, not to deal with hypotheticals and limit one's self instead to real controversies. In fact, that really underlies the constitutional Article III requirements. So the record is here for any court to look at, but I don't see that an adequate basis has been made, even assuming standing, and I'm not sure about standing; but even assuming standing, that an adequate record has been made to require any change in the proposed settlement. So I thank Ms. Freeman for bringing it to my attention, but I will not require any further determination to be made in light of the objection.

And so we'll go on to consider the settlement in its present form. I read all the factors before, both the statutory factors and the *Grinnell* factors. And I'm not going

to go through each and every one of them, but just to mention a few, there's no question that there's been adequate representation by the distinguished law firms on both sides of this case; that there's been an arm's length negotiation. In fact, the settlement was reached after negotiations before a very distinguished mediator, the former Judge Elaine Phillips. And there's no even hint of collusion or any impropriety.

The risk of going to trial and the risk of appeal in a case like this are obvious and would involve not only a major expense but very complex issues of both fact of law. The effectiveness of the proposed method of distribution is clear, and I think I want to say a little bit more about that. Although the general formula and the general requirements for relief are clear and adequate, the determination of specific claims and their amounts is quite properly left in the first instance to the very able claims administrator, Ms. Lelchuk, subject to oversight and review by this Court.

She first has to determine whether a claim is valid. The experience in the other settlements is that she's found a great majority of claims to be valid, but not all. And I don't want to dwell on this, but when you have large sums of money, as you do in this settlement and other similar settlements, there perhaps inevitably are two people who will make false or fraudulent claims, and it is important that we have -- someone has experience, as Ms. Lelchuk, aided by counsel and overseen

by the Court, to piece out the real from the false.

Now, for the much, much greater number of claims that are legitimate, there's the difficult question of how much to give each claimant. The settlements here and others have been very large, and the claimants get very substantial money. I don't want to be misunderstood, though. No amount of money can make up for the wrongs that they suffered and the harms that they still feel. But a formula has been developed that is part of the settlement here and has been applied with greater particularity by Ms. Lelchuk, as to determining in a fair way and not specific to any individual but specific to their situation and the harms they suffered how much they get.

And, again, that's also subject to oversight by the Court, but I see that the same plan of allocation that's been suggested here was the one that the Court has approved in other cases and has worked extremely well, thanks in part to the care of the agreement, but most particularly to the very way in which Ms. Lelchuk has administered that.

Going back to some of the other factors, and, again, I'm just hitting I think from everything I know about this and other similar cases, it more than satisfies the range of reasonableness in light of the possible recovery and in light of any risk of litigation I think subject to the formula, and it equitably treats the class members. Aside from the objections raised by Ms. Freeman, no one else has objected to

the settlement. There has been sufficient discovery, more than sufficient discovery to indicate a real understanding of the case and the claims. Maybe the only factor that cuts the other way relates to defendants' ability to withstand a greater judgment.

I do believe the Bank of America is a well haled institution, but, you know, that's not very relevant to the question here. The question here is fairness, adequacy, reasonableness. Those are the underlying requirements, and they are all satisfied here. So, with the one exception of attorneys' fees, which I'm going to turn to in a second, I approve the final settlement. I'll take the order that I got from counsel and massage it a little bit, but it will be entered by no later than tomorrow as the final approval.

But now let's talk about something that defense counsel has no more than an academic interest in but plaintiffs' counsel have a more immediate interest in, which is plaintiffs' attorneys' fees. So, I think there are two questions here. The first is the question of whether plaintiff's counsel should get 30 percent. I have awarded 30 percent to counsel, same counsel in very similar cases, and that was done after considering all the relevant factors. But I did make one change and I made this change in virtually every class action I've had over the more than 30 years I've been on the bench, which is that, as I held in the *JPMorgan* case, where

I did award 30 percent, but, quote, 50 percent of the fees will be paid in effect immediately, and the remainder following payment to the victims. And I didn't see that in the proposal from plaintiffs' counsel here.

So is there any objection to my incorporating that provision?

MS. MCCAWLEY: Thank you, your Honor. That's our fault for not including it, but we certainly agree to proceed in that manner. Thank you.

THE COURT: I knew you would. Okay. I haven't often given 30 percent in cases involving lots of money. It meets the lodestar and all those things. I'm not going to bother the record with all that, but I have gone through all the factors. But why I've done it in similar cases like the *JPMorgan* case, and why I think I should do it here, it turns, among other things, and perhaps most importantly, the very considerable public service counsel has rendered by bringing these actions.

As I put out earlier, no amount of money could fully compensate Mr. Epstein's victims for the harms they've suffered, but it is substantially through the efforts of plaintiffs' counsel in these cases before me, not exclusively, but primarily, that substantial compensation has and will be received by a great amount of victims. You know, we all know there's endless stuff online and in the media about why aren't those who facilitated Epstein being brought to justice, or

words to that effect. I sometimes think it is much too simplistic and overwrought, but the more basic point is that here are cases, including very much this one, where that hasn't just been talked about. It's been reality. It is thanks to plaintiffs' counsel that a substantial number of Epstein victims are receiving substantial amounts of money and that some at least modest justice is thereby being accomplished, not just talk.

And so, while I think the 30 percent meets all of the requirements under the various factors specified by the Second Circuit, I want to single out that factor, because I think me and, most importantly, the victims of Mr. Epstein should be grateful to the highly professional way that counsel have brought actual justice, even if partial, actual justice in this case, as opposed to mere talk. So I will approve again, with a little massaging of the order, of the words, I will issue an order tomorrow approving the 30 percent.

Anything else anyone needs to raise with the Court?

MS. MCCAWLEY: Nothing from the plaintiffs. Thank you, your Honor.

MS. BIESENTHAL: Nothing from the bank.

THE COURT: Very good. That concludes this proceeding.

(Adjourned)